**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 11/2/09

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *  09-cr-30-1-2-GZS
            v.                    *  July 7, 2009
                                  *  8:30 a.m.
EDWARD BROWN and ELAINE BROWN     *
                                  *
* * * * * * * * * * * * * * * * *
```

DAY 6
EXCERPTED TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE GEORGE Z. SINGAL
AND A JURY

Appearances:

For the Government:   Arnold Huftalen, Esq.
                      Terry Ollila, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH 03301

For Elaine Brown:     Bjorn Lange, Asst. Fed. Defender
                      Federal Defender's Office
                      22 Bridge Street
                      Concord, NH  03301

For Edward Brown:     Michael Iacopino, Esq.
                      Kristin L. Clouser, Esq.
                      Brennan, Caron, Lenehan & Iacopino
                      85 Brook Street
                      Manchester, NH  03104

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

```
 1                          I N D E X
 2

 3
     Witness              Direct    Cross    Redirect    Recross
 4

 5   EDWARD BROWN

 6   By Mr. Iacopino       3

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    BEFORE THE COURT

 2           THE CLERK:  Please raise your right hand.

 3                    EDWARD BROWN

 4      having been duly sworn, testified as follows:

 5           THE CLERK:  And for the record, if you'd

 6      please state your name.

 7           THE WITNESS:  My name is Edward, upper case E,

 8      lower case d-w-a-r-d, hyphen Lewis, upper case L, lower

 9      e-w-i-s: Of the family or clan Brown, upper case B,

10      lower case r-o-w-n.  I'm a secured party creditor of a

11      limited commercial liability and holder in due course of

12      that name and commercial property.

13                    DIRECT EXAMINATION

14      BY MR. IACOPINO:

15           Q.   How old are you?

16           A.   I'm 42 years old, sir.

17           THE COURT:  Move that mic down a little bit if

18      you would.

19           A.   I'm 42 years old.

20           THE COURT:  Mr. Brown, if you'd just move the

21      tip of that down and we'll be able to hear you better.

22      Thank you.

23           Q.   Are you saying you're 42 years old or born in

24      1942?

25           A.   I'm sorry, I was born 1942.  I was thinking
```

4

1   the other.

2        Q.   And for the jurors' sake, how old does that

3   make you today?

4        A.   66, sir.

5        Q.   Thank you.  What kind of educational

6   background do you have, sir?

7        A.   Wow.

8        Q.   Informal schooling.

9        A.   Informal schooling, GED.  One semester of

10  philosophy from Secom (ph) Community College in

11  Massachusetts, and then of course my own personal

12  education through studying and research depending what I

13  was doing any given time, which never ends.

14       Q.   And were you born and raised in Massachusetts?

15       A.   I was born in Roxbury, Boston.  I was with the

16  division of child guardianship at age of six with my

17  brothers and sisters and raised by the state until I was

18  16.

19       Q.   In other words, you were a ward of the state

20  of Massachusetts?

21       A.   That's correct, sir.

22       Q.   And did you get your GED in Massachusetts?

23       A.   No, I did that from Blackstone, all I can

24  remember is Blackstone in Los Angeles, California,

25  Department of Education.  I was there approximately

1   1964, '65.

2        Q.   Okay, so you haven't continuously resided in

3   New England, have you?

4        A.   No, sir.

5        Q.   What other parts of the country have you

6   resided in, Mr. Brown?

7        A.   Florida for a brief time, California of

8   course, Pennsylvania.  For years I was homeless.  I

9   moved around for about five years trying to find work

10  and get a new start, but mostly the northeast.  My home

11  is here in the northeast, sir.

12       Q.   When were you homeless?

13       A.   From 1979 until 1984 when I met my wife of

14  24 years.

15       Q.   Do you have a work history, sir?

16       A.   A work history, sir?

17       Q.   Employment history.

18       A.   Massive.

19       Q.   What kind of employment have you held over the

20  years, sir?

21       A.   From the time I left school, being boarded at

22  school I began working in the various industrial plants

23  in western Massachusetts.  A hat shop I can remember was

24  my first job in Milton, Massachusetts.  From there I --

25       Q.   Hat shop?

1        A.   Yes, sir.  Cargate (ph) was the name of it,

2   the hat shop.  They used to make those flowered hats

3   back in the 50s and 60s.

4             From there I went to working for Bate (ph)

5   Shoe, Webster Shoe, Stevens Linen Mill.  Averaged a job

6   a month back in those days because the jobs bored me so

7   quickly and I learned them so fast, it just wasn't what

8   I was looking for.

9        Q.   It was factory work pretty much?

10       A.   Yes.  I was assigned to factory work.  I used

11  to see people in suits like I see you folks and I can

12  remember my thoughts back in those days, I'm going to be

13  like that, I'm going to have a suit, I'm going to be

14  that businessman, and I'm going to, you know.

15       Q.   And at some point did you in fact operate your

16  own business?

17       A.   Several.

18       Q.   Tell the jury what kind of businesses you've

19  owned and operated?

20       A.   Well, I got my training, first off, during

21  those years I decided I wanted to have a suit and to,

22  you know, to buy a home.  I started working in sales.

23  So I started working for Fuller Brush Company back in

24  those days and Amway back in even 1972.  I guess I

25  should have stayed with them because they really took

1   off and today I'd probably be a multi-millionaire just

2   from that alone, but I didn't because I had decided

3   their program was more important than their product.

4       Q.   Let's talk about your jobs.  What employment

5   have you held, or I guess my question is, what

6   businesses have you owned?

7       A.   That I owned?

8       Q.   Yes, owned and operated.

9       A.   I owned a seafood market back during my second

10  marriage in the 1970s called The Lobster Trap.  I

11  couldn't make that -- couldn't compete with the bigger

12  guys, so that lasted for about seven months.  I lost

13  about $22,000.  I just up and quit.  So from there,

14  prior to that or -- during that time I was trying to

15  break away, I'm sorry, chronology.

16      Q.   Give us a list of the businesses.

17      A.   Beauty salon we ended up owning, my wife and I

18  at the time had two salons going.  We had Ed's Bait Shop

19  and Ed's Bait Shop in the house during the 70s.  I had

20  an FFL license to sell firearms.  So bait and tackle and

21  shiners and stuff like that.  Just a small store.

22  Working for another company, during my homeless years

23  worked for a period of time trying to develop that

24  company.  I think most people in here that are at least

25  40 years old remember the hip combs and pocket combs.

1    Used to have colorful ones for hair back 20 or something

2    years ago or so.  We were the ones selling them and

3    putting them in all the stores all throughout the

4    northeast, and we had a money back guarantee which is

5    place combs in the store and come back a couple weeks

6    later and recycle them.  Worked out good.

7         Q.   And you're not saying you owned that business,

8    though, are you?

9         A.   No, but I was kind of a semi-working partner

10   so to speak.

11        Q.   Working your own sales group?

12        A.   Yes, that's correct, which was quite

13   extensive.  I worked from Detroit to Tennessee to New

14   Jersey to up here through Maine.

15        Q.   What's the last business you owned and

16   operated yourself?

17        A.   I developed a, actually International Roach

18   Busters.  Of course international, I had plans.  I had

19   discovered, this is during the last year of my

20   homelessness, I had gone to California and I had, Los

21   Angeles, and I was trying to make a go of it out there

22   because I knew from times before, years before I had

23   gone to California and discovered the collection agency

24   industry and I worked for them a few years.  But this

25   time of year I bumped into a sales company, and I picked

1    sales simply because with sales it is the highest paid

2    hard working job in the world and the lowest paid

3    easiest job in the world, and I knew that, but I knew

4    that sales, what am I trying to say, rules, things you

5    have to do in order to be a good salesman, I knew them

6    at least.  So I had developed with this small company I

7    had worked for a little sex trap that they had picked up

8    in England for with pheromone in it for cockroaches.

9    Knowing myself I says, yeah, I'll take it on, let me

10   have it, I said I know what to do with it, they didn't

11   know what to do with it.  So I took the trap and I hit

12   the streets of the city of Los Angeles with it and over

13   the course of the next few months I had placed these

14   traps in many locations and it was beginning to work,

15   but it wasn't eliminating the problem.  So what I had to

16   do then was to find out how could I go the rest of the

17   way to eliminate the problem, because it was never

18   enough for me, I had to get to the bottom, had to get to

19   the root.

20        Q.   So what did you do?

21        A.   I talked to Dr. Walter Eberle at UCLA.

22        Q.   As a result of your conversations with the

23   professor from UCLA, what course of business did you

24   undertake, what did you start to do?

25        A.   Well, after talking to him and his partner and

1    UC Riverside I developed International Roach Busters,

2    and we found -- I found actually, thanks to the help of

3    Dr. Eberle and Dr. Russ, how to eliminate totally,

4    totally now, eliminate cockroaches without using any

5    strong toxics, any strong pesticides, totally safe.

6        Q.   What was it?

7        A.   And it was just using boric acid.  It works

8    just fine.  And it cut costs by 90 percent at the same

9    time.

10       Q.   And did you continue to operate International

11   Roach Busters as a company?

12       A.   Yes, I did.

13       Q.   Were you in the business of exterminating

14   roaches for clients?

15       A.   Oh, I went to Long Beach Navy Base and from

16   there I was ready to do the entire military worldwide,

17   so I went to the chief of armed forces in Washington,

18   and I called them and said I wanted to see them, and he

19   said no.  This was my first true direct experience with

20   the United States government.

21       Q.   All right --

22       A.   I have to finish this one.  Because --

23            THE COURT:  Just a second.  Ask another

24   question.

25       Q.   At some point did you move International Roach

 1    Busters to the New England area?

 2         A.   After about a year, yes, sir, I did.

 3         Q.   And did you undertake the same type of

 4    business in the New England area; in other words, an

 5    extermination company where you were called in to

 6    exterminate cockroaches?

 7         A.   Yes, I did.

 8         Q.   At some point in time while you were operating

 9    that business, did you come to meet your wife?

10         A.   I did.

11         Q.   Please tell the jury when and where that was?

12         A.   It was perhaps the following spring I came

13    back, in July during the marathon run going west to

14    California, and I came in and I started doing housing

15    authorities here in the New England area.

16         Q.   Okay, when you say doing housing authorities,

17    you mean exterminating for them?

18         A.   Correct.  Very fortunately I walked into the

19    town of Lawrence housing authority --

20              THE COURT:  Just a second.  Ask another

21    question.

22         Q.   So you were in the business of conducting your

23    extermination business when you met Elaine; correct?

24         A.   Correct.

25         Q.   Did you meet her through your business?

1      A.   Yes, I did.

2      Q.   Please explaining to the jury how?

3      A.   She had -- I got a phone call through a friend

4  of hers and mine at the same time, set me up with one of

5  the housing authorities, and I went to see her.  She had

6  a building in Revere, I believe it was, or Lynn, I think

7  it was Revere.

8      Q.   This was a building she owned?

9      A.   That's correct, sir.

10      Q.   Apartments?

11      A.   Apartments, apartment unit.  It had roaches

12  almost near total infestation.  Five families.

13      Q.   Were you able to terminate the roaches?

14      A.   I wiped them all out.  Took me a couple times

15  to go through, but we took care of it.

16      Q.   And what happened with your relationship with

17  Elaine?

18      A.   Well, we were friends immediately and we were

19  going the same place.  She was up and coming in her

20  industry as a dentist and I was up and coming in my

21  industry as an exterminator, and like I said, it was

22  International Roach Busters and I was going.  I had a

23  hundred percent -- killed a hundred percent of the time

24  so I wasn't going to lose and neither was she going to

25  lose.

1    Q.   At some point did you Elaine determine to get

2    married?

3    A.   Oh, not initially, but we decided in a few

4    years.  I suppose we lived in sin for a while, then we

5    eventually married, yes.

6    Q.   And where did you live with Elaine?

7    A.   We lived in Burlington, Massachusetts, for a

8    period of time, then we decided to move up into New

9    Hampshire I believe in the late 80s.

10   Q.   Why did you choose to move to New Hampshire?

11   A.   Just because we wanted to get away from all

12   the hubbub and commotion.  We liked to kind of go back

13   to our roots a little bit, something quieter, because we

14   were children of the 50s, so that's what we kind of

15   wanted to see.  We figured we would find that up here in

16   New Hampshire.

17   Q.   And when you first moved to New Hampshire, did

18   you move directly to Plainfield, New Hampshire?

19   A.   No, sir, we moved into -- bought a condominium

20   in Laconia, South Down Shores.  I believe it was in '87

21   or '88 that we did that.

22   Q.   And how long did you live in Laconia?

23   A.   Up until we purchased the land to build a home

24   in I think it was '89 in Plainfield, bought the land up

25   there and carved it out ourselves.

14

1        Q.   Okay, we've seen lots of pictures in this

2    trial, Mr. Brown, of the home in Plainfield, New

3    Hampshire.  When you bought that land, was there any

4    structures on it?

5        A.   No, sir.

6        Q.   In fact, was it all trees?

7        A.   Yes, sir, and a huge hole at the end of the

8    driveway that led to the property you look down and see

9    the house now.

10       Q.   Did you clear the lot?

11       A.   I subcontracted to have a local power plant

12   that uses, I think it was in, New London, I think it was

13   New London, a power plant down there, and they came in

14   and clear-cut it, hired somebody to come in, yeah, yes,

15   sir.

16       Q.   And then did you build a house?

17       A.   Yes, sir.  Small building.  It's about

18   75 percent completed.

19       Q.   When did you start building it?

20       A.   Right away back in 1989, '90.

21       Q.   Now, was it ever your intention to just build

22   it all at once or was it going to be an ongoing project?

23       A.   It was our home.  We had come up with

24   retirement, we talked about this is the place we're

25   going to go for the rest of our lives, be part of the

1   community, that was it.  That's what we had decided.  I

2   can remember saying look it, honey, as we're driving

3   down the road to the property, they just paved the road,

4   look, so they paved the road for us, you know, all new.

5        Q.   We heard one witness testify that there was an

6   amazing view from the deck at your house; is that

7   correct?

8        A.   That's true.  That was one of the reasons I

9   picked the property, sir.  It had a ten-acre beaver pond

10  down at the bottom of the hill --

11            THE COURT:  All right.  Ask another question.

12       Q.   Now, sir, in some point -- at some point after

13  you moved to New Hampshire, did you become what people

14  might call a survivalist?

15       A.   No, sir.  I had been a survivalist all my

16  life.  I've been a survivalist from the first time I was

17  six years old and put into the state when I would often

18  leave the house at six years of age and go into the

19  woods by myself.  I learned from there.

20       Q.   Why don't you tell the jury what types of

21  actions you took at your home as a result of considering

22  yourself to be a survivalist?

23       A.   Oh surely.  The entire design of the home was

24  originally based on it being a survivor's mentality

25  already anyway, those are the basic things you hear

1  about storing and having food for several years, making

2  sure you have plenty of good water and a way to grow

3  crops.  That's why you put the greenhouse on the back

4  and to make sure you have ample power and power

5  supplies.  And we put wood stoves in from day one.  The

6  first thing that went into the home was a wood stove.

7  The home itself, as the home developed with the years,

8  everything was taken into consideration including from

9  day one we put in solar panels.  I got solar panels to

10  give ourselves enough to run the entire home just off

11  the sun.  If we have enough sunny days, I would have no

12  problem.  But this summer because of all the cloudy

13  days, what we had to do was come up with generator power

14  to support that, which we've been running that until

15  about 2001, 2002.

16      Q.   Was it always your plan from the day that you

17  began construction of the house to have the house be

18  self-sufficient?

19      A.   Yes, sir, always, because we believed there

20  could be a crisis here in this country.

21      Q.   During the course of the evidence presented by

22  the government, we've seen photographs of reading

23  material that was in your house and a badge all related

24  to the New Hampshire Constitution Rangers.  Do you know

25  what that organization is?

1      A.   Yes, sir.

2      Q.   What is it?

3      A.   The United States Constitution Rangers was, as

4  far as we can tell through the history books, was

5  created in 1777 by the Second Continental Congress, and

6  their mission was, the Continental Congress, to keep an

7  eye on the new budding government that was developing.

8  The Continental Congress at that time created rangers

9  for different things and different people for different

10  things, to keep an eye on things and report back from

11  time to time what was going on.

12      Q.   And were you a member of a group called the

13  Constitution Rangers?

14      A.   Yes, sir.  I was under upper case TXu42 hyphen

15  45, you will find it in the file of the Library of

16  Congress.  It was reestablished or reconfirmed by

17  lieutenant -- by Lawrence Matthew Robinson, Jr., an

18  ex-officer of World War II, that had found it

19  accidentally while he was doing bivouacking in the White

20  House in the basement, and he had found a badge inside

21  of a book called Footprints of the Time.

22      Q.   Is the Constitution Rangers or has it ever

23  been a militia group?

24      A.   Oh no, sir.  That's a misconception by the

25  anti-defamation league who are trying to demonize as

1   many people as they can.

2           MR. HUFTALEN:  Objection.

3           THE COURT:  Sustained.  Jury will disregard.

4       Q.   As part of your membership as a member of the

5   Constitution Rangers, did you ever undertake to cause

6   harm to anybody?

7       A.   If you allow me to read our mission statement,

8   I think that would probably clarify that up, sir.

9           MR. HUFTALEN:  Objection.

10          THE COURT:  Sustained.  Jury will disregard.

11  Ask another question.

12      Q.   Mr. Brown, have you ever caused, as a

13  Constitution Ranger, have you ever caused harm to

14  anybody?

15      A.   It's like an impossibility.  Of course not.

16  We're here to protect the United States of America.

17          THE COURT:  Jury will disregard the remainder.

18  Ask another question.

19      Q.   At some point in time after you moved to

20  Plainfield, New Hampshire, did you undertake a course of

21  study in questioning of the authority of the Internal

22  Revenue Service to levy tax on yours and your wife's

23  income?

24      A.   Yes, at the time because of the Un-American

25  activities investigation.

1           MR. HUFTALEN:  Objection.

2           THE COURT:  Jury disregard everything after

3    yes.

4           MR. HUFTALEN:  May we approach?

5           THE COURT:  You may.

6                          AT SIDEBAR

7           THE COURT:  Counsel?

8           MR. HUFTALEN:  Thank you, your Honor.  I asked

9    to approach the bench because I believe we're now

10   getting into the substance of Mr. Brown's testimony

11   where it appears he's going to go off on a discourse

12   concerning the illegality or the unlawfulness of the IRS

13   to collect an income tax.  I object to any questions and

14   answers along those lines.  It's irrelevant to this

15   case.  Counsel in opening has I believe conceded that it

16   is the law in the United States that we're required to

17   pay income tax and therefore under a 401 and 403

18   balancing any of this testimony should be held

19   inadmissible.

20          THE COURT:  Where are you going?

21          MR. IACOPINO:  I'm going to the mens rea

22   involved in this case in his belief that the

23   government --

24          THE COURT:  What mens rea you talking about?

25   The mens rea here is willfulness, isn't it, and

 1    knowingly, at least in some of the indictment.

 2              MR. IACOPINO:  And as we have indicated, your

 3    Honor --

 4              THE COURT:  Some of the counts.  Go ahead.

 5              MR. IACOPINO:  As we have indicated, it is our

 6    intention to present a justification defense, and

 7    important to that is his understanding and whether

 8    considering that is reasonable or not, but we can't get

 9    to whether it's reasonable until we get to his

10    understanding of how he came to the position to have

11    been, and where we're going with this is, I'm going to

12    lay out what they did with the IRS, because I'll make a

13    proffer to you that what they did was at the end, in the

14    90s, to write a course of letters to the IRS asking the

15    IRS to show them where in fact the law says that the

16    income tax has to be paid by individual's on labor, and

17    he will testify that they never got any responses to

18    letters year after year after year.  They stopped paying

19    the income tax and eventually that's what led to the

20    search in 2004 of the dental office which he will

21    testify was done by a number of agents with snipers and

22    excessive force and excessive use of government

23    resources, if you will, your Honor.

24              THE COURT:  Why is that relevant?

25              MR. IACOPINO:  What?

1          THE COURT:  Why is that relevant?

2          MR. IACOPINO:  It's relevant to his belief and

3   whether his belief is reasonable.  That the agents were

4   trying to kill him and his wife commencing on June 7th

5   of 2007 and thereafter until his arrest on October 4th.

6          THE COURT:  Mr. Lange.

7          MR. LANGE:  Your Honor, to further elaborate,

8   I join my brother, but to further elaborate, the

9   government has already brought in the tax convictions.

10  I think that the defendants' understandings of the tax

11  laws is essential to rebut the negative inference that's

12  going to be drawn by the jurors by virtue of the fact

13  that they were convicted.  The government's position is

14  going to be, oh, they were convicted, end of story, but

15  given the fact that they --

16         THE COURT:  You want to reargue whether they

17  should have been convicted or not?

18         MR. LANGE:  No, no.

19         THE COURT:  What is it?

20         MR. LANGE:  My point is that they felt they

21  should not have been convicted.

22         THE COURT:  Therefore they had a right to

23  what?

24         MR. LANGE:  Therefore they had an

25  understanding that what they were doing was lawful, and

1   they had an understanding or a sense that there would be

2   retaliation, and after June 7th that there would be

3   lethal retaliation against them because of their

4   involvement in the tax case.

5           THE COURT:  Anything else?

6           MR. HUFTALEN:  Only with respect to --

7           THE COURT:  To tell you the truth, I'm a

8   little lost here.  I'm failing to understand why his

9   research on the federal tax laws has anything to do with

10  a justification defense during the time of this

11  indictment.

12          MR. IACOPINO:  That particular question about

13  his study may have been inartfully worded, your Honor.

14  Where I'm going with this line of questioning is the

15  fact that they sent letters to the IRS, and I will

16  admit, I have less than stellar control over the

17  witness.

18          THE COURT:  I understand that.

19          MR. IACOPINO:  But where I'm trying to go with

20  it is to talk about what he in fact did, not necessarily

21  what he studied.

22          THE COURT:  I am not going to permit him to

23  testify whether or not he believes the tax laws are

24  constitutional or unconstitutional.  I don't understand

25  how that has anything to do with this.  I'm open to

1   being educated, but I'm lost.  As far as that he

2   believed that because he believed that the tax laws were

3   unconstitutional, the government was going to kill him,

4   is that what you're arguing?

5           MR. IACOPINO:  No, there's an intermediate

6   step there, your Honor.  He believes that the tax laws

7   are unconstitutional and that is why in fact the

8   government -- I'm sorry, and the intermediate step, your

9   Honor, is that that's why he left his trial and that's

10  why he believes that the efforts taken by the government

11  thereafter, by using force against him, led him to the

12  belief that in fact he was going to be killed by the

13  government agents.  There is an intermediate step in

14  there.  It's not just I don't believe in the tax laws

15  and therefore the government is being unfair, because he

16  will want to testify, your Honor, that during the tax

17  trial he was not permitted to put on witnesses that they

18  had offered or to submit the evidence that they had

19  offered, and that's when he left the court.

20          THE COURT:  And therefore the judge -- when

21  the judge won't let you put on your witnesses, that's a

22  legal excuse to leave a trial.  Is that your argument?

23          MR. IACOPINO:  I am saying that that goes to

24  his mens rea, his state of mind, your Honor, and whether

25  or not he acted knowingly and willfully or whether he

1   was working under a mistaken belief about the laws.  I

2   think that's relevant.

3          THE COURT:  So if someone doesn't know what

4   the law is, they are innocent.  Is that your argument?

5          MR. IACOPINO:  In some respects, yes, your

6   Honor, perhaps not to every single charge --

7          THE COURT:  Tell me the mens rea applicable to

8   any of these charges where that becomes relevant.

9          MR. IACOPINO:  Willful and knowing I believe

10  is the same as willful violation -- willful evasion of

11  taxes.  I believe it's the same mental state, your

12  Honor.  I would point to the Cheek (ph) case, Cheek (ph)

13  versus United States that says a firm belief in a -- a

14  firm mistaken belief in the law can be a defense.  And

15  I'm not saying that that's just the whole defense.  I'm

16  saying that that's part of it, the part that's the

17  foundation of why they believed that they could lawfully

18  not surrender to the Marshal Service.

19         MR. LANGE:  And they felt they did not get a

20  fair trial, and that's why they departed from the trial.

21  That's why they didn't come back for sentencing.

22         THE COURT:  Are you presenting any additional

23  evidence with regard to what the marshals did or said

24  that would have caused them to believe they were going

25  to be murdered?

1          MR. IACOPINO:  Yeah, he intends to testify

2    about the events of June 6 and June 7 and --

3          THE COURT:  We've heard.

4          MR. IACOPINO:  And also -- yeah, but from his

5    view.

6          THE COURT:  Yes.

7          MR. IACOPINO:  And also to testify about

8    another incident that we've only heard a little bit

9    about, judge, that happened in July about the shots

10   being fired out around the backside, actually on three

11   sides of the house I think he's going to testify.

12          MR. LANGE:  July 28th.

13          MR. IACOPINO:  And he's also going to testify,

14   your Honor, that the amount of force used by the

15   government in 2004 when they searched her dental

16   practice, the amount they used on the date of their

17   arrest for the tax evasion charge of which we've already

18   heard some evidence about, and of course as I've already

19   indicated, the June 7th incident.

20          THE COURT:  All right, right now the issue is

21   his belief with regard to -- right now what you're

22   saying is you want to put in evidence that he didn't

23   believe that he was required to pay income taxes.  He

24   wrote the government and they didn't write him back.

25          MR. IACOPINO:  That's correct, your Honor.

1          THE COURT:  That's what you want to put in

2     right now.

3          MR. IACOPINO:  Yes, your Honor.

4          THE COURT:  Do you object?

5          MR. HUFTALEN:  Yes.

6          THE COURT:  It's out.

7                    BEFORE THE JURY

8     Q.    BY MR. IACOPINO:  Mr. Brown, in 2004 did you

9     have any contact with government agents at your wife's

10    dental practice in West Lebanon, New Hampshire?

11    A.    We're referring to the small army that came at

12    us in November.

13    Q.    What do you mean when you say a small army?

14    A.    Well, we were going in to work normally that

15    morning and around 7, 7:30 I guess it was, and suddenly

16    appeared turned out about 28, 30 something agents

17    appeared all around us.

18    Q.    Were you expecting to see government agents at

19    your wife's dental practice on that date?

20    A.    Absolutely not.

21    Q.    And what did those government agents do?

22    A.    Well, they seemed to have secured us in making

23    sure everybody was like unarmed and they were protected

24    and -- excuse me, so I get it right so nobody

25    misunderstands me.

1          Q.    Just tell us what they did.

2          A.    I came in just after they were already there

3    with my wife, and I drove in like maybe five minutes

4    after it happened and they were already inside the

5    building and outside in the parking lot and all over the

6    place, and I just drove up and asked what was going on.

7    They didn't detain me or anything.  They just said they

8    were here to download our computer.  And I was talking

9    with Mr. John Hickey.  He's a postal, I guess a postal

10   CIT, criminal investigation officer or something from

11   Boston.

12              MR. HUFTALEN:  Objection.

13              THE COURT:  Overruled.  He's not attempting to

14   put in what Mr. Hickey said, just says he talked to

15   someone.  Ask another question.

16         Q.    You said there was approximately 20 agents on

17   that day?

18         A.    Approximately 30.

19         Q.    And do you know -- where were they positioned

20   when you, during the course of that search or

21   downloading the computer?

22         A.    They were everywhere, throughout the parking

23   lot, inside the building.  I think there were probably a

24   dozen anyway if not more, 15, 16 inside the building.

25   There were another 10, 12 outside the parking lot with

1    me, Mr. James John, Mr. Hickey, state police there,

2    local town officers there, there was a sundry of ATF --

3    not ATF, criminal CIT for the postal service.

4         Q.    Let me ask you a question, Mr. Brown.  Did

5    anybody, when those agents were there, did anybody try

6    to stop them from downloading the information off the

7    computer that they wanted?

8         A.    Oh no.  I merely told Mr. Hickey, I had asked

9    him why did you --

10             THE COURT:  Hold it.  Jury disregard

11   everything after no.  Go ahead.  Ask another question.

12        Q.    Prior to that day had anybody asked you for

13   that information that was in the computer?

14        A.    No.  By the way, so you know, there were

15   snipers up on the hill that day.

16             THE COURT:  Jury disregard the rest of that

17   answer.  Ask another question.

18        Q.    Let me take you to May of 2006 when you were

19   arrested on the tax case, Mr. Brown.  What happened on

20   that day?

21        A.    I received a phone call approximately 6:30

22   a.m.  We were both preparing for work.  The phone call

23   seemed to have come in from the Lebanon Police

24   Department dispatch stating that I had a water leak and

25   that it was a very bad one and I should come down to see

1   what the problem was.

2        Q.   And being a good citizen, did you go down to

3   West Lebanon?

4        A.   Immediately.  I told them I would be there in

5   approximately 15 minutes.

6        Q.   And what happened when you got down there?

7        A.   Well, I remember on the way down I knew I

8   didn't have a water leak.  That's an impossibility.  As

9   a survivalist I have backups to backups for every system

10  and that includes flooding and leaking, and nothing

11  could have come out of the building leaking because of

12  the pumping system I had inside of the building.  So

13  when I arrived at the building some 15 minutes later, I

14  noticed there was a blue truck with some -- I know most

15  of the guys in the water department down in Lebanon and

16  I didn't see anybody that I recognized, so I thought

17  that rather odd.  So rather than pull into the parking

18  lot like I would normally do at my parking place, I

19  parked on the left side of the building.  As I recall,

20  as I carry -- I could have sworn I unloaded my 45 and

21  put the magazine inside the box and left the gun inside

22  the car.

23       Q.   Well, do you know if you actually did that?

24       A.   I'm sorry?

25       Q.   Do you know if you actually did that?

1    A.   I have to be fair and say normally I don't do

2  that, but I can remember pulling up to the driveway that

3  day thinking there was something wrong here and no, this

4  is not a time, not a time to be armed.

5    Q.   Let me ask you a question about that.  You've

6  heard, there's some testimony from the marshals who

7  arrested you that in fact at the time when you were

8  arrested that day you had the gun in your waistband?

9    A.   That's possible, that's very possible, but I'm

10  not going to argue that issue at all with them.  I'll

11  give them the benefit of the doubt, that's correct.

12    Q.   Let's talk about this issue.  When you were

13  arrested, what did the marshals do?

14    A.   Well, as I was walking toward it, I was really

15  heading for the office building rather than walking over

16  because I knew exactly every square inch of that drain,

17  I had been in and around it, filled it, built it.

18    Q.   And this is the drain in the photograph that

19  you saw?

20    A.   That's correct.

21    Q.   That had -- with the yellow cones -- with

22  orange cones around it?

23    A.   That's right.  I knew it.  I knew all the

24  drains because I was there throughout the construction.

25  I knew where it was from exterminating the building and

1    that's what I was doing.

2         Q.   And at some point did the officers there, the

3    agents, did they put hands on you?

4         A.   Oh, huge.

5         Q.   Tell the jury how that happened?

6         A.   I went over to one of the officers and I said

7    okay, let's resolve this, I walked over to the officer.

8    As I approached the officer, he reached out, grabbed my

9    hand.

10        Q.   Which hand of yours did he grab?

11        A.   My right.

12        Q.   Why was it your right?

13        A.   I don't know.  That's what you normally shake

14   hands with.

15        Q.   So you were going to shake hands?

16        A.   Yeah.

17        Q.   What happened when he grabbed your right hand?

18        A.   Well, he immediately grabbed me and then

19   somebody else hit me from behind and slammed me to the

20   ground and somebody screamed at the top of their lungs

21   get up, get up, get up, and I said I can't get up, I

22   have a thousand pounds of man on top of me.

23        Q.   Let me stop you right there.  When that

24   happened, did you reach for the gun at all?

25        A.   Well, sir, I didn't remember I had a gun, but

1    I couldn't anyway, they had my hand, I'm right handed.

2         Q.   So what you're telling the jury is you

3    couldn't reach for the gun even if you wanted to?

4         A.   Impossibility.

5         Q.   Where did they take you after that arrest?

6         A.   From there they threw me into the back seat of

7    a Lebanon cruiser.  I felt betrayed there.

8         Q.   I'm sorry, when you say Lebanon, you mean

9    Lebanon Police Department?

10        A.   Lebanon Police Department cruiser with an

11   officer that I knew.

12        Q.   Where did they take you?

13        A.   They took me to the Lebanon Police Department.

14        Q.   And then did they take you somewhere from the

15   Lebanon Police Department?

16        A.   I was there for a while.  They gave me a

17   disgusting strip search, my first of many since I've

18   been incarcerated, and I was very upset about that one.

19   They kept me there for about 10 minutes or so and then

20   back out into, I forget, and then off into Concord.

21        Q.   They take you to this building, the United

22   States District Court?

23        A.   Oh yes, this building, yes, sir, they took me

24   here.

25        Q.   And when you came to this building, were you

1    arraigned before Judge Muirhead?

2         A.   Yes, sir, that's correct.  At least they

3    called it that.

4         Q.   And in fact, that's the first time you ever

5    met me, isn't it?

6         A.   That is correct, sir.

7         Q.   And at your arraignment, were some conditions

8    set with respect to your ability to have weapons?

9         A.   I was being cooperative with law enforcement

10   because I've always been friends with them --

11        Q.   Ed, please listen to my question.

12             THE COURT:  Jury disregard.  Ask again.

13        Q.   Were some conditions set by Judge Muirhead on

14   your ability to have weapons?

15        A.   Yes, they were.  And the conditions were we

16   had a contract that, on record, we had a contract that

17   no one would enter the home until my wife arrived, and I

18   would give --

19        Q.   Let me --

20        A.   And I would turn over all of the guns.

21        Q.   That's my point.  Let me back up for a second.

22   Part of the conditions that you agreed to was that the

23   guns that you owned at the time would be able to be

24   taken into custody by the United States Probation

25   Department; is that correct?

1        A.   That is correct.

2        Q.   Okay.  And in fact the exhibit, I think it's

3   1a-1 or 1a-2 actually says that United States probation

4   is to take custody of your guns and store them I think

5   at Riley's Gun Shop?

6        A.   That is correct.

7        Q.   And it was your understanding from your

8   arraignment that they would not go into your home until

9   you or your wife was present; is that correct?

10       A.   That was the only reason I made the agreement.

11  The only reason.

12       Q.   And did you learn whether that agreement was

13  kept?

14       A.   Sir, that agreement or contract, when the

15  contract was made with Mr. Muirhead, was in violation

16  and null and void.  Mr. Muirhead --

17       Q.   The jury doesn't know why you're saying that.

18  Why do you say that contract was null and void.  What

19  happened, tell us what happened?

20       A.   Because when we got home that day we had found

21  out that the agents were inside at 11 a.m.

22            MR. HUFTALEN:  Objection.

23            THE COURT:  Sustained.  Jury will disregard

24  it.  Lay a foundation.

25       A.   Of course.

1     Q.   When --

2     THE COURT:  Disregard that comment also.

3     Q.   When you eventually got home, did you learn

4  some information?

5     A.   Yes, sir.

6     Q.   And did you take some action as a result of

7  learning that information?

8     A.   Action?

9     Q.   Yeah, did you raise an issue with the court or

10  with any other court?

11     A.   Well, yes.  What happened is I sued them

12  ultimately.

13     Q.   And who did you sue?

14     A.   I sued the U.S. Attorney's Office here in this

15  building, I sued Mr. John Hickey, James John and Mr.

16  John Hickey, and one or two others.

17     Q.   What was the claim of your lawsuit?

18     A.   It was a tort, state tort claim for damages

19  for what they had done to us.

20     Q.   I understand there's legal labels for it, but

21  what is it that you were saying that those folks did

22  that you could sue them for, that you were entitled to

23  damages for?

24     A.   Well, for the business, for what they did to

25  the business, for assault to us, deprivation of

1   character.

2          Q.   Did any of it involve the guns?

3          A.   Well, violation, of course, violation -- that

4   was part of that, yes, sir, the fact that they stole the

5   property along with due process.

6          Q.   Now, eventually there was a trial held in this

7   building; is that correct?

8          A.   No, sir, not for that case, sir, it was

9   denied.

10         Q.   Oh, I'm sorry.  Okay, you're right.  We were

11  just talking about a lawsuit that you brought?

12         A.   Correct.

13         Q.   All right.  At some point after your

14  arraignment in this court, though, you were in this

15  court for trial for charges of tax evasion; is that

16  correct?

17         A.   Oh, many things happened between then and

18  then.

19         Q.   But that is a fact?

20         A.   Ultimately, ultimately.

21         Q.   Okay.

22         A.   Everybody needs to know the truth.  We've

23  missing a huge gap here.

24         Q.   But let me ask you some questions about that

25  trial first, okay.  You weren't represented by a lawyer

1    during that trial, you represented yourself; correct?

2        A.    No, sir.  I cannot represent or represent

3    myself in a courtroom, but I can be present, sir, that's

4    all I can do.

5        Q.    You were present and you did not have the

6    assistance of a lawyer; correct?

7        A.    That is correct, and I did not plead.

8        Q.    And similarly your wife was present and did

9    not have the assistance of a lawyer at least while you

10   were there; correct?

11       A.    That is correct, and she did not plead.

12       Q.    Did you seek to put witnesses on the stand

13   during that trial?

14       A.    Oh yes.  I recall we had a total of 28, 2

15   percent in the case.

16       Q.    Did the judge allow you to present witnesses?

17       A.    No.

18             MR. HUFTALEN:  Objection on basis said at the

19   sidebar.

20             THE COURT:  Jury will disregard that

21   objection.  It's sustained.

22       Q.    At some point did you -- well, how many days

23   of that trial did you actually come to the courthouse

24   for?

25       A.    We were told it was probably going to be a 6

1    or 7-day trial, as I recall, and we were looking forward

2    to it for over two years, we were waiting for this trial

3    because we were waiting ten years prior to that for a

4    tax case.

5              MR. HUFTALEN:  Objection, move to strike.

6    Nonresponsive.

7              THE COURT:  Overruled.  I'll leave it.

8         Q.   And when the trial started, how many days did

9    you come here to this building for that trial?

10        A.   That I actually physically come?  I only

11   physically came for one, two -- third day I left.

12        Q.   And on the third day, did the government stop

13   putting in its evidence, did they rest?

14        A.   No, sir.

15        Q.   Had they rested before the third day?

16        A.   No, sir.

17        Q.   Why did you leave on the third day?

18        A.   Because Mr. Muirhead took us --

19        Q.   You just said Mr. Muirhead.

20        A.   I'm sorry, Mr. McAuliffe cleared the room out

21   and made sure that no one heard that we have witnesses

22   or evidence.

23             MR. HUFTALEN:  Objection.

24             THE COURT:  Basis?

25             MR. HUFTALEN:  Hearsay and the basis at the

1    sidebar.

2              MR. IACOPINO:  Goes to state of mind, your

3    Honor.

4              THE COURT:  I'm sustaining that.  Go ahead.

5         Q.   Did you come back to the court after the third

6    day?

7         A.   There was no point.

8         Q.   Let me ask you this.  On that third day, did

9    you see Judge McAuliffe sitting up on a bench similar to

10   the one that Judge Singal is sitting at?

11        A.   After the third day?

12        Q.   On that third day.

13        A.   Yes.

14        Q.   At any point during that day, did Judge

15   McAuliffe say to you, Mr. Brown, you have to come back

16   here tomorrow?

17        A.   No, sir.

18        Q.   Did you ever receive any type of piece of

19   paper that said to you you have to come back on the next

20   day?

21        A.   No, sir.

22        Q.   Did you come back on the fourth day?

23        A.   No, sir.

24        Q.   Why not?

25        A.   He denied my witnesses and my evidence.

1                MR. HUFTALEN:  Objection, move to strike.

2                THE COURT:  Overruled.  Go ahead.

3        Q.    And where did you go when you didn't come back

4   here?

5        A.    I retired to my home.

6        Q.    And when you say home, do you mean in

7   Plainfield?

8        A.    That is correct, sir.

9        Q.    And from that day forward until October 4,

10   2007, did you ever leave your home in Plainfield, and I

11   don't mean just stepping over the property line, I mean

12   leave the home?

13        A.    No, sir.

14        Q.    Now, we've heard some testimony from Deputy

15   DiMartino that he had some telephone calls with you.  Do

16   you recall speaking on the telephone with Deputy

17   DiMartino?

18        A.    Yes, some of them.

19        Q.    Do you agree with Deputy DiMartino that those

20   phone calls were basically cordial?

21        A.    Yes, sir.

22        Q.    And do you remember with him when he says that

23   -- well, let me strike that.  It's a poorly worded

24   question.

25                Can you tell us what information was relayed

1    to you by Deputy DiMartino in those phone calls?

2        A.   All I can remember from that, there was so

3    many things going on so fast continuously, plus the

4    anxiety that goes with it, basically all I can remember

5    was turn yourself in, there's a warrant out for your

6    arrest, do the right thing.  And my replies to him were

7    consistent throughout --

8        Q.   Well, what were those replies?

9        A.   I didn't get any witnesses, I didn't get any

10   evidence in trial, I'm not going back until I get a fair

11   trial.  I'll be glad to meet with you publically with an

12   open forum, public forum and discuss the entire thing

13   only publically because I don't feel that my safety is

14   going to be guaranteed.

15       Q.   We heard some testimony about the date of June

16   7, 2007.  Do you recall what happened on that day?

17       A.   It would probably take me a week to tell you

18   it all.

19       Q.   Well, why don't we start, okay.  Tell us in

20   your own words when you first got up that morning.

21       A.   Beautiful morning.  The sun was out.  Are we

22   talking the 7th of October now?

23       Q.   No, 7th of June.

24       A.   Oh, June.

25       Q.   June 7th.

1        A.   Yes, I'm sorry.  June 7th.

2        Q.   And for the record it's 2007.

3        A.   Thank you.  It was, as I said, beautiful,

4   early summer day, quiet, birds are chirping, sun was

5   beating down, and I walked out on the front steps

6   looking for Danny and --

7        Q.   Okay, let me take you back.  Who slept at your

8   house the night before.  I take it you did?

9        A.   Yeah, my wife and I, Danny Riley was there.

10  I'm not sure if there was someone else there, I forgot,

11  people came and went so often and so, you know, for a

12  day or two, sometimes for a few days.

13       Q.   And when you say people, do you mean all

14  different people or only people you know?

15       A.   Oh no, people coming and going all the time

16  from January until October, all kinds of people.

17       Q.   And were these people that you had any sorts

18  of special relationships with or were they just people

19  who showed up?

20       A.   I'm not sure what you mean by special

21  relationships.

22       Q.   Were they family members or close friends?

23       A.   Sometimes.  But everyone that came to me was

24  family as far as I was concerned.  That's the way we

25  are.

1       Q.   But they weren't related to you by blood;

2   right?

3       A.   No, no, sir.

4       Q.   And some of these people, if I understand

5   correctly, and please correct me if I'm wrong, you

6   didn't know them before they came to your house to

7   visit?

8       A.   Oh, no, no, sir.  I didn't really know any of

9   them, none of them.  My wife and I have always been that

10   way.  We used to bring in strangers all the time.  She

11   used to yell at me for doing it sometimes.

12       Q.   Okay.  Let's get back to June 7th, all right.

13   You said it was a beautiful morning when you woke up,

14   and you think that it was you and your wife and Danny

15   Riley in the house and perhaps one other person;

16   correct?

17       A.   Correct.

18       Q.   What happened?

19       A.   I was standing out on the left post looking

20   south.

21       Q.   Okay.  The jury has not spent a lot of time up

22   at your home in Plainfield.  So if you could just tell

23   us where that would be in relation to the front of the

24   house?

25       A.   The main drive, the front of the house would

44

1    be the big entrance you see in the pictures, double

2    doors, and I was sitting next to the left post, having

3    the sun bake on me, and I hear a couple of bangs.  And

4    now I'm a hunter, all my life I know the sounds, I

5    recognize them, I knew they were gun shots of some type,

6    didn't recognize the caliber, and of course I became

7    alert, and it couldn't have been more than 20 seconds

8    later Zoe comes tearing down the driveway.

9         Q.   Who is Zoe?

10        A.   Zoe is our dog, German Shepard we had acquired

11   over the past four or five months.  And teared down the

12   driveway.  I thought she would come running right up to

13   me like she would normally do, but she didn't, instead

14   she ran right into the house.  I really went on alert at

15   that time.  Like I say, being a survivalist also and a

16   hunter and well tuned into sounds and things and

17   situations, my instincts were very high, like there was

18   something wrong.  I waited for Danny to come running

19   down next.

20        Q.   Did Danny ever come running up the driveway?

21        A.   No.

22        Q.   When did you next see Danny?

23        A.   Well, I saw the helicopter first, and that's

24   what really kept me going because --

25        Q.   Okay, explain to the jury when you say you saw

45

1    a helicopter, what kind of helicopter, could you tell?

2        A.    I believe it was a dark medical helicopter,

3    blue and white one that we see fly over the house all

4    the time, back and forth.

5        Q.    And how low is it flying?

6        A.    Literally just about clipping the tree tops.

7    Come over, made one quick pass at the corner of the

8    property, one of these, and then immediately veered

9    away, just come in and take a look-see right after the

10   shots were fired, and then went away, and from there I

11   ran into the house.

12       Q.    Why?

13       A.    I figured, well, we're going to get killed, I

14   really thought that.  You didn't hear because we -- I'm

15   not allowed to tell you everything.

16       Q.    Just --

17            THE COURT:  Jury will disregard that last

18   comment.

19       A.    It built up to that, so I was in a high state

20   of concern, and frankly I was scared to death, and so I

21   ran back into the house, and I have an upper deck, the

22   government seems to like to call a tower, it's an upper

23   deck for viewing, and I ran up there because there's a

24   view on this deck, and when I got out there I could see

25   better all around me, and on the way up I knew there was

1    a larger caliber gun in the house.  If I'm going to be

2    killed, I'm going to protect myself.  Grabbed that

3    larger caliber gun and went up to the deck there and

4    waited to see whether they come down.

5          Q.   Did you ever point that gun at anybody?

6          A.   No, sir.  Sir, I'm a ranger.  You don't do

7    that.

8          Q.   I'll ask you more about that gun in a couple

9    minutes, okay.

10         A.   Yes, sir.

11         Q.   At some point did Danny ever come back up that

12   drive?

13         A.   No, sir -- well, no, sir, he didn't.

14         Q.   At some point, did he come back to the house?

15         A.   Around 3:30, 4 that afternoon, yes, sir.

16         Q.   And did you have a conversation with Danny

17   Riley about what had happened to him?

18         A.   Yes, I did.  Yeah, I did, yes.

19         Q.   And based upon your conversation with Danny

20   Riley, what did you believe was happening?

21         A.   We believed that we were in imminent danger

22   and that people were going to be coming in shortly or

23   whatever they were going to do.

24         Q.   Let me ask you.  Other than that helicopter on

25   June 7th, was there any other air traffic over your home

1   that day?

2        A.   That day?

3        Q.   June 7th.

4        A.   Just one pass, I saw one pass briefly of --

5   gosh, I think we saw the helicopters all over the place

6   with the news media.  That was the day they were

7   everywhere.  Thought they would be crashing into each

8   other.  That was earlier.  A fixed wing aircraft, I

9   recall that day, it was a state police one.

10       Q.   Okay, so you saw a fixed wing aircraft come

11  over your home?

12       A.   Just one.

13       Q.   At what altitude?  Appeared to be low or high?

14       A.   That one was pretty high, but the night before

15  we had a Global, what they call Global Hawk surveillance

16  plane about 10,000 feet.

17            MR. HUFTALEN:  Objection, beyond the scope of

18  the question, and foundation.

19            THE COURT:  Sustained.  Jury will disregard

20  the last portion.

21       Q.   The night before did you see any unusual

22  aircraft come over your home?

23       A.   Yes, sir, we did.

24       Q.   What did you see?

25       A.   It was approximately 8:30 in the evening and

1    we were sitting outside, and first I noticed a bright

2    light coming from west heading due east, and I say exact

3    because of all the aircraft, none of them ever headed in

4    such a straight line as this one did, that's why I

5    identified what it was from experience years ago, and it

6    flew due west to due east at approximately 80,000 feet.

7         Q.   What did you identify it as?

8         A.   They call it a Global Hawk Preditor I believe

9    is what they call it.  It's a surveillance craft,

10   unmanned surveillance.  Mr. Monier identified it the

11   following day and said it was at 50,000 feet the day

12   after.

13        Q.   Let me bring you back to June 7th.  After

14   Danny Riley had come back to your home, did anything

15   change in the way you were living as a result of what

16   happened on June 7th?

17        A.   At that point all I had now was visions of

18   Waco and also Ruby Ridge in Idaho with --

19        Q.   Let me ask you a question.  How did you know

20   about Waco?

21        A.   During the Waco siege --

22        Q.   No, I didn't ask what Waco was.  How did you

23   know about what happened at Waco, Texas?

24        A.   Television.

25        Q.   And did you have any media in your home

49

1    regarding Waco and what happened there?

2        A.   Yeah, that I was involved in it from day one

3    when it actually happened from here.

4        Q.   When you say you were involved, you meant you

5    were following?

6        A.   I was following, but I was also calling the

7    U.S. Attorney's Office, Attorney General's Office in DC

8    about it for suggestions what to do, and they did it,

9    but they used deadly gas rather than using sleeping gas.

10       Q.   And how did you know about Ruby Ridge?

11       A.   Videos.

12       Q.   And did you have those videos in fact in your

13   home?

14       A.   Many of them, correct.

15       Q.   So did you have images of Waco and Ruby Ridge

16   in your mind after Danny Riley came back and told you

17   what happened to him?

18       A.   Yes, plus much more.

19       Q.   And how did that change the way you were

20   living?

21       A.   We've known for some time that the United

22   States government was making war against its people

23   but --

24            MR. HUFTALEN:  Objection.

25            THE COURT:  Objection sustained.  Jury will

1    disregard that entire answer.  Re-ask your question.

2        Q.    The question is, how did your style of life at

3    that point change.  Not what happened before, what

4    happened after Danny Riley came back and told you what

5    the agents had done to him?

6        A.    Well, we were a happy couple.  Progressing

7    well, doing well.  We had achieved the American dream.

8    We had paid all debts, all taxes.  We were totally free

9    and clear from everything.  We made it.  Now suddenly we

10   have the United States government declaring war on us

11   because we asked a question --

12            MR. HUFTALEN:  Objection.  Move to strike.

13            THE COURT:  Jury will disregard the entire

14   answer.  Ask another question.

15       A.    Of course.

16            THE COURT:  Mr. Brown, try to be responsive to

17   the questions.

18       A.    I thought you wanted me to tell the whole

19   truth and nothing but the truth, sir.

20            THE COURT:  Jury disregard that.

21       Q.    After June 7th, Mr. Brown, did you

22   periodically speak on radio shows or television shows?

23       A.    Yes, sir, I did.

24       Q.    In those appearances on radio -- first of all,

25   we're not talking about on Fox Network or anything like

1   that, are we?

2       A.   Not at that time.

3       Q.   We're talking about the local cable channel?

4       A.   Yes, sir, for years.

5       Q.   And some local, not necessarily local but some

6   smaller radio shows?

7       A.   Cable shows.  WBGN -- yes, local stuff, sir.

8       Q.   And did you ever make any broad threats

9   against the United States government or the United

10  States Marshal Service or anybody during those radio

11  interviews?

12      A.   I'm sworn --

13           MR. HUFTALEN:  Objection.

14           THE COURT:  Just a second.

15           MR. HUFTALEN:  Objection.  Hearsay.

16           THE COURT:  Overruled.  The question is did

17  you make any threats during any of those interviews.

18      A.   Impossible.

19           THE COURT:  Ask another question.

20      Q.   During that period of time did you take any

21  aggressive action against the United States Marshal

22  Service?

23      A.   Never.

24      Q.   Against the Internal Revenue Service?

25      A.   Never.

1      Q.   Against any other government agency?

2      A.   I'm sworn to protect it.

3      Q.   During that period of time from June 7th to

4    October 4th, did you try to arrange a public meeting

5    with the United States Marshal Service regarding your

6    situation?

7      A.   Yes, sir.  Several times.

8      Q.   Am I correct that you were willing to talk

9    about the situation with them?

10     A.   Only if it was out in the public so everyone

11   could hear.  They wanted to have secrets.  I didn't.

12          THE COURT:  Jury will disregard everything

13   after everyone could hear.

14     Q.   On October 4th you were arrested by the

15   Marshal Service; correct?

16     A.   I was kidnapped, yes, sir.

17     Q.   Now, I just want to ask you a couple questions

18   about that night.  Did you point a rifle at anybody that

19   night?

20     A.   No, sir.

21     Q.   Did you have a rifle on your person?

22     A.   Yes, sir.

23     Q.   Did you point it in the direction of the

24   individuals who were unloading a truck?

25     A.   No, sir.  Impossible.

1       Q.   Did you have pizza with those individuals?

2       A.   I'm sorry?

3       Q.   Did you have pizza with those individuals?

4       A.   Yes, sir.  We provided beer and they provided

5   the pizza.

6       Q.   And at some point that's the group of

7   individuals that arrested you; correct?

8       A.   That is correct, sir.

9       Q.   When they tried to arrest you, did you go for

10  any weapons?

11      A.   No, sir.

12      Q.   How do you know that?

13      A.   Did I go for any weapons?

14      Q.   Right.  Did you reach for any guns?

15      A.   Well, again, I got slammed to the floor and

16  everyone was pinned on top of me and I was even tasered,

17  I wouldn't do that anyway, I had the opportunity to

18  reach for it, my 45, I had a second or two to do it.

19      Q.   Did you do it?

20      A.   No, sir, I decided not to do it, that fast.

21      Q.   There's been testimony that you struggled.

22  Did you struggle with those agents?

23      A.   Sir, no, sir, it's impossible.

24      Q.   Fair to say they got the jump on you?

25      A.   Huge.

54

1      Q.   All right.

2      A.   But it was allowed.

3      Q.   Mr. Brown, let me turn your attention and talk

4   for a minute about firearms.

5      A.   Yes.

6      Q.   Okay.  You've previously I think testified

7   today that you've owned guns all your life; is that

8   correct?

9      A.   That is correct, all my adult life, even as a

10   child, yes, sir.

11      Q.   Now, we have heard various agents talk about

12   doing surveillance of you in April of 2006 and on other

13   occasions prior to your tax case, and they testified

14   that you routinely had a pistol in your pants area?

15      A.   That is correct, sir, I've had that since I

16   was 21 or 23.

17      Q.   And in fact, did you hold a license to carry a

18   concealed firearm in the state of New Hampshire?

19      A.   All my life.

20      Q.   And does that license also cover your right to

21   carry a firearm in your vehicle?

22      A.   Yes, sir.

23      Q.   And in fact --

24      A.   I'm sorry, sir, I beg your pardon.  That's not

25   required to carry a firearm in your vehicle.

1       Q.   For a rifle?

2       A.   Correct.

3       Q.   And a rifle is what you carry; right?

4       A.   That's correct, or shotgun.

5       Q.   And did you also have a gun collection prior

6   to your tax case?

7       A.   Sure, yes, sir, about 30 pieces.

8       Q.   I want to turn now and talk about any guns

9   that you actually possessed on June 7, 2007.  Did you

10   have a Colt pistol on your person on that day?

11       A.   That is correct.

12       Q.   And at some point during that day did you

13   carry a rifle of some sort?

14       A.   That is correct.

15       Q.   Other than those two guns, prior to June 7,

16   2007, were there any other guns in your home between the

17   time that you got to the tax trial and June 7th?

18       A.   People came and went all the time and they had

19   their own personal firearms, almost everybody did.

20   That's their business.

21       Q.   Okay.  Let me address that for a minute.  I

22   think, if I hear what you're saying correctly, people

23   would come and visit you, they might have their own

24   firearm on their person?

25       A.   Correct.

1      Q.   And is there anything illegal about that that

2  you know of?

3      A.   Not that I know, sir.

4      Q.   Would you consider that you possessed any of

5  those firearms that these people had when they came to

6  visit you?

7      A.   Those were theirs, not mine.  I don't touch

8  other people's property, sir.

9      Q.   The rifle or the shotgun that you had, where

10  did that come from?

11      A.   That was one that the marshals had missed.

12  They left it there.  I had forgotten about it.

13      Q.   We also heard some testimony about Goex black

14  powder?

15      A.   Yes, sir.

16      Q.   How long ago had you bought Goex black powder?

17      A.   I have had Goex black powder for a number of

18  years.  That's used for ammunition stuff.

19      Q.   And was that in your home before your arrest

20  on the tax case?

21      A.   I had a good 20 plus cans, yeah, in my home.

22      Q.   And did that remain in your home after the

23  probation department came and removed all weapons?

24      A.   Yes.  I thought it was no concern for them so

25  they left it there.

1       Q.    Let's talk about .50-caliber weapons.

2       A.    Yes, sir.

3       Q.    There's been testimony that on June 7th you

4  were seen up on your observation deck with a .50-caliber

5  weapon.  Did you ask anybody to get that weapon for you?

6       A.    No, sir.

7       Q.    Was that a weapon that you had owned prior to

8  that day?

9       A.    No, sir.  My .50-caliber was taken during --

10  or I should say was stolen from me during the original,

11  I believe when I had Mr. Muirhead.

12      Q.    Where did you go to get that weapon on that

13  day?

14      A.    It was up on the third floor.

15      Q.    Who slept on the third floor the night before?

16      A.    Nobody slept, it was just left up there I

17  guess for a weekend.  I'll tell you the truth, sir, I

18  slept with my wife, and where everybody slept was up to

19  them.  We didn't pick places.  We had rooms that were

20  empty.  I don't know.

21      Q.    Why did you get that weapon that day?

22      A.    My fear for my life and my wife's.

23      Q.    Did you ever fire it?

24      A.    That, no, sir.

25      Q.    Let me ask you this.  There's been some

58

1   testimony in this case about Jason Gerhard and Cirino

2   Gonzalez and Danny Riley buying Serbu .50-caliber

3   rifles.  Do you recall that testimony?

4       A.   Yes, sir.

5       Q.   Did you ever ask those individuals to buy

6   those rifles for you?

7       A.   After the 7th of October I said I would like

8   to have one of those.

9       Q.   Okay, but when they were purchasing it, were

10  you involved in them purchasing them?

11      A.   No, not at all.

12      Q.   Why after June 7th did you ask to have one of

13  those?

14      A.   I had an army, I found out later on, I thought

15  it was about 30 people come at me but it was more like

16  200 plus people come at me.  No one would ever do that

17  unless they were going to do a Waco incident or a Ruby

18  Ridge, Mr. Weaver, his family.  I prepared to protect

19  myself, my family, as any American would do.

20      Q.   Did you accumulate any other guns after

21  June 7, 2007?

22      A.   At that point, as far as I was concerned, all

23  bets were off.  I didn't really care too much of what

24  came into the house.  They wanted war.  I wasn't going

25  to just put my hands up and kill me and my wife like

1    they did at Waco and Ruby Ridge.  Wasn't going to

2    happen.  I'm a ranger.  I'm here to protect this nation.

3          Q.    You believed they were trying to kill you?

4          A.    Yes, sir.  I still do.  If you notice closely,

5    you will see these needles on my forehead and in and

6    around my ears and hips, they have given me since I've

7    been in the BOP.

8          Q.    When you say BOP, you mean Bureau of Prisons?

9          A.    That is correct.  They did that through the

10   tuberculosis testing shot.  Came out after that.

11         Q.    After June 7th, did you assemble pipe bombs?

12         A.    Yes, sir.

13         Q.    Why?

14         A.    I had no choice.

15         Q.    What do you mean when you say you had no

16   choice?

17         A.    They had helicopters, surveillance planes,

18   tanks, army, automatic weapons.  I know what the army

19   has for weaponry.  They have microwave, they have all

20   kinds of weaponry, just like Waco.

21         Q.    But what was the purpose of you having a pipe

22   bomb?

23         A.    If they came into the house, I would have used

24   them.

25         Q.    To do what?

1     A.    To kill me.  I would have used them to protect

2    myself against whoever it was, doesn't matter who it was

3    at that point.

4     Q.    Let me ask you a question.  Those pipe bombs,

5    how many of them actually have fuses in them?

6     A.    I think, I believe I only kept one in there in

7    case I had to use one.  They scared the daylights out of

8    me.  I never tried one, so I didn't know what they would

9    do.

10     Q.    After June 7th did you put wicks and nails on

11    some Goex cans?

12     A.    On some Goex, yes, I did.  They have hand

13    grenades and the law says I can use equal or greater

14    force to protect my life and wife and my property --

15          MR. HUFTALEN:  Objection.  Move to strike.

16          THE COURT:  Stop, stop.  Jury will disregard

17    everything after I did, everything else the jury will

18    disregard.

19     Q.    Why did you do that?

20     A.    I'm sorry, sir?

21     Q.    Why did you do that?

22     A.    Put the nails on the cans?

23     Q.    And wicks.

24     A.    Equal force to equal force.

25     Q.    Why?

1          A.      Because they had grenades too.

2          Q.      What were you trying to do?

3          A.      Protect my life, my wife and family and my

4     home.

5          Q.      After June 7th did you hang Tannerite targets

6     in trees?

7          A.      Yes, I did.

8          Q.      Why?

9          A.      Because they were benign, kind of benign to

10    begin with.  They wouldn't, on the outside, and it would

11    be used as a flash bang, in other words, make a big bang

12    and throw up a lot of smoke.  It was, to me, was the

13    safest way to do it so no one would get hurt.  All I

14    want to do is keep everybody away from us.  I had been

15    warning them for months, not threatening, and warning

16    stay away unless you want to have a public meeting about

17    this entire situation.  I said it publically many, many

18    times and they just wouldn't do it.  They just kept

19    coming.

20         Q.      After June 7th did you assemble those metal

21    devices that Mr. Klees testified about?

22         A.      Little scrims on them?

23         Q.      Yes.

24         A.      They were designed -- trip wires with a sound

25    so I could take them, put them out in the woods.  What

1    you do with those, they sell them, you can buy them $20

2    a piece somewhere here in New Hampshire, as I recall,

3    from a little catalog --

4           Q.    Why did you put those together?

5           A.    Just sound detectors.  Somebody trips the

6    wire, if they would work, turns out they didn't, they

7    would just make a bang, and then I would know from what

8    direction somebody might be coming to the property.

9           Q.    Did you ever set those out in the yard?

10          A.    No, sir.

11          Q.    Did you ever booby trap or mine your yard?

12          A.    No, that's insanity.  I mean, the animals

13   would get hurt.  I wasn't going to allow that.  I had

14   deer and turkey all over the place.  I fed the turkey.

15   And bear came through, the black bear, moose also came

16   through.

17          Q.    With respect to all these weapons, the guns

18   that you had and the other devices, what was your

19   purpose in having them after June 7th?

20          A.    Just to protect our lives.

21          Q.    Did you ever throw a pipe bomb at a government

22   agent?

23          A.    No, sir.

24          Q.    Did you ever put one in a place that would

25   bring harm to a government agent?

1    A.   No, sir.

2    Q.   Did you ever even light one off between

3 June 7th and --

4    A.   As I said earlier, that's not --

5    Q.   Please let me finish.  Did you ever even light

6 one off between June 7th and October 4th of 2007?

7    A.   I never ever lit one off period.

8    Q.   Did you ever throw a Goex can at any

9 government agents?

10    A.   No, sir.

11    Q.   Did you ever place a Goex can in a place that

12 would bring harm to a government agent?

13    A.   No, sir.

14    Q.   Did you ever even light one of those off

15 between June 7th and October 4th, 2007?

16    A.   For the same reason, no, sir, I wouldn't do

17 it.

18    Q.   Well, those -- well, what have been referred

19 to by others as zip guns but you refer to them as signal

20 devices, did you ever put one of those in place that

21 would bring harm to government agents?

22    A.   No, sir, I couldn't get them to work.

23    Q.   Did you ever shoot one at a government agent?

24    A.   No, sir.

25    Q.   Any other firearms that you had in your home

1   after June 7, 2007, did you ever shoot any of those in

2   the direction of government agents?

3        A.   No, sir.

4        Q.   Did you ever point them in the direction of

5   any government agents?

6        A.   I'm an NRA instructor, sir, you don't do that.

7   You don't point a gun at anything you don't wish to

8   destroy, and I don't want to destroy anything.

9        Q.   And did you ever use any of those guns in any

10  manner to bring harm to any government agent?

11       A.   Under no circumstances, sir.

12       Q.   Did the government take action that could

13  bring harm to you during that period of time?

14       A.   They've escalated it from the very first day

15  with the computer search, yes, sir, every incident got

16  worse and worse and worse and worse and was planned by

17  the U.S. Attorney's Office here in New Hampshire.

18       Q.   Did the government put your life in danger?

19       A.   Yes, sir.

20       Q.   When?

21       A.   From the very first day.

22       Q.   Was there any point in time in particular that

23  it came to a head?

24       A.   That it came to a head?

25       Q.   Yup.

1          A.   Well, I suppose the night they kidnapped us.

2          Q.   Did the government ever fire weapons in your

3     direction?

4          A.   Yes, sir.

5          Q.   On what day?

6          A.   Danny Riley on the 6th of June, 7th of June.

7          Q.   Did you return any fire?

8          A.   Under no circumstances.  I had full control of

9     my capacity with a firearm, what to do or not do at all

10    times even under a stressful situation.

11         Q.   And why did you not return fire?

12         A.   There was no need to.

13         Q.   Why?

14         A.   No one was pointing a gun at my face.  If I

15    had seen one, I would have done what I had to do.  You

16    hate to use those words, they are disgusting words, but

17    I would have done what I had to do.

18         Q.   We talked a lot about June 7th, 2007, Mr.

19    Brown.  How do you think the events of that day changed

20    your life?

21         A.   Destroyed it.  Absolutely obliterated my life

22    and my wife's.

23         Q.   And what was it about that day that

24    obliterated your life and your wife's life?

25         A.   I have lost total faith and confidence in the

1    United States government.  I have lost total faith and

2    confidence of my local town government, county

3    government, and state government.

4         Q.   And what did those governments do to make you

5    lose your faith?

6         A.   They created a multi-jurisdictional task force

7    with 14 different agencies and they declared war on us

8    as they have on many other people in this country.

9         Q.   And what did you think they were going to do

10   to you?

11        A.   Kill us.  They were going to kill us.  We knew

12   that for sure.

13             MR. IACOPINO:  I have nothing further.

14             THE COURT:  Do you have cross?

15             MR. HUFTALEN:  Yes, I do.

16             THE COURT:  All right, ladies and gentlemen,

17   we're going to take our mid-day break at this time.

18   We'll take a 20-minute break.  Don't discuss this case.

19   Keep an open mind.  You haven't heard all of the

20   evidence.  The jury is excused.

21             (Jury exited the courtroom.)

22             THE COURT:  We're in recess.

23             (Recess taken.)

24             (CONCLUSION OF EXCERPT.)

25

1                    C E R T I F I C A T E

2

3          I, Sandra L. Bailey, do hereby certify that

4     the foregoing transcript is a true and accurate

5     transcription of the within proceedings, to the best of

6     my knowledge, skill, ability and belief.

7

8

9     Submitted: 8/3/09        /s/ Sandra L. Bailey
                               SANDRA L. BAILEY, LCR, CM, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25