1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                              *
UNITED STATES OF AMERICA      *
                              *  09-CR-30-01/02-GZS
          v.                  *  July 8, 2009
                              *  8:20 a.m.
EDWARD BROWN and ELAINE BROWN *
                              *
* * * * * * * * * * * * * * * *
```

Day 7
Morning Session
EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE GEORGE Z. SINGAL
and a jury

Appearances:

For the Government:    Arnold Huftalen, AUSA
                      Terry Ollila, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH  03301

For the Defendant,    Michael J. Iacopino, Esq.
Edward Brown:         Brennan, Caron, Lenehan & Iacopino
                      85 Brook Street
                      Manchester, NH 03104

For the Defendant,    Bjorn R. Lange, Esq.
Elaine Brown:         Federal Defender Office
                      22 Bridge Street
                      Concord, NH  03301

Court Reporter:       Diane M. Churas, LCR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1442

2

<pre>
1                          I N D E X

2

3
     WITNESS:           DIRECT  CROSS   REDIRECT RECROSS
4
     EDWARD BROWN
5
     By Mr. Huftalen               9                  33
6    By Mr. Lange             20
     By Mr. Iacopino                        22
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

```
 1                     IN CHAMBERS

 2            THE COURT:  Mr. Iacopino, you've had an

 3   opportunity to talk to your client?

 4            MR. IACOPINO:  I have twice, your Honor.

 5            THE COURT:  Pardon me?

 6            MR. IACOPINO:  I have twice.

 7            THE COURT:  Is he ready to proceed?

 8            MR. IACOPINO:  He is ready.  Yesterday he

 9   indicated that he believes he would be able to follow

10   the judge's instructions.  I will report to you though

11   this morning he's rather agitated.

12            THE COURT:  We'll do the best we can.  We'll

13   try to give him as fair a trial as he allows us to do.

14            MR. IACOPINO:  Your Honor, in fairness, I

15   do -- the government represented they have about ten

16   more minutes of cross-examination.  I do intend to

17   redirect.

18            THE COURT:  I'm not going to hold the

19   government to the ten minutes, and you certainly can

20   redirect after Mr. Lange has an opportunity.

21            Number two, Mr. Lange, at some point when you

22   do decide whether your client is going to testify, if

23   she's not going to testify let me know so I can make

24   sure on the record that she understands her rights with

25   regard to her testimony.
```

4

1          MR. LANGE:  I will need to speak to her

2     briefly.

3          THE COURT:  Anytime.  I just wanted to remind

4     me and you in that regard.

5          Finally, with regard to a couple of potential

6     witnesses, I think of Mr. Lange, is Christine Arvizu; is

7     that correct?

8          MR. LANGE:  Yes, your Honor.

9          THE COURT:  Of White River Junction, New

10    Hampshire?

11         MR. LANGE:  Of Vermont.

12         THE COURT:  Vermont?

13         MR. HUFTALEN:  It's right across the river

14    from Lebanon.

15         THE COURT:  And Sean Farnsworth of Rumney, New

16    Hampshire?

17         MR. LANGE:  Yes, sir.

18         THE COURT:  Those were late additions after we

19    went through jury selection.

20         MR. LANGE:  They were.

21         THE COURT:  I'm going to ask the jury if any

22    of them know them.  If any of them do, we may have an

23    issue because even though I preliminarily agreed to let

24    them go, if we are going to have a problem, they may be

25    out.

1           MR. LANGE:  I understand.

2           THE COURT:  Anything else, counsel?  Go ahead.

3           MR. HUFTALEN:  Yes.  Last night I received an

4    e-mail at 8:35 from Inspector LaBier who's the case

5    agent for this case informing me that some posts

6    appeared on the Newhampshireunderground.com log site or

7    website.  Those posts appear to indicate that Kat, with

8    a K, Kanning, with a K, who's a fairly vocal supporter

9    of the Browns and who I'm told was in court yesterday is

10   attempting to ascertain the identity of one of the

11   jurors.  There were comments asking whether or not it is

12   a security person in this courthouse, some posts in

13   response to that with a photograph, which I didn't see,

14   but her response is, okay, thanks but that's not him.

15           I think it may be the security person in

16   Keene.  Given the history of this case and the threats

17   that have been made against a number of people and

18   public comments which are not part of the record, and

19   I'm not trying to put them in the trial record here, by

20   Mr. Brown concerning the jurors in the last trial, I'm

21   extremely concerned.

22           I did two minutes' worth of research this

23   morning of First Circuit law with respect to anonymous

24   juries, and I don't know what the Court's options are,

25   but if there's a way to order that the identities of the

1    jurors which have not yet been made public remain

2    anonymous for a certain period of years, I think it

3    would be prudent to do.

4              THE COURT:  All right.  I'm going to get

5    counsel on both sides to think about that, government.

6              MR. IACOPINO:  I didn't understand one thing

7    that Mr. Huftalen said.  You said something about it

8    being Keene?

9              MR. HUFTALEN:  I will give you the copy of the

10   posts and you can look at that.

11             THE COURT:  Counsel, put together whatever

12   authority you'd like in this regard and I will talk to

13   you tomorrow morning with regard to where we go on that

14   issue.

15             MR. HUFTALEN:  Thank you.

16             MR. LANGE:  Your Honor, I assume you have not

17   changed your mind at this point with regard to a

18   justification instruction.

19             THE COURT:  I have an open mind on the issue.

20   I think it's a tough hill to climb with the defendants.

21   I'm convincible.  But I have to be blunt with you, it

22   seems difficult under the circumstances, though please

23   understand that -- file whatever you want and try to

24   persuade me however you wish.  It's a difficult issue

25   under the best of circumstances, for instance, the Lahey

1   case, very difficult here under these circumstances.

2   But I'm convincible.

3            MR. LANGE:  Thank you.

4            MR. HUFTALEN:  Mr. Iacopino, you can keep that

5   copy of the blogs that are referred to, and I will get

6   copies for Mr. Lange.

7            THE COURT:  First thing we're going to do is

8   I'm going to talk to the jury and ask about these names.

9   If someone knows them I will call them over to side bar

10  and see where we go.  If no one does, then we'll move

11  along.  Have your client not on the stand.

12           MR. IACOPINO:  Okay.

13           THE COURT:  Have him next to you because it

14  may be necessary for us to talk to a juror at side bar.

15  Anything else, counsel?

16           MR. HUFTALEN:  No.

17           THE COURT:  All right.  See you in court.

18                         BEFORE THE COURT

19           MR. HUFTALEN:  One matter, your Honor.

20  Yesterday I read into the record a stipulation to

21  Government's Exhibit 46, and you instructed me to read

22  it to the jury when we came back and I didn't.

23           THE COURT:  All right.  We'll do it right now.

24  First I'm going to take care of the witness issues and

25  then you can read it in front of the jury.  Bring in the

1    jury, please.

2              THE CLERK:  Yes, your Honor.

3                    BEFORE THE JURY

4              THE COURT:  Members of the jury, good morning.

5    Thank you for being so prompt this morning.  You

6    remember that during the jury selection process I read a

7    list of possible witnesses to find out if anybody knew

8    anyone.  I have two more names as possible witnesses.  I

9    don't know if they will be or not obviously.  If

10   anybody -- does anybody know, have any personal

11   relationship, relative of, etc., of Christine Arvizu of

12   White River Junction, Vermont?  Just raise your hand if

13   the answer is yes.

14             All right.  There's no one raising their hand.

15   Number two, Sean Farnsworth of Rumney, New Hampshire.

16   No one raised their hand.  All right.  Thank you very

17   much, members of the jury.

18             And Mr. Huftalen.

19             MR. HUFTALEN:  Thank you, your Honor.  The

20   government and counsel for the defendants and the

21   defendants through them have reached a stipulation which

22   I'd like to read into the record at this time.

23             THE COURT:  You may.  Ladies and gentlemen,

24   you remember I told you at the beginning during my

25   preliminary instructions that sometimes the two sides or

1    the three sides will agree on something; so it's not

2    necessary to present a witness.  This is such a

3    stipulation.  Go ahead.

4              MR. HUFTALEN:  Thank you, your Honor.  It's

5    marked as Government Exhibit 46 and it's captioned in

6    this case and reads as follows:  Stipulation, the

7    government and both defendants, Edward Brown and Elaine

8    Brown through respective undersigned counsel, stipulate

9    that Government Exhibits 8b, 8c, 8d, 8e, 8f, 8g, 8h, 8i,

10    8j, 8k, 8L, 8m, 8n, 8o, 8p, 8q, 8r, 8s, 8t, 8u, 8v, 8w,

11    9a, 9b-1, 9b-2, 9b-3, 9c-1 through 9c-10, 9c-11, 9c-12,

12    9d, 9e-1 through 9e-7, 9f-1 and 11j all contain

13    gunpowder.  And then there are signatures of counsel.

14              THE COURT:  All right.  Ladies and gentlemen

15    of the jury, you can accept that evidence as true, give

16    it whatever weight you believe that it deserves.

17    Anything else with regard to that stipulation, counsel?

18    I hear nothing.

19              MR. HUFTALEN:  Nothing.

20              THE COURT:  All right.  And, Mr. Brown, you

21    may take the stand.  Please be seated.  You are still

22    under oath. You may proceed.

23              MR. HUFTALEN:  Thank you.

24                   CROSS-EXAMINATION (cont'd)

25    BY MR. HUFTALEN:

1          MR. HUFTALEN:  Mr. Brown, good morning.

2     Q.   Mr. Brown, during Mr. Lange's opening

3 statement when you were in the courtroom, you heard him

4 say that your wife returned to you after having spent

5 some time away from the home in January and February of

6 2007.  Is that true?

7     A.   She returned to me; that's correct.

8     Q.   And before returning to you, she had been

9 living in Massachusetts.  Is that what you understood?

10    A.   Yes, yes.

11    Q.   Mr. Lange described her as a -- I believe one

12 of the words he used was a devoted wife.  Would you

13 agree with that characterization?

14    A.   Absolutely.  We have been together 24 years.

15    Q.   You consider your relationship with your wife

16 to be an important and sincere relationship?

17    A.   There is nothing more important to me in the

18 world than my wife except God.

19    Q.   And would it be fair to say that over the

20 years you've come to share beliefs?

21    A.   We're on the same path in life.

22    Q.   And with respect to some of the beliefs that

23 you articulated yesterday concerning fear of the

24 government, does she share those with you?

25    A.   Sir, I am the government in this country.  I

1    don't fear myself.  I fear the criminal element in

2    government.  The public service changed the direction of

3    their endeavors in terms of how they represent us.

4         Q.   Mr. Brown, while you and your wife were at

5    your home between February of 2007 and October of 2007

6    you made a number of statements through the media.  Is

7    that right?

8         A.   That's correct.

9         Q.   And oftentimes you made statements through

10   radio shows, be they local broadcasts or Internet radio.

11   Is that also true?

12        A.   Yes.

13        Q.   And is it also true that on many occasions you

14   and your wife were together speaking, each of you,

15   during those radio broadcasts?

16        A.   Yes.

17        Q.   In particular are you familiar with the

18   Republic Broadcast Network?

19        A.   I'm familiar with it.

20        Q.   Known commonly as RBN?

21        A.   Yes.

22        Q.   RBN, or the Republic Broadcast Network,

23   carried on almost a daily radio show called Ed Brown

24   Under Siege; is that right?

25        A.   That's correct.

1       Q.    And you oftentimes called in and spoke with a

2  host and with callers on that show; did you not?

3       A.    Yes.

4       Q.    And on a number of occasions did your wife

5  participate in those conversations with you?

6       A.    Yes.

7       Q.    Would it be fair to characterize those

8  comments by you as comments to your supporters?

9       A.    No.  To the world, sir.

10      Q.    To the world.  Okay.  Was the purpose in those

11 statements by you to let the world know who you were and

12 what you were doing?

13      A.    No.  The statements were to warn the world of

14 the danger that they are in, the same as John F. Kennedy

15 did prior to his assassination.

16      Q.    And with particularity, were you warning the

17 world of the dangers --

18            MR. IACOPINO:  Objection, your Honor.  May we

19 approach?

20            THE COURT:  You may.

21                      AT SIDE BAR

22            THE COURT:  Go ahead.

23            MR. IACOPINO:  Your Honor, I object.  This is

24 well beyond the scope of direct examination.  It's an

25 area in which I was actually prohibited from addressing

1   this particular witness on direct examination by the

2   Court, and it's political statements that are irrelevant

3   to the issues before the Court.  On that basis, your

4   Honor, I don't think he should be permitted this line of

5   cross-examination.

6          I would also point out that although I respect

7   Mr. Huftalen, I think that this line of

8   cross-examination could be perceived to be an effort to

9   agitate this defendant in his behavior on the witness

10  stand.

11         THE COURT:  I don't think your client is being

12  agitated at all.  I think he's much calmer than he was

13  yesterday.  And number two, I think these are

14  preliminary questions; so Mr. Huftalen is trying to set

15  a foundation for later questions and I'm going to deny

16  it.

17         MR. HUFTALEN:  Yes.  Thank you.

18                        IN OPEN COURT

19  Q.   Mr. Brown, let me ask you that question in a

20  different way.  Would it be fair to say that your

21  comments on RBN on the Ed Brown Under Siege radio show

22  during the time frame between February '07 and October

23  '07 were designed by you in particularity to warn the

24  world, as you say, of the dangers specifically

25  identified in your particular situation?

1        A.    No.

2        Q.    Did you speak about your particular situation,

3   and by that I mean the fact that you were at your home

4   and that the Marshal Service was making attempts to

5   arrest you.

6        A.    Well, of course they weren't there to arrest

7   me.  They were attempting to create a scenario of arrest

8   and allusion that we were the bad guys.  That's all they

9   were doing.  They had to do it that way.  That's why

10  they didn't try to speak to us a few weeks earlier in a

11  public manner.

12       Q.    Mr. Brown, do you remember speaking on that

13  show on March 20th, 2007, with your wife by your side

14  speaking as well about the position you had taken?

15       A.    How could I know?  I don't remember any

16  particular date.  I don't remember most of the

17  conversations we've had or things I've even said over

18  the year.

19       Q.    Let me ask you with particularity, do you

20  recall on March 20, 2007, in response to statements by

21  you that people had to make a stand, your wife said, and

22  I quote, you've got to defend with all the force you

23  need to defend with.  Do you recall words to that

24  effect?

25       A.    No.  But I maintain on the stand absolutely

1    the position that all Americans have had to take from

2    its inception, this country since its inception against

3    the same people, and it's happening again now with the

4    same people by the way.

5         Q.   Let me ask you if you recall immediately

6    thereafter those statements by she that you said:  And

7    how far and much force will you need to do if necessary

8    under the law?  Do you remember saying that?

9         A.   No.  But whatever the law dictates.  I would

10   have probably stated something that the law had said or

11   one of our forefathers had said more than likely.

12        Q.   And do you remember in response to your

13   question Mrs. Brown saying on March 20th, '07, "To the

14   death."  Do you recall her using those words?

15        A.   Sir, I don't recall words that were used from

16   my wife this morning barely.  No.  She may have said

17   that.  I don't know.  If it's recorded, you would know

18   that already, and if that's the case, that's the case.

19   I don't remember personally, no.

20        Q.   And do you recall whether or not in response

21   to that you said, "To the death.  Do you hear it, ladies

22   and gentlemen?"

23        A.   Oh, sir, again, I repeat to you.  This country

24   was founded to take that kind of position.  We live in a

25   live free or die state.  Do you understand what that

1  means, sir?

2      Q.   Mr. Brown, about a minute and a half or a

3  minute and 40 seconds later, do you recall your wife

4  saying, "We don't know how this will end, but there's

5  only two ways we're coming out of here, as a free man

6  and a free woman or in body bags."  Do you recall her

7  saying that?

8           MR. IACOPINO:  Objection, hearsay.

9           THE COURT:  Overruled.

10     A.   I'm sorry, I don't remember her saying that.

11 If I clearly remembered, I would tell you that.  I don't

12 remember her saying that.

13     Q.   Do you remember her using that phrase numerous

14 times in many public statements thereafter?

15     A.   She may have even heard me use that statement,

16 you know, if that's the case.  The federal government

17 has used it several times and that's probably why you

18 originally had picked it up.

19          THE COURT:  The jury will disregard the last

20 part.

21          THE WITNESS:  Of course.

22          THE COURT:  Mr. Brown, don't start.

23          THE WITNESS:  Of course.  You asked me --

24          THE COURT:  Mr. Brown --

25          THE WITNESS:  -- to speak the whole truth,

1   sir.  I will speak the whole truth and nothing but the

2   truth so help me God.  If you try to delay me, sir,

3   we'll have this confrontation.

4           THE COURT:  Mr. Brown, you have to obey the

5   rules of the court.

6           THE WITNESS:  Sir, there are no rules except

7   the ones that you make, sir, for your own personal

8   enrichment.  That's a fact of record.  Would you like to

9   have me bring that record forward, sir, to show the

10  jury?  I will be glad to do so.

11          THE COURT:  Jury's excused.

12          THE WITNESS:  Yes.

13          (Jury left courtroom.)

14                    BEFORE THE COURT

15          THE COURT:  Mr. Brown, you can go back to your

16  counsel.  Be seated.  I'll hear from the government with

17  regard to possible sanctions.

18          MR. HUFTALEN:  Your Honor, although there are

19  a number of other questions I'd like to ask Mr. Brown, I

20  believe I've had a fair and full opportunity to

21  cross-examine him and I will ask no further questions at

22  this point, and I would request that his, both direct

23  and cross, not be stricken from the record.  With

24  respect to his continuing misbehavior, I respectfully

25  request that if he continues to interrupt the

1    proceedings, that he be removed from the courtroom.

2            THE COURT:  Mr. Iacopino, your position?

3            MR. IACOPINO:  Your Honor, we certainly oppose

4    any decision by the Court to strike Mr. Brown's direct

5    testimony, and in doing so I would rely on United States

6    versus Bartelho, 129 Fed. 3d, 663, which in summary

7    states that if defendant's behavior interferes with the

8    cross-examination and prohibits the government from

9    getting a fair cross-examination, then the appropriate

10   remedy might be to strike his direct testimony -- strike

11   all of his testimony.

12           However, your Honor, I don't think that that's

13   been the case here.  The government's made a

14   representation to you they believe they have had a full

15   and fair opportunity to cross-examine the defendant, and

16   I would point out for the record that the defendant's

17   comments that are causing difficulty here are not in

18   terms of providing information in the questions.  They

19   are in nature of the defendant's remarks towards the

20   Court.  And I don't think that these cases address that,

21   and I don't think that an appropriate remedy for a

22   contemptuous remark to the judge is in fact the striking

23   of the testimony.  I think that's where you are

24   required, your Honor, to balance the defendant's Sixth

25   Amendment right to a trial and to a fair trial and to

1    his right to testify against what other sanctions you

2    might impose on a condemnor in your court.  I think the

3    appropriate way to deal with any sanctions for contempt,

4    your Honor, would be in a separate hearing at the

5    conclusion of these proceedings and not during the

6    course of these proceedings.  And that would be our

7    response to you.

8              THE COURT:  All right.  Mr. Lange, do you have

9    a position?

10             MR. LANGE:  Yes, your Honor.  I would ask that

11   his testimony not be stricken.

12             THE COURT:  All right.  I'm not going to

13   strike his testimony at this point.  Mr. Brown has in

14   the way he's answering the questions, refusing to answer

15   the questions directly, and is deliberately refusing to

16   obey the rules of court.  I'm warning Mr. Brown that if

17   he continues his disruptive behavior, he will be removed

18   from the courtroom, just so he's aware of what happens.

19   That will happen even though he's in the midst of being

20   examined.  He can return to the courtroom if he promises

21   to obey the court rules.  Are we ready for the jury?

22             MR. HUFTALEN:  Government's ready.

23             MR. IACOPINO:  Yes, your Honor.

24             THE COURT:  Bring in the jury.

25                            BEFORE THE JURY

1          THE COURT:  Mr. Brown, you may resume the

2    stand.

3          MR. HUFTALEN:  No further questions, your

4    Honor.

5          THE COURT:  Thank you.  Mr. Lange?

6                    CROSS-EXAMINATION

7    BY MR. LANGE:

8          MR. LANGE:  Good morning, sir.

9          THE WITNESS:  Good morning, sir.

10          MR. LANGE:  I just have a couple points I want

11    to clarify.

12     Q.   First of all with regard to the Tannerite

13    that's been discussed during the course of this trial,

14    what part, if any, did Elaine play with regard to

15    anything involving the Tannerite?

16     A.   Nothing.

17     Q.   With regard to the Goex cans or the various

18    other cans of black powder, some of which were described

19    as having a fuse in the top and some of which were

20    described as having nails taped around them, what part,

21    if any, did Elaine have with regard to any of those

22    items?

23     A.   Nothing.

24     Q.   There was a basket of -- looked like plumbing

25    parts, items had been assembled that several of the ATF

1    witnesses testified about.  Do you remember where that

2    basket was?  There was a basket -- do you remember or

3    you don't?  It was a basket.  I don't remember if these

4    were the pipes with the cotter pin --

5         A.   Correct.

6         Q.   -- or if they were the pipes with the hole in

7    the middle.  Do you remember the basket?

8         A.   My wife had nothing to do with any of that --

9    those devices, nothing.

10        Q.   So that's true with regard to what's been

11   described as the pipe bombs?

12        A.   That's what they called them, yes.

13        Q.   That's true with what has been described as

14   the zip guns or booby traps?

15        A.   They were neither zip guns nor booby traps.

16   They were merely sound signaling devices.  And they

17   didn't work anyway.  That's why I put them back in the

18   house.

19        Q.   Earlier in the trial there was a photograph of

20   a portion of a tree trunk in your yard, and there was a

21   wire going out and there was some debris around the

22   wire.  What was that?

23        A.   Correct.  That was a test with one of the

24   sound devices to see if they would work.  We found --

25   they found the one shell.  I noticed it was the one --

1   we finally forced it to make it work, but they were no

2   good.  The springs weren't strong enough to make them

3   work; so we got rid of them.

4        Q.   What part, if any, did Elaine have with regard

5   to those items?

6        A.   Nothing.

7             MR. LANGE:  Those are my questions.

8        A.   Wasn't even present.

9             THE COURT:  Thank you, Mr. Lange.  Mr.

10   Iacopino, redirect.

11             MR. IACOPINO:  Thank you, your Honor.  Your

12   Honor, may I just approach the witness with Exhibit 5p

13   which was introduced during cross-examination?

14             THE COURT:  Of course.

15             MR. IACOPINO:  I'm sorry, your Honor.  I

16   should have grabbed it before.

17             THE COURT:  Take your time.

18                    REDIRECT EXAMINATION

19   BY MR. IACOPINO:

20        Q.   Mr. Brown, I'm going to show you what was

21   marked during your cross-examination as Exhibit 5p,

22   okay?  And the exhibit that was presented to you by the

23   government has one, two, three, four pages.  Would you

24   just take a quick look at those four pages, and tell me

25   if pages three and four are simply another list of the

23

1    same guns that are contained on page one and two?

2         A.    That's correct; they are just redundancies.

3    Those pages are the same as page one.   Page four is the

4    same as page one.

5         Q.    So anybody who reviews this exhibit should

6    understand that if -- they can't just count all the way

7    through the four pages and determine a number of weapons

8    from that.

9         A.    Oh, of course not.   That's how the U.S.

10   Attorney's Office operates.

11        Q.    Mr. Brown, towards the end of your testimony

12   you were asked by Mr. Huftalen about comments that

13   you've made on various public radio shows.   Do you

14   recall that series of questions?

15        A.    Yes, sir.

16        Q.    And you told him that you did in fact make

17   such comments; correct?

18        A.    That's correct.

19        Q.    In fact on WFRB radio in an interview with a

20   gentleman by the name of Chris Fazio did you not tell

21   the public that shots were fired by the government on

22   June 7th and that changed the whole complexion of the

23   situation?

24             MR. HUFTALEN:   Objection.

25        A.    Correct.

1            THE COURT:  Just a second.

2            MR. HUFTALEN:  Objection.

3            THE COURT:  Basis?

4            MR. HUFTALEN:  Hearsay.

5            MR. IACOPINO:  Government's opened the door.

6            THE COURT:  You're allowed.

7       Q.   Did you tell the public that?  That on

8  June 7th shots were fired by the government and that

9  changed the whole complexion of the situation?

10      A.   That is correct.

11      Q.   Did you also make a statement to the public on

12 the radio that the police had decided that they were

13 going to kill Ed and Elaine for a few bucks even though

14 Ed indicated that he would pay if the government would

15 show him the law that required him to pay it?

16      A.   That's correct.

17           MR. HUFTALEN:  Objection.

18           THE COURT:  Just a second.  Objection is

19 sustained.  Jury will disregard his answer.

20      Q.   Did you tell the public in a radio interview

21 of Mr. Fazio that there was no crisis situation at the

22 Brown residence prior to June 7th, but that the

23 government was trying to incite the crisis situation by

24 its actions on June 7th, but it didn't work and it

25 wouldn't work?

1        A.    That's right.

2              MR. HUFTALEN:  Objection, hearsay, move to

3    strike.

4              THE COURT:  Sustained.  The jury will

5    disregard.

6              MR. IACOPINO:  Your Honor, may I approach on

7    this?

8              THE COURT:  No.  Move on.

9              THE WITNESS:  Good job.

10             THE COURT:  Hold it.  Mr. Brown, out of the

11   courtroom.  Take him out.

12             THE WITNESS:  You'd do well for a prosecutor,

13   Judge.  You'd do well.

14             THE COURT:  The jury.

15             (Jury left courtroom.)

16                      BEFORE THE COURT

17             THE COURT:  The record will reflect that after

18   I sustained the last objection, Mr. Brown talked to the

19   Court, smirked, and muttered "good job" to the Court.

20   This is one of multiple times Mr. Brown has been

21   contemptuous, and I've warned him.  He is to remain out

22   of the court until he can behave himself.  We're going

23   to take a five-minute recess.  Mr. Iacopino, talk to

24   your client.  Tell him he's free to reenter the court

25   when he's able to behave, follow the court orders, and

1  not be contemptuous to the Court.  We'll take a

2  five-minute recess.

3           (Brief recess taken.)

4                       BEFORE THE COURT

5           THE COURT:  Mr. Iacopino, your client I see is

6  not present.

7           MR. IACOPINO:  No, he's not, your Honor, but

8  that's only because I -- when the court staff asked me,

9  I said I'd rather address you.  I have spoken to my

10  client.  The last thing that he indicated to me before I

11  left was that he would try to follow your instructions,

12  and so I didn't know if that was going to satisfy the

13  Court or not; so that's why I came out to report that to

14  the Court.

15           THE COURT:  Mr. Lange, do you have a position?

16           MR. LANGE:  No, your Honor.

17           THE COURT:  Government?

18           MR. HUFTALEN:  If he behaves himself, I think

19  he should be in the courtroom.

20           THE COURT:  Bring Mr. Brown in, put him back

21  on the stand, please.  We'll give it one more try.

22           (Mr. Brown resumed the stand.)

23           THE COURT:  Ready for the jury?

24           MR. HUFTALEN:  Yes.

25           THE COURT:  Bring in the jury, please.

```
 1                        BEFORE THE JURY

 2            THE COURT:  Mr. Iacopino?

 3            MR. IACOPINO:  Thank you, your Honor.

 4       Q.   BY MR. IACOPINO:  Mr. Brown, did you give an

 5   interview on June 8, 2007, to Republic Broadcasting

 6   Network?

 7            MR. HUFTALEN:  Objection.  May we approach?

 8            THE COURT:  Yes.

 9                        AT SIDE BAR

10            MR. HUFTALEN:  I object to the continuing line

11   of questions that Mr. Iacopino knows are going to draw

12   hearsay objections and I believe may be designed to make

13   the government look like the obstructionist in this

14   trial.  To the extent he's eliciting hearsay statements

15   which are statements made by Mr. Brown, they are

16   self-serving, they are hearsay, and I don't believe

17   there's any legitimate hearsay exception upon which a

18   basis of admissibility could be made.

19            THE COURT:  What's the expected response?

20            MR. IACOPINO:  Your Honor, the expected

21   response is on that date he did give such a statement

22   and that he specifically told people not to come to New

23   Hampshire and that he did not want people coming up to

24   the residence.  This is a day after Danny Riley was

25   tasered at the home, and I believe that the government
```

1    in their cross-examination has opened the door to every

2    public statement that my client's made because they have

3    picked and they have chosen amongst many to put in front

4    of this jury, and we have the right to show that my

5    client was not out there continuously making these

6    public statements that he's left the jury with the

7    impression that they have made.

8            And they started this with the indictment,

9    your Honor.  The indictment contained a number of overt

10   acts that asserted that various people were making

11   public statements.  Now, I understand that those have

12   been removed from the indictment at this point on my

13   motion, but the fact is that this is an issue that was

14   created by the government, and we have the right to make

15   sure that this jury understands that my client was not

16   out there continuously trying to rile people up or to

17   come up to New Hampshire or to cause violence or

18   trouble.

19           MR. LANGE:  I join.

20           THE COURT:  I'm not clear what exception to

21   the hearsay rule you are asserting here, either one of

22   you, Mr. Lange or Mr. Iacopino.

23           MR. LANGE:  Yes, your Honor.  It's the

24   doctrine of rule of completeness, once the government

25   opened the door by bringing in the defendant's

1    statements.

2              THE COURT:  That's Rule --

3              MR. LANGE:  104?

4              THE COURT:  It's 106, remainder of writings or

5    recorded statements.  Is that the one you are talking

6    about?

7              MR. LANGE:  Yes, your Honor.

8              THE COURT:  Is this part of a statement that

9    the government referred to or a separate statement?

10             MR. IACOPINO:  We don't know because the

11   defendant when he was questioned by the government

12   didn't know what dates he made various particular

13   statements, but the impression that's been left with

14   this jury, your Honor, from the cross-examination is

15   that my client had made -- was making such statements.

16   It also leaves the impression that my client acted

17   willfully, bringing a state of mind into state here,

18   your Honor, and I would respectfully submit that under

19   these circumstances, under both 803(3) and under the

20   catch-all provision, this is appropriate evidence to be

21   presented through his direct examination.

22             THE COURT:  As far as the catch-all provision,

23   I see no indicia of reliability on that statement at

24   all.  As far as Rule 106, if you can lay a foundation

25   that it was part of another statement, I will deal with

1    it.  Do you have another rule that you want to refer to?

2            MR. IACOPINO:  Not at this point, your Honor.

3            THE COURT:  All right.  That's out then.

4                        IN OPEN COURT

5        Q.   BY MR. IACOPINO:  Mr. Brown, I'm going to

6    change tracks for a moment, okay?  During your

7    cross-examination you were asked about the fact that at

8    some of the jamborees and the barbecue that was had at

9    your home, children were present.  Do you recall that

10   series of questions by Mr. Huftalen?

11       A.   Yes, I do.

12       Q.   At any point in time when visitors came on

13   your property, were there ever booby traps set out?

14       A.   No.  That's in itself -- of course not.

15       Q.   Were there ever any kind of explosives

16   available to anybody?

17       A.   No, sir.

18       Q.   Were guns left around for children to find?

19       A.   No, sir.

20       Q.   Was your property made safe for any children

21   and families that may come up?

22       A.   That's correct, sir.

23       Q.   He also asked you about those jamborees and

24   about aircraft.

25       A.   Yes, sir.

1     Q.   And at the second jamboree did aircraft come

2   over your home?

3     A.   Yes, sir.

4     Q.   Please explain to the jury what type of

5   aircraft and the conduct of that aircraft.

6     A.   It was a helicopter with two or three

7   personnel inside of it.  You could see them clearly

8   because they were just at treetop level.  They came in

9   at approximately -- I believe it was around one o'clock,

10   around there sometime, and they stayed for eight hours

11   and hovered and circled and circled and hovered just

12   above the tops of the trees.  We were concerned many

13   times throughout the day that if anything should happen,

14   if it crashes with the crowd that was down below.  We

15   asked them to retire.  They refused.  We called the

16   Lebanon Airport.  The same thing.  They said that they

17   could not --

18          THE COURT:  That's it.  Stop.  You are moving

19   into hearsay.  Move on, next question.

20     Q.   Is it fair to say that the aircraft bothered

21   you enough you tried to take action to stop it?

22     A.   Excuse me?

23     Q.   Is it fair to say that the aircraft was

24   bothersome enough that you tried to take action to stop

25   it by calling somebody with authority?

1          A.    That's correct.  They were like right here,

2    absolutely.

3          Q.    Thank you.  On June 7th, 2007, how did you

4    learn about the presence of armored cars and things of

5    that nature in the area of your home?

6          A.    After a distress fire as I testified earlier

7    standing out in front, within about three or four

8    minutes or so, a cellphone rang.  I picked it up.  The

9    caller simply said there was APC, armored personnel

10   carrier, heading south on 12A toward our home with three

11   state troopers in cruisers in the front and three state

12   troopers in the back, and they said they had seen one

13   earlier, probably about an hour prior to that, the same

14   kind of situation.

15         Q.    How did that make you feel?

16         A.    I panicked almost.  I decided they're coming

17   now.

18         Q.    What did you think the armored personnel

19   carrier and the various state trooper vehicles -- what

20   did you think their purpose was?

21         A.    I know what their purpose was.  Their purpose

22   is to assault.  That's what they do.  That's the only

23   reason they'd be in the area is to assault.

24         Q.    Assault who?

25         A.    Me.  Who else?  I was already in speculation

1   after what's already happened prior with the helicopter

2   circling over and everything else.  I knew.  It was

3   building, constantly building.  U.S. Attorney's Office

4   kept building them up.

5            THE COURT:  All right.  Ask another question.

6       Q.   Why did you pick up that 50-caliber on

7   June 7th?

8       A.   Defense.

9            THE COURT:  Ask another question.

10      Q.   Defense of what?

11      A.   Defense of my life and property, my wife.

12      Q.   After June 7, 2007, did you want people to

13  come up to your property?

14      A.   Not like they were before, no.

15           MR. IACOPINO:  Thank you.  I have no further

16  questions.

17           THE COURT:  Thank you, Mr. Iacopino.

18  Government, questions?

19           MR. HUFTALEN:  Very, very briefly, your Honor.

20           THE COURT:  Go ahead.

21                    RECROSS-EXAMINATION

22  BY MR. HUFTALEN:

23      Q.   The last question Mr. Iacopino asked you, I

24  think he said after June 7th you didn't want people to

25  come to your property.  Is that right?

34

```
 1        A.   Not as much, sir.

 2        Q.   But it was after June 7th that you had the

 3   jamboree and the barbecue and the parties; is that

 4   right?

 5        A.   That's correct.  I didn't set any of that up.

 6   They came on their own, sir.  After June 7th I was

 7   discouraging it.  They came in anyway from all over the

 8   country.

 9        Q.   Okay.  So the jamboree that was on your

10   property you didn't want to happen.  It was other people

11   that came and did it?

12        A.   That's correct.

13        Q.   And the barbecue in July, you didn't want that

14   to happen.  It was the other people who made you do

15   that?

16        A.   No, I didn't.  That's correct.

17             MR. HUFTALEN:  Okay.  Thank you.  Nothing

18   further.

19             THE COURT:  Mr. Lange, questions?

20             MR. LANGE:  No, thank you.

21             THE COURT:  Mr. Iacopino?

22             MR. IACOPINO:  Nothing further, your Honor.

23             THE COURT:  Thank you, Mr. Brown.  You may

24   step down.

25             (End of excerpt.)
```

1                    C E R T I F I C A T E

2

3          I, Diane M. Churas, do hereby certify that the

4    foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7
     Submitted:  8/4/09
8
                              /s/  Diane M. Churas  __
9                             DIANE M. CHURAS, LCR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25