**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/1/10

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  09-cr-30-01-02-GZS
            v.                  *  July 6, 2009
                                *  12:50 p.m.
EDWARD and ELAINE BROWN         *
                                *
* * * * * * * * * * * * * * * * *
```


DAY 5
AFTERNOON SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE GEORGE Z. SINGAL
AND A JURY


Appearances:

For the Government:   Arnold Huftalen, AUSA
                      Terry Ollila, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH 03301

For Edward Brown:     Michael J. Iacopino, Esq.
                      Kristin Clouser, Esq.
                      Brennan, Caron, Lenehan
                      & Iacopino
                      85 Brook Street
                      Manchester, NH  03104


For Elaine Brown:     Bjorn Lange, Asst. Fed. Defender
                      Federal Defender's office
                      22 Bridge Street
                      Concord, NH  03301

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                    I N D E X

2

3   Witness              Direct    Cross    Redirect    Recross

4   MICHAEL POWELL

5   By Mr. Huftalen                          11
    By Mr. Lange                    3                     13
6   By Mr. Iacopino                 7


7

    AARON MCINTIRE
8
    By Mr. Huftalen      15
9   By Mr. Iacopino                17


10

    DANIEL TANNER
11
    By Mr. Huftalen      18                   53
12  By Ms. Clouser               50


13

    CATHY SMITH
14
    By Ms. Ollila        54

15

16  JAMIE BERRY

17  By Ms. Ollila        63


18


19


20  Exhibit                                  ID        Evid.

21  Government's Exhibit No. 12                         28
    Government's Exhibit No. 12g                        29
22  Government's Exhibit No. 12d, 12e, 12f              30
    Government's Exhibit No. 12c                        38
23  Government's Exhibit No. 7a-1a                      43
    Government's Exhibit No. 20 and 21                  58
24  Government's Exhibit No. 1h                         71

25

3

1                          BEFORE THE COURT

2                  THE COURT:  Ready for the jury?

3                  MR. HUFTALEN:  Yes.

4                  THE COURT:  Bring in the jury.

5                          BEFORE THE JURY

6                  THE COURT:  Cross-examination, Mr. Lange.

7                  CROSS-EXAMINATION OF MICHAEL POWELL

8    BY MR. LANGE:

9         Q.   Good afternoon, sir.

10        A.   Good afternoon.

11        Q.   Your responsibilities with the Bureau of

12   Alcohol, Tobacco & Firearms is to determine whether

13   particular items meet the various federal definitions

14   under the gun control -- federal gun control law; right?

15        A.   That is correct.

16        Q.   The law draws a distinction, does it not,

17   between firearms and destructive devices?

18        A.   It does.

19        Q.   Simply because something is a firearm does not

20   mean it's a destructive device under the law; is that

21   correct?

22        A.   Correct.

23                 MR. LANGE:  May I approach?

24                 THE COURT:  You may.

25        Q.   BY MR. LANGE:  Sir, I have in my hand

1   Government's Exhibit 5m.  Sir, I show you 5m.  That is

2   not a grenade, is it?

3        A.   No, sir.

4        Q.   That is not a missile?

5        A.   No, sir.

6        Q.   That is not a rocket?

7        A.   No, sir.

8        Q.   That is not a mine?

9        A.   No, sir.

10        Q.   That is not a booby trap?

11        A.   No, sir.  Doesn't appear to be.

12        Q.   That is not a destructive device at least as

13   you see it there?

14        A.   Not as I see it here.

15        Q.   You were asked to determine the significance

16   of the various components that were brought down to you

17   from Plainfield; is that right?

18        A.   Yes, sir.

19        Q.   You were given -- they arrived in evidence

20   boxes or evidence bags, these various pipes and fittings

21   and so forth?

22        A.   Yes, sir.

23        Q.   And you were asked to draw some conclusions as

24   to whether or not they were firearms; is that right?

25        A.   Yes, sir, that's correct.

```
 1          Q.    In drawing those conclusions you applied all

 2    your expertise; correct?

 3          A.    Yes, sir.

 4          Q.    All of your knowledge?

 5          A.    Yes, sir.

 6          Q.    You didn't simply look at the items as they

 7    were given to you and say, oh, that's a firearm?

 8          A.    No, sir.

 9          Q.    You testified one of the items that you refer

10    to as booby traps with a shotgun round, a live round?

11          A.    Yes, sir.

12          Q.    And the effect of that was to thereafter

13    render the device inoperable without further replacement

14    parts; right?

15          A.    Correct.

16          Q.    The spring broke?

17          A.    Correct.

18          Q.    The individual components of those devices,

19    each of the individual components is legal; is that

20    correct?

21          A.    Each of the components themselves, yes, sir.

22          Q.    It's when they're assembled, as you testified

23    they were assembled, that they become firearms?

24          A.    If it can be shown, sir, that the combination

25    of those parts, if the intent is to assemble a
```

1    destructive device, the parts themselves can be

2    determined to be a destructive device or a firearm,

3    whichever it is.  If you take a gun and strip it down to

4    all its component parts, you still have a firearm.

5         Q.   But the average person looking at component

6    parts of those items would not know what you found out

7    by virtue of your experience and your testing in this

8    case; right?

9         A.   The average person probably would not, sir.

10        Q.   And the only other question I have is you're

11   probably very comfortable between -- going between the

12   English measuring system and the metric system?

13        A.   Somewhat.

14        Q.   37 millimeters would be approximately a little

15   less than one and a half inches; is that right?

16        A.   I'm not that familiar.  Give me a moment.

17             (Pause.)

18        A.   It would be more than an inch because -- I'm

19   just doing some math in my head, but -- I don't have it

20   memorized.

21        Q.   More than an inch, certainly well more than

22   half an inch?

23        A.   Yes, sir.

24             MR. LANGE:  Those are my questions.

25             THE COURT:  Mr. Iacopino, cross-examination.

1          MR. IACOPINO:  Yes, your Honor, thank you.

2                    CROSS-EXAMINATION

3    BY MR. IACOPINO:

4          Q.   Good afternoon, sir.

5          A.   Good afternoon.

6          Q.   Your Honor, can I ask that the government

7    bring up their Exhibit 6a.

8                    And while she's doing that, Agent Powell, you

9    received essentially three separate exhibits at your lab

10   in West Virginia; correct?

11         A.   Without referring to my report I can't be

12   sure.  It seems like there was actually four.

13         Q.   I stand corrected.  You received four actual

14   separately boxed exhibits that you received?

15         A.   Yes, sir.

16         Q.   And in photograph 6a -- your Honor, could I

17   ask you to have the government put that up on the

18   screen.

19                    That is one of the exhibits that you received;

20   correct?

21         A.   Yes, sir.  I have it labeled Exhibit 15.

22         Q.   Right.  And Exhibit 15 came to you in the form

23   in the upper left-hand photograph of Exhibit 6a?

24         A.   Yes, sir.

25         Q.   I note in the lower right-hand corner you have

1   a little label there --

2        A.   Yes.

3        Q.   -- saying that the cotter pin was from

4   Exhibit 17; correct?

5        A.   Correct.

6        Q.   So Exhibit 15 as it came to you was not

7   equipped with a cotter pin, was it?

8        A.   That's correct.

9        Q.   It was not equipped with a trip wire, was it?

10       A.   No, sir.

11       Q.   And it was not equipped with a shotgun shell?

12       A.   No, sir.

13       Q.   Your Honor, I would ask if you could have the

14   government bring up Exhibit 6a-1.

15            This is the second exhibit that you received

16   at your lab in West Virginia; correct, sir?

17       A.   Yes, sir.

18       Q.   And did you receive it in essentially the

19   condition displayed on the left-hand photograph?

20       A.   No, sir.

21       Q.   Those four things in the middle, the orange

22   tags on them, were they disassembled when you received

23   it?

24       A.   They were not assembled.

25       Q.   In fact, you assembled these; correct?

1        A.    That's correct.

2        Q.    What you received as the exhibit, 17, was a

3   whole bunch of stuff just in a basket or some kind of

4   box; correct?

5        A.    That's correct.

6        Q.    And in fact you went into that exhibit to get

7   that cotter pin to try to show how Exhibit 15 works;

8   correct?

9        A.    Correct.

10        Q.    Now I'd ask if the government, your Honor,

11   could bring up Exhibit 6a-2.

12            And this is the third exhibit that you

13   received in your lab in West Virginia; is that correct,

14   agent?

15        A.    Yes, sir.

16        Q.    Now, on the left-hand side of this exhibit

17   there are a number of these things with the orange

18   stickers on them.  By the way, did you put the orange

19   stickers on them?

20        A.    I did.

21        Q.    They didn't come to you that way?

22        A.    No, sir.

23        Q.    And that's the case, then, in the other

24   exhibits as well; correct?

25        A.    Correct.  All the orange stickers I applied.

1      Q.   Is that the way that this exhibit was

2  presented to you?

3      A.   I don't understand your question.

4      Q.   Well, did you assemble these ones?

5      A.   No, they were fully assembled.

6      Q.   None of them had cotter pins; correct?

7      A.   No, sir.

8      Q.   I'm not correct or they did not have cotter

9  pins?

10     A.   They did not have cotter pins.

11     Q.   And none of them had trip wires; correct?

12     A.   No, sir.

13     Q.   And none of them had shotgun shells; correct?

14     A.   No, sir.

15     Q.   And the court exhibit that you had -- that you

16  received, you entitled Exhibit 41; correct?

17     A.   Without my report I can't remember.

18     Q.   Do you have your report?

19     A.   I don't have it, sir.

20         MR. IACOPINO:  May I approach, your Honor?

21         THE COURT:  You may.

22     Q.   BY MR. IACOPINO:  And agent, I'm just going to

23  show you the last page of your report that references

24  Exhibit 41.  Does that refresh your recollection about

25  Exhibit 41?

1          A.   Yes, sir.

2          Q.   And in fact, Exhibit 41 was of no relevance or

3    value to you?

4          A.   I wouldn't say they were of no value.  I just

5    said they were not regulated under the National Firearms

6    Act or Gun Control Act.

7          Q.   Nothing subject to regulation; correct?

8          A.   Correct.

9               MR. IACOPINO:  Thank you, your Honor, I have

10   no further questions.

11              THE COURT:  Government?

12              MR. HUFTALEN:  Briefly.

13                      REDIRECT EXAMINATION

14   BY MR. HUFTALEN:

15         Q.   Mr. Powell, I had not asked you about

16   destructive devices but Mr. Lange did, so let me focus

17   there for a moment.

18              Under federal law can a firearm be classified

19   as a destructive device?

20         A.   Yes, sir.

21              MR. IACOPINO:  Objection.  Move to strike.

22   Calls for a legal conclusion.

23              THE COURT:  He opened it, Mr. Lange opened the

24   issue on cross.

25         Q.   How can a firearm be classified as a

1    destructive device?

2         A.   Well, the -- one of the criteria is a firearm

3    that has a barrel that exceeds one-half inch in bore

4    diameter.

5         Q.   The exhibits in 6d and 6b, the nine and the

6    one, what was your testimony about the bore diameter or

7    diameter of the barrel?

8         A.   They exceeded eight/tenths of an inch.

9         Q.   Mr. Lange showed you a Glock handgun which is

10   marked as 5m.

11             THE COURT:  You still have it -- Mr. Lange

12   still has it in the back.

13        Q.   Let me hand that to you.  Now, that's

14   certainly not a destructive device, is it?

15        A.   No, sir.

16        Q.   But in your professional opinion, is that a

17   firearm?

18        A.   Yes, sir, it is.

19        Q.   It's not a grenade, it's a firearm; right?

20        A.   Yes, sir.

21        Q.   You put a 9mm round in that gun and you point

22   it at somebody and you shoot, what happens?

23        A.   You could kill the individual.

24             MR. HUFTALEN:  Thank you.  Nothing further.

25             THE COURT:  Thank you.  Mr. Lange?

1

2                           RECROSS-EXAMINATION

3   BY MR. LANGE:

4        Q.   The barrel on that is less than half an inch;

5   is that right?

6        A.   That is correct.

7        Q.   And any firearm that has a barrel -- a

8   diameter of the barrel of half an inch or less would not

9   be a destructive device by virtue of the diameter of the

10  barrel; is that right?

11       A.   That's correct.

12       Q.   It's only when the barrel exceeds a half inch,

13  that together, the criteria of that being met, it may

14  become a destructive device?

15       A.   Yes, sir, it may become.

16            MR. LANGE:  Thank you.

17            THE COURT:  Mr. Iacopino?

18            MR. IACOPINO:  Nothing further.

19            THE COURT:  Government?

20            MR. HUFTALEN:  No, thank you.

21            THE COURT:  All right, thank you, you may step

22  down.

23            MR. HUFTALEN:  May the witness be excused.

24            THE COURT:  Without objection, you may be

25  excused.

14

```
 1              MR. HUFTALEN:  Aaron McIntire.

 2              MR. IACOPINO:  Your Honor, may we be seen at

 3    sidebar?

 4              THE COURT:  Of course.  Witness, come right up

 5    here and have a seat at the witness stand.

 6                        AT SIDEBAR

 7              MR. IACOPINO:  Your Honor, my understanding is

 8    that the government is calling this witness, he's from

 9    the Concord Fire Department, I don't believe that he was

10    involved at all out at the Brown residence.  It's my

11    understanding they are calling him to say that he has

12    never seen the gas on the air tank system that they have

13    here in a private home.  It's irrelevant.  It doesn't

14    make any difference whether he has had any personal

15    experience with anybody having it in their homes.  So I

16    would object to him being called as a witness.

17              THE COURT:  You people know more about this

18    than I do.

19              MR. HUFTALEN:  He will testify that the two

20    Scott air packs which are already in are devices used by

21    firefighters in adverse environments when it's harsh to

22    get out of a fire or a smoke or a chemical environment,

23    and yes, he will testify that in his multiple years on

24    the force, he's never seen one in a residence.

25              THE COURT:  I'm going to permit him to testify
```

1   as to what they are and how they are used, but I don't

2   think that his opinion of whether he's seen them in a

3   private home or not is admissible.

4           MR. HUFTALEN:  Okay.  That's all right,

5   thanks.

6                       BEFORE THE JURY

7           THE CLERK:  If the witness would please stand

8   and raise your right hand.

9                       AARON MCINTIRE

10      having been duly sworn, testified as follows:

11          THE CLERK:  Please be seated.  And for the

12  record, if you'd please state your name and spell your

13  name, and make sure you stay up close to the mic.  Thank

14  you.

15          THE WITNESS:  My name is Aaron McIntire,

16  A-a-r-o-n M-c-I-n-t-i-r-e.

17          THE COURT:  Government.

18          MR. HUFTALEN:  Thank you.

19                     DIRECT EXAMINATION

20  BY MR. HUFTALEN:

21      Q.  Could you please introduce yourself to the

22  members of the jury, and by that I mean tell them who

23  you are, where you work, and how long you've been doing

24  what it is you do?

25      A.  As I mentioned, my name is Aaron McIntire.

1    I'm battalion chief of the Concord Fire Department here

2    in Concord, New Hampshire.  I've been with the

3    organization for 10 years.  I've been in the fire

4    service roughly 15 years.

5         Q.   Sir, I'm going to show you what's marked and

6    has been received as a full exhibit identified as

7    Government Exhibit 31b as in boy.  Could you take that

8    and take a look at it for me, please.

9         A.   (Witness examining exhibit.)

10        Q.   Have you had a chance to look at it?

11        A.   Yes.

12        Q.   Let me hold this one up and represent to you

13   that this is Government's Exhibit 31a.  Other than some

14   minor modifications or changes, are these virtually

15   identical units?

16        A.   Correct.

17        Q.   What are they?

18        A.   They're known as SCBA's, self-contained

19   breathing apparatus.

20        Q.   Okay.  I'll take that off your lap.

21        A.   Generally for firefighting purposes to allow

22   us to enter into what is defined as IDLH atmosphere,

23   immediately dangerous to life or health atmosphere,

24   generally found within fire departments to allow us to

25   do our work or in commercial industries where --

1          THE COURT:  Sorry, wait for another question.

2   Go ahead.

3          Q.   These are used by fire departments?

4          A.   Yes.

5          Q.   In hazardous environments?

6          A.   Correct.

7          Q.   Can you tell us approximately how much one of

8   these things costs?

9          A.   New, anywhere from $3,000.

10         MR. HUFTALEN:  Thank you.  No further

11  questions.

12         THE COURT:  Thank you.  Mr. Lange?

13         MR. LANGE:  No, thank you.

14         THE COURT:  Mr. Iacopino?

15                   CROSS-EXAMINATION

16  BY MR. IACOPINO:

17         Q.   Neither one of those tanks is a weapon, is it?

18         A.   No.

19         MR. HUFTALEN:  Nothing further.  Thank you.

20         THE COURT:  Thank you.  You may step down.

21         MR. HUFTALEN:  Daniel Tanner, your Honor.

22         THE CLERK:  Please raise your right hand.

23                   DANIEL TANNER

24  having been duly sworn, testified as follows:

25         THE CLERK:  Please be seated.  For the record,

1    if you'd please state your name and spell your name.

2              THE WITNESS:  Daniel J. Tanner, T-a-n-n-er.

3              THE COURT:  You may proceed, Mr. Huftalen.

4              MR. HUFTALEN:  Thank you, your Honor.

5                        DIRECT EXAMINATION

6    BY MR. HUFTALEN:

7         Q.   Mr. Tanner, would you please tell the members

8    of the jury what type of business you're involved in and

9    where you work?

10        A.   I work in Pleasant Hill, Oregon.  I own

11   Tannerite Explosives.  And we manufacture explosives,

12   fireworks, pyrotechnics, exploding targets.

13        Q.   Do you manufacture a binary explosive compound

14   known as Tannerite?

15        A.   Yes, I do.

16        Q.   Without disclosing any trade secrets, what is

17   it?

18        A.   It is a two-part explosive.  It's intended to

19   be shot with a rifle.  And upon mixing the two

20   components, it's a rifle bullet.

21        Q.   The two separate components are, would it be

22   fair to say, inert, as long as they are separate?

23        A.   Correct.

24        Q.   And can it be shipped through interstate

25   commerce on standard common carriers such as UPS, FedEx?

1     A.   Correct.

2     Q.   When you mix the two together, what changes?

3     A.   It becomes a high explosive.

4     Q.   And how is it that your product is intended to

5  be used?

6     A.   As a shock indicator.

7     Q.   Give us an example if you.  I'm not sure we

8  understand what a shot indicator is.

9     A.   For long range shooting, 3, 400 yards, you can

10  shoot it from a distance and see a visual, that you hit

11  your target.

12     Q.   How do you ship your product, how is it

13  packaged?

14     A.   Packaged in a 32 crush weight box.  Has ORM-D.

15  That's Other Regulated Material - Domestic.

16     Q.   Dena, could you please pull up 7f-1.  Mr.

17  Tanner, I would like to direct your attention to the

18  screen on your left.  Do you recognize what's depicted

19  in the middle of that picture there, in the middle of

20  that paragraph, Mr. Tanner?

21     A.   Yes, sir.

22     Q.   What do you see it to be?

23     A.   Looks like a half pound exploding target in a

24  bag nailed to a tree.

25     Q.   Now, it appears to have something that's

1   orange on it.  What is that?

2       A.   That appears to be the label that I have on

3   the targets.

4       Q.   Dena, could you pull up 7g-1, please.  What do

5   you see in that photograph, Mr. Tanner?

6       A.   That appears to be an exploding target.  Looks

7   like a half-pounder nailed to a structure of some sort.

8       Q.   Now if you look closely at that you can see

9   Tannerite on the top of that orange label; right?

10      A.   Correct.

11      Q.   Is that a tradename for that product?

12      A.   Yes, sir.

13      Q.   There's a circle with a cross in the middle of

14  it.  What's that for?

15      A.   That is the indicator, that's what you're

16  supposed to aim for, the cross hairs.

17      Q.   Now, you see how that's mounted?

18      A.   Yes, I do.

19      Q.   What's it in?

20      A.   Excuse me?

21      Q.   It's in a plastic bag; right?

22      A.   Right.

23      Q.   And how is the plastic bag mounted to whatever

24  that surface is that it's mounted to?

25      A.   Looks like two nails.

1      Q.   Is that how you recommend mounting targets to

2  be shot?

3      A.   I haven't recommended that, no.

4      Q.   Dena, could you pull up 7h-1, please.  What do

5  you see in that photograph, Mr. Tanner?

6      A.   Looks like an exploding target, probably half-

7  pound attached somehow to a tree.

8      Q.   Dena, 7i-1, please.  What do you see in that

9  photograph?

10      A.   A half-pound target attached somehow to a

11  tree.

12      Q.   Somehow.  Can you see how it's attached by

13  looking closely at it?

14      A.   Yes, I do.  With some nails.

15      Q.   Also in a Ziploc bag?

16      A.   Correct.

17      Q.   Have each of what we've looked at been in a

18  clear plastic bag that looks like a Ziploc bag?

19      A.   Yes.

20      Q.   Dena, 7j-1, please.  What are we looking at,

21  Mr. Tanner?

22      A.   An exploding target nailed to the tree in a

23  Ziploc bag.

24      Q.   7k-1, please, Dena.  What are we looking at

25  here?

1          A.    An exploding target nailed to a tree in a

2    Ziploc bag.

3          Q.    Dena, 7d-1.  What do we see in 7d-1, Mr.

4    Tanner?

5          A.    An exploding target nailed to a tree in a

6    Ziploc bag.

7          Q.    Now, all of these pictures you've looked at so

8    far, the material inside the plastic container looks to

9    be dark gray?

10          A.    Correct.

11          Q.    Is that the color that you expect your product

12    to take on when the two components are mixed?

13          A.    After they are mixed, correct.

14          Q.    Before they're mixed what color is your

15    product?

16          A.    It's white.

17          Q.    Dena, could you please pull up 7c-1.  What are

18    we looking at there behind that pine bough?

19          A.    Behind the pine bough?

20          Q.    What's in the middle of the picture that's

21    orange?

22          A.    Exploding target in a Ziploc bag.

23          Q.    Is it Tannerite?

24          A.    It appears to be.

25          Q.    All right.  Dena, could you pull up 7a-2,

1   please.  Now, Mr. Tanner, what are we looking at in

2   7a-2?

3       A.   It looks like -- I have to take careful

4   counting of it, but --

5       Q.   I don't need you to count the bottles.  Just

6   tell us what the product is that you see in the

7   photograph?

8       A.   Right.  Tannerite exploding targets in mixed

9   form.

10       Q.   Now, some of the containers look like the ones

11   we've just looked at and some of them are tall and

12   skinny.  What's the difference between those containers?

13       A.   The -- we were in the process of changing the

14   containers to facilitate easier mixing.

15       Q.   In the process of changing.  When did you

16   change those, is that the summer of '07?

17       A.   Approximately, yes, sir.

18       Q.   Mr. Tanner, I'm going to show you what's

19   marked -- well, it's up here as Government Exhibit 7a-4

20   and 7a-3 and ask if you recognize those?

21       A.   Yes, sir, they appear --

22       Q.   Well, just do you recognize them?

23       A.   Yes, sir.

24       Q.   And what do they appear to be to you?

25       A.   Some broken down boxes that were shipped to

24

1    Mr. Daniel Riley from Tannerite.

2         Q.   From you; right?

3         A.   Right.

4         Q.   Can you tell us where they were shipped to

5    based on a view of those boxes?

6         A.   Cohoes, New York.  I'm not sure --

7         Q.   No, just -- I didn't mean to interrupt.  I

8    just want you to answer the questions that are posed.

9         A.   Okay.

10        Q.   Now, is your business a big business or is it

11   fairly small?

12        A.   I don't have any employees.  I have three

13   contract workers.

14        Q.   All right.  Do you do most of the

15   record-keeping yourself?

16        A.   I did.  I have an assistant now.

17        Q.   In June of 2007 did you handle orders over the

18   telephone yourself?

19        A.   Correct.

20        Q.   Do you have a recollection or a memory as you

21   sit here today of talking over the phone with an

22   individual named Daniel or Danny Riley?

23        A.   Yes, I do.

24        Q.   And tell us what the substance of that

25   conversation was?

```
 1              MS. CLOUSER:  Objection.  Hearsay.
 2              MR. HUFTALEN:  801(b)(2).
 3              THE COURT:  Let me see counsel.
 4                          AT SIDEBAR
 5              THE COURT:  Riley talked to him?
 6              MR. HUFTALEN:  About purchasing Tannerite.
 7              THE COURT:  Riley said?
 8              MR. HUFTALEN:  Riley said I want to buy
 9    Tannerite.
10              THE COURT:  Okay, now, is that hearsay?
11              MS. CLOUSER:  Yes.
12              THE COURT:  Why is that hearsay?  Whether he
13    really wanted to buy it or not, this fellow was going to
14    ship it.  Who cared whether Riley believed that he
15    wanted to buy it, was fooling whether he wanted to buy
16    it, or the truth of whether he wanted to buy it.  This
17    is like I go into a store and say I want a pencil.  They
18    give me a pencil.  I may be lying.  I don't have to --
19    it isn't for the truth.
20              MS. CLOUSER:  Well, it's my understanding that
21    Riley had additional conversations regarding where he
22    was at the time he was ordering Tannerite.
23              THE COURT:  Okay, we haven't gotten up to
24    that.  How about the part we're talking about now.  Are
25    you objecting to that?
```

 1          MS. CLOUSER:  No.

 2          THE COURT:  All right, let's move on to the

 3  next statement.  Is there another statement?

 4          MR. HUFTALEN:  Yeah, there are some e-mails as

 5  well as a telephone conversation between Mr. Riley and

 6  Mr. Tanner talking about purchasing the Tannerite which

 7  was later recovered at the Brown property.

 8          THE COURT:  Why isn't this a co-conspirator

 9  statement pursuant to in furtherance of the conspiracy?

10          MR. LANGE:  I think some of it may be, your

11  Honor, from Elaine Brown's perspective.  My objection

12  would go toward what I think they're also going to seek

13  to offer which is that Riley's identifying himself as a

14  supporter of the Browns and indicating that the Browns

15  are tax protesters and so forth.  That I don't think

16  furthers the conspiracy.

17          THE COURT:  Is there anything like that in

18  there?

19          MS. CLOUSER:  I would join that objection.

20          MR. HUFTALEN:  With respect to the e-mails,

21  no.  There was a telephone conversation during which Mr.

22  Riley spoke to Mr. Tanner and said I am at the Brown

23  property.  Mr. Tanner then asked -- or Mr. Riley said

24  would you like to speak with him.  Mr. Tanner then spoke

25  to Mr. Brown.  We do not intend to elicit statements

1    made by Mr. Brown during that conversation, nor do we

2    intend to elicit statements that Mr. Riley was a

3    supporter.  We're steering clear of that.

4              THE COURT:  Okay.  Sounds fine, then.

5                        BEFORE THE JURY

6              THE COURT:  You may proceed.

7              MR. HUFTALEN:  Thank you.

8         Q.   BY MR. HUFTALEN:  Mr. Tanner, I'm going to

9    hand you what's marked for identification as

10   Government's Exhibit 12.  Without disclosing the

11   contents of it, would you please take a look at it and

12   then tell me if you recognize it?

13        A.   Yes, sir.

14        Q.   Again, without disclosing the contents, what

15   is it?

16        A.   It is my record-keeping.  A page from my

17   record logs.

18        Q.   A record log.  That's a log of orders you

19   received?

20        A.   Correct.

21        Q.   Now, is that document a record that you kept

22   as part of your regularly kept records in your business?

23        A.   Correct.

24        Q.   And was it your regular practice at that time

25   to keep those records?

1      A.   Yes, it was.

2      Q.   And does that reflect a purchase of Tannerite

3   by Mr. Riley?

4      A.   Yes, it does.

5           MR. HUFTALEN:  Your Honor, the government

6   offers 12.

7           THE COURT:  Without objection.

8           (Government's Exhibit 12 admitted.)

9      Q.   BY MR. HUFTALEN:  Dena, could you please pull

10  up Government Exhibit 12.

11          Now, Mr. Tanner, I'd like you to look at the

12  monitor on your left.  The second entry from the bottom,

13  can you tell us what that says?

14     A.   Dan Riley, 62 Younglove Avenue, 12047.

15     Q.   Then does it have a phone number?

16     A.   Yes.  518-470-7443.

17     Q.   Now way over in the far right-hand margin

18  there appears to be a dollar sign and some numbers.  Is

19  that a dollar sign?

20     A.   Yes, it is, sir.

21     Q.   What does it say?

22     A.   $397.

23     Q.   397 or 379?

24     A.   I'm sorry, 379.

25     Q.   And what does that mean, 379?

1          A.   That's the price for five cases of targets at

2     the time.

3          Q.   Let me hand you what is marked as Government

4     Exhibit 12g.  Can you tell me what that is again without

5     disclosing the contents?

6          A.   A money order.

7          Q.   I'm sorry, a money order?

8          A.   Or cashier's check -- yes, it's a money order.

9          Q.   Is that a copy of the money order that you

10    received from someone in payment of Tannerite?

11         A.   Yes, sir.

12         Q.   From whom?

13         A.   From Dan Riley.

14         Q.   For the order you just testified about?

15         A.   Yes, sir.

16              MR. HUFTALEN:  Your Honor, I move Government

17    Exhibit 12g.

18              THE COURT:  No objection?  It's entered.

19              (Government's Exhibit 12g admitted.)

20         Q.   BY MR. HUFTALEN:  Now I'm handing you what's

21    marked as Government's Exhibit 12d, 12e and 12f.  Could

22    you take a look at those three, and again, without

23    disclosing the content, do you recognize them?

24         A.   Those are --

25         Q.   Well, just do you recognize them?

1       A.   Yes, sir.

2       Q.   What do you recognize them to be?

3       A.   To be shipping labels.

4       Q.   From whom?

5       A.   From Tannerite Company.

6       Q.   To whom?

7       A.   To Mr. Dan Riley.

8       Q.   Is that again relating to the order that

9  you've already testified about?

10      A.   Yes, sir.

11           MR. HUFTALEN:  Your Honor, the government

12  offers 12d, 12e and 12f.

13           THE COURT:  If there's no objection, they are

14  admitted.

15           (Government's Exhibits 12d, 12e and

16           12f admitted.)

17      Q.   BY MR. HUFTALEN:  Now, these are UPS ground

18  shipping labels; right?

19      A.   Correct.

20      Q.   Did you communicate with Mr. Riley about this

21  order through e-mail?

22      A.   I received an e-mail after shipping --

23      Q.   Hang on, before you go on.  Just answer this

24  question.  Did you communicate with Daniel Riley by

25  e-mail about this order?

1          A.    He was the one called in the order.

2          Q.    Okay, I understand he called in, you spoke to

3     him on the phone.

4          A.    Right.

5          Q.    After you spoke to him on the phone, did you

6     have any communications with Dan Riley by e-mail?

7          A.    Yes.

8          Q.    Let me hand you what is marked as Government's

9     Exhibit 12a for identification and ask if you recognize

10    it?

11         A.    Yes.

12         Q.    Without disclosing any content, what is it?

13         A.    It's an e-mail that I didn't understand who it

14    was from at the time.

15         Q.    When you received it, there was nothing in it

16    that helped you understand who it was from?

17         A.    No.  Well, it said Dan Riley in the subject

18    line.

19         Q.    It said Dan Riley in the subject line?

20         A.    Right.

21         Q.    Did it appear that it came from an e-mail

22    address attributable to Dan Riley?

23         A.    I don't recognize that, no, sir.

24         Q.    Did it come from an e-mail address that

25    appeared to be Daniel Riley?

1       A.   No.

2       Q.   Okay.  Let me hand you what's marked as 12b

3   and ask you to take a look at that and tell me whether

4   you've ever seen it before?

5       A.   Yes, I have.

6       Q.   What is it?

7       A.   It is an e-mail regarding asking for a

8   tracking number.

9       Q.   And what's in the subject line of that e-mail?

10      A.   Dan Riley.

11      Q.   It says Dan Riley NY; right?

12      A.   Correct.

13      Q.   Did you understand from the e-mail address

14   that appeared in the from line who was sending that to

15   you?

16      A.   No, sir.

17      Q.   It didn't say Dan Riley at such and such;

18   right?

19      A.   No.

20      Q.   Nor did Government Exhibit 12a; right?

21      A.   No.

22      Q.   No, it didn't?

23      A.   No.

24      Q.   Okay.  So at that point you were a little bit

25   befuddled, would it be clear to say, about who was

33

1   sending these to you?

2        A.   Yes, sir.

3        Q.   Let me hand you what's marked as Government's

4   Exhibit 12c and ask you to take a look at that.  Do you

5   recognize it?

6        A.   Yes, sir.

7        Q.   What is it?

8        A.   It's an e-mail from Dan Riley.

9        Q.   From Dan Riley to who?

10       A.   To me.

11       Q.   Now, all three of those exhibits, 12c, 12b and

12   12a, those are e-mails that you produced for this case;

13   right?

14       A.   Correct.

15       Q.   When you got the third e-mail, 12c, did you

16   have a better understanding of who was sending 12c, 12b

17   and 12a?

18       A.   I suppose so, sir.

19       Q.   You suppose so, or yes, you did?

20       A.   The -- well, it said the track number.  I

21   don't know what computer it came from or who it came

22   from.

23       Q.   12c, read it to yourself, please.

24       A.   Yes.  Dan --

25       Q.   No, no, no, no.  Read it to yourself.

34

```
 1        A.   Oh, I'm sorry.

 2             (Witness reading document.)

 3        A.   Yes, sir.

 4        Q.   Have you read it to yourself?

 5        A.   Yes.

 6        Q.   Now, after you received this e-mail, 12c, did

 7   you have a better understanding, based on the content as

 8   you read it, of who had sent you 12c, 12b and 12a?

 9        A.   Yes, sir.

10        Q.   And did you have a conversation on the phone

11   with Dan Riley?

12        A.   I was called by him, yes.

13        Q.   And during the conversation with Dan Riley did

14   you better understand who had sent you these three

15   e-mails?

16        A.   Yes, sir.

17        Q.   Who sent you these three e-mails?

18        A.   Dan Riley.

19        Q.   Did he tell you why his e-mail address didn't

20   appear on these?

21             MS. CLOUSER:  Objection.

22             MR. LANGE:  Objection.

23             THE COURT:  Basis?

24             MS. CLOUSER:  Hearsay.

25             THE COURT:  Overruled.
```

1       Q.   Did he tell you why his e-mail address didn't

2   appear on these e-mails?

3       A.   No, sir.

4       Q.   Let me hand you 12c again and ask you to read

5   it to yourself one more time.

6       A.   Okay.

7            (Witness reading exhibit.)

8       A.   Okay, sir.

9       Q.   Did Dan Riley say anything to you in the

10  telephone conversation or in this e-mail that helped you

11  understand why it didn't have Dan Riley's e-mail address

12  on the e-mails 12a, 12b and 12c?

13      A.   I -- I'm not sure what to say, sir.

14      Q.   Okay.  I apologize, it's got to be me.  Read

15  the first sentence to yourself.

16      A.   Okay.

17      Q.   Starting here.  Don't read it out loud.

18      A.   Oh, okay.

19      Q.   Pay particular attention to these words here.

20  This one, this one, this one and this one and this one

21  and this one and this one.

22      A.   All right, I couldn't read this here, I'm

23  sorry.

24      Q.   Oh, I'm sorry, do you need glasses?

25      A.   No, I don't.

1          Q.   Okay, have you had an opportunity to clearly

2     read that now?

3          A.   Yes.

4          Q.   Now, who sent you these e-mails?

5          A.   Yes, Mr. Riley.

6          Q.   Why doesn't his e-mail address appear on them?

7               MR. LANGE:  Objection.

8          Q.   Did he tell you why his e-mail doesn't --

9               MR. LANGE:  Objection.

10         Q.   I'm sorry.

11              MR. LANGE:  This witness is speaking of

12    personal knowledge.  The government is trying to slide

13    the e-mail into evidence.

14              THE COURT:  Overruled.  Go ahead.

15         A.   He was using a different computer.

16         Q.   Did he tell you where he was when he was

17    sending this e-mail 12c?

18              MR. LANGE:  Objection.

19              MS. CLOUSER:  Objection.

20              THE COURT:  Overruled.

21         A.   Yes.

22         Q.   Where was he?

23         A.   At Mr. Brown's location.

24              MR. HUFTALEN:  I offer 12a, 12b, 12c.

25              MR. LANGE:  Can we have a sidebar on this?

1           THE COURT:  Of course.

2                       AT SIDEBAR

3           THE COURT:  Okay, now, Exhibit 12a, what is

4    it?  What is this e-mail?  I don't see anything in it

5    other than a bit of a rant on the bottom, but I don't

6    know the relevance of it.

7           MR. HUFTALEN:  I'm offering it to show that

8    Mr. Tanner had multiple e-mail communications with Mr.

9    Riley.

10          MR. LANGE:  That's already in evidence.

11          THE COURT:  How about b, 12b.

12          MR. HUFTALEN:  Likewise.

13          THE COURT:  Defendants object to 12a or 12b?

14          MR. LANGE:  I don't think it adds anything to

15   the government's case --

16          THE COURT:  You object?

17          MR. LANGE:  I object.

18          THE COURT:  Basis?

19          MR. LANGE:  It is an out of court statement

20   and I object on that ground.

21          MS. CLOUSER:  And it's already in evidence.

22          THE COURT:  It's already in evidence?

23          MS. CLOUSER:  The fact that there's multiple

24   communications with Dan Riley is already in evidence so

25   it's unnecessarily duplicative.

```
 1              THE COURT:  I don't think 12 -- thank you --
 2   12a or 12b add anything here.  He's already testified
 3   that he's had communications with them.
 4              12c.  Is anyone objecting to this?
 5              MR. LANGE:  I don't object.
 6              THE COURT:  No one objects.  There you go.
 7   Okay.  Good.  12c is in without objection.  12a and b
 8   are out.
 9              MR. HUFTALEN:  Thank you.
10                      BEFORE THE JURY
11              THE COURT:  12c without objection.
12              (Government's Exhibit 12c admitted.)
13      Q.  BY MR. HUFTALEN:  Mr. Tanner, I'm handing you
14   now what's in, 12c.  The first line of that, let me read
15   it to you.  Dan -- is that to you?
16      A.  Yes, sir.
17              THE COURT:  Keep your voice up, Mr. Tanner.
18      A.  Yes, sir.
19      Q.  Dan, I was staying at the Browns at the time
20   so I used Reno's e-mail to contact you.  Right?
21      A.  Right.
22      Q.  Would that explain who sent 12a and 12b?  Does
23   that help you understand --
24      A.  I don't know Reno.
25      Q.  And then Mr. Riley goes on and says a couple
```

1    of other things to you; right?

2         A.   Correct.

3         Q.   Later in the e-mail it says if you haven't

4    shipped it, don't exclamation point exclamation point.

5    Did you know what he was talking about?

6         A.   At that point, no, as to why.

7         Q.   Okay, let's read the whole thing.  The

8    sentence before that says, the feds knew I was waiting

9    on an item that was coming in what, and it looks like an

10   exclamation point or I, they just asked me and I told

11   them Tannerite period.  If you haven't shipped it, don't

12   exclamation point.

13        Now, having heard the sentence before it, what

14   did you understand if you haven't shipped it, don't, was

15   referring to?

16        A.   Don't ship the shipment.

17        Q.   Of Tannerite; right?

18        A.   Correct.

19        Q.   Thank you.  You had already shipped it; right?

20        A.   Correct.

21        Q.   Mr. Tanner, let me ask you this.  If you take

22   a half-pound container of your mixed exploding binary

23   explosive compound and you shoot at it with a

24   high-powered rifle from 20 feet away, what's going to

25   happen?

40

```
 1         A.    It's going to explode when you hit it.

 2         Q.    And what's going to happen to it?

 3         A.    It's going to detonate.  It's called a high

 4    order explosive.

 5         Q.    Would there be a concussive force that

 6    emanates from it?

 7         A.    Yes, sir.

 8         Q.    Will the plastic cap that's on top fragment

 9    and become projectiles?

10         A.    Yes, sir.

11         Q.    If it's nailed to a tree with ten penny nails

12    or big nails, what's going to happen to those nails?

13               MR. LANGE:  Objection.

14               THE COURT:  Basis?

15               MR. LANGE:  Foundation.

16               THE COURT:  Lay a foundation.  Lay a

17    foundation that he knows what happens when --

18         Q.    Do you know what happens when Tannerite

19    explodes?

20         A.    Yes, sir.

21         Q.    Tell us what happens when a half-pound

22    container of Tannerite explodes?

23         A.    When it detonates the molecular break down,

24    the molecules separate and break the sound barrier and

25    produces an audible bang.
```

41

1          Q.    And does it create a concussive force outward

2    from the point of impact?

3          A.    Yes, sir.

4          Q.    And have you seen it distribute material that

5    was part of the container outward in that concussive

6    force?

7          A.    Yes, sir.

8          Q.    And have you seen it distribute other material

9    that was next to it in that concussive force?

10         A.    Yes, sir.

11         Q.    Now let me ask you, if you take a half-pound

12   can or plastic container, put it in a Ziploc bag and

13   nail it to the tree with two large nails, in your

14   professional opinion, being the owner of binary or

15   Tannerite, can you tell us what's going to happen to

16   those two nails?

17         A.    They are going to take flight.

18         Q.    At supersonic speed perhaps?

19               MR. LANGE:  Objection, leading.

20               THE COURT:  That's leading.

21         Q.    How fast will they go?

22               MR. LANGE:  If he knows.

23               THE COURT:  If you know.

24         A.    Fast.

25         Q.    What was the answer, fast?

1        A.    Fast.

2        Q.    Okay.  Good.  What about the tree bark that's

3   right behind it.  What's going to happen to the tree

4   bark?

5        A.    It's going to be blown off the tree.

6        Q.    Now, you saw a picture of one that was mounted

7   on what appeared to be gray wood, 7g-1.  Could you bring

8   that up, Dena.  As that is positioned right now, do you

9   see nails at the top of it?

10        A.    Yes, sir.

11        Q.    If you were to fire a high-powered rifle and

12   cause that to detonate, in your opinion, what would

13   happen to those nails?

14        A.    They would take flight, sir.

15        Q.    And what would happen to the wood that the

16   nails are in?

17        A.    It would blow up.

18        Q.    And go fly away fast as you say; right?

19        A.    Correct.

20        Q.    Would you want to be within 20 feet of that

21   when someone detonates it?

22              MR. LANGE:  Objection.

23              THE COURT:  Sustained.

24        A.    No, sir.

25              THE COURT:  Jury disregard.  Ask another

43

 1   question.

 2        Q.   When you sell this product, do you recommend

 3   to people get within a certain distance or stay a

 4   certain distance away from this product when it's going

 5   to detonate or explode?

 6        A.   Yes, sir.

 7        Q.   How far away do you tell people to be?

 8        A.   About a hundred yards.

 9        Q.   A hundred yards?

10        A.   Right.

11        Q.   Mr. Tanner, when you ship Tannerite, you ship

12   an instructional DVD along with it; right?

13        A.   Yes.

14        Q.   Yes?  Did you ship an instructional DVD along

15   with the Tannerite you sent to Dan Riley?

16        A.   Yes.

17             MR. HUFTALEN:  Your Honor, we have marked as

18   7a-1a, one of the instruction -- Tannerite instruction

19   videos.  I've spoken with opposing counsel about

20   offering it.  My understanding is there's no objection.

21             THE COURT:  All right, you're offering it?

22             MR. HUFTALEN:  Yes.

23             THE COURT:  No objection, it's admitted.

24             (Government's Exhibit 7a-1a

25             admitted.)

1          MR. HUFTALEN:  I'd like to play it.  I'm not

2    going to play the whole thing, it's 17 minutes long, but

3    I'd like to play it at this point and ask Mr. Tanner a

4    couple questions.

5          THE COURT:  No objection, you may proceed.

6    Just a second.  7a-1a is what you said?

7          MR. HUFTALEN:  7a hyphen 1a.

8          (Video being played.)

9     Q.   What did we just see?

10    A.   A charge of Tannerite being shot with a rifle.

11    Q.   Do you know how far away that is?

12    A.   That film taken -- yes and no.  I'm trying to

13    answer correctly.  I don't know exactly how far.  It was

14    like probably 80 yards.

15    Q.   That's fine.  Dena, please play.

16         (Video being played.)

17    Q.   Stop it right there.  How much Tannerite --

18    well, excuse me, what did we just see?

19    A.   A person shooting a charge at Tannerite

20    targets.

21    Q.   Do you know how much Tannerite we just saw

22    explode?

23    A.   A half a pound.

24    Q.   Play it, Dena.

25         (Video being playing.)

45

```
1        Q.   This is you; right?

2        A.   Ten years ago, yes.

3             (Video being played.)

4        Q.   Can you tell us what you're doing in the

5   video?

6        A.   Yeah, I'm explaining how to mix the targets.

7        Q.   So you take part A and you dump part B into

8   it?

9        A.   Yes, sir.

10       Q.   And then you shake it like that?

11       A.   Right.

12       Q.   To distribute part B?

13       A.   Right.

14            (Video being played.)

15       Q.   Other than what we saw you do, is there

16  anything you have to do to this product to make it ready

17  to be exploded by a bullet?

18       A.   No, sir.

19       Q.   Okay.  Dena play, please.

20            (Video being played.)

21       Q.   Is that you?

22       A.   Yes, sir.

23       Q.   What caliber is that rifle you're firing?

24       A.   556.

25            THE COURT:  What did you say?
```

46

```
1        A.   556.

2             THE COURT:  556.

3        A.   Yes, caliber.

4        Q.   Which means what?

5        A.   223.

6        Q.   A 223 round?

7        A.   (Nods head affirmatively.)

8        Q.   Please play.

9             (Video being played.)

10       Q.   Now, this shows a person mixing it in the

11  field; right?

12       A.   Correct.

13            (Video being played.)

14       Q.   Can you pause that.  The person is using a

15  plastic spoon to mix it; right?

16       A.   Yes.

17       Q.   I'm going to hand you what's marked as

18  Government's Exhibit 7b-2 which is a box that has a

19  number of items inside.  I'm going to hand one of them

20  to you and ask you to take a look and tell me what's in

21  that plastic bag.

22       A.   That's a mixing spoon, 5 cc.

23       Q.   What else?  There are two items in there.

24       A.   And there is a lid to the targets.

25       Q.   Lid to Tannerite?
```

47

1      A.   Yes, sir.

2      Q.   Do you send these spoons with the material you

3   ship?

4      A.   Yes, sir.

5      Q.   Dena, could you play that, please.

6           (Video being played.)

7      Q.   Would you pause that.  Now I'm going to hand

8   you another bag with the same Government's Exhibit 7b-2.

9   It has something yellow in that.  What's that?

10     A.   That is the funnel.

11     Q.   Do you ship funnels with the Tannerite as

12  well?

13     A.   I did, yes.

14     Q.   Like the funnel that's in the video right now?

15     A.   Correct.

16     Q.   Now why did you ship funnels before but you

17  don't know?

18     A.   It makes it easier to funnel into the small

19  neck bottles.

20     Q.   But you don't use the small neck bottles

21  anymore?

22     A.   Right.

23     Q.   You use all bigger bottles?

24     A.   Correct.

25     Q.   Or wider neck bottles?

1        A.    Correct.

2        Q.    Dena, play it, please.

3              (Video being played.)

4        Q.    While that's playing let me hand you one more

5    plastic bag that comes out of Government's Exhibit 7b-2

6    and ask you to tell us what's in that bag?

7        A.    That's a mixing container.

8        Q.    Can you pause that, Dena.  That's what?

9        A.    A mixing container.

10       Q.    Mixing container for Tannerite?

11       A.    Right.

12       Q.    Is that the size container you would leave it

13   in to shoot or would you put it in a smaller one?

14       A.    No, you'd put it in a smaller one.

15       Q.    Let me hand you a smaller one that happens to

16   be in the same exhibit, 7b-2.  Can you tell us what that

17   smaller container is?

18       A.    That's the half-pound charge, exploding

19   charge.

20       Q.    Now, is that what we saw blowing up in the

21   video earlier?

22       A.    Yes, sir.

23       Q.    Thank you.  Play the next.

24             (Video being played.)

25       Q.    Would you pause that.  Mr. Tanner, what are

1   you demonstrating in that portion of the video?

2        A.   Showing that every firing rifle isn't capable

3   of setting it off.

4        Q.   I'm holding up Government Exhibit 5d.  Do you

5   know what this thing is?

6        A.   It appears to be a .50-caliber.

7        Q.   Would a round from this set it off?

8        A.   Certainly.

9        Q.   How about what I'm holding up now, which is

10  Government Exhibit 5h which has been identified as a

11  308.  Would this set it off?

12       A.   A 308 will, yes, sir.

13       Q.   Would a 223 round set it off?

14       A.   Yes, sir.

15       Q.   Play the video, please.

16            (Video being played.)

17       Q.   Actually stop the video.

18            MR. HUFTALEN:  I have no further questions at

19  this point, your Honor.

20            THE COURT:  Thank you.  Take the video off,

21  thank you.  Mr. Lange?

22            MR. LANGE:  I have no questions, thank you.

23            THE COURT:  Mr. Iacopino?  All right, Ms.

24  Clouser?

25            MS. CLOUSER:  Just one moment, your Honor.

1          THE COURT:  Take your time.

2          MS. CLOUSER:  Your Honor, if I could ask the

3     government to continue to play the video that was just

4     playing, and in fact from the spot that was left off is

5     fine.

6          (Video being played.)

7          MS. CLOUSER:  Thank you.

8                    CROSS-EXAMINATION

9     BY MS. CLOUSER:

10     Q.   Good afternoon.  We just watched a portion of

11     the instructional DVD video that you send out with your

12     product; correct?

13     A.   Correct.

14     Q.   And in that portion you talk about how safe

15     your product is when used properly; correct?

16     A.   Correct.

17     Q.   When the products are mixed together, you can

18     shake it as much as you want and it won't set it off;

19     correct?

20     A.   Yes.

21     Q.   And we saw in the video a blowtorch being held

22     against the mixed compounds; correct?

23     A.   Yes.

24     Q.   And it didn't go off?

25     A.   Correct.

1      Q.   Same thing with the fuse; correct?

2      A.   Yes.

3      Q.   And in fact, you invented the Tannerite as a

4  smoke and noise indicator for long-range shooting;

5  right?

6      A.   Correct.

7      Q.   And some of what we saw on the video when you

8  set the Tannerite off with a high-powered rifle, that

9  isn't a flame that's set off; correct?

10     A.   Correct.

11     Q.   It's actually water vapor; right?

12     A.   Largely, yes.

13     Q.   And a loud noise?

14     A.   Correct.

15     Q.   In fact, some people call this the Hollywood

16  effect; right?

17     A.   Some people have, yes.

18     Q.   Have you heard Tannerite described as the

19  Hollywood effect?

20     A.   Probably so.  I probably describe it myself

21  that way sometimes.

22     Q.   And that's because of the water vapor that's

23  deployed and the loud noise that's deployed when it's

24  set off?

25     A.   The visual, yes.

```
 1        Q.   You recall the government asked you about that
 2   yellow warning label that's on the cans of the
 3   Tannerite?
 4        A.   A yellow label?
 5        Q.   I'm sorry, the orange label?
 6        A.   (Nods head affirmatively.)
 7        Q.   And that's where you warn people to stay a
 8   hundred yards away?
 9        A.   Yes.
10        Q.   And there's no warning on that label with
11   respect to exploding Tannerite throwing debris or
12   anything like that; right?
13        A.   Right.
14        Q.   There's no warning on that label about not
15   affixing Tannerite with nails nearby; correct?
16        A.   Well, not on the label, no.
17        Q.   And you don't talk about throwing debris or
18   anything like that in the DVD instructional video; do
19   you?
20        A.   I think there is.  I would have to watch it.
21        Q.   And it's not unlawful to have Tannerite;
22   correct?
23        A.   No, it's not unlawful.
24        Q.   Do you recall the government showing you some
25   shipping labels with respect to Tannerite you shipped to
```

1   a Mr. Riley?

2        A.   Yes.

3        Q.   And you shipped that to Cohoes, New York;

4   right?

5        A.   Yeah.

6        Q.   In fact, every single one of those shipping

7   labels was to New York?

8        A.   Yes.

9        Q.   You never shipped any Tannerite to New

10  Hampshire?

11       A.   I ship every day to New Hampshire.

12       Q.   Excuse me --

13       A.   I ship it --

14       Q.   You never --

15            THE COURT:  Wait a second.  Let him finish his

16  answer.  Go ahead.

17       A.   I ship every day to New Hampshire.

18       Q.   You never shipped any Tannerite to Danny Riley

19  in New Hampshire; correct?

20       A.   No.

21            MS. CLOUSER:  I have no further questions.

22  Thank you.

23            THE COURT:  Thank you very much.  Government?

24                    REDIRECT EXAMINATION

25  BY MR. HUFTALEN:

```
 1          Q.   Ms. Clouser asked you a lot of things that
 2    your label and DVD don't say.  Do they say don't mount
 3    it to a tree and shoot when deputy marshals come walking
 4    through?
 5               MR. LANGE:  Objection.
 6               THE COURT:  Sustained.
 7               MR. HUFTALEN:  No questions.
 8               THE COURT:  Thank you very much.  You can step
 9    down.  You're done, thank you.
10               MR. HUFTALEN:  Is the witness excused from his
11    appearance?
12               THE COURT:  Hearing no objection, he's
13    excused.  Thank you, Mr. Tanner.
14               MS. OLLILA:  The United States calls Cathy
15    Smith.
16               THE CLERK:  Please raise your right hand.
17                         CATHY SMITH
18          having been duly sworn, testified as follows:
19               THE CLERK:  Please be seated.  And for the
20    record, if you'd please state your name and spell your
21    name.
22               THE WITNESS:  Cathy Smith.  C-a-t-h-y
23    S-m-i-t-h.
24                      DIRECT EXAMINATION
25    BY MS. OLLILA:
```

1          Q.    Good afternoon, Ms. Smith.  How are you

2    employed?

3          A.    I'm employed with the Internal Revenue Service

4    Criminal Investigation.

5          Q.    How long have you been with the Internal

6    Revenue Service Criminal Investigation?

7          A.    About 13 and a half years.

8          Q.    Were you so employed in October 2007?

9          A.    Yes.

10          Q.    Did you travel to 401 Center of Town Road in

11    October, in late October 2007?

12          A.    Yes, I did.

13          Q.    Why?

14          A.    We were installing an alarm system at the

15    property and I was up there, I'm the supervisor for New

16    Hampshire.

17          Q.    Why was an alarm system being installed at 401

18    Center of Town Road?

19          A.    To protect the property from being broken into

20    or any damage occurring.

21          Q.    Do you recall the specific date that you were

22    there in October 2007?

23          A.    It was October 27, 2007.

24          Q.    Were you there alone?

25          A.    No, I was not.

1        Q.    Who was there with you?

2        A.    Several special agents with IRS as well as two

3    alarm guys from Ideal Security.

4        Q.    Had you hired the alarm guys from Ideal

5    Security?

6        A.    Not me specifically but through a

7    representative.

8        Q.    And were they there to install the alarm

9    system at the residence?

10        A.    Yes, they were.

11        Q.    Did you let them into the residence?

12        A.    Yes.

13        Q.    Where did they proceed?

14        A.    Well, they were throughout the residence but

15    they -- on the first, second, third floors.

16        Q.    Did you travel with them in the residence, Ms.

17    Smith?

18        A.    Not me specifically but there was always an

19    agent with them.

20        Q.    Let me show you -- actually, Dena, please pull

21    up 30a-40.

22            Ms. Smith, I direct your attention to the

23    monitor on your left.  Do you recognize what this is a

24    photograph of?

25        A.    Yes.

1       Q.    What is it a photograph of?

2       A.    This is in the second floor master bedroom.

3   It was a little room that held a safe.

4       Q.    Now, to the left of the photo there appears to

5   be some wood.  Is that correct?

6       A.    Yes, that's correct.

7       Q.    What is that?

8       A.    That was an open elevator shaft, so it was

9   just the shaft of an elevator.  The elevator hadn't been

10  installed in it.

11      Q.    Were the installation crew working in that

12  elevator shaft?

13      A.    Yes.

14      Q.    Why were they working in that elevator shaft?

15      A.    They were trying to run some wires for the

16  alarm system through the upper ceiling on the second

17  floor.

18      Q.    Let me show you what's marked as Government's

19  Exhibit 20 for identification and 21 for identification.

20  Do you recognize what these exhibits are?

21      A.    Yes, I do.

22      Q.    What are they of?

23      A.    This is the inside of the elevator shaft.  If

24  you're facing the inside of the elevator shaft up on the

25  right-hand side, this is the paneling up on the side.

58

1          Q.    Who took those photographs?

2          A.    One of the agents that day.

3          Q.    Are these photographs a fair and accurate

4     depiction of the way that paneling looked on that day

5     you were at the residence?

6          A.    Yes, it is.

7                MS. OLLILA:  Your Honor, the United States

8     moves to admit Government's Exhibit 20 and 21.

9                THE COURT:  Hearing no objection, admitted

10    without objection.

11               (Government's Exhibits 20 and 21

12               admitted.)

13         Q.    BY MS. OLLILA:  Dena, please pull up 21.  Now,

14    at some point in time while the alarm installation crew

15    was working in the elevator shaft, were you called to

16    the elevator shaft?

17         A.    Yes, I was.

18         Q.    Why were you called to the elevator shaft?

19               MR. LANGE:  May we approach, your Honor.

20                          AT SIDEBAR

21               MR. LANGE:  Your Honor, maybe I'm getting a

22    little bit ahead here, but I think where the government

23    is going is they are going to seek to offer what the

24    agent or what the security people found, which was over

25    a hundred thousand dollars' worth of currency and gold.

1   My objection is based on Rule 403 to the extent that

2   they may be probative of something, like the fact that

3   the defendants had a financial ability to pay taxes,

4   that probative value is substantially outweighed by the

5   prejudice.  The average person would find it highly

6   incriminating that someone was keeping that quantity of

7   cash in their own home.

8          MS. CLOUSER:  I join in the objection.

9          MS. OLLILA:  This has nothing to do with

10  whether or not they had the ability to pay taxes.  It

11  has to do with the fact that they had the ability to

12  remain at their residence for nine months and purchase

13  weapons through their co-conspirators and maintain an

14  existence during nine months and beyond nine months,

15  your Honor.

16         THE COURT:  All right, let me see if I

17  understand what's going on here.  The government's

18  position was that they were going to try to hold out

19  indefinitely, and the government's position is the

20  defendants intended to hold out indefinitely, or resist

21  in case they were arrested.  The government's attempting

22  to show that they had the resources there to hold out

23  indefinitely because people were being permitted to go

24  in and out of the property during some period of time,

25  therefore they were going to finance this with the --

60

1   with these funds, is that it?

2            MR. LANGE:  That's correct, your Honor.

3            THE COURT:  Your position is that may be true,

4   but the prejudice would outweigh any relevance.

5            MR. LANGE:  Significantly outweigh any

6   probative value, that's my argument, it's a 403

7   argument.

8            THE COURT:  I understand.

9            MR. LANGE:  That's it.

10           THE COURT:  I agree with the defense.  It's

11   out.

12           MS. OLLILA:  Thank you.  Your Honor --

13           THE COURT:  Whoa, whoa.  He wants to leave

14   before I change my mind.

15           MS. OLLILA:  Then the United States has no

16   more questions for this witness.

17           THE COURT:  Good.  Does defense have any

18   questions?

19           MR. LANGE:  No.

20           THE COURT:  No questions?  Okay, very good.

21                    BEFORE THE JURY

22           THE COURT:  Okay, Ms. Smith, we're all done,

23   thank you, you may step down.

24           MS. OLLILA:  Your Honor, I just have one more

25   question.

1    THE COURT:  Oh, you do have a question, okay.

2  Q. BY MS. OLLILA:  Ms. Smith, the alarm was put

3 in to that residence in order to protect the property;

4 is that correct?

5  A. Correct.

6  Q. And how long did it take approximately for the

7 alarm installation crew to put that monitoring device

8 in, the alarm in?

9  A. I'm going to say at least that day.  We may

10 have come back the following day, I'm not positive

11 honestly.

12    MS. OLLILA:  We have no further questions,

13 your Honor.

14    THE COURT:  Defense have questions?

15    MR. LANGE:  No.

16    MS. CLOUSER:  No.

17    THE COURT:  No questions.  Very good, please

18 step down.

19    MS. OLLILA:  The United States calls Deputy

20 Marshal Jamie Berry.

21    THE COURT:  Jamie Berry, okay.

22    MS. OLLILA:  Your Honor, we need to approach

23 for this witness.

24    THE COURT:  Okay.

25        AT SIDEBAR

1           THE COURT:  Counsel.

2           MS. OLLILA:  Your Honor, I suspect that I know

3   what your Honor's position is on this, however, counsel

4   does not object to the following testimony coming in.

5   We are approaching, your Honor, in order to notify you

6   that Jamie Berry went to the residence after the initial

7   arrest --

8           THE COURT:  Yes.

9           MS. OLLILA:  -- in order to assist probation

10  with the location and seizure of the weapons.  He is not

11  going to testify in any way about those weapons.

12  However, consistent with the assent of counsel, he is

13  going to testify that the safe was open in the master

14  bedroom, and in the safe was an amount of U.S. currency.

15  He doesn't know how much there was, but there was an

16  amount of U.S. currency.  Counsel does not object to

17  that coming in.

18          THE COURT:  Fine.  They didn't object to the

19  currency in the nightstand either.

20          MS. OLLILA:  Correct.

21          THE COURT:  Fine.

22          MS. OLLILA:  Thank you.

23          THE CLERK:  Please raise your right hand.

24                      JAMIE BERRY

25      having been duly sworn, testified as follows:

1          THE CLERK:  Please be seated.  And for the

2    record, if you'd please state your name and spell your

3    your name.

4          THE WITNESS:  Jamie Berry, B-e-r-r-y.

5                    DIRECT EXAMINATION

6    BY MS. OLLILA:

7          Q.    Sir, how are you employed?

8          A.    As a Deputy U.S. Marshal.

9          Q.    How long have you been a Deputy U.S. Marshal?

10         A.    Approximately six years now.

11         Q.    And what did you do prior to being employed as

12   a Deputy U.S. Marshal?

13         A.    I was in the United States Army for ten years.

14         Q.    What did you do in the Army?

15         A.    Served as a military policeman and an

16   investigator for five of those years.

17         Q.    Did you have any special skills with respect

18   to your service in the Army?

19         A.    Yes.  I was also attached as a system

20   administrator for the various MP stations where I

21   worked.

22         Q.    What does that mean to be a system

23   administrator?

24         A.    Locally I would take care of servers,

25   Microsoft exchange servers.  I once had a unit server

1    for a database, things of that nature.

2        Q.   What do you mean by taking care of the

3    servers, the systems?

4        A.   I maintained them, routine updates, anything

5    of that nature.

6        Q.   Do you have specialized training with respect

7    to computer software or hardware?

8        A.   Yes.  I have an associate's degree through

9    Grantham University in software engineering, also

10   attended various training in computer forensics, things

11   of that nature.

12       Q.   What types of training in the way of computer

13   forensics, Mr. Berry?

14       A.   Seizure of electronic evidence.  Also the

15   acquisition of electronic evidence off a hard drive and

16   analysis of that hard drive.

17       Q.   Are there certain protocols that you have to

18   comply with in order to obtain documents off of

19   computers?

20       A.   Yes.

21       Q.   And what would they be, for example?

22       A.   Protocols as in --

23       Q.   How you would attain them, how you would then

24   maintain that evidence?

25       A.   How would I maintain it afterwards?

1        Q.    Yes.

2        A.    Okay, after you found the documentation

3    possibly on a hard drive you would basically document

4    that, you know, keep notes on it, where you obtained it

5    from, locations, things of that nature.

6        Q.    How would you gain access to records on a

7    computer, Deputy Berry?

8        A.    You would do it -- you would need a data, like

9    a data block so you didn't disturb the hard drive.  You

10    would have a specialized device where I could hook it

11    from one hard drive to the other, and it will pull the

12    data over, it will make a bit by bit copy of that hard

13    drive.

14        Q.    When you search computer records, do you do so

15    first by obtaining a search warrant for those records?

16        A.    Yes.

17        Q.    Now, in May of 2006 did you assist members of

18    the U.S. Probation Office?

19        A.    Yes.

20        Q.    Did you assist them with going to the

21    residence known as 401 Center of Town Road?

22        A.    Yes.

23        Q.    Were you alone when you went there with

24    members of the U.S. Probation Office?

25        A.    No.

66

1      Q.   Who else was there?

2      A.   It was myself, Deputy U.S. Marshal Ken Nunes,

3  Deputy U.S. Marshal Jeff White, Deputy U.S. Marshal

4  Leigh Marchegiana, I'm not sure of the spelling of the

5  last name, and Deputy Marshal Doug Bartlett.

6      Q.   Did you enter the residence before members of

7  the probation office arrived?

8      A.   No.

9      Q.   Did anyone arrive with members of the

10 probation office.  When I say anyone, I mean either

11 defendant Edward Brown or defendant Elaine Brown?

12     A.   Elaine Brown arrived.

13     Q.   Is that when you went into the residence?

14     A.   Yes.

15     Q.   Who showed you around the residence?

16     A.   Elaine Brown.

17     Q.   At some point in time were you brought up to

18 the master bedroom area?

19     A.   Yes.

20     Q.   Was there a safe in the master bedroom area?

21     A.   Yes.

22     Q.   Did someone open the safe?

23     A.   Yes.  Elaine Brown did.

24     Q.   Did she open it by using the combination lock?

25     A.   Yes.

1      Q.   Now, I'm going to lead you on this.  Was there

2    currency in that safe?

3      A.   Yes, there was.

4      Q.   Where was it located in the safe?

5      A.   Bottom left-hand side of the safe.

6      Q.   What did it look like?

7      A.   There was bags of coins and then there was a,

8    the only way I can describe it is a shrink, like a

9    shrink wrapped cube of money.

10     Q.   You say shrink wrapped cube of money.  I want

11   you to describe it by identifying how many inches it was

12   in length and how many inches it was in height.

13     A.   I just remember pretty much a cube.  I don't

14   know how far back it went because we didn't go in and

15   grab it or pull it out and look at it.  I remember

16   seeing a cube.

17     Q.   Looks like you are motioning with your hands

18   approximately 12 inches wide by 12 inches high; is that

19   correct?

20     A.   Probably approximately.  I really can't

21   remember the exact dimensions.

22     Q.   Did you touch that money?

23     A.   No.

24     Q.   Was it left at the residence?

25     A.   Yes.

68

```
1       Q.   Now, at some point in time, Deputy Berry, did
2   you have meetings with members from your office about
3   the apprehension of defendants Edward and Elaine Brown?
4       A.   Yes, I did.
5       Q.   Was there a plan to apprehend defendants
6   Edward and Elaine Brown?
7       A.   I wasn't privy to any plans.  I know there was
8   the expectation of arresting them, yes.
9       Q.   What was your role going to be?
10      A.   My role, I assisted operationally and on
11  surveillance, and I also did -- conducted electronic
12  surveillance online for open source information.
13      Q.   All right, what does that mean you conducted
14  electronic surveillance for open source information?
15      A.   Open source information is information readily
16  available on the Internet to anybody in the public.
17  Initially this group posted a lot of information --
18      Q.   What group?
19      A.   Various members, supporters of Ed and Elaine
20  Brown posted this information, videos, blogs, things of
21  that nature.
22      Q.   And what was your job with respect to
23  monitoring those blogs or looking at them?
24      A.   I monitored them daily and storing any
25  information that may be pertinent to either maybe a
```

1    possible threat or further prosecution in the future.

2         Q.    You indicated that you would monitor the blogs

3    and the Internet for open source information; is that

4    correct?

5         A.    Yes.

6         Q.    Can you explain that further?

7         A.    Just monitoring.  We identified early on

8    specific web sites that were holding content in

9    reference to the defendants, and we -- we just

10   consistently logged on to those web sites just simply

11   through a browser, information would be posted, and I

12   just gather that information and save it.

13        Q.    When you would log on to the web site through

14   a browser, what type of browser would you use?

15        A.    Initially we used Internet Explorer 6 and we

16   had a few issues where we were -- there was an

17   individual that was able to monitor what we were looking

18   at and could monitor what computer was logging on, so we

19   then started using Firefox where we could disguise

20   ourselves a little better.

21        Q.    When you say we, do you mean you?

22        A.    Yes, I initially did all the setups and we had

23   I believe it was six laptops that was set up to do this

24   and distributed variously through the deputies that was

25   working on this.

1          Q.    Let me show you what's marked as Government's

2    Exhibit 1h for identification.  Do you recognize what

3    that is a photograph of?

4          A.    Yes.

5          Q.    What is it?

6          A.    It's a photograph of Jason Gerhard, Cirino

7    Gonzalez, Edward Brown, individual by the first name of

8    Luke, we don't know the last name.

9          Q.    How did you come into possession of this

10   photograph?

11         A.    While monitoring web sites certain supporters

12   had MySpace accounts, and I was monitoring specific

13   MySpace accounts.  This one was Jason Gerhard's.

14         Q.    You were monitoring Jason Gerhard's MySpace

15   account; is that correct?

16         A.    Yes.

17         Q.    When was that approximately?

18         A.    We became aware some time in early June.

19         Q.    When you say June, what year?

20         A.    June of 2007, sorry.

21         Q.    Did you gain access to Jason Gerhard's MySpace

22   account?

23         A.    Anybody can get access to it.  It was a public

24   site and so you could pretty much go over anything he

25   had, photographs, anything he had posted.

1        Q.   And did you gain access to that account?

2        A.   Yes.

3        Q.   And did you print out a photograph from that

4   MySpace account?

5        A.   Yes, I did.

6        Q.   Is that the photograph that is depicted in 1h

7   for identification?

8        A.   Yes.

9             MS. OLLILA:  Your Honor, the United States

10   moves 1h into evidence.

11            MR. IACOPINO:  Objection, your Honor, lack of

12   foundation, lack of relevance.

13            THE COURT:  Mr. Lange, any objection?

14            MR. LANGE:  Join, same grounds.

15            THE COURT:  Overruled.

16            (Government's Exhibit 1h admitted.)

17        Q.   BY MS. OLLILA:  Dena, please bring up 1h.

18   Now, Deputy Berry, you have indicated that contained in

19   this photograph is Jason Gerhard.  Which of these

20   individuals is Jason Gerhard?

21        A.   He's the individual on the left with the blue

22   staff shirt.

23        Q.   You also indicated that Cirino Gonzalez is in

24   this photograph.  Where is Cirino Gonzalez in this

25   photograph?

1       A.   He is adjacent to Ed Brown on the left.   The

2   Hispanic individual with the glasses.

3       Q.   And you also indicated that the defendant

4   Edward Brown is in the photograph.   Where is Edward

5   Brown in the photograph?

6       A.   He's the third one in on the right there with

7   the glasses and the mustache and the blue shirt.

8       Q.   Now, you also indicated that you conducted a

9   search of a computer, is that correct, during the course

10  of this investigation?

11      A.   I didn't do any searches of any computers.

12      Q.   Let me ask you this.   I apologize.   I'm

13  showing you what is marked as Government's 41a for

14  identification.   Do you recognize what that document is?

15      A.   Yes, it's a declaration of authentication of

16  business records from Hotmail.

17      Q.   Why was that requested from Hotmail

18      A.   I did a search warrant on Cirino Gonzalez's

19  Hotmail account.

20      Q.   So there was a search warrant for the Hotmail

21  account of Cirino Gonzalez; is that correct?

22      A.   Yes.

23      Q.   And who was provided with the search warrant?

24      A.   I believe it was the individual at Microsoft,

25  we served Microsoft.

1        Q.    And after serving Microsoft did you gain

2   information from Microsoft?

3        A.    Yes.  They initially sent us the CD with the

4   contents of the e-mail.

5        Q.    Is that CD what is contained in Government's

6   Exhibit 41a for identification?

7        A.    No, not specifically that CD.  There was

8   another CD that contained both accounts.

9        Q.    All right, we will explain that.  Was there

10  another CD recently requested?

11       A.    Yes, there was a -- data provided by CD, they

12  gave me access to a secured server on Microsoft's site,

13  all the data there, and then it was copied down from

14  there and placed on the CD by myself.

15       Q.    And in preparation for this trial did you

16  again request the same documentation from the

17  individuals at Microsoft?

18       A.    Yes.

19       Q.    And did they then provide you with that

20  information on a CD rom?

21       A.    Not a CD rom.

22       Q.    Did they give you access to a secure web site?

23       A.    Yes, secure web site.

24       Q.    And once you got on that secure web site, what

25  did you do?

1      A.   I downloaded the data for the specific

2   account.

3      Q.   And once you downloaded the data for that

4   specific account, what did you do?

5      A.   I unzipped that file and then I made a copy of

6   the folder that was unzipped to.

7      Q.   All right, what does it mean to unzip an

8   account?

9      A.   The account was compressed it was so large.

10  It was over, I believe it was over two gigabytes, and

11  that was close, I believe, in its volume to one and a

12  half gigabytes of information there.

13     Q.   And then what did you do after that?

14     A.   When I unzipped it, I unzipped it into a

15  directory.  Then after that I made a copy of that

16  directory on to the CD.

17     Q.   Okay.  And so the CD that is attached to

18  Government's 41a is actually a CD that you prepared; is

19  that correct?

20     A.   Yes.

21     Q.   And you prepared that CD after gaining access

22  through Microsoft in the account; is that correct?

23     A.   Yes.

24     Q.   And whose account were you gaining access to?

25     A.   Cirino Gonzalez's.

1      Q.    And did you review all of those e-mails

2    contained in that account?

3      A.    Not all of them.  It was very voluminous.  I

4    reviewed the ones that pertained to the time frame that

5    we were looking at.

6      Q.    And what was the time frame that law

7    enforcement were looking at?

8      A.    It was the beginning of 2007 on after that.

9      Q.    Let me show you what is marked as Government's

10   Exhibit 2d for identification.  I'll ask if you

11   recognize what that document is?

12     A.    Yes, it's an e-mail.

13     Q.    And how did you gain access to that e-mail?

14     A.    Through the data that was given to me through

15   Microsoft.

16     Q.    And when you say through the data that was

17   given to you through Microsoft, is that what you mean by

18   Government's Exhibit 41a?

19     A.    Yes.

20     Q.    All right.  And what is the date of that

21   e-mail, Deputy Berry?

22     A.    The date of this e-mail is May 28, 2007.

23     Q.    Let me show you what is marked as Government's

24   Exhibit 2e for identification.  Do you recognize what 2e

25   is?

 1        A.   Yes, it's another e-mail from the account.

 2        Q.   When you say it's another e-mail from the

 3   account, what do you mean?

 4        A.   It's another document that was generated

 5   through that account.

 6        Q.   Let me show you what is marked as 2f for

 7   identification.  Do you recognize what 2f is?

 8        A.   Yes, it's another e-mail from the account.

 9   Again, it was another document generated through that

10   e-mail account.

11        Q.   What is the date of that e-mail?

12        A.   This is June 4th, 2007.

13        Q.   And again, are all these e-mails taken from

14   the e-mail account of Cirino Gonzalez?

15        A.   Yes.

16        Q.   By the way, what was the name of that e-mail

17   account?

18        A.   Gonzobluegonzo@hotmail.com.

19        Q.   Gonzobluegonzo@hotmail.com?

20        A.   Yes.

21        Q.   I'm showing you what's marked as Government's

22   Exhibit 2 for identification.  Do you recognize what

23   Government's Exhibit 2 is?

24        A.   Again it's another e-mail generated from that

25   account.

1        Q.    The e-mail account of Cirino Gonzalez?

2        A.    Of Cirino Gonzalez.

3        Q.    What's the date on Government's Exhibit 2?

4        A.    May 17, 2007.

5        Q.    Let me show you what is marked as Government's

6    Exhibit 2a for identification.  Do you recognize what

7    that document is?

8        A.    Yes.  It's another e-mail generated by the

9    Cirino Gonzalez account.

10        Q.    And what is that dated?

11        A.    May 18, 2007.

12        Q.    Let me show you what is marked as Government's

13    Exhibit 2b for identification.  Do you recognize what

14    that document is?

15        A.    Yes.  It's another e-mail from the Cirino

16    Gonzalez e-mail account.

17        Q.    And what's the date on that document?

18        A.    22 May 2007.

19        Q.    2c for identification, Deputy Berry?

20        A.    Again, another e-mail from the Cirino Gonzalez

21    e-mail account.

22        Q.    And what's it dated?

23        A.    May 23rd, 2007.

24        Q.    Two more I'm going to show you at the same

25    time.  2g and 2i for identification.  What are these

78

1    documents?

2         A.   These are both e-mails generated by the Cirino

3    Gonzalez e-mail account.

4         Q.   Now, Deputy Berry, when you print out an

5    e-mail, do you have to take any special care in printing

6    out the header versus the content?

7         A.   Yes.  With Microsoft it allows you to break

8    that up.  You can print out specifically the header, the

9    content, or the entire message itself.

10        Q.   With respect to all of these e-mails from

11   Cirino Gonzalez's Hotmail account, did you print out

12   these e-mails with a header?

13        A.   Yes, I did.

14        Q.   What is a header?

15        A.   The header contains information about the

16   e-mail, who it was generated from, at times general

17   location, depending on what types of service you're

18   using, where it's coming from, time zone that's

19   generated on that server, and usually how it was routed

20   to that e-mail account as going from server to server in

21   order to get to that specific e-mail account.

22        Q.   And did you engage in the same process with

23   respect to each and every single one of these e-mails

24   from the e-mail account of Cirino Gonzalez?

25        A.   Yes.

1           MS. OLLILA:  Your Honor, the United States

2   would move into evidence 2d, e, f, c, a, b and 2.

3           MR. LANGE:  Sidebar, please.

4           THE COURT:  Pardon me?

5           MR. LANGE:  May we have a sidebar, please.

6           THE COURT:  Of course.

7                        AT SIDEBAR

8           THE COURT:  Counsel.

9           MR. LANGE:  My position is that it's hearsay.

10   I understand the government's position is that these are

11   co-conspirator statements in furtherance of the

12   conspiracy.  My position with regard to that is that

13   they have to establish the conspiracy by means other

14   than simply the e-mails, and pursuant to Petrozziello

15   the court has to at some time make determinations as to

16   whether they've met that burden.

17           MR. IACOPINO:  Same objection on behalf of Mr.

18   Brown, your Honor.

19           MS. OLLILA:  We already met that burden, your

20   Honor, through the testimony that Danny Riley was at the

21   residence during the time frame.  That he had shipped

22   Tannerite to his residence which he then brought to the

23   Brown residence.  Those boxes with the shipping label

24   containing his New York address were contained on them.

25   Your Honor also knows that he was there on June 7th

1    during the course of the conspiracy when law enforcement

2    tasered him.  All of these e-mails reference Ed Brown

3    and other co-conspirators, including Cirino Gonzalez.

4    They are all e-mails from Danny Riley to Cirino Gonzalez

5    talking about actions by the co-conspirators.

6             THE COURT:  Anything else?

7             MR. IACOPINO:  Your Honor, at this point there

8    is absolutely no evidence in this record that Tannerite

9    was delivered at any time in conjunction with these

10   e-mails.

11            THE COURT:  I thought they found boxes --

12            MR. IACOPINO:  There was --

13            THE COURT:  -- on site.

14            MR. IACOPINO:  There was Tannerite found there

15   and there was boxes with the shipping label, but she was

16   trying to tie it in to the time frame of these e-mails,

17   and there's no evidence indicating that it actually

18   arrived there during that time frame.

19            THE COURT:  Anything else from anyone?  All

20   right, I'm going to admit these under Petrozziello.

21            MS. OLLILA:  Thank you very much.

22            THE COURT:  Subject to your --

23            MR. IACOPINO:  Should we make an objection at

24   the end of their case?

25            THE COURT:  Remember to make an objection at

1    the end of all evidence.

2                 MR. LANGE:  Yes.

3                 THE COURT:  If you don't make it, I won't rule

4    on it.

5                 MR. IACOPINO:  I understand, your Honor.

6                         BEFORE THE JURY

7        Q.   BY MS. OLLILA:  Dena, please bring up 2d.

8             Deputy Berry, what is it that we're looking at

9    in Exhibit 2d?

10       A.   It's a header to an e-mail.

11       Q.   Now Dena, I'd like you to highlight from and

12   to.  Do you see where that is?  Who is this e-mail from?

13       A.   It's from Danny Riley.

14       Q.   Who is the e-mail to?

15       A.   Cirino Gonzalez.

16       Q.   Now Dena, on the bottom of the page, highlight

17   the date.

18            What is the date that this e-mail was sent?

19       A.   28 May 2007.

20       Q.   Now Dena, take that down and please turn to

21   the second page and highlight.

22            What does this e-mail state, Deputy Berry?

23       A.   It says Reno, I sent for 50 pounds of Brown

24   Skin-a-rite.  Hopefully it will be here when the other

25   gear arrives.  When all arrives is when I will be coming

82

1   out again.  Was Ed happy that we are making progress?

2   D.

3        Q.   Okay, Dena, you can take that e-mail down.

4   Dena, please pull up 2e and highlight the to and from.

5             Deputy Berry, who is this e-mail from?

6        A.   It's from Danny Riley.

7        Q.   Who is it to?

8        A.   To Cirino Gonzalez.

9        Q.   What is the date?

10       A.   29 May 2007.

11       Q.   Now Dena, please turn to page two and enlarge

12   that.

13            What does this e-mail state, Deputy Berry?

14       A.   It says Reno, are you guys scoped up?  No use

15   in waiting then have to re-wait for the eyeball.  I

16   talked to Danny Tanner in Oregon today.  It's a go.  He

17   said he's going to throw a little extra for me.  He said

18   he had over 150 orders over the weekend.  Nice.  I hope

19   to be back out in a couple weeks.  Dan.

20       Q.   Now, Dena, please take that down and pull up

21   2f and highlight the from and two.

22            Who is this from and who is it to?

23       A.   From Danny Riley to Cirino Gonzalez.

24       Q.   What is the date?

25       A.   Dated 4 June 2007.

1    Q.   Please turn to the second page.  What does

2   this e-mail state, Deputy Berry?

3    A.   It says Reno, I will be there tomorrow.  I

4   think around 1 p.m. or so.  Does Ed want rounds?  Dan.

5    Q.   Do you know what the term rounds means in law

6   enforcement?

7    A.   It means bullets.

8    Q.   Dena, please pull up 2a and highlight the to

9   and from.

10         Who is this e-mail from and who is the e-mail

11   to?

12    A.   The e-mail is from Danny Riley to Cirino

13   Gonzalez.

14    Q.   And when is it dated?

15    A.   18 May 2007.

16    Q.   Now Dena, please pull up page two.  What does

17   this e-mail state?

18    A.   It says Reno, I spoke with Dick and he said

19   there is a cabine available.  I believe that's a

20   misspelling.

21    Q.   What's a cabine?

22    A.   Nothing.  I believe it's a carbine.

23    Q.   What's a carbine?

24    A.   A rifle.

25    Q.   Keep reading.

1      A.    They are supposed to come in early June from

2    Florida.  Dick said we can come out next week and start

3    the paperwork and pay so when they come in we can just

4    go and get them.  I always get delayed so this is

5    helpful.  How does Wednesday sound.  We can meet in

6    Newport around 11:30 a.m., do our business and go our

7    separate ways.  D.

8      Q.    Now, Dena, please pull up Exhibit 2.  What is

9    Exhibit 2?

10     A.    It's an e-mail, a header of an e-mail.

11     Q.    Who is it from, who is it to?

12     A.    It's from Danny Riley to Cirino Gonzalez.

13     Q.    What is it dated?

14     A.    17 May 2007.

15     Q.    Now turn to the second page, please, Dena.

16   And what I just want you to read is the very top of that

17   e-mail, Deputy Berry.

18     A.    It says Reno, yes, this is the one we looked

19   at, web address http://serbu.com/top/bfg50.php.  Here is

20   the last e-mail I got from Stone Eagle.  He says, it's

21   cut off a little but it says he will have one extra 50

22   that is not accounted for in this order and that it is

23   mine if I want it.  A second order will have to be

24   placed to get another one which could take a few months.

25   The demand is so high they are on back order according

1    to the shop I went to in Schenectady.  When he let's me

2    know when they arrive, I will go to Newport, New

3    Hampshire, and get it, then come to you with it.  I

4    think you only need one for the house unless you want

5    one for your personal collection, that's up to you, but

6    it may take a while because of the demand.  I hope I can

7    get this on my own, if not, I will find a way.

8        Q.   Now, what -- do you know what Serbu is?

9        A.   Yes, they are a weapons manufacturer.

10       Q.   Do they manufacture 50-caliber weapons?

11       A.   Yes, they do.

12       Q.   Do you know what Stone Eagle is?

13       A.   Yes, it's a gun dealership.

14       Q.   Where is it located?

15       A.   Newport, New Hampshire.

16       Q.   Dena, please bring up 2b and highlight the

17   from and the two.

18            Who is this e-mail from and who is it to,

19   Deputy Berry?

20       A.   From Danny Riley to Cirino Gonzalez.

21       Q.   And when is it dated?

22       A.   22 May 2007.

23       Q.   Turn to the second page, please, Dena.  And

24   what does this e-mail say?

25       A.   It says Reno, I will be in NP NH around 11:30

1   a.m.  My cell is 518-470-7443.  First one there call the

2   other one.  Your number is 603-863-6411?  I will be in

3   my car.  Confirm.  D.

4          MS. OLLILA:  Your Honor, I just have two more

5   e-mails with this witness and that might be a good place

6   to stop with these e-mails.  Is that fine?

7          THE COURT:  All right, we will finish after

8   that.

9      Q.   BY MS. OLLILA:  Dena, please bring up 2c and

10  highlight the from and the to.

11         And who is this from and who is it to?

12     A.   From Danny Riley to Cirino Gonzalez.

13     Q.   What is the date?

14     A.   23 May 2007.

15     Q.   Now please bring up the second page, Dena.

16  What is this?

17     A.   It's an address for Stone Eagle.

18     Q.   Now, I neglected when I originally showed you

19  the government's exhibit, I neglected to show you 2i.

20  Do you recognize what 2i is?

21     A.   2i is another e-mail from Dan Riley to Cirino

22  Gonzalez.

23     Q.   And how did you obtain that e-mail?

24     A.   Through Cirino Gonzalez's Hotmail account.

25     Q.   The same way you obtained all the other

1   e-mails?

2        A.   Yes.

3             MS. OLLILA:  Your Honor, the United States

4   moves to admit 2i for the same reason, co-conspirator

5   statements.

6             THE COURT:  Same objections?

7             MR. LANGE:  Same.

8             THE COURT:  Overruled.

9             MR. IACOPINO:  Your Honor, I also object on

10  relevance, if you take a look at the statements --

11            THE COURT:  All right, you have additional

12  questions for this witness?

13            MS. OLLILA:  No, just this is the last -- I

14  have additional questions tomorrow.

15            THE COURT:  For this witness.

16            MS. OLLILA:  Yes.

17            THE COURT:  I think we're going to stop right

18  now.

19            MS. OLLILA:  Okay.

20            THE COURT:  Ladies and gentlemen of the jury,

21  we've gone a little after.  I'm going to release you at

22  this time.  Remember what I told you about not

23  discussing this case.  Don't read any news items,

24  newspapers, et cetera, don't do any independent

25  research, and I'll see you bright and early tomorrow

88

1    morning at 8:30.  The jury's excused.

2              (Jury exited the courtroom.)

3              THE COURT:  Anything else before we adjourn?

4    I'll see counsel in my chambers and we're in recess.

5              (Recess at 2:35 p.m.)

6              (In chambers at 2:45 p.m.)

7              THE COURT:  Couple of things.  Just in terms

8    of scheduling.  Government, how long?

9              MR. HUFTALEN:  We rest tomorrow, probably

10   10 a.m. at the latest -- well, depending on cross.

11   We've got one witness after this witness and possibly a

12   second, but if we do, he'll be very brief.

13             THE COURT:  10, 10:30.  And Mr. Lange, are you

14   going first?

15             MR. LANGE:  No.

16             THE COURT:  Oh, you're switching.

17             MR. LANGE:  Mr. Brown is going to go first.

18   I'll be there to pick up the pieces.

19             THE COURT:  Mr. Iacopino, you've got the ball.

20   Lateraled over to you.  Are you going to put anybody on?

21             MR. IACOPINO:  We have two witnesses under

22   subpoena, your Honor.

23             THE COURT:  Who are they?

24             MR. IACOPINO:  Lauren Canario and Christopher

25   Fazio.

1            THE COURT:  Are there any Fifth Amendment

2    issues with any of those witnesses, either one?

3            MR. IACOPINO:  I don't believe so.

4            MR. HUFTALEN:  Lauren Canario was charged with

5    her entry -- it was an entry into property or --

6            MS. OLLILA:  Something funky like that.

7            MR. IACOPINO:  Yeah, she got arrested for

8    trying to go on the property after September 15th.

9            THE COURT:  All right.  There are two.  Fazio

10   you said?

11           MR. IACOPINO:  Yeah, Fazio.

12           THE COURT:  What's the first name?

13           MR. IACOPINO:  Christopher.

14           THE COURT:  Chris.  And the second person

15   again?

16           MR. IACOPINO:  Lauren Canario.  K-a-n-a-r-i-o

17   (sic).

18           THE COURT:  Does anyone know whether we need

19   to have her confer with counsel on Fifth Amendment

20   issues?

21           MR. IACOPINO:  The stuff that we're going to

22   ask her on direct has got nothing to do with that.

23           THE COURT:  I don't hear anything, all right.

24   How long are you going to be, do you think?  I'm not

25   going to hold you to it.

1          MR. IACOPINO:  Neither one of them will be

2    very long.  I'll be surprised if either one of them is

3    more than 10 or 15 minutes.

4          THE COURT:  So probably by 12:30 we'll be done

5    with you.

6          MR. IACOPINO:  Unless Mr. Brown decides to

7    testify.

8          THE COURT:  Okay.

9          MR. IACOPINO:  In which case --

10          THE COURT:  We may be a while.  That's okay.

11    That's perfectly fine.  As I told you, I don't get paid

12    by the hour.  I'm happy to be here.

13          All right, that's it for you, two witnesses

14    unless Mr. Brown testifies.  Is that right?

15          MR. IACOPINO:  Yes, that's correct, your

16    Honor, I'm sorry.

17          THE COURT:  And Mr. Lange, 12:30 tomorrow I'm

18    going to be looking at you.

19          MR. LANGE:  I have Susan Berge from

20    Harrisville, Rhode Island.  As far as I know she doesn't

21    have any Fifth Amendment issues.

22          THE COURT:  All right.  Susan Berge.

23    Government jump in if you disagree.

24          MR. LANGE:  I have Scott and Catherine Dion,

25    and they do have Fifth Amendment issues.  I believe that

1    the government met with you ex parte on that.

2            THE COURT:  Yes.

3            MR. LANGE:  I have Shawn Farnsworth who is a

4    contractor.

5            THE COURT:  So we need to have Scott and

6    Catherine talk to counsel.

7            MR. HUFTALEN:  I think so, yes.

8            THE COURT:  We may have to have a hearing.  So

9    do we have someone available, Debbie?

10           THE CLERK:  Yes.

11           THE COURT:  They need separate counsel.

12           THE CLERK:  I'd have to talk to counsel about

13   it.

14           THE COURT:  All right, talk to them.  Let's

15   get that done first thing in the morning as soon as

16   possible so we don't delay the hearing, so that we will

17   put them on, see what they have to say.

18           MR. LANGE:  The witnesses that I may be

19   calling are Bethany and David Hatch.  They are my

20   client's children.  But they may not be called.  It

21   depends.

22           THE COURT:  All right, very good.

23           MR. LANGE:  And the last witness is David

24   Vonkleist.  He performed at one of the concerts at

25   Center of Town Road.

1          THE COURT:  No problem on Fifth Amendment

2    there?

3          MR. LANGE:  Not as I'm aware.  I can't say for

4    certain whether --

5          THE COURT:  She may or may not testify.

6          MR. LANGE:  She may or may not testify.

7          THE COURT:  Okay, so it's possible we could

8    finish tomorrow.

9          MR. LANGE:  I think it's unlikely, your Honor,

10   that we will finish by tomorrow, but it is possible.

11         THE COURT:  Possible.  So tomorrow is Tuesday.

12   Assuming neither of the defendants testify we will

13   finish up Wednesday morning.  So counsel should be ready

14   to close Wednesday.

15         MS. OLLILA:  How long do we have to close?  I

16   know my closing is an hour, maybe an hour and five

17   minutes.

18         THE COURT:  I'll give you all the time you

19   need for closing, I'm not going to hinder you, this is a

20   long case.  But once you tell me how long it's going to

21   be, that's what I'm going to hold you to.

22         MS. OLLILA:  Okay, I'll say an hour and 15.

23         THE COURT:  Okay, you can tell me later as you

24   get closer.  You don't have to tell me.  We will go

25   through a charge conference -- what I do is we will have

1   a charge conference, I'll indicate where we are in terms

2   of the instructions, we will do closing, and I give all

3   my instructions at once.  Some judges divide them up,

4   some don't.  I don't divide them up.  I'll give my

5   charge last and then send them out.

6            MR. LANGE:  So the closings will be back to

7   back to back.

8            THE COURT:  One, two, three closing, jury

9   instructions, out they go.

10           MR. LANGE:  Do you recess --

11           THE COURT:  I'll recess between them depending

12  on time.  I'm not going to run this jury forever, you

13  know, I'll try -- tend to break at the same times

14  depending where we are.  Yes?

15           MR. HUFTALEN:  Rebuttal closing?  De minimus I

16  know.

17           THE COURT:  15.

18           MR. HUFTALEN:  And does it violate your

19  courtroom practice if she does closing and I do the

20  rebuttal?

21           THE COURT:  No.  You people care?

22           MR. LANGE:  No.

23           THE COURT:  Defendants don't object.

24           MR. IACOPINO:  I've been the victim of both

25  before, so it doesn't make any difference.

1          MR. LANGE:  The one thing I want to bring up,

2     and I have an exhibit list which is fairly long, more of

3     a wish list than an exhibit list, but a lot of what was

4     on that list are statements by the defendants, and my

5     client in particular, and I think the government's

6     position is going to be that unless I call her they are

7     inadmissible because they are not offered by party

8     opponent and they are hearsay, and then the question

9     becomes if Elaine testifies, are they admissible on some

10    other ground.

11          THE COURT:  She can say them anyway.  If she

12    testifies she can say what's in the statements pretty

13    much, can't she?

14          MR. IACOPINO:  I think part of the concern

15    here, though, judge, actually I should have raised this

16    too, depending on what Mr. Berry continues on to testify

17    about what he found out there in the ether of the

18    Internet, they are charged with knowingly and

19    intentionally, by intimidation or threat, interfering

20    with the actions of the marshals or with their own

21    arrests by the marshals, and as I understand it the

22    government intends to point to things that are out there

23    in the Internet.  There are other things out there in

24    the Internet that clearly are not threats, that are

25    clearly or clearly consistent with the defense, that

1   we're not doing anything but protecting ourselves from

2   what we consider to be an unlawful thing.  So I guess

3   what I'm getting at is I think that in order for the

4   jury to be fairly educated about what they were saying,

5   that you have to allow both sorts of those things in

6   there, and I'm prepared to do that depending upon what

7   Mr. Berry testifies about through his cross-examination.

8   I certainly think it also could come in, if the

9   defendants should choose to testify, through them, but

10  I, you know, it just seems to me that that's a --

11        THE COURT:  I'll have to deal with it when it

12  comes.  Everything is fact specific.  I'll make a

13  determination based on objections as they arise.  I

14  don't want to give a declaratory judgment here.  Yes?

15        MR. LANGE:  I can reasonably assume that

16  you're going to object to out-of-court statements by the

17  defendants at least as part of -- prior to them

18  testifying, in other words, you're not going to agree

19  that those CDs and such that I gave you will come in.

20        MR. HUFTALEN:  Correct.  As you know from our

21  discussions before the trial and through the trial,

22  we've been very careful not to put in evidence of

23  out-of-court statements by either of the defendants

24  because we didn't want to be fighting the uphill battle

25  of the rule of completeness and we kept that out of our

1   case entirely.  And I understand your position is that

2   all of those DVDs and video recordings all come in

3   perhaps as 803(3) present sense impressions which we

4   object to.  We think any of those statements by the

5   defendants are self-serving statements.  They're not

6   offered against the party in interest and I don't see

7   any exception to the hearsay rules that would allow

8   them, so yes, we're going to object to all of those, any

9   statements by the defendants that were made out of

10  court.

11          THE COURT:  Go ahead, Mr. Iacopino.

12          MR. IACOPINO:  Do I understand that you're not

13  going to put in any statements either through Berry or

14  the other witnesses that you have left about things Mr.

15  and Mrs. Brown said?

16          MS. OLLILA:  That's correct.

17          MR. IACOPINO:  He's not going to put in any of

18  the web site stuff or --

19          MS. OLLILA:  No.

20          MR. HUFTALEN:  He's going to put in some

21  e-mail communications between Jason Gerhard --

22          MS. OLLILA:  No, he's not.  The ones that we

23  have today are it.  And I had neglected to indicate 2i

24  was into evidence, your Honor, and you did review it and

25  allow it in.  I just couldn't find it.

1           THE COURT:  Okay, so again, to the extent

2    anyone is going to put in videos or whatever, I want to

3    see them so I don't have to waste the jury's time.  Give

4    them to me in advance.

5           MR. LANGE:  The other issue is, it hasn't been

6    played yet, you agree that the surveillance video of

7    Riley be played.

8           MR. HUFTALEN:  Sure, you can play that any

9    point when you want to.

10          MR. LANGE:  I want to play that before you

11   rest.

12          THE COURT:  Okay.

13          MR. IACOPINO:  Judge, the only other thing I

14   wanted to raise --

15          THE COURT:  Just a second, I'm just trying to

16   think of something -- all right, I'll think of it.  Go

17   ahead.

18          MR. IACOPINO:  Just with that 2i which Ms.

19   Ollila, I don't know if it was actually part of the

20   package that got admitted together or not, I didn't

21   think it was, but just before we broke I had made that

22   -- I argued that it was irrelevant.  It's an e-mail that

23   says why do you want to know, in response to one that

24   says who wrote this.  I don't think that has any

25   relevance to, even under a co-conspirator statement

1    theory, there's really no relevance to that.  To the

2    extent it's been admitted, I would move it be stricken

3    from the record.

4              THE COURT:  2i?

5              MR. IACOPINO:  If it hasn't been admitted, I

6    object to it being admitted.

7              THE COURT:  Just a second, just a second, just

8    a second.  This appears to be an e-mail from Dan Riley

9    to Art Pollack?

10             MR. IACOPINO:  No, it's really an e-mail, as I

11   understand it, from Dan Riley to Reno, and Reno has

12   something under him that was from Dan Riley to Pollack

13   but that was sent from Reno to Dan Riley, as I

14   understand the way that this works, and I don't know who

15   Art Pollack is.  We have no idea who he is.

16             THE COURT:  I'm not so much concerned about

17   who they sent it to as much as who sent it.  This says

18   on the header sheet it's from Dan Riley to

19   gonzobluegonzo.

20             MR. IACOPINO:  That's Reno.

21             MS. OLLILA:  Correct.

22             THE COURT:  And then why do you want to know

23   appears to be the initial message.

24             MS. OLLILA:  Sure, we can redact that, your

25   Honor, that's not important.  It's the content contained

1    in the large paragraph that we're seeking to admit.

2            THE COURT:  And that's from Dan Riley to Art

3    Pollack.

4            MS. OLLILA:  Yes, which was also contained in

5    that e-mail, your Honor, so it was taken off of Cirino

6    Gonzalez's e-mail.

7            MR. HUFTALEN:  E-mail soliciting --

8            MS. OLLILA:  Correct, correct.

9            MR. IACOPINO:  This isn't an e-mail to Reno.

10   It's in some other e-mail that Reno is forwarding, and

11   as far as I know we don't have any background for this

12   or who these people are.  I mean, I assume these are

13   only admissible under the co-conspirator --

14           THE COURT:  Well, the statement has to be made

15   by a co-conspirator.  The statement can be made to a

16   police officer.

17           MS. OLLILA:  Correct.

18           THE COURT:  Unless I'm misreading

19   Petrozziello.  The issue is not who is receiving the

20   statement.  The issue is who is saying the statement.

21           MS. OLLILA:  And it's Danny Riley.

22           MR. IACOPINO:  Right, but it has to be in

23   furtherance of a conspiracy.

24           THE COURT:  Well, the statement here, Dan

25   Riley is saying this is what Ed needs, et cetera, et

1   cetera, et cetera.  He needs clothesline, deerflies,

2   flashlights, night vision goggles, smoke grenades, et

3   cetera, et cetera, et cetera, that's what I'm -- among

4   other things.  Counsel, you work on this.

5               MS. OLLILA:  Sure.

6               THE COURT:  If you can't agree, I'll make a

7   decision, but as far as I'm concerned, Petrozziello

8   deals with whether a co-conspirator is making the

9   statement and it's in furtherance of the conspiracy.  He

10  may be making it to an undercover agent.  He may be

11  making it to a police officer.  In some cases they do.

12  That has no relevance as to whether or not it's

13  admissible per se, and -- is this in already?

14              MS. OLLILA:  I believe it is.

15              MR. HUFTALEN:  I think it's not.

16              THE CLERK:  My understanding was you moved for

17  it.  They objected.  Then they asked if there were going

18  to be more questions of Jamie Berry and there were, so

19  you kind of put an end to it.

20              THE COURT:  Counsel talk to each other.  To

21  the extent you can work it out, fine.  To the extent you

22  can't, I'll deal with it before the jury comes in

23  tomorrow.

24              MR. LANGE:  Your Honor?

25              THE COURT:  Anyone else?

1          MR. LANGE:  I anticipate that there are going

2     to be some gaps tomorrow because I think there, speaking

3     for myself, I'm probably going to be making proffers as

4     to what's on those CDs.  I'll try and do it in the

5     morning, try to offer it before you bring the jury in.

6     And there are issues with respect to witnesses my client

7     will agree and not agree to be presented, so I don't

8     think tomorrow is going to go as smoothly as today.

9          THE COURT:  Okay.

10          MR. IACOPINO:  And I also would be surprised.

11          THE COURT:  I'm dealing with very competent

12    counsel.  I have high hopes and expectations.

13          MR. LANGE:  Hope we don't disappoint you.

14          THE COURT:  I'm rarely disappointed, trust me.

15          MS. OLLILA:  You are really or rarely?

16          THE COURT:  I'm rarely.  I am rarely

17    disappointed.

18          MR. HUFTALEN:  Until this week.

19          THE COURT:  Okay.

20          MR. HUFTALEN:  One other issue.

21          THE COURT:  Yes.

22          MR. HUFTALEN:  Mr. Iacopino's two witnesses.

23    Lauren Canario, I don't see a problem with her

24    testifying.  Christopher Fazio.  I've met with him.  I

25    think I know what the evidence is because we gave it to

 1    Mr. Iacopino.  We're going to object to Mr. Fazio

 2    testifying about -- Mr. Fazio is a radio personality.

 3    Conducted two recorded interviews of Ed and Elaine

 4    Brown.

 5              THE COURT:  Okay, when?

 6              MR. HUFTALEN:  When?

 7              THE COURT:  Yeah.

 8              MR. HUFTALEN:  While they were holed up in the

 9    house.

10              MR. IACOPINO:  After June 7th.

11              THE COURT:  When was the Riley incident?

12              MR. HUFTALEN:  June 7th.

13              THE COURT:  Go head.

14              MR. HULTALEN:  We interviewed them.  We have

15    recordings of the interview where they go into their

16    whole tax stance, as if you will.  We produced copies of

17    both of those.  I met with Mr. Fazio.  I considered

18    putting him on.  The price of admission wasn't low

19    enough for me, we didn't put him on.  If he's going to

20    be put on to talk about what the Browns have said or to

21    authenticate his recordings of them, we're going to

22    object to his testimony in its entirety, and I just

23    don't want Mr. Iacopino to be blind-sided tomorrow.

24              THE COURT:  So Mr. Fazio interviewed them and

25    what's he going to say?

1          MR. IACOPINO:  He's basically going to talk

2     about what they said during the course of their

3     interview.

4          THE COURT:  And what is that?  Do you have an

5     offer of proof?

6          MR. IACOPINO:  Yeah, depending upon how much

7     of it I were to get into, there are two lengthy

8     interviews, and during the course of that, the parts

9     that we are mostly interested in are those portions that

10    they indicate that they were going to defend themselves

11    from essentially what they considered to be unlawful

12    force.  That they haven't taken a shot I think is what

13    they -- all of the -- any aggressive action was all on

14    the part of the government, and I can make a better --

15         THE COURT:  Why don't you --

16         MR. IACOPINO:  -- better proffer for you in

17    morning.

18         THE COURT:  After you go through it.

19         MR. IACOPINO:  I'll even put it in writing for

20    you, your Honor.

21         THE COURT:  All right.  When the jury comes --

22    tell the jury, if we can tell them now, not to come in

23    till 9.  If they're already coming in, as soon as they

24    come in tell them they're going to be delayed till 9.

25    We'll start off with the proffer and we'll have argument

1  with regard to its admissibility, and then we will move

2  on from there.

3          MR. IACOPINO:  Okay.

4          THE COURT:  Then we will let the government

5  finish their case.  If Fazio can testify as to some of

6  it, you'll know.  If not, you don't have to worry about

7  it.

8          MR. IACOPINO:  Thank you, judge.

9          MR. HUFTALEN:  One other issue, and I should

10  know the answer to this and I don't.  I don't know if

11  David Hatch has any Fifth Amendment issues.  It was --

12          MR. LANGE:  He doesn't.

13          MR. HUFTALEN:  It was he who she was living

14  with when she cut the bracelet off and went back.

15          MR. LANGE:  Wasn't there when she --

16          MR. HUFTALEN:  Okay.

17          MR. LANGE:  I looked into that.

18          THE COURT:  Okay.

19          THE CLERK:  As far as the Dions, will you have

20  them here in the morning so if we get counsel for

21  9:00 --

22          MR. LANGE:  We'll try to get them here by 9.

23  I didn't think we were going to put our case in until

24  Wednesday, so I'll scramble.

25          THE CLERK:  And government, are there any

1    conflicts that you know of attorney wise?

2              MR. HUFTALEN:  I'm not aware of any conflicts,

3    no.

4              THE COURT:  All right, thank you.

5              MR. IACOPINO:  Thank you, your Honor.

6              THE COURT:  Feel free to chat with each other.

7              (Adjourned at 3:05 p.m.)

8                   C E R T I F I C A T E

9

10             I, Sandra L. Bailey, do hereby certify that

11   the foregoing transcript is a true and accurate

12   transcription of the within proceedings, to the best of

13   my knowledge, skill, ability and belief.

14

15

16   Submitted: 11/3/09       /s/ Sandra L. Bailey
                              SANDRA L. BAILEY, LCR, CM, CRR
17

18

19

20

21

22

23

24

25