**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/1/10

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                  \*
UNITED STATES OF AMERICA          \*
                                  \*  09-cr-30-01-02-GZS
            v.                    \*  July 7, 2009
                                  \*  8:30 a.m.
EDWARD and ELAINE BROWN           \*
                                  \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DAY 6
MORNING SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE GEORGE Z. SINGAL
AND A JURY


Appearances:

For the Government:    Arnold Huftalen, AUSA
                       Terry Ollila, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301

For Edward Brown:      Michael J. Iacopino, Esq.
                       Kristin Clouser, Esq.
                       Brennan, Caron, Lenehan
                       & Iacopino
                       85 Brook Street
                       Manchester, NH  03104

For Elaine Brown:      Bjorn Lange, Asst. Fed. Defender
                       Federal Defender's office
                       22 Bridge Street
                       Concord, NH  03301

Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

2

<pre>
 1                       I N D E X

 2

 3   Witness              Direct   Cross   Redirect   Recross

 4
     JAMIE BERRY
 5
     By Ms. Ollila          10               33
 6   By Mr. Lange                    22
     By Mr. Iacopino                 28                  35
 7
     KENNETH NUNES
 8
     By Ms. Ollila          36
 9   By Mr. Lange                    47
     By Mr. Iacopino                 48
10
     EDWARD BROWN
11   (Previously transcribed under separate cover)

12


13


14   Motions, page 52

15


16
     Exhibits                            ID        Evid.
17
     Government's Exhibit No. 11g                    45
18   Government's Exhibit No. 4g-1                   52
     Government's Exhibit No. 1a-a                   53
19   Government's Exhibit No. 7a-1                   53
     Government's Exhibit Nos. 8b through 8w; 9a;
20                       9b-1 through 9b-3;
                         9c-1 through 9c-12;
21                       9d; 9e-1 through 9e-7;
                         9f-1; 11j                   54
22   Government's Exhibit No. 1a-3                   59

23


24   Defendant's Exhibit No. 2-O                     23

25
</pre>

1                    IN CHAMBERS

2          THE COURT:  We're in chambers.  All counsel

3  are present.  We have a juror issue.

4          THE CLERK:  Yes, your Honor.  Juror Branden

5  Gould, who is in seat 13, his juror number was 48, he is

6  the crane operator --

7          THE COURT:  You all remember him?

8          MR. HUFTALEN:  Yes.

9          THE CLERK:  He advised me this morning that

10 yesterday one of his employees had to leave with a

11 stomach hernia and is in the hospital.  He is the only

12 person, Branden now, that can run the cranes.  This is

13 his busy season.  He's actually been very stressed

14 throughout this trial.  He hasn't been sleeping, he's

15 been getting migraines because of his business, and it's

16 a big business, and he feels he's not staying on top of

17 it, so he wanted to bring that to the court's attention.

18         THE COURT:  The obvious concern is that he's

19 going to want to rush.  He would like to be excused.

20 Government's position?

21         MR. HUFTALEN:  As much as I'd like to keep him

22 on the jury, I think it's a legitimate concern not only

23 for him personally, but the issue he alleges.

24         THE COURT:  Defendants?  Mr. Lange?  Do you

25 want to confer outside?  You're welcome to.

1          MR. IACOPINO:  Your Honor, I have no objection

2     to excusing him.

3          THE COURT:  Mr. Lange?

4          MR. LANGE:  Nor I.

5          THE COURT:  I didn't hear you.

6          MR. LANGE:  Nor I.

7          THE COURT:  I'm going to let him go.  That

8     leaves us with one alternate.  We're so close to the end

9     of the case, I'm not terribly concerned.  What I plan to

10    do, even if they go deliberate, is I'll keep the

11    alternate in reserve, tell him not to communicate with

12    anyone in case someone has a problem during

13    deliberation.

14         Would you let him know he's free to go, not to

15    discuss this case with anyone.

16         THE CLERK:  Yes, your Honor.  That would leave

17    alternate number 2, Sona Hirth, will be filling in.

18    I'll take his notebook as well and shred it.

19         THE COURT:  Don't have him talk to the other

20    jurors.

21         All right, let me know when we're ready.

22    Okay, thank you.

23                       BEFORE THE COURT

24         THE COURT:  Ready for the jury?  Bring in the

25    jury.  Is there something -- yes?

1          MR. IACOPINO:  Yes, your Honor, we thought you

2   were going to take a proffer from us on the Christopher

3   Fazio --

4          THE COURT:  All right, let me take a look.

5   Have a seat.  I have testimony of Christopher; is that

6   correct?

7          MR. IACOPINO:  Yes, sir.

8          THE COURT:  Are they number one?  They're not

9   going to be testifying right now, are they?

10          MR. IACOPINO:  No.

11          THE COURT:  I'll read it.

12          MR. IACOPINO:  Thank you.

13          THE COURT:  You have the actual video?

14          MR. IACOPINO:  Yes, it's --

15          MS. CLOUSER:  Yes, we do.  It's Exhibit M.

16          THE COURT:  I'll take a look at it during the

17   break.  How long is the video?

18          MS. CLOUSER:  The first video is 50 minutes.

19   The second --

20          THE COURT:  5-0?

21          MS. CLOUSER:  5-0.  The second video is

22   24 minutes.

23          THE COURT:  And you expect to play the entire

24   videos, both?

25          MS. CLOUSER:  No.

1            THE COURT:  You have the portion redacted that

2   you plan to play?

3            MS. CLOUSER:  Yes, we do.

4            THE COURT:  How long is that?

5            MS. CLOUSER:  That is approximately

6   13 minutes.

7            THE COURT:  All right, I want that portion

8   available to me during our first recess.  I'll take a

9   look at it.

10            MR. IACOPINO:  Thank you.

11            THE COURT:  Anything else?  Let's bring in the

12   jury.

13                     BEFORE THE JURY

14            THE COURT:  Good morning, members of the jury.

15   Couldn't get the sun to last even another day,

16   unfortunately.

17            You know that one of the members of your jury

18   is not with you.  He's been excused.  You're not to

19   speculate why or have that in any way relate to what's

20   going on here.

21            We ready to proceed?

22            MS. OLLILA:  We are, your Honor.

23            THE COURT:  All right.  You may proceed.

24            MS. OLLILA:  Your Honor, counsel has requested

25   that we approach sidebar on an issue.

1          THE COURT:  All right.

2                    AT SIDEBAR

3          MS. OLLILA:  Your Honor may recall from the in

4   chambers conference last night that counsel objected to

5   this exhibit coming in.  The United States had

6   proposed -- and specifically the objection that counsel

7   raised was some additional language which were not

8   co-conspirator statements.  The additional language

9   includes the language contained on the top of page two

10  of Government's Exhibit 2i which states, why do you want

11  to know, and who wrote this.  The United States proposes

12  that we redact that portion of the e-mail.  Counsel has

13  indicated that they don't want that redacted but counsel

14  still does object to the admission of that e-mail.

15         THE COURT:  Let me hear from defense counsel.

16  Basis of the objection.

17         MR. IACOPINO:  It's the same objection that I

18  made yesterday, your Honor, in terms of it being hearsay

19  and not relating in any -- not being relevant in any way

20  to the conspiracy.  The statement that they are trying

21  to get in through this exhibit is not the e-mail from

22  one of the alleged co-conspirators to another alleged

23  co-conspirator, but it's some body of an e-mail

24  apparently addressed to some person named Art Pollack.

25         THE COURT:  Would it make a difference if they

1   were talking to -- you're saying the difference is they

2   are not talking to a co-conspirator?

3          MR. IACOPINO:  Right.  We're saying it's the

4   manner in which it's being offered in that it says

5   something that was written to somebody who we don't even

6   know who he is makes it irrelevant to this case, your

7   Honor, and it's for that reason that we object.  I

8   understand that the government's offered to redact it.

9   They did.  However, if it's going to come in, we prefer

10  that it come in without the proposed redaction.

11         THE COURT:  Mr. Lange.

12         MR. LANGE:  I join in his arguments and only

13  add that I submit that this does not fall under Rule

14  801, that it's not a statement by a co-conspirator

15  during the course of the conspiracy which furthers the

16  conspiracy.  It appears to be an e-mail written by Riley

17  to Gonzalez sometime after Gonzalez left.

18         MR. IACOPINO:  And I agree with that as well,

19  your Honor.

20         THE COURT:  So defense counsel is not in favor

21  of any redactions?

22         MR. LANGE:  No, we object to it, but if it's

23  going to come in we'd ask that it not be redacted.

24         THE COURT:  All right, I'm going to let it in.

25  It's a co-conspirator statement.

1         MS. OLLILA:  And there's one final issue, your

2    Honor, that counsel raised with the United States

3    yesterday.  It involves Government's Exhibit 2g.  This

4    is also an e-mail taken from Cirino Gonzalez's e-mail

5    account.  The only portion which the United States wants

6    to get in, your Honor, as a co-conspirator statement is

7    one line contained on page two which says, we have a war

8    to win and we need everybody.  The United States has

9    offered to redact the rest of the document, the complete

10   document except that line, and accept the fact it was an

11   e-mail from Danny Riley to Cirino Gonzalez.  Counsel has

12   indicated that if your Honor rules that this is a

13   co-conspirator statement, they want the entirety of that

14   document to come in.

15        THE COURT:  All right, let me look at it.  All

16   right, just for the record, the first document we were

17   just talking about was Government's Exhibit 2i.  The

18   document I'm looking at now is 2g.

19        (Pause.)

20        THE COURT:  All right, I don't see this as a

21   co-conspirator exception statement.  I'm going to let it

22   in.

23        MS. OLLILA:  Okay, thank you.

24        THE COURT:  Anything else?

25        MS. OLLILA:  Nothing further.

 1          THE COURT:  All right.

 2                     BEFORE THE JURY

 3          THE CLERK:  Just to remind you, Mr. Berry, you

 4  are still under oath.

 5          THE WITNESS:  Yes.

 6               DIRECT EXAMINATION cont'd

 7  BY MS. OLLILA:

 8      Q.   Dena, please pull up Government's Exhibit 2i

 9  and highlight the from and to section.

10           Deputy Berry, who is this e-mail from?

11      A.   It's from Dan Riley.

12      Q.   And who is it to?

13      A.   It's to Cirino Gonzalez.

14      Q.   When is it dated?

15      A.   It's dated August 4th, 2007.

16      Q.   Now, Dena, please turn to page two.  And what

17  I want you to do is highlight that section, the first

18  line.

19           Deputy Berry, the first line starts with hum.

20  Can you read that?

21      A.   Hum, everything that Ed needs real bad is.

22      Q.   And what is the date of this e-mail?

23      A.   August 4, 2007.

24      Q.   Now, Deputy Berry, if you count down in that

25  e-mail eight lines which starts with batteries Motorola,

1    can you please read -- I'm sorry, six lines starting

2    with someone comes near, could you please read that

3    sentence, and Dena, highlight it starting with someone

4    comes near.

5        A.   Someone comes near it, cardboard, thicker the

6    better, roofing nails, bigger better, black and green

7    spray paint, loud sirens, bullhorns, portable 12-volt

8    power jack, they're about 20 to $30, two-way radios, not

9    the ones that take Triple A batteries, Motorola

10   preferably, I cannot emphasize enough night vision

11   goggles, any reading material to do with tactical

12   training, hand-held scanners trunked if possible,

13   individual cameras hand-held, throw away cell, I believe

14   it's supposed to be phones, hones, with minutes and the

15   phone number written on it with a piece of tape,

16   clothesline rope, you know this hot weather is perfect

17   for drying outdoors and save on Ed's batteries and fuel,

18   parachute cord flares and flare guns, bigger better.  Oh

19   yeah, I forgot the number one most important thing.

20   People to come and make a stand to their death if

21   necessary.

22       Q.   Okay, stop there.  Deputy Berry, let me draw

23   your attention to April of 2006.  Dena, you can take

24   that down.  In April of 2006 were you conducting

25   surveillance on Edward and Elaine Brown?

1        A.   Yes.

2        Q.   And was your surveillance in anticipation of

3   arresting Edward and Elaine Brown?

4        A.   Yes.

5        Q.   Who were you conducting surveillance with?

6        A.   Deputy Ken Nunes.

7        Q.   And how often were you conducting

8   surveillance?

9        A.   I believe we did it for a few weeks every day,

10  Monday through Friday.

11       Q.   What is surveillance?

12       A.   Just watching an individual.  In reference to

13  this we were trying to establish a pattern, see how they

14  lived, see how they reacted throughout the day.

15       Q.   Did it appear based on your surveillance that

16  Edward Brown had a job and went to work?

17       A.   No.

18       Q.   Did it appear based on your surveillance that

19  the defendant Elaine Brown had a job and went to work?

20       A.   Yes.

21       Q.   Where did she go to work?

22       A.   Her dental practice.

23       Q.   Do you know where her dental practice is

24  located?

25       A.   It's on Glen Road in Lebanon, New Hampshire.

1          Q.    Now, after Edward and Elaine Brown left trial,

2     did you also have another job of surveilling -- being

3     surveillance in the area of their Plainfield residence?

4          A.    Yes.

5          Q.    And when did you approximately start that

6     surveillance?

7          A.    I assisted a few times April, May and

8     sometimes in June and July.

9          Q.    What did that surveillance consist of?

10         A.    Initially it consisted of the installation of

11    the camera across from the driveway, and that was the

12    April/May time frame.

13         Q.    How did you install a camera across from the

14    driveway.  When you say the driveway, you're referring

15    to their residence?

16         A.    Yes.

17         Q.    How did you install a camera?

18         A.    I -- we inserted in the woods probably a mile

19    from the residence, we followed basically a snowmobile

20    path until we came in front of the driveway.  The first

21    camera I didn't actually see physically installed.  It

22    was a hard drive digital camera and we would have to go

23    in and swap out the hard drive and the batteries every

24    couple days.

25         Q.    Why did you have to swap out the hard drive

1    and the batteries every couple of days?

2        A.    The hard drive can only keep so much

3    information and then the batteries only last so long.

4        Q.    Now, you didn't do this with people watching

5    you, did you, with neighbors and the Browns seeing you,

6    did you?

7        A.    No.

8        Q.    You did it in a covert manner; is that

9    correct?

10       A.    Yes.

11       Q.    How was the quality of that first camera?

12       A.    It was very poor.

13       Q.    Where was the camera pointed toward?

14       A.    It was pointing towards the driveway.

15       Q.    At some point in time did you have to replace

16   that camera?

17       A.    Yes, it was in May.

18       Q.    May of what year?

19       A.    2007.

20       Q.    Why did you have to replace that camera?

21       A.    It actually was in a water tight container and

22   it wasn't water tight, it actually flooded out a couple

23   times.

24       Q.    And what did you replace it with?

25       A.    Initially we replaced it with the same camera

1   system but just a newer box which contained the hard

2   drive.

3        Q.   And how was the quality of that second camera?

4        A.   It was the same.  We installed an additional

5   camera after that.

6        Q.   So the third camera, how did you install the

7   third camera?

8        A.   That one was a little bit more work.  Took a

9   bit more team members.  Our electronic surveillance unit

10  assisted and we started again a mile from the residence

11  into the woods, followed a snowmobile path, and then

12  installed a camera while we had a line crew who appeared

13  as normal telephone workers, had a bucket and

14  everything, on the van.  It appeared to me to be a 56K

15  modem style older system.

16       Q.   What does that mean?

17       A.   It was basically an older modem.  It had a

18  direct phone line that went to that modem which

19  transmitted the camera signal to a location.

20       Q.   All the cameras that were utilized, were they

21  pointed at the direction of Edward and Elaine Brown's

22  residence -- excuse me, driveway?

23       A.   Just the driveway.

24       Q.   Now, with respect to that final camera, how

25  did that operate?

1       A.    That operated fine.  The video quality was

2   poor.  Like I said, it's an older type modem.

3       Q.    Why was the video quality poor?

4       A.    Personally I believe just because it was an

5   older -- it was an older system.  Like I said, it was

6   basically an older modem system and that's how it was

7   explained to us, that this is an older system but it

8   works.

9       Q.    How is reception in that area in Plainfield,

10  New Hampshire?

11      A.    Horrible.

12      Q.    Now, is it also fair to say that you conducted

13  roving surveillance?

14      A.    At times, yes.

15      Q.    What is roving surveillance?

16      A.    A certain area you may want to concentrate on

17  looking for individuals that may have to do with your

18  case or, you know, just kind of watching an area just to

19  see what's going on, times people are coming and going.

20      Q.    When you conducted surveillance, you never

21  crawled up on to their property toward their house, did

22  you?

23      A.    No.

24      Q.    Did you ever see Cirino Gonzalez during your

25  surveillance?

1      A.   Yes.

2      Q.   Where did you see him?

3      A.   One time when we were switching out the hard

4   drives I saw him coming down the driveway in his

5   vehicle.

6      Q.   Do you remember approximately what month that

7   was?

8      A.   It would have been May 2007.

9      Q.   Dena, please pull up 26.

10          Deputy Berry, who is this pictured in the

11   photograph depicted on the monitor in Government's

12   Exhibit 26?

13      A.   Cirino Gonzalez.

14      Q.   Did something happen on July 17, 2007?

15      A.   Yes, there was a vehicle accident.

16      Q.   Who got into an accident in a vehicle?

17      A.   Jason Gerhard.

18      Q.   Whose motor vehicle was he in?

19      A.   Elaine Brown's.

20      Q.   What happened on July 18th?

21      A.   July 18th Jason Gerhard went to the Lebanon

22   Police Department to file a stolen vehicle report.

23          MR. LANGE:  Objection, foundation.

24          THE COURT:  Lay a foundation.  Jury disregard.

25      Q.   Do you know how, just yes or no, do you know

1   what happened to Elaine Brown's vehicle on July 17th?

2        A.   Yes.

3        Q.   Did someone seize that vehicle?

4        A.   Yes.

5        Q.   Who seized it?

6        A.   Ken Nunes and another deputy that was assigned

7   up there with him, I'm not sure who it was.

8        Q.   Now, were you present at the Lebanon Police

9   Department on July 18th?

10       A.   Yes.

11       Q.   Why were you present there?

12       A.   Lebanon PD had called.  I was dropping off

13  supplies to Ken Nunes, and Lebanon PD had called him to

14  say Jason Gerhard was at the police station to file a

15  stolen vehicle report.

16       Q.   Did you go to the Lebanon Police Department?

17       A.   Yes, we did.

18       Q.   And what did you do when you were there?

19       A.   We spoke with Jason Gerhard.

20       Q.   Why did you speak with him?

21       A.   We were trying to convey a message to go home

22  and don't ruin your life over this.

23       Q.   Did he threaten you?

24            MR. LANGE:  Objection.

25            THE COURT:  Basis?

1         MR. LANGE:  It's leading and also foundation.

2         MR. IACOPINO:  It's also hearsay, your Honor.

3         MS. OLLILA:  Co-conspirator statement, your

4    Honor.

5         THE COURT:  It is leading.  Ask another

6    question.

7    Q.   BY MS. OLLILA:  When -- how long --

8         THE COURT:  I'm having trouble hearing.

9         MS. OLLILA:  Oh, I'm sorry, your Honor.  I

10   thought I was so loud I was trying to tone it down.

11   Q.   BY MS. OLLILA:  Did you sit down with Jason

12   Gerhard, Deputy Berry?

13   A.   We didn't sit down.  It was kind of just

14   standing, talking to him.

15   Q.   How long did your conversation last?

16   A.   45 minutes approximately.

17   Q.   And just yes or no to this question.  Did he

18   make statements to you about Edward and Elaine Brown?

19   A.   Yes.

20   Q.   Just yes or no to this next question.  Did he

21   make comments to you or statements to you about your

22   attempts to arrest Edward and Elaine Brown?

23   A.   Yes.

24   Q.   What did he say?

25         MR. IACOPINO:  Objection.

1          THE COURT:  Basis?

2          MR. IACOPINO:  It's hearsay, your Honor.

3          THE COURT:  Let me see counsel.

4                        AT SIDEBAR

5          THE COURT:  I think I know the answer, but let

6     me hear it.

7          MS. OLLILA:  The answer is Jason Gerhard told

8     us that our attempts to arrest Edward and Elaine Brown

9     were a violation of the Constitution which constituted

10    treason and are therefore punishable by death.

11         MR. IACOPINO:  I object, your Honor, it's

12    hearsay.  It's not a statement made in furtherance of

13    the conspiracy, number one.  Number two, it's a

14    statement made to a police officer, so I believe under

15    Crawford and the Sixth Amendment it's also inadmissible,

16    and on those bases I would object.

17         MR. LANGE:  I join.

18         THE COURT:  All right, I think it is a

19    statement in furtherance of the conspiracy made by a

20    co-conspirator and subject to Petrozziello.  A statement

21    by a co-conspirator does not have to be made to another

22    co-conspirator to be within that exception.  If counsel

23    has any case law that says that, I'd like to see it, but

24    I don't believe that's necessary.  I see this as a

25    statement in furtherance of the conspiracy because it's

1   done to discourage attempts to arrest, attempts to scare

2   or intimidate the Marshal Service.  Go ahead.

3   Overruled.

4                          BEFORE THE JURY

5        Q.   BY MS. OLLILA:  Deputy Berry, what did Jason

6   Gerhard say?

7        A.   To summarize it, if somebody violated the

8   rights set forth within the Constitution, it would be

9   considered treason and executable by death.

10       Q.   Executable by death?

11       A.   Yes.

12       Q.   Where were you on June 7, 2007?

13       A.   Farmington, New Hampshire.

14       Q.   Why were you in Farmington, New Hampshire?

15       A.   Conducting surveillance.

16       Q.   Let me show you, Deputy Berry, what is marked

17   and has come into full evidence as Government's Exhibit

18   la-3.  Do you recognize what that is?

19       A.   Yes.

20       Q.   What is it?

21       A.   It's a fingerprint card of Edward Lewis Brown.

22       Q.   Where did that fingerprint card come from?

23       A.   This would have originated from our office.

24       Q.   And do you frequently turn those over when

25   requested to do so?

```
 1        A.   Yes.

 2        Q.   Did you turn this fingerprint card over?

 3        A.   Not personally, but --

 4        Q.   Did your office turn it over?

 5        A.   Yes.

 6        Q.   I didn't hear that.

 7        A.   I know one was, yes.

 8        Q.   Okay.

 9             MS. OLLILA:  I believe that's it, your Honor.

10   May I have a moment?

11             (Pause.)

12             MS. OLLILA:  Nothing further, your Honor.

13             THE COURT:  Thank you.  Cross-examination, Mr.

14   Lange?

15             MR. LANGE:  Yes, your Honor.

16                       CROSS-EXAMINATION

17   BY MR. LANGE:

18        Q.   You testified about a surveillance camera that

19   was positioned at the end of the Brown driveway.  That

20   camera was there on June 7, 2007; is that right?

21        A.   Yes.

22        Q.   And did you make recordings of the images that

23   were taken from that camera?

24        A.   I didn't personally.

25        Q.   Did you or someone working in your office make
```

1    such recordings?

2         A.    I believe that that camera was set up straight

3    to a DVR.

4         Q.    So that someone could record off a DVR?

5         A.    Yes.

6              MR. LANGE:  Your Honor, at this time I offer

7    Defendant's Exhibit 2-O.  It's a clip from the

8    surveillance video.

9              MS. OLLILA:  No objection, your Honor.

10             MR. LANGE:  I'd ask that it be played.

11             THE COURT:  Exhibit 2-O is admitted without

12   objection.

13             (Defendant's Exhibit 2-O admitted.)

14        Q.    BY MR. LANGE:  Deputy Berry, this is just a

15   clip.  This is not the whole --

16        A.    Yes, sir.

17             MS. OLLILA:  Your Honor, this is just going to

18   take a moment to load up.

19             THE COURT:  That will be fine.

20        Q.    BY MR. LANGE:  There's no audio in this; is

21   that right?

22        A.    There's no audio.

23        Q.    Do you actually know where the camera was

24   positioned?

25        A.    Yes.

1        Q.    How far back from Center of Town Road was the

2   camera?

3        A.    Maybe 15 feet back.

4        Q.    You're aware that an effort was made to arrest

5   Ed Brown at the driveway particularly on the morning of

6   June 7?

7        A.    Yes.

8        Q.    Are you aware of who came in front of the

9   camera at some point around 8 or 8:30 that morning?

10       A.    Yes, Danny Riley.

11             (Video clip being played.)

12       Q.    I take it that there are some skipping in

13   this.  It does not take a continuous image?

14       A.    I'm not sure how it was set up.  Because it

15   was an older system I think the data stream was probably

16   a little slow.

17       Q.    There was some motion in there at the lower

18   left corner.

19       A.    Yes.

20       Q.    Do you know what that was?

21       A.    I take it it was a person.

22       Q.    What -- is the camera looking in the direction

23   of the driveway?

24       A.    Yes.  On the right you can see the three

25   trees.  The driveway I believe is right there.

1          Q.    Now we're seeing some figures directly in

2   front of the camera?

3          A.    Yes.

4                (Video clip still playing.)

5          Q.    Is the driveway just the light area?

6          A.    Yes.  Just left to the trees I believe is the

7   driveway.

8          Q.    A little right of center of the image?

9          A.    Ah-hum, yes.

10         Q.    When you see something in that driveway area,

11  please let us know.

12               (Video clip still playing.)

13         A.    I see a dog.

14         Q.    That's also known as Zoe?

15         A.    Yes.

16         Q.    She's moving from the right side of the image.

17  Now there's a figure behind the tree?

18         A.    Yes.

19         Q.    That turns out to be Daniel Riley?

20         A.    Yes.

21               (Video clip continuing to play.)

22         Q.    What's moving across the image now?

23         A.    Daniel Riley coming down the driveway with the

24  dog Zoe.

25         Q.    He appears to be approaching the agents that

1    are hidden in the woods?

2         A.   Yes.

3         Q.   Can you tell what's in his hand?

4         A.   I can't, but I heard it was a coffee cup.

5         Q.   There's motion off to the left.  Appears to be

6    the dog?

7         A.   Yes.

8         Q.   He appears to have his left hand raised over

9    his eyes at some point?

10        A.   Yes.

11        Q.   Fair to say the dog is coursing back and forth

12   in front of the camera?

13        A.   Yes.

14        Q.   We don't see any motion from the agents or the

15   marshals at this point, do we?

16        A.   No.

17             (Video clip still playing.)

18        Q.   Is there any way to tell how long this

19   sequence takes in realtime that you're aware of?

20        A.   I have no idea.

21        Q.   Mr. Riley seems to be doing the classic

22   looking for something pose there with his hands over his

23   eyes?

24        A.   Yes.

25        Q.   Now we're seeing motion in the front, and

1   that's the back of one of the marshals?

2        A.   Yes.

3        Q.   Where's Mr. Riley at that point?

4        A.   Up the driveway.

5        Q.   Appears to be at least two uniformed personnel

6   going after Mr. Riley?

7        A.   Seems to be a few people there.  It's hard to

8   tell.

9        Q.   Now, there was no other camera positioned

10  along the driveway, is that right, on June 7th?

11       A.   I believe there was still another one there,

12  but I don't think it was operational.  It was motion

13  sensored.

14       Q.   So the only image that we might have as to

15  what occurred between Mr. Riley and the agents around

16  this time is the photo we're looking at now?

17       A.   Yes.

18            (Video clip still playing.)

19       Q.   I take it that that's one of the deputies

20  going up the driveway to the cleared area?

21       A.   Yes.

22            MR. LANGE:  Your Honor, at this point there's

23  additional portions if the government wants to look at

24  it or someone wishes to see it.  My point has been made.

25            THE COURT:  All right.  We can end it now,

1   then, if that's what I'm hearing.

2           MR. LANGE:  I don't have anymore questions,

3   thank you.

4           THE COURT:  Thank you.  Mr. Iacopino,

5   questions?

6           MR. IACOPINO:  Yes, thank you, your Honor.

7                   CROSS-EXAMINATION

8   BY MR. IACOPINO:

9       Q.   Good afternoon -- good morning, deputy.

10      A.   Good morning.

11      Q.   You indicated that you were involved in

12  surveilling the Browns prior to their arrest on the tax

13  case in May of 2006?

14      A.   Yes, sir.

15      Q.   All right.  And were you involved on the day

16  of their arrest in the tax case in May of 2006?

17      A.   Yes, I was, sir.

18      Q.   Had you been involved previously in assisting

19  the Internal Revenue Service with conducting a search of

20  the dental practice in Lebanon in 2004?

21      A.   No, sir.

22      Q.   Are you aware of that search?

23      A.   Yes, sir.

24      Q.   And was that made known to your agency?

25      A.   Yes.

1     Q.   And did you have any role in that at all

2   through communications or any other role?

3     A.   In the 2004 search?

4     Q.   Yes.

5     A.   No.

6     Q.   Do you know how many agents were involved in

7   that search?

8     A.   I have absolutely no idea.

9     Q.   Let me take you back, then, to the time prior

10   to the May 2006 arrest of Mr. and Mrs. Brown.

11        You indicated that you conducted some

12   surveillance; is that correct?

13     A.   Yes, sir.

14     Q.   And on one day during that surveillance you

15   were in the vicinity of the Brown property when Mr.

16   Brown was mowing his lawn; correct?

17     A.   The residence, sir?

18     Q.   Was it the residence or was it the office?

19     A.   The office, I did see him doing some yard work

20   there, yes, sir.

21     Q.   And on that occasion he was all by himself;

22   correct?

23     A.   Yes, sir.

24     Q.   Just out there working, minding his own

25   business; right?

1       A.   Yes, sir.

2       Q.   You had a warrant for his arrest; correct?

3       A.   Yes, sir.

4       Q.   And you called in to your superior and said I

5  think I can go up and arrest him right now, didn't you?

6       A.   Yes.

7       Q.   But you were told not to?

8       A.   Yes, we were told not to.

9       Q.   And instead what happened was your superiors

10  developed this ruse that was conducted on May 6th to

11  have Mr. Brown come down to West Lebanon; correct?

12       A.   Yes.

13       Q.   And there were a number of agents from

14  different agencies involved in that; correct?

15       A.   It was all Marshal Service personnel.

16       Q.   I'm sorry, but you brought in marshals from

17  other jurisdictions as well; correct?

18       A.   Yes.

19       Q.   You had snipers up on the hill; correct?

20       A.   No.

21       Q.   No?

22       A.   I was up on the hill that day.

23       Q.   Okay.  You had an arrest team and a transport

24  team and the surveillance team all in place; isn't that

25  correct?

1      A.   Yes.

2      Q.   How many total agents to arrest Mr. Brown on

3   May 6th?

4      A.   Arresting agents would have been four.  We had

5   four as an over watch, and then there was probably four

6   transport people.

7      Q.   So that, by my brief count, is 12?

8      A.   12.

9      Q.   Were there any more than that?  Anybody doing

10   surveillance or anybody else involved?

11      A.   There could have been some surveillance teams,

12   but I just really can't recall.

13      Q.   What about local or state police, were they

14   involved?

15      A.   I know Lebanon Police Department had two

16   cruisers there.

17      Q.   Now, sir, you testified about this incident

18   with Jason Gerhard where you saw him at the -- was it

19   the Lebanon Police Department?

20      A.   Yes, sir.

21      Q.   As a Deputy United States Marshal, do you

22   receive training in the United States Code, the law of

23   the United States, federal law?

24      A.   Yes.

25      Q.   And you're aware, sir, aren't you, that 18 --

1   Title 18, Section 2381 is in fact a law that makes

2   treason illegal?

3        A.   I would need to see the code.

4             MR. IACOPINO:  May I approach, your Honor?

5             THE COURT:  Yes.

6        Q.   BY MR. IACOPINO:  Let me show you 18, United

7   States Code, Section 2381, deputy.

8        A.   Yes, sir.

9        Q.   And is that in fact the law that makes treason

10  illegal in the United States?

11       A.   Yes.

12       Q.   And in fact does the law state what the

13  penalty for treason is?

14       A.   Yes.

15       Q.   And what is it?

16       A.   Let's see, the United States -- guilty of

17  treason shall suffer death or shall be in prison not

18  less than five years and fined under this title but not

19  less than $10,000.

20       Q.   So when Mr. Gerhard said to you that the

21  penalty for treason is death, it was a correct statement

22  of the law as you just read it; isn't that correct?

23       A.   Yes.

24       Q.   And you weren't afraid of that statement, were

25  you?

1        A.   Not for myself, no.

2             MR. IACOPINO:  Thank you.  I have nothing

3    further, your Honor.

4             THE COURT:  Government?

5                     REDIRECT EXAMINATION

6    BY MS. OLLILA:

7        Q.   Deputy Berry, at the time Jason Gerhard went

8    to the Lebanon Police Department on July 18, 2007, how

9    long had it been since Ed Brown left trial on the tax

10   evasion charges?

11            MR. IACOPINO:  Objection, beyond the scope.

12            THE COURT:  Overruled.

13            THE WITNESS:  Approximately seven months.

14       Q.   Were there arrest warrants out for Edward and

15   Elaine Brown?

16       A.   Yes.

17       Q.   Is it your job to effectuate arrest warrants?

18       A.   Yes.

19       Q.   Were you engaged in treason, Deputy Berry?

20       A.   No.

21       Q.   Now, Mr. Iacopino just questioned you about

22   how many officers were there to effectuate the arrest

23   warrants of Edward and Elaine Brown in May of 2006.  You

24   recall his questions?

25       A.   Yes.

```
 1          Q.   And he asked you a question about whether or

 2     not you saw Ed Brown mowing the lawn before May 24th.

 3     Do you recall that question?

 4          A.   Yes.

 5          Q.   While you were doing surveillance of Ed Brown,

 6     did you ever see him with weapons?

 7          A.   Yes.

 8          Q.   How often did you see him with weapons?

 9          A.   Every time we saw him.

10          Q.   Did you ever look in his car?

11          A.   Yes.

12          Q.   Did you look in it from outside?

13          A.   Yes.

14          Q.   Did you ever open the door to get into his

15     car?

16          A.   No.

17          Q.   When you would looked in it, what was there?

18          A.   There was a rifle.

19          Q.   Why didn't you attempt to arrest him when he

20     was mowing the lawn?

21          A.   There was safety concerns because he was

22     armed.

23          Q.   And how many men did you have with you that

24     day when you saw him mowing the lawn?

25          A.   Myself and Ken Nunes.
```

1          Q.    You had two men; is that correct?

2          A.    Yes.

3                MS. OLLILA:  Nothing further, your Honor.

4                THE COURT:  Thank you.  Mr. Lange?

5                MR. LANGE:  Nothing further.

6                THE COURT:  Thank you.  Mr. Iacopino?

7                        RECROSS-EXAMINATION

8    BY MR. IACOPINO:

9          Q.    You were aware on that day when you called in

10   and asked for permission to arrest Mr. Brown that he

11   carried a weapon as a matter of course; isn't that

12   correct?

13         A.    Yes.

14         Q.    But you called in anyway, didn't you, to get

15   permission to make the arrest?

16         A.    Yes.

17         Q.    Because you felt you could reasonably do it;

18   isn't that correct?

19         A.    At the time, yes.

20               MR. IACOPINO:  Thank you.

21               THE COURT:  Government?

22               MS. OLLILA:  Nothing further.

23               THE COURT:  Thank you.  Mr. Lange?

24               MR. LANGE:  Nothing further.

25               THE COURT:  Thank you.  You may step down.

1    Call your next witness, please.

2              MS. OLLILA:  The United States calls Deputy

3    Ken Nunes.

4              THE CLERK:  Please raise your right hand.

5                        KENNETH NUNES

6         having been duly sworn, testified as follows:

7              THE CLERK:  Please be seated.  And for the

8    record, if you'd please state your name and spell your

9    name.

10             THE WITNESS:  My name is Kenneth Nunes.  The

11   last name N-U-N-E-S.

12             THE COURT:  You may proceed.

13             MS. OLLILA:  Thank you, your Honor.

14                     DIRECT EXAMINATION

15   BY MS. OLLILA:

16        Q.   Sir, how are you employed?

17        A.   Currently I'm the senior inspector with the

18   United States Marshal Service.

19        Q.   What's a senior inspector?

20        A.   I work for the Investigative Operations

21   Division which is a division that specializes in

22   fugitive investigations within the Marshal Service.

23        Q.   And what district do you work in?

24        A.   Currently I'm not -- I don't work in a

25   district, I work directly for headquarters.  We're a

1    division of the Marshal Service in general, so I'm not

2    assigned to a specific district.

3         Q.   Were you employed in the same capacity in the

4    year 2006?

5         A.   No.   In 2006 I was a deputy in the District of

6    New Hampshire.

7         Q.   What were your duties in 2006 as a deputy in

8    this district?

9         A.   In 2006 my duties would have been the general

10   duties of a Deputy United States Marshal which would

11   include fugitive investigation, witness protection,

12   asset forfeiture, court responsibilities, et cetera.

13        Q.   In April of 2006 were you tasked with

14   conducting surveillance on Edward and Elaine Brown?

15        A.   Yes.

16        Q.   Why?

17        A.   We received a request from the IRS for

18   assistance with executing an arrest warrant on Edward

19   and Elaine Brown.   So at that time one of the first

20   things we did was, you know, surveillance.

21        Q.   When you say one of the first things we did,

22   who is we?

23        A.   It was myself and other deputies in the

24   district.

25        Q.   And who would some of those other deputies be?

1       A.    Jamie Berry, Jeffrey White.   Those are the two

2   other main guys that helped on that.

3       Q.    How long did you engage in surveillance of

4   Edward and Elaine Brown?

5       A.    In 2 -- early 2006 it was probably a month to

6   a month and a half.

7       Q.    And by way of surveillance that means

8   following them around in a covert fashion?

9       A.    Yes.  It was covert surveillance, so we were,

10  you know, attempting to remain hidden, to try and

11  observe different patterns, to try and ascertain, you

12  know, some background and what, you know, possibly

13  develop a plan.

14      Q.    And did you see Edward and Elaine Brown while

15  you conducted surveillance?

16      A.    Yes, we did.

17      Q.    Did you ever see Edward Brown with a weapon on

18  him?

19      A.    Yes.

20      Q.    How often?

21      A.    Every time that I observed him and was close

22  enough to see, I was able to see a weapon in his

23  waistband.

24      Q.    And did you ever go up to his vehicle while he

25  was not in it and look inside?

```
 1          A.   I did.

 2          Q.   Did you ever open the door to the vehicle?

 3          A.   No.

 4          Q.   What would you see when you looked inside?

 5          A.   He was carrying an M1 carbine which is a

 6   military type, you know, World War II career military

 7   type rifle that fires a 30 carbine round.  It was with a

 8   long wooden shoulder stock.  It was in between the two

 9   seats where the console is, in between but visible

10   through the window.

11          Q.   All right.  Now let me direct your attention

12   to July 2007.  Are you aware that in July 2007 there

13   were arrest warrants for Edward and Elaine Brown?

14          A.   Yes, there were.

15          Q.   And was this after their tax evasion trial?

16          A.   Yes.

17          Q.   Did something happen on July 17, 2007?

18          A.   It did.

19          Q.   What happened on that date?

20          A.   (No response.)

21          Q.   Was there a motor vehicle accident?

22          A.   There was.  There was a -- we were called to

23   the parking lot of the Ninety Nine Restaurant in

24   Lebanon, New Hampshire, by a sergeant with Lebanon

25   police, and he called and said you might want to come
```

1    over here.  Elaine Brown's vehicle was just in an

2    accident.

3          Q.    Who was in Elaine Brown's vehicle when there

4    was an accident?

5          A.    It was a subject that we identified as Jason

6    Gerhard and two other females.

7          Q.    Had you ever seen Jason Gerhard prior to that

8    date, July 17, 2007?

9          A.    Yes, I had.

10         Q.    Where had you seen him, Deputy Nunes?

11         A.    I observed him at the commercial dental

12    property in Lebanon, New Hampshire.  I had also observed

13    him at the Plainfield Police Department.

14         Q.    Dena, please pull up 26-a.  Deputy Nunes, if

15    you look at your monitor to your left.  Who is depicted

16    in the photograph in Government's Exhibit 26a?

17         A.    That's Jason Gerhard.

18         Q.    Now, after the motor vehicle accident on

19    July 17th, 2007, were you at the Lebanon Police

20    Department the following day, July 18th, 2007?

21         A.    Yes.  We received a call from one of the

22    officers at Lebanon PD and he informed us that Jason was

23    at the PD in the lobby attempting to file a stolen

24    vehicle report.

25         Q.    Well, when Elaine Brown's vehicle was in a car

1    accident the day before on July 17th, what happened to

2    the car, did someone seize it?

3         A.   Yes, we seized it.

4         Q.   When you say we, who do you mean?

5         A.   The U.S. Marshals.  Myself and my partner that

6    day.

7         Q.   Now, when Jason Gerhard showed up at the

8    Lebanon Police Department the following day on the

9    18th of July, did you meet with him?

10        A.   Yes.

11        Q.   Were there other officers present?

12        A.   Yes, there were three other deputies and there

13   was also a Lebanon police officer in the lobby.

14        Q.   All right, now, the next series of questions I

15   just want yes or no answers to.

16             Did you speak with Jason Gerhard?

17        A.   Yes.

18        Q.   Did he speak with you?

19        A.   Yes.

20        Q.   Did he say anything to you, just yes or no,

21   about your efforts to arrest Edward and Elaine Brown?

22        A.   Yes.

23        Q.   What did he say to you about your efforts?

24             MR. LANGE:  Objection.

25             MR. IACOPINO:  Same objection we made, your

1   Honor, before at sidebar.

2           THE COURT:  Let me see counsel.

3                   AT SIDEBAR

4           THE COURT:  What is the expected answer?

5           MS. OLLILA:  The expected answer is that what

6   we were doing was a violation of the Constitution which

7   constituted treason punishable by death.

8           THE COURT:  Same objections?

9           MR. LANGE:  Yes.

10          MR. IACOPINO:  Same objection.  I'd also

11  object, your Honor, this is unnecessarily cumulative and

12  in violation of 403 in that it's the same testimony of

13  the witness that they just previously put on and that

14  any probative value of it coming in through this witness

15  is vastly outweighed by the cumulative and the unfair

16  prejudicial cumulative effect.

17          MR. LANGE:  I join.

18          THE COURT:  All right.  It's overruled.

19                  BEFORE THE JURY

20      Q.  BY MS. OLLILA:  Deputy Nunes, what did Jason

21  Gerhard say to you?

22      A.  Well, when we entered the lobby --

23          THE COURT:  The question is what did he say to

24  you.

25      Q.  With respect to your attempts to arrest Edward

43

1    and Elaine Brown, what did he say to you?

2         A.   He said that we were not following the

3    Constitution by attempting to arrest Ed and Elaine.

4         Q.   What else did he say?

5         A.   Well, I responded to that.

6         Q.   Okay, and then what did he say?

7         A.   He said that we were seen as enemies of the

8    Constitution and that would be considered treason, and

9    the penalty for treason was death.

10        Q.   Deputy Nunes, were you conducting surveillance

11   of Danny Riley in July of 2007?

12        A.   Yes.

13        Q.   Excuse me, and were you conducting

14   surveillance of Danny Riley in August of 2007?

15        A.   Yes.

16        Q.   Did you at some point surveil him to a

17   Wal-Mart?

18        A.   Yes.

19        Q.   What happened?

20        A.   We followed the vehicle he was driving into

21   the parking lot.  Parked in the parking lot.  Observed

22   him exit the vehicle, enter the Wal-Mart.  He returned

23   out of the store to his vehicle.  He was carrying

24   something at that time.  We were far enough where we

25   couldn't see exactly what he was carrying.  He got in

44

1      his vehicle and he made a couple other stops.

2            Q.   And do you recall what month this occurred in?

3            A.   I think this was some time in August.

4            Q.   And did you enter the Wal-Mart in attempt to

5      find out where Danny Riley went?

6            A.   At the conclusion of the surveillance that day

7      we did.

8            Q.   And where did you go inside the Wal-Mart?

9            A.   To the photo developing area.

10           Q.   And did you gain anything or get anything from

11     the photo developing area?

12           A.   Yes, we did.

13           Q.   Were the employees helpful and able to speak

14     with you without a problem?

15           A.   They were.

16           Q.   Let me show you what's marked as Government's

17     Exhibit 11g for identification.  Do you recognize what

18     that photograph is of?

19           A.   Yes, I do.

20           Q.   What is it of?

21           A.   It's a photo of Ed and Elaine Brown.

22           Q.   How did you get it?

23           A.   We obtained it from the Wal-Mart kiosk which

24     is a fancy printer that you put a memory card in.

25           Q.   Is that picture a fair and accurate depiction

1  of the photograph you obtained that day in August of

2  2007?

3      A.   Yes, that looks like the exact photograph we

4  obtained.

5           MS. OLLILA:  Your Honor, the United States

6  moves 11g into evidence.

7           MR. IACOPINO:  Objection, irrelevant.

8           THE COURT:  Overruled.

9           MR. LANGE:  Objection --

10          THE COURT:  Same objection?  Overruled.

11          (Government's Exhibit 11g admitted.)

12          MS. OLLILA:  Dena, please bring up 11g.

13      Q.   BY MS. OLLILA:  Deputy Berry, who is this a

14  photograph of?

15      A.   This is a photograph of Edward and Elaine

16  Brown.

17      Q.   Does Edward Brown appear to have something

18  tucked into his pants?

19      A.   He does.

20      Q.   What is tucked into his pants?

21      A.   A pistol.

22      Q.   Now, let me just back you up one more time.

23           In March of 2006, March 24th, 2006, did you

24  accompany members of the probation department to the

25  Brown residence?

46

1      A.   I did.

2      Q.   Were you there to assist members of the

3   probation office?

4      A.   Yes.

5      Q.   Were you let inside the residence?

6      A.   Yes, we were.

7      Q.   Did you go into the master bedroom?

8      A.   Yes.

9      Q.   Did you go into a safe -- or was a safe opened

10   in the master bedroom?

11      A.   There was a safe there, yes.

12      Q.   Did someone open it?

13      A.   Yes.

14      Q.   Who opened it?

15      A.   Elaine Brown.

16      Q.   Was there money in that safe?

17      A.   There was.

18      Q.   What did the money look like to you.  Can you

19   describe it by identifying how large it was?

20      A.   It was on the bottom shelf of the safe, and

21   from where I was standing it appeared to be a cube,

22   probably a foot by a foot and some depth, I couldn't see

23   how deep the cube would have been.

24      Q.   Was it in a bag?

25      A.   It was -- it wasn't -- it didn't appear to be

1   a bag.  It appeared to be some type of shrink wrap type

2   plastic around it.

3               MS. OLLILA:  I have no further questions, your

4   Honor.

5               THE COURT:  Thank you.  Cross-examination, Mr.

6   Lange.

7                         CROSS-EXAMINATION

8   BY MR. LANGE:

9        Q.   What you just described, did you take it out

10  of the safe?

11       A.   No.

12       Q.   Did you make any effort to open the bag?

13       A.   No.

14       Q.   Did you photograph the bag?

15       A.   I did not.

16       Q.   Did anybody else who was there with you

17  photograph the bag?

18       A.   I believe there is a photograph of it, but --

19       Q.   Have you seen the photograph?

20       A.   Yes.

21       Q.   And where did you see the photograph?

22       A.   I believe it was in the series of photographs

23  that somebody took of the search in general that day.

24       Q.   So you think that there's a photograph of the

25  search done on March 24th of 2006 which will show what

1  you just described?

2       A.  I believe so.

3           MR. LANGE:  Thank you.

4           THE COURT:  Thank you, Mr. Lange.  Mr.

5  Iacopino, questions?

6                    CROSS-EXAMINATION

7  BY MR. IACOPINO:

8       Q.  Let me get something straight, deputy.  The

9  role the United States Marshals were to play on that day

10  where you claim to have seen this cube is to assist

11  probation in removing any firearms from the home;

12  correct?

13      A.  Yes.

14      Q.  Your role was not to search the Browns'

15  residence, was it?

16      A.  Our role was to insure that there were no

17  dangers there present while probation carried out their

18  duties.

19      Q.  And it was probation's obligation to take the

20  firearms; correct?

21      A.  Yes.

22      Q.  And in fact, probation was further ordered by

23  the magistrate judge in that case to take those firearms

24  to a gun shop in Hooksett, New Hampshire, for

25  safekeeping; correct?

1      A.    I believe that's where the firearms ended up,

2  yes.

3      Q.    You weren't tasked in taking pictures or doing

4  any other kind of search on that day, were you?

5      A.    We would have been responsible to insure that

6  there were no dangers in the residence, and part of that

7  would have been accomplished by a search.

8      Q.    It wouldn't be accomplished by taking pictures

9  of anything, though; would it?

10     A.    No.

11     Q.    Let me bring you back to I think it was

12  identified as being in July of 2007 when you had the

13  contact with Mr. Gerhard.

14           You weren't at the Lebanon Police Department

15  when Mr. Gerhard arrived there; correct?

16     A.    Correct.

17     Q.    You received a call from somebody at the

18  Lebanon Police Department and you responded?

19     A.    Yes.

20     Q.    And it wasn't just you -- I take it at the

21  time it's fair to say Deputy Berry was pretty much your

22  partner?

23     A.    He was that day, he was up there that day,

24  yes.

25     Q.    So it wasn't just you and Deputy Berry that

1    responded to the Lebanon Police Department, but there

2    was another group of marshals that responded as well?

3        A.   There were four of us together at the time

4    that responded over there.

5        Q.   And you responded there because Mr. Gerhard

6    wanted to make a stolen motor vehicle report; correct?

7        A.   Correct.

8        Q.   And the Lebanon police officers simply could

9    have taken that report and provided you with a copy of

10   it; isn't that correct?

11       A.   Yes.

12       Q.   It's not your role as the United States

13   Marshal to take a stolen motor vehicle report, is it?

14       A.   No.

15            MR. IACOPINO:  Nothing further, your Honor.

16            THE COURT:  Thank you, Mr. Iacopino.

17   Government?

18            MS. OLLILA:  Nothing further, your Honor.

19            THE COURT:  Thank you.  Mr. Lange?

20            MR. LANGE:  No, thank you.

21            THE COURT:  You may step down.  Thank you.

22            MR. HUFTALEN:  May we approach?

23            THE COURT:  Of course.

24                        AT SIDEBAR

25            THE COURT:  Yes?

1          MR. HUFTALEN:  Subject to a few housekeeping

2     matters dealing with exhibits, a stipulation and asking

3     you to take judicial notice of one thing, the government

4     intends to rest at this point.

5          MR. LANGE:  What's the judicial notice?

6          MR. HUFTALEN:  Title 26, Section 1, based upon

7     your comments in your opening which I have at the table

8     where you, I believe, and I will paraphrase, state that

9     there's no clear statutory authority that Elaine could

10    look at that was in black and white that allowed her to

11    understand that there was an income tax.

12         MR. LANGE:  I don't know if that's judicial

13    notice.  I think it would be a jury instruction.

14         THE COURT:  So you want me to excuse the jury

15    and deal with this in open court?

16         MR. HUFTALEN:  I think so.  And I'll do the

17    Rule 29 also.

18         THE COURT:  Very good.

19                     IN OPEN COURT

20         THE COURT:  All right, ladies and gentlemen,

21    I'm going to excuse you at this time.  Probably going to

22    be around a half hour.  I've got some legal issues I

23    need to attend to.  We will call you back after that.

24    This will constitute your mid-morning break.

25         (Jury exited the courtroom.)

1            THE COURT:  You may be seated.  Mr. Huftalen.

2            MR. HUFTALEN:  Thank you, your Honor.  I

3    believe it was yesterday, if it wasn't yesterday it was

4    the day previous, the government introduced an exhibit

5    which was the U.S. Marshal Service video sweep of the

6    property -- it wasn't yesterday, a couple days ago --

7    second video showing a sweep of the property we played

8    without the audio.  I have today Government's Exhibit

9    4g-1 which we'd like to offer as the exhibit that will

10   go to the jury and not the one that had the audio.

11           THE COURT:  All right.  And there's no

12   objection to that, is that correct?

13           MR. LANGE:  Correct.

14           THE COURT:  All right.  And hearing no

15   objection this will replace the other one for purposes

16   of going to the jury, but we will retain the G exhibit.

17           (Government's Exhibit 4g-1 admitted.)

18           MR. HUFTALEN:  Likewise with Exhibit 1a-a

19   which is the undercover video of the arrest, I have a

20   copy that has no audio, and we'd offer to substitute

21   this for the previously marked and I believe admitted

22   copy of that video.

23           THE COURT:  Is that without objection?

24           MR. LANGE:  Without objection.

25           THE COURT:  All right, submitted and it will

1    replace the other.

2                (Government's Exhibit 1a-a admitted.)

3                MR. HUFTALEN:  I thought yesterday that I had

4    offered Government's Exhibit 7a-1 which is a Tannerite

5    instructional DVD that was actually played or a

6    significant portion of it was played.  I am told that

7    what I offered was 7a-1a which is a copy of the

8    instructional DVD that had been in the box and had been

9    to the lab and was covered with dust powder.  I'd offer

10   Government Exhibit 7a-1 which is in fact the DVD that

11   was played yesterday, and I understand that's without

12   objection as well.

13               THE COURT:  Is that to replace the other

14   exhibit or in addition to?

15               MR. HUFTALEN:  In addition to.

16               THE COURT:  Any objection?

17               MR. LANGE:  No, your Honor.

18               MR. IACOPINO:  No, your Honor.

19               THE COURT:  Without objection it's admitted.

20               (Government's Exhibit 7a-1 admitted.)

21               MR. HUFTALEN:  Additionally, your Honor, we

22   have one stipulation that I will mark as the

23   government's next sequentially numbered exhibit.

24               THE COURT:  What number would that be?

25               THE CLERK:  46, your Honor.

54

1           THE COURT:  46.

2           MR. HUFTALEN:  And I'd like to read it into

3   the record and make it an exhibit as well.

4           THE COURT:  All right, you'll have to do that

5   in front of the jury, but go ahead.

6           MR. HUFTALEN:  So the court knows, it's

7   captioned in this case and reads:  Stipulation.  The

8   government and both defendants, Edward Brown and Elaine

9   Brown, through respective undersigned counsel stipulate

10  that Government Exhibits 8b, 8c, 8d, 8e, 8f, 8g, 8h, 8i,

11  8j, 8k, 8l, 8m, 8n, 8o, 8p, 8q, 8r, 8s, 8t, 8u, 8v, 8w,

12  9a, 9b-1, 9b-2, 9b-3, 9c-1 through 9c-10, 9c-11, 9c-12,

13  9d, 9e-1 through 9e-7, 9f-1 and 11j all contain

14  gunpowder, and then it has signatures of all counsel.

15          THE COURT:  All right.  Is that agreed to by

16  all counsel?

17          MR. LANGE:  Agreed to by me, your Honor.

18          MR. IACOPINO:  Yes, your Honor.

19          THE COURT:  All right.

20          MR. HUFTALEN:  Earlier --

21          THE COURT:  That is admitted without

22  objection.  Again, Mr. Huftalen, as soon as the jury

23  comes back, read that to them.

24          MR. HUFTALEN:  I will, thank you.

25          (Government's Exhibits mentioned

1             above admitted.)

2             MR. HUFTALEN:  Earlier in the proceedings the

3    government had moved to strike as surplusage three

4    enumerated paragraphs in the indictment.  That was done

5    without objection.  Those paragraphs were paragraph 10C,

6    10E and 10F.

7             THE COURT:  10C, 10E and 10F.

8             MR. HUFTALEN:  E as in Edward, F as in frank.

9    At this point, without objection, I move to strike some

10   additional limited language which I have highlighted and

11   will give to the deputy clerk so there's no mistake.

12            What I propose to strike, generally, and I'll

13   read it in a moment, is some identifying information

14   with respect to the Colt firearm that there's been

15   testimony concerning Mr. Brown holding, and the Glock

16   firearm that was in Mrs. Brown's custody when she was

17   arrested.

18            As the indictment now reads in a number of

19   places as to the Colt, it says a Colt Model 1911, .45

20   cal. handgun.  I propose to strike each place where that

21   appears the words Model 1911, .45 cal.  So it merely

22   reads a Colt handgun.  That appears at paragraph 10B,

23   paragraph 10HH, and paragraph 17.

24            Likewise with the Glock handgun, the

25   indictment in several places now reads a Glock Model 17

1    .40 cal. handgun.  I propose to strike each time where

2    that appears the words Model 17 .40, so that it reads

3    after it's stricken, a Glock handgun.  That appears at

4    paragraph 10D, paragraph 10II, and at paragraph 18.

5            And for the deputy clerk's benefit I will hand

6    that copy that's marked to her.

7            THE COURT:  Very good.  Without objection, is

8    that correct, Mr. Lange?

9            MR. LANGE:  Yes, your Honor.

10            THE COURT:  Mr. Iacopino?

11            MR. IACOPINO:  Yes, sir.

12            THE COURT:  Done.

13            MR. HUFTALEN:  And your Honor, during Mr.

14    Lange's opening statement, a transcript of which I have

15    in front of me, he said, among other things, now you're

16    going to hear evidence in this case about plausible

17    argument that there is no statutory provision which

18    clearly states in black and white that we have a duty to

19    pay federal income tax on the gain from our personal

20    labor.  I'm skipping part of his text, and then he says

21    typically for someone like Elaine, that duty is not

22    clearly and succinctly laid out in statutory language in

23    some book which you and I can open and point to and read

24    and understand for ourselves.  In light of those remarks

25    I'd request that the court take judicial notice of Title

1   26, Section 1, and include in your instructions the

2   reference to Title 26, Section 1, which is that portion

3   of the Internal Revenue Code which deals with personal

4   income tax.

5            MR. LANGE:  I object to that, your Honor.  The

6   language in the section that they would propose you give

7   to the jury states very succinctly there is hereby

8   imposed on a taxable income and so on, a tax determined

9   in accordance with the following table.  The issue is

10  taxable income.  There is no clear definition of what

11  taxable income is.

12           THE COURT:  Mr. Lange, are you going to argue,

13  is it your intent to argue to the jury that your client

14  did this because she didn't find a taxable income

15  provision in the federal statutes, is that your

16  position?

17           MR. LANGE:  My position is going to be that

18  she did not find, as I indicated in my opening, the

19  government correctly quoted me, my position is going to

20  be the same in closing, that she did not find in the

21  income tax laws a clear statement what constitutes

22  taxable income.

23           THE COURT:  Therefore what?

24           MR. LANGE:  And therefore she had a good faith

25  reason for believing that she was unjustly convicted in

58

1    the other trial.

2            THE COURT:  I'm not sure I'm going to permit

3    you to argue that over objection.  I'll consider that

4    issue.  I won't give a -- I won't at this time rule with

5    regard to an instruction issue rather than a judicial

6    notice issue.  Go ahead.

7            MR. IACOPINO:  Your Honor, I would also lodge

8    our objection on the basis that counsel's statement in

9    the openings are not evidence and I assume the court's

10   going to give the jury instruction that such statements

11   are not evidence.

12           THE COURT:  I do intend to do that.  Anything

13   else from the government?

14           MR. HUFTALEN:  No, your Honor.  The government

15   rests.

16           THE COURT:  Very good.

17           MR. LANGE:  Your Honor, I have a couple of

18   points.  I want to make sure that Defendant's Exhibit

19   2-O is a full exhibit.

20           THE COURT:  Is 2-Oin?

21           THE CLERK:  Defendant's exhibit, yes.

22           MR. LANGE:  Also 2-i, Defendant's 2-i.

23           THE COURT:  Is that in?

24           THE CLERK:  2i-1.

25           MR. LANGE:  That would be the one without the

1    audio.

2            THE CLERK:  There's 2i-1 is the video without

3    the sound, yes.

4            THE COURT:  There you go.  Anything else, Mr.

5    Lange?

6            MR. LANGE:  Not at this time.

7            THE COURT:  All right.  Mr. Iacopino, do you

8    have anything?

9            MR. IACOPINO:  I do have a Rule 29 motion.

10           THE COURT:  We will deal with that in a

11   second.  The government's got a piece of paper in his

12   hand.

13           MR. HUFTALEN:  Yes, I apologize.  Government's

14   Exhibit 1a-3 which is the fingerprint card that Ms. Rees

15   used during her testimony, we offered it subject to

16   later testimony by Deputy Berry.  At the time we offered

17   it the ID, as we call it in New Hampshire, was stricken.

18   AUSA Ollila did have Agent Berry or Deputy Berry testify

19   that it was in fact a record kept in the ordinary course

20   of the Marshal Service.  To the extent that it wasn't

21   offered or received full, we offer it.

22           THE COURT:  Any objection?  No objection is

23   heard.  It's in.

24           (Government's Exhibit 1a-3 admitted.)

25           MR. HUFTALEN:  Thank you.  Nothing further.

1    The government rests.

2              THE COURT:  Very good.  Mr. Lange, do you want

3    to argue your motion first or second?

4              MR. LANGE:  I'll argue the motion first.

5              THE COURT:  Go right ahead.

6              MR. LANGE:  The first point I want to bring up

7    is the Petrozziello -- you know the case.

8              THE COURT:  Well, no, that's at the end of all

9    evidence.

10             MR. LANGE:  All right, Okay.

11             THE COURT:  You're a little premature.

12             MR. LANGE:  All right.  The second point --

13             THE COURT:  Petrozziello.

14             MR. LANGE:  Petrozziello.

15             THE COURT:  I think you're a little premature.

16   You're free to make your motion, but I think I'm

17   correct, that it's at the end of all evidence.

18             MR. LANGE:  I will renew it later.  With

19   respect to Count One of the indictment as modified,

20   Count Two with respect to the indictment as it charges

21   my client, and with respect to Count Four which charges

22   my client, I move pursuant to Rule 29 of the Federal

23   Rules of Criminal Procedure for a directed verdict of

24   acquittal on those counts.  My position is that with

25   regard to Elaine Brown the government has not met its

1   burden --

2               THE COURT:  Which counts are those again?

3               MR. LANGE:  They are counts one.

4               THE COURT:  One.

5               MR. LANGE:  Two.

6               THE COURT:  Two, yup.

7               MR. LANGE:  And four.

8               THE COURT:  Okay.  Go ahead.  Sorry to

9   interrupt.

10              MR. LANGE:  Succinctly stated, my point is

11  that the government has not proven with respect to

12  Elaine Brown that she was involved in the conspiracy as

13  alleged in those counts, and that they have not been

14  proven to the satisfaction of any reasonable juror

15  beyond a reasonable doubt that she in fact was involved

16  in the conspiracy, and more particularly have not proven

17  that she was involved in bringing explosive compounds

18  into the home, assembling those devices, and publicly

19  announcing any intention to resist arrest by virtue of

20  those devices and similar destructive devices.  I at

21  this point concede that the government has met its

22  burden at this point to show a prima facie case with

23  respect to the other counts, but with regard to those

24  three counts they have not met their burden.

25              THE COURT:  The motion is denied.  Mr.

1    Iacopino.

2            MR. IACOPINO:  Thank you, your Honor.  Your

3    Honor, at this time I would move to dismiss under Rule

4    of Criminal Procedure 29 Counts One, Two, Three, Seven,

5    Nine and Ten of the indictment.  Those are all counts

6    that are lodged against Mr. Brown.  I will work

7    backwards, your Honor.

8            With respect to Count Ten, that charges Mr.

9    Brown with failure to appear for sentencing in violation

10   18, USC, Section 3146.  The record evidence in this case

11   fails to establish that Mr. Brown was ever ordered by a

12   court to appear for sentencing.  There is no evidence

13   within this record that demonstrates that a court

14   ordered him to appear.  Although there is evidence that

15   there was an arrest warrant issued for him, there is no

16   evidence that that arrest warrant was ever served upon

17   him or that he in any way otherwise received an order of

18   the court notifying him to appear for sentencing as

19   alleged in the indictment.

20           Similarly, your Honor, with respect to Count

21   Nine which charges my client under the same statute with

22   failure to appear for trial, the evidence before the

23   court and before this jury in this case is that my

24   client appeared and eventually did not continue to go to

25   his trial.  However, your Honor, under that statute it

```
 1    requires an order of the court directing him to appear,

 2    and in this particular case there was no order directing

 3    him to appear on the next day of trial.  There is no

 4    evidence establishing that the judge in that trial told

 5    him you have to appear here tomorrow for the

 6    continuation of the trial, and there is no evidence in

 7    the record otherwise demonstrating that any formal order

 8    of the court was made to Mr. Brown directing him to

 9    appear for trial.  What is in evidence, your Honor, are

10    bail receipts that says -- not bail receipts but the

11    conditions of release on bail, your Honor, and I forget

12    the exhibit numbers at this point, but perhaps Ms.

13    Clouser can help me in a moment, those, if you look at

14    those exhibits, your Honor, the way the court works here

15    in the District of New Hampshire, there's actually a

16    space to put the date for their next appearance in

17    court.  In those no date is present.  Above that there

18    is a requirement indicating that the defendant appear as

19    required by the court, yet the government has not

20    completed the obligation showing that the defendant, or

21    presented any evidence, that the defendant was in fact

22    required by the court to appear in the continuing course

23    of their trial, nor is there any evidence that at any

24    point in time Mr. Brown was instructed by Judge

25    McAuliffe that he even had to appear for his trial at
```

1    all.  And those exhibits are Exhibit 1a -- I'm sorry,

2    that's Elaine Brown.  1a-2, your Honor, is the order

3    setting conditions of release dated on May 24th, 2006.

4    And on that basis, your Honor, I would move to dismiss

5    under Rule 29 Counts Nine and Ten.

6            Your Honor, I also move to dismiss Counts One,

7    Two and Seven, and I actually have two motions with

8    respect to counts -- with respect to Count One.  So I'll

9    address One, Two and Seven first, your Honor.

10           Each of these counts in the indictment allege

11    that the defendant either conspired to prevent arrest,

12    conspired to impede the United States Marshal Service,

13    or actually obstructed justice by impeding the United

14    States Marshal Service.  In essence, they're really all

15    charges that claim my client violated the law under

16    basically the same set of actions.  And the evidence of

17    those actions that is before this court is that my

18    client never made an affirmative step to voice anything

19    that can reasonably be construed as force, violence,

20    intimidation or threats to any United States Marshal,

21    and for basis -- and on that basis, your Honor, I would

22    respectfully submit that Counts One, Two and Seven must

23    be dismissed under Rule 29.

24           I also would submit that Count Three which

25    charges my client with being a felon in possession --

1    I'm sorry, charges my client with possession of a

2    weapon, use and carrying of a weapon during the

3    commission of a crime of violence must also fail.  That

4    particular count specifically references Counts One and

5    Two as being a crime of violence, and obviously since

6    the government has not made their case on Counts One and

7    Two, Count Three must be dismissed as well.

8            Your Honor, I would also point out that in

9    Count One of the indictment the government has set forth

10   in the indictment a number of overt acts of which there

11   has been no proof, and I'm going to list those for the

12   court at this time.

13           I would suggest to the court that in paragraph

14   ten of Count One, which begins on page four, but

15   specifically if you go to page five of the indictment,

16   subsection 10C alleges a radio interview where Elaine --

17           THE COURT:  10C has already been stricken I

18   believe.

19           MR. IACOPINO:  I'm sorry, yes, 10E and F, your

20   Honor.  I also draw the court's attention to 10H.

21           THE COURT:  10H.

22           MR. IACOPINO:  10H where they allege that

23   Jason Gerhard temporarily resided in the Browns' home.

24   There's been no evidence of that.  That Cirino Gonzalez

25   temporarily resided in the Browns' home.  There's been

1    no evidence of that in 10I.  In 10J they allege that an

2    individual by the name of Robert Wolffe who I would

3    suggest his name is never even mentioned during the

4    course of this trial temporarily resided in the Browns'

5    home.  In 10K the government alleges that Danny Riley

6    publicly declared his intention to forcibly resist any

7    effort by the Marshal Service to arrest.  That has not

8    been established by any evidence in this case, your

9    Honor.  In 10L, your Honor, they allege that Cirino

10   Gonzalez publically declared his intention to forcibly

11   resist.  There's been no evidence of that.  In 10M they

12   allege that Jason Gerhard publically declared his

13   intention to forcibly resist.  There's been no evidence

14   about that allegation contained in Section 10M either.

15          I would also point to page eight of the

16   indictment, 10S, the last sentence of Section 10S, the

17   overt act there asserts that the -- there is a picture

18   in evidence, your Honor, of Mr. Brown and Mr. Gonzalez

19   and Jason and I believe with an individual named Luke,

20   that part of that subsection we don't dispute.  There is

21   in fact a photograph that was posted to an account of a

22   social networking space, there is testimony it's

23   registered to Jason Gerhard, however, the last sentence

24   says that Internet account was used to elicit statements

25   in support of Edward Brown and Elaine Brown.  That

1   sentence is incorrect, your Honor.  There's been no

2   evidence of that in this trial.  There's been absolutely

3   no evidence of that.

4          I would then draw the court's attention to 10W

5   which alleges that Robert Wolffe provided a 1992

6   Chevrolet Caprice to the Browns.  There's been no

7   evidence of that in this trial.

8          10X, your Honor, which begins on page eight of

9   the indictment and goes over on to page nine alleges

10  that Robert Wolffe, again whose name we have not heard

11  during the course of this trial, conducted counter

12  surveillance.  That has not been proven, your Honor.

13         With respect to 10Y they alleged that Mr.

14  Wolffe provided armed security.  That has not been

15  proved in this case, your Honor.

16         With respect to 10Z they allege that Wolffe

17  made his residence available as a point of

18  transshipment.  There's been no evidence of that.  The

19  only evidence of any shipments that there has been, your

20  Honor, is of Tannerite that was shipped to Cohoes, New

21  York, I believe is the shipping address.

22         So, your Honor, I would draw your attention to

23  page 11 of the indictment, Section 10KK.  There's an

24  allegation that there was evidence that Elaine Brown

25  held an assault rifle while in the presence of

1    undercover Deputy United States Marshals.  I don't

2    believe that there was ever any testimony to that

3    effect, your Honor.

4           So in addition to moving that Count One be

5    dismissed under Rule 29 because even if you take all

6    inferences in a light most favorable to the government,

7    that they fail to establish a prima facie case.  Even if

8    you choose not to do that, they have failed to establish

9    evidence on those overt counts and we'd move that at

10   least those overt acts, I'm sorry, alleged in Section 10

11   of the indictment that I've just listed, be dismissed

12   out of the indictment, your Honor.

13          MR. LANGE:  I join with respect to the

14   argument about overt acts.

15          THE COURT:  All right.  Government, with

16   regard to 10J?

17          MR. HUFTALEN:  No objection to that being

18   stricken.

19          THE COURT:  10J is stricken.  10K?

20          MR. HUFTALEN:  No objection.

21          THE COURT:  Stricken.  10L?

22          MR. HUFTALEN:  No objection.

23          THE COURT:  Stricken.  10M?

24          MR. HUFTALEN:  Stricken.

25          THE COURT:  Stricken.

1           MR. HUFTALEN:  No objection, excuse me.

2           THE COURT:  No objection, I understand,

3   stricken.  10S?

4           MR. HUFTALEN:  I don't object to the last

5   sentence being stricken which is I believe what Mr.

6   Iacopino complained about.

7           MR. IACOPINO:  Second to last sentence.

8           THE COURT:  Second to last sentence is

9   stricken.

10          MR. HUFTALEN:  Oh, second to the last

11  sentence.

12          THE COURT:  All right.

13          MR. LANGE:  And I would ask that the last

14  sentence also be stricken.  I don't recall seeing rifles

15  in photographs.  Maybe I'm wrong.

16          MR. HUFTALEN:  As a factual matter, if you

17  look at the picture, you can see the rifles --

18          THE COURT:  Next to the last sentence is

19  stricken.  10W?

20          MR. HUFTALEN:  No objection.

21          THE COURT:  Stricken.  10X?

22          MR. HUFTALEN:  No objection.

23          THE COURT:  That is stricken.  10Z?

24          MR. HUFTALEN:  No objection.

25          THE COURT:  That is stricken.  10KK?

1          MR. HUFTALEN:  No objection.

2          THE COURT:  That is stricken.  Anything else

3    from the government?

4          MR. HUFTALEN:  No, thank you.

5          THE COURT:  All right.  And to the extent the

6    motion has any other grounds for dismissal, that motion

7    is also denied.

8               All right, we're going to take a look at the

9    video.  Who is going first, Mr. Iacopino?

10         MR. IACOPINO:  Yes, your Honor.

11         THE COURT:  All right, you ready to go?

12         MR. IACOPINO:  Yes, your Honor.

13         MR. LANGE:  We're going to look at the Fazio,

14   it's an audio.

15         MR. IACOPINO:  Yes, it's an audio.

16         THE COURT:  Just an audio?  All right, I'll

17   listen to it.  Yes?

18         MR. HUFTALEN:  I saw counsel poke his head in

19   the back who I believe the court has appointed to

20   represent one of the witnesses.

21         THE COURT:  That's one of your witnesses, is

22   that correct?

23         MR. LANGE:  That's it, that's an Elaine Brown

24   witness.

25         THE COURT:  All right, let me get started with

1    them.  Counsel is here?

2              MR. HUFTALEN:  I saw at least one.  I saw Mr.

3    Ramsdell.

4              THE COURT:  Good, I'm going to see -- bring up

5    the audio.  I will see counsel in chambers.  I want to

6    listen to the audio with counsel present.  Then we will

7    talk to counsel for those two witnesses.

8              (Recess taken.)

9              (In chambers with counsel at 10:20

10             a.m.)

11             THE COURT:  We're in chambers with counsel.

12   I've been provided with two exhibits proposed by

13   defendant Elaine Brown.

14             MR. IACOPINO:  Ed Brown.

15             THE COURT:  Ed Brown, I'm sorry.  This is

16   Exhibit 1h-1 and 1g-1.  And does it make any difference

17   which one I play first?

18             MS. CLOUSER:  1g-1 is the first interview.

19             MR. IACOPINO:  And it is the longer one, too,

20   I think.

21             MS. CLOUSER:  It is the longer one.

22             (Pause.)

23             THE COURT:  Is there objection to both of

24   these?

25             MR. HUFTALEN:  Yes.  Hearsay.

1              (Radio interview being played.)

2              MS. CLOUSER:  That's the end of that clip.

3              THE COURT:  That's it?

4              MS. CLOUSER:  Yup.

5              MR. HUFTALEN:  That's not the end of the CD.

6              THE COURT:  That's the end of that?

7              MS. CLOUSER:  Yup.

8              MR. IACOPINO:  That's the end of the excerpt.

9              MR. HUFTALEN:  I thought they were all on the

10    same CD?

11             MS. CLOUSER:  No, they are each on separate

12    CDs.

13             THE COURT:  All right, the record should

14    indicate that I've now listened to Exhibit 1h-1 with

15    counsel present.  And now I'm going to listen to Exhibit

16    1g-1.  Is that the longer one?

17             MS. CLOUSER:  Yes.

18             MR. IACOPINO:  I think it's approximately

19    13 minutes, your Honor.

20             THE COURT:  And you want to admit both of

21    those in their entirety?

22             MR. IACOPINO:  In the entirety of the

23    excerpts.

24             THE COURT:  That's what I mean.

25             MR. IACOPINO:  Yeah, we received these from

1   the government.  It's a whole radio show, your Honor --

2            THE COURT:  What I'm saying now is both

3   exhibits as they appear you want in.

4            MS. CLOUSER:  Yes.

5            MR. IACOPINO:  Yes.

6            (Radio interview being played.)

7            MR. IACOPINO:  I think that's it.

8            MS. CLOUSER:  That's the end.

9            THE COURT:  The record should indicate I've

10   now listened to Defendant's 1g-1.

11            All right, why is this admissible over a

12   hearsay objection?

13            MS. CLOUSER:  This is state of mind.

14            THE COURT:  Under rule?

15            MS. CLOUSER:  803(3).

16            THE COURT:  Go ahead.

17            MS. CLOUSER:  He's indicating that after

18   June 7th that the federal U.S. Marshals have declared

19   their intention to use lethal force against them, and

20   it's our argument that the weapons that were found on

21   October 4th, there certainly have been no, beyond the

22   three weapons that were testified to with respect to the

23   U.S. Marshals who were surveilling the property on

24   June 7th, there's no indication that any of the weapons,

25   pipe bombs, anything else were there prior to June 7th,

1   and the reason that none of those items were there is

2   because it was after the U.S. Marshals declared their

3   intention to use lethal force that Ed and Elaine Brown

4   felt that they had to defend themselves against this

5   lethal force.  And this radio show shows that Ed

6   believed reasonably after the show of force on June 7th

7   that the U.S. Marshals intended to use lethal force

8   against them.  They shot at one of the supporters that

9   was at his house on June 7th, and their intention was to

10  kill the Browns.

11          THE COURT:  Why is that 803(3)?

12          MS. CLOUSER:  Well, it shows that Ed Brown's

13  state of mind at the time was that he had to use lethal

14  force to defend himself against the unlawful show of

15  force by the U.S. Marshals.

16          THE COURT:  Government's position?

17          MR. HUFTALEN:  I object.  I believe it is

18  hearsay and I believe the case law in the First Circuit

19  as well as the advisory committee notes at 803(3)

20  clearly demonstrate that it is hearsay, and in

21  particular I bring the court's attention to U.S. versus

22  Alzanki, 54 F.3d 994, 1995 First Circuit; U.S. versus

23  Cianci, 378 F.3d 71, 2004; and U.S. versus Cohen, 631

24  F.2d 1223, 1980, Fifth Circuit.  The advisory committee

25  notes in particular I think are apt in this case where

1    they say, and I quote, the exclusion of statements of

2    memory and belief to prove the fact remembered though

3    believed is necessary to avoid the virtual destruction

4    of the hearsay rule which would otherwise result in

5    allowing state of mind provable by a hearsay statement

6    to serve as the basis for an inference of the happening

7    of the event which produced the state of mind, and it

8    cites to Shepard versus United States, 290 U.S. 96, 1933

9    case.  There are several other cases cited as well.  I

10   think the attempt by the defense to put these statements

11   in, albeit there are some nuggets in there that I'd like

12   to get in front of the jury, it's not worth the price of

13   admission for me, clearly is an attempt to put in their

14   theory of the case, that is, show us the law and we'll

15   pay, we're non-violent people, without exposing

16   themselves to cross-examination.  It's hearsay and it's

17   inadmissible.

18          THE COURT:  All right, my ruling is that in

19   their entirety each exhibit is hearsay.  It does not

20   come within Rule 803(3).  To the extent that minute

21   portions of it do, although it hasn't been offered

22   separately, the law in my mind is clear that the

23   declarant here is attempting to show reasons for his

24   state of mind and that's prohibited as set forth in

25   Alzanki that the government cited.

1          I also would note that in my view the

2     defendant in this case is attempting to show why

3     something was not done in the past.  That's covered by

4     the Cianci case.

5          I also find that these are self-serving

6     attempts to cover tracks already made and they don't --

7     these statements have no indicia of reliability.  This

8     is an individual who is in the midst of criminal

9     activity attempting to create an alibi, a reason for the

10    criminal activity while in the midst of it.  That

11    doesn't give any indicia of reliability as to these

12    statements.  So as presented these exhibits are excluded

13    as hearsay.

14          What else before we go back?

15          MR. LANGE:  Your Honor, we will probably be

16    visiting something similar when we get to the Elaine

17    Brown part of this case.

18          THE COURT:  All right, do you have any audios

19    for me to listen to?

20          MR. LANGE:  Not yet, your Honor, because I'm

21    going to offer them under --

22          THE COURT:  You may.  The attorney for who is

23    here?

24          MR. HUFTALEN:  Both attorneys for the Dions

25    are here.  William Christie I believe --

1              THE COURT:  Just a second.

2              MR. HUFTALEN:  Oh, sorry.

3              THE COURT:  Let me write this down.  William

4    Christie?

5              MR. HUFTALEN:  William Christie,

6    C-h-r-i-s-t-i-e.

7              THE COURT:  For?

8              MR. LANGE:  He's for Scott Dion, D-i-o-n.

9              THE COURT:  All right.

10             MR. LANGE:  Michael Ramsdell is for the wife

11   Catherine, spelled with a C.

12             THE COURT:  Are they here?

13             MR. LANGE:  Yes.

14             THE COURT:  Counsel want to do it at this time

15   or do you want to wait?

16             MR. LANGE:  Now is fine.

17             THE COURT:  Get them.

18             THE CLERK:  Yes, sir.

19             THE COURT:  Let's get Mr. Christie and Mr. --

20             MS. OLLILA:  Ramsdell.

21             THE COURT:  Ramsdell, thank you.

22             (Pause.)

23             THE COURT:  Let me also indicate for the

24   record as regards to those exhibits.  It seemed to be

25   attempting to apply the justification defense, and in my

1   view at this point I don't see a justification defense

2   as applicable.  I'll expand on that as we move toward

3   jury instructions.

4             (Off the record.)

5             THE CLERK:  This is attorney Bill Christie and

6   Attorney Ramsdell.

7             THE COURT:  Have a seat.  Have a seat.  Okay.

8   We have present with us Mr. Christie and Mr. Ramsdell,

9   correct?

10            MR. RAMSDELL:  Yes.

11            MR. CHRISTIE:  Correct.

12            THE COURT:  All right, preliminarily let me

13  thank both of you for coming forward and agreeing to

14  talk to these two individuals.

15            Mr. Christie, you had an opportunity to talk

16  to Mr. Dion, is that correct?

17            MR. CHRISTIE:  That's right.

18            THE COURT:  And without your telling me

19  anything that you two discussed, which is obviously

20  privileged, is it Mr. Dion's intent to waive any Fifth

21  Amendment rights that he may have and testify with

22  regard to this matter?

23            MR. CHRISTIE:  It is not.  His intention is to

24  assert the Fifth Amendment.

25            THE COURT:  Mr. Ramsdell, have you had a

1      chance to talk to Mrs. Dion?

2            MR. RAMSDELL:  I have, your Honor.

3            THE COURT:  Again, without your indicating to

4      me whether or not what you've discussed specifically, is

5      it her intent to waive her Fifth Amendment rights or

6      assert them?

7            MR. RAMSDELL:  She intends to assert them.

8            THE COURT:  And you've been advised of the

9      nature of the proposed testimony, either of you?

10           MR. LANGE:  I don't think that you have.  You

11     have a little bit but --

12           MR. RAMSDELL:  Well, I can tell you, I spoke

13     to Attorney Lange briefly yesterday.  He gave me an idea

14     of at least some of the testimony he would seek to

15     elicit, and I shared the information I got with Attorney

16     Christie, and so we have some idea.

17           THE COURT:  All right.  What I propose to do,

18     I'll hear from counsel, but normally what I would do is

19     I would have these witnesses present, out of the hearing

20     of the jury, we will put them on the stand, I'll advise

21     them of their Fifth Amendment privilege.  Counsel, you

22     indicate, if you want to indicate the issues that you

23     wish them to testify about, I'll determine from them

24     whether they wish to claim privilege with regard to

25     those specific issues.  I'll hear counsel with regard to

1   any additional questions you want me to ask the

2   witnesses, and then we will make a decision with regard

3   to their testimony.  Is that satisfactory to counsel?

4           MR. LANGE:  It is, your Honor.

5           MR. IACOPINO:  Yes.

6           MR. HUFTALEN:  Yes.

7           THE COURT:  Everyone agrees, very good.  So we

8   will see them -- are they available at 2:30?  Are you

9   available 2:30?

10          MR. CHRISTIE:  Today?  Yes.

11          MR. RAMSDELL:  Yes.

12          THE COURT:  We will do it as soon as we finish

13  with the day's trial so I don't keep you people late,

14  we'll but them right on.

15          Counsel, if you would, before 2:30 if you have

16  an opportunity, let Mr. Christie and Mr. Ramsdell know

17  generally the issues so that they can discuss it with

18  their clients, all right?

19          Anyone have anything else on the record?  All

20  right, we're off the record.  Thank you very much.  I'll

21  see you both at 2:30 with your clients.

22          MR. RAMSDELL:  Thank you.

23          MR. CHRISTIE:  Thank you.

24          (Off the record.)

25          (Back in the courtroom at 10:50 a.m.)

1          THE COURT:  Ready for the jury?  Please bring

2   in the jury.

3                    BEFORE THE JURY

4          THE COURT:  Sorry for the delay, members of

5   the jury, we have been working throughout that period of

6   time, just kept you waiting.

7          All right, Mr. Iacopino, call your first

8   witness.

9          MR. IACOPINO:  Thank you.  Ed Brown.

10         (Testimony of Edward Brown previously

11          transcribed.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

82

1

2                          C E R T I F I C A T E

3

4              I, Sandra L. Bailey, do hereby certify that

5      the foregoing transcript is a true and accurate

6      transcription of the within proceedings, to the best of

7      my knowledge, skill, ability and belief.

8

9

10     Submitted: 11/3/09          /s/ Sandra L. Bailey
                                   SANDRA L. BAILEY, LCR, CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25