**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/1/10

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                * 09-cr-30-01-02-GZS
           v.                   * July 8, 2009
                                * 1:00 p.m.
EDWARD and ELAINE BROWN         *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 7
AFTERNOON SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE GEORGE Z. SINGAL
AND A JURY

Appearances:

For the Government:    Arnold Huftalen, AUSA
                       Terry Ollila, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301

For Edward Brown:      Michael J. Iacopino, Esq.
                       Kristin Clouser, Esq.
                       Brennan, Caron, Lenehan
                       & Iacopino
                       85 Brook Street
                       Manchester, NH  03104

For Elaine Brown:      Bjorn Lange, Asst. Fed. Defender
                       Federal Defender's office
                       22 Bridge Street
                       Concord, NH  03301

Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

2

1                          I N D E X

2

3    Closing Arguments:

4    By Ms. Ollila, page 3

5    By Mr. Lange, page 37

6    By Mr. Iacopino, page 43

7    By Mr. Huftalen, page 54

8

9

10

11   Jury Instructions, page 61

12

13

14

15   Jury Questions, page 99 and 100

16

17

18

19

20

21

22

23

24

25

```
 1                    BEFORE THE JURY

 2             THE COURT:  Is the government prepared to

 3   close?

 4             MS. OLLILA:  The United States is, your Honor.

 5             THE COURT:  The jury will be pleased to hear

 6   from you.

 7             MS. OLLILA:  Thank you very much.  Good

 8   afternoon, ladies and gentlemen.  Before I begin I would

 9   like to just take a moment to thank you all very much.

10   You have sat patiently, listened intently and seeing

11   over 200 exhibits during a very short period of time.

12             THE COURT:  Move the microphone a little

13   closer, I'm having trouble hearing.

14             MS. OLLILA:  I'm sorry, your Honor.

15             THE COURT:  Thank you.

16             MS. OLLILA:  I've always thought my voice has

17   been too loud, your Honor.

18             THE CLERK:  Is it on?

19             MS. OLLILA:  I think it is on.  I'll try to

20   keep my voice up, your Honor.

21             THE COURT:  Very good.

22             MS. OLLILA:  So on behalf of the United

23   States, on behalf of Assistant United States Attorney

24   Arnold Huftalen, on behalf of paralegal Dena Blanco, and

25   on behalf of senior inspector Andre LaBier, we thank you
```

4

1  all very much.

2          As you now know, ladies and gentlemen, the

3  criminal conduct engaged in by Edward and Elaine Brown

4  which forms the basis of the charges in the instant

5  indictment occurred after they were indicted in April of

6  2006 for, among other things, tax evasion.  Although

7  they were charged with tax evasion in a 17-count

8  indictment in April of 2006, they weren't taken into

9  custody until May, May 24th, 2006, when members of the

10  United States Marshal Service engaged in a ruse and

11  arrested Edward and Elaine Brown outside of Elaine

12  Brown's dental practice located on Glen Road in Lebanon,

13  New Hampshire.  After they were arrested, they were

14  transported to the United States District Court, this

15  very courthouse, arraigned and then released on bail

16  conditions.

17          In January of 2007, January 9th, 2007, Edward

18  and Elaine Brown proceeded to trial.  After three days

19  of trial, Edward and Elaine Brown decided that they

20  didn't like what was happening, so they refused to come

21  back.  The court issued an arrest warrant for defendant

22  Edward Brown, and he never returned.

23          Because it had been a long weekend, Chief

24  Deputy Gary DiMartino, who was in contact with Edward

25  Brown and Elaine Brown, successfully convinced the

1   defendant Elaine Brown to return to trial, and she in

2   fact did.  She returned on Tuesday, January 16th, 2007.

3          When she did so, the court, understandably,

4   amended her bail conditions.  The court ordered that she

5   not return to 401 Center of Town Road, the residence she

6   shared with her husband Ed Brown.  The court also

7   ordered that she reside with her son David in

8   Massachusetts.  And the court also ordered that she wear

9   an electronic monitoring bracelet on her ankle.

10         The jury returned its verdict on January 18,

11  2007.  Defendants Edward and Elaine Brown were convicted

12  on all 17 counts of the indictment.  Sentencing was

13  scheduled to commence on April 24, 2006, and Elaine

14  Brown was once again released on the same bail

15  conditions.

16         On February 21st, 2007, Elaine Brown removed

17  the electronic monitoring device from her ankle and

18  returned to 401 Center of Town Road.  As it had done

19  when defendant Ed Brown failed to come back to court,

20  the court issued an arrest warrant for the defendant

21  Elaine Brown.

22         On April 24th, 2007, both defendants, Edward

23  and Elaine Brown, were sentenced by the court, sentenced

24  in absentia.  Neither one showed up.

25         The court ordered both to serve a 63-month

1    term of imprisonment.

2            By the time the court imposed the sentence on

3    Edward Brown it had been three and a half months since

4    he had fled.  And by the time the court imposed the

5    sentence on Elaine Brown it had been just over two

6    months since she returned to the very cause that she

7    lived for.

8            What did they do during their time, ladies and

9    gentlemen?  They solicited supporters, supporters to

10   take up arms with them.  They spent their time stock

11   piling weapons, lethal weapons, all in order to forcibly

12   resist any attempt by law enforcement to take them into

13   custody.

14           Ladies and gentlemen, Edward and Elaine Brown

15   were not going to surrender.  They were never going to

16   surrender.  They wanted to wage war against the United

17   States, and they wanted to wage war against the United

18   States Marshal Service, just like what Ed Brown told

19   undercover Deputy Robinson on the porch during the night

20   of October 4.  Any attempt by law enforcement to take

21   either he or his wife into custody would be met with

22   certain death.

23           Now, as you sit and listen to what will

24   inevitably be a lengthy attempt by defense counsel to

25   justify Edward and Elaine Brown's conduct --

```
1              MR. LANGE:  Objection.

2              THE COURT:  Yes.

3              MR. LANGE:  Speculation.

4              THE COURT:  Go ahead.

5              MS. OLLILA:  To justify their conduct based

6    upon their personal belief of the tax laws, keep this

7    point in mind.  It simply didn't and doesn't matter what

8    Edward and Elaine Brown's views are on taxation.  The

9    fact is, they were charged in an indictment, convicted

10   by a jury of their peers, and sentenced by a United

11   States District Court judge.  They alone decided that

12   their rules, not the rules and not the law of the United

13   States, would apply.

14             But they don't get to decide, ladies and

15   gentlemen, that when the outcome is contrary to what

16   they want, that they somehow have the right to turn

17   their back, head home, create a massive fortress of

18   firearms, IED's and pipe bombs, get caught and then

19   incredibly come here and try to turn the tables --

20             MR. LANGE:  Objection.  Burden shifting.

21             MR. IACOPINO:  I join, your Honor.

22             MR. LANGE:  Burden shifting.

23             THE COURT:  Rephrase.

24             MS. OLLILA:  Edward and Elaine Brown want you

25   to believe they are innocent.
```

8

1          MR. LANGE:  Objection, same ground.

2          THE COURT:  I said rephrase.

3          MS. OLLILA:  Edward and Elaine Brown were tax

4    protesters.  That much is absolutely clear.  And they

5    believe they didn't have to pay their taxes.  But there

6    was nothing about them or their views that equated to

7    peacefulness.  They were devoted, single-mindedly

8    devoted to launching an offensive war in support of

9    their cause.  They didn't care about the jury's verdict.

10   They didn't care about the court's arrest warrants.

11   They didn't care about the law.  They certainly didn't

12   care that they had been sentenced to a term of

13   imprisonment because Edward and Elaine Brown only do

14   what suits their purpose.

15          Didn't Edward Brown say it so succinctly

16   himself when he testified yesterday.  When he was

17   questioned about the tax evasion verdict, this is what

18   he said.  He said, I could have cared less about the

19   verdict.  I had no consideration for those people

20   anymore.

21          Doesn't this statement alone so epitomize what

22   Edward and Elaine Brown believed?  How do you know that

23   the second Edward and Elaine Brown turned their backs

24   and went home that they had every intention to wage war?

25          Well, you can start by looking at their

1   residence.  It is an enormous structure.  Almost 10,000

2   square feet surrounded by a hundred acres of land.  It

3   has a driveway that is over a quarter mile long and

4   360-degree views.  The residence has a windmill, solar

5   panels.  Can be powered either on or off the grid and

6   has an enormous generator that can power the entire

7   house.  Although the residence would seemingly be

8   impenetrable based upon its location, Edward and Elaine

9   Brown and their supporters, their co-conspirators, left

10  nothing to chance.

11          Extensive effort was taken to fortify the

12  perimeter against the enemy, the United States Marshal

13  Service.  Nailed to the many trees covering the entire

14  perimeter were containers of the binary explosive

15  compound Tannerite.  Each container came conveniently

16  equipped with a bright orange viewing label and a

17  targeting site.  If more Tannerite was needed, Edward

18  and Elaine Brown and their supporters need only take a

19  few steps into their garage where more was ready for

20  immediate use.

21          What was also clear was that Ed and Elaine

22  Brown experimented with zip guns, what Ed Brown now

23  calls noise makers, as yet another way to guard against

24  the United States Marshal Service attempting to enter

25  their property.

1          As the testimony made clear, zip guns are

2     booby trap devices.  They are man-made firearms

3     consisting of a pipe, a spring, a cotter pin, trip wire

4     and ammunition consisting of .12-gauge shotgun rounds.

5          When an unsuspecting individual such as a law

6     enforcement officer attempting to effectuate a lawful

7     arrest walks into one of them, the cotter pin is pulled

8     and the weapon fires.

9          Edward and Elaine Brown's garage included the

10    elements of zip guns in the process of being made and

11    finished.  But the garage wasn't the only area used to

12    manufacture lethal weapons to use against law

13    enforcement.  The basement, as you saw during the course

14    of the testimony, was also utilized by Ed and Elaine

15    Brown and their supporters.

16         So, next to enough food and alcohol and dry

17    goods to last a very long time were parts for the

18    manufacture of zip guns.  The zip guns were located next

19    to extra parts for pipe bombs.  And yet, ladies and

20    gentlemen, did this actually make you wonder, seeing

21    this picture, did it make you wonder why Ed and Elaine

22    Brown and their supporters would actually need more

23    parts for pipe bombs?  As if 21 pipe bombs, all located

24    in their master bedroom, weren't already enough.   21

25    pipe bombs weren't enough for Ed and Elaine, and there

1   would never be enough pipe bombs available to Ed and

2   Elaine because they and their supporters wanted action.

3   It's exactly what they wanted.  What better way to

4   advertise your cause than to engage in a bloody and

5   deadly battle with law enforcement.

6           They and their co-conspirators intended to use

7   every weapon available against law enforcement,

8   including IED's, improvised explosive devices, which you

9   also heard referred to as Goex can bombs.  They would

10  use IED's with nails and ones without nails.  They kept

11  the IED's throughout their house, in their bedroom, in

12  the safe in the master bedroom, and the library hallway

13  overlooking the foyer, in the laundry room, even in

14  Elaine's kitchen jelly cabinet.  Whatever it took,

15  ladies and gentlemen, they were not going to surrender.

16          And yet, as if the litany of pipe bombs and

17  IED's weren't enough, Ed and Elaine Brown fortified

18  their residence with every conceivable firearm

19  imaginable.  The house was a virtual armory of deadly

20  firearms, and the weapons were strategically positioned

21  at windows so they could be used against law

22  enforcement.

23          Do you recall that when Assistant United

24  States Attorney Huftalen asked Deputy Marchegiana one of

25  the very last questions of his testimony, Mr. Huftalen

1  placed up this photograph on the screen, and then he

2  asked Deputy Marchegiana where he was in relation to the

3  house, and Deputy Marchegiana's testimony was he was

4  approximately 80 yards away from the house.  What Deputy

5  Marchegiana didn't know then but what you absolutely

6  know now is that covering Deputy Marchegiana's position

7  was a .50-caliber firearm.  This is the firearm, ladies

8  and gentlemen, which you heard is capable of firing up

9  to three miles.  A weapon which would blow a human body

10  apart.  But this wasn't the only firearm utilized by Ed

11  and Elaine Brown.

12          Along with the .50-calibers was a Vanguard

13  .308-caliber rifle, a Ruger rifle, a .12-gauge shotgun,

14  all located in their bedroom in close proximity to the

15  most advantageous point, the French doors next to Mr.

16  Teddy Bear.  And ladies and gentlemen, if Ed and Elaine

17  Brown needed ammunition, their residence was well

18  stocked.  You certainly heard that.  They had over

19  60,000 rounds of ammunition at their disposal, an amount

20  which was shocking to law enforcement, but what Ed Brown

21  characterized when he testified yesterday, he testified

22  that that was moderate by today's standards.  60,000

23  rounds might be moderate based upon who Ed and Elaine

24  Brown hang out with, but that much ammunition should be

25  horrifying to anyone else.

1           With respect to the firearms, ladies and

2    gentlemen, defense counsel did something interesting.

3    They did this with numerous law enforcement witnesses.

4    They attempted on cross-examination to infer that law

5    enforcement officers the night of Ed and Elaine Brown's

6    arrest on October 4th moved those weapons closer to the

7    window.  Do you honestly think that these highly trained

8    law enforcement officers that night as they were walking

9    around the residence looking at 21 pipe bombs, 21 IED's,

10   more ammunition than they could ever count, it actually

11   occurred to them that this isn't enough evidence?  We

12   better put some of these firearms that we see here

13   closer to the window.  It's a ludicrous and preposterous

14   allegation.  But the tables couldn't be turned for long,

15   ladies and gentlemen, because while on cross-examination

16   counsel for Edward and Elaine Brown were trying to lay

17   that inference, Ed Brown proudly stated yesterday that

18   he placed those weapons there.

19           Now, of course the testimony about what a

20   .50-caliber can do to a human being was shocking and

21   startling.  But everything in Ed and Elaine Brown's

22   residence was shocking and startling.  And if you think

23   what a .50-caliber weapon can do to a human body, if you

24   think that that's shocking?  What do you think an IED

25   could do to the same body.  And how do you think a human

1    being could ever survive being hit by or even being near

2    one of those pipe bombs that was in their bedroom.  You

3    saw the enormous chemical reaction from a small

4    cannister of Tannerite.  You saw it.  Defense counsel

5    admitted that video tape into evidence.  Don't you think

6    that an explosion from a GOEX can with nails taped to it

7    would make that Tannerite explosion seem like a mere

8    firecracker in comparison?

9            MR. IACOPINO:  Your Honor, I object.  There's

10   a slide show going on.  There's no way for that to be

11   reflected in the record.  She's not referencing these

12   exhibits that are being put up on the screen, and

13   there's no way for the record to reflect what's being

14   shown to the jury.

15           MS. OLLILA:  I'll reference each exhibit, your

16   Honor, as I go along.

17           THE COURT:  All right, she will do that.

18           MS. OLLILA:  So ladies and gentlemen, it is

19   clear that Ed and Elaine Brown worked together to

20   accomplish this feat.  But did they actually have

21   supporters and how do you know?

22           You know from the testimony that after the

23   return of the tax return evasion indictment, Ed and

24   Elaine Brown needed firearms and they had plenty of

25   money to obtain them.  You know this because Deputy

1   Berry and Deputy Nunes both testified that they

2   accompanied members of the probation department to Ed

3   and Elaine Brown's residence on May 24th when Ed and

4   Elaine Brown had to turn over weapons.

5           Elaine Brown brought the deputies through the

6   house and she also brought them into the master bedroom

7   to an area where the safe was.  She turned the

8   combination lock and opened the safe.  What was in the

9   safe?  A cube of money that both Deputy Berry and Deputy

10  Nunes testimony was about 12 inches high and 12 inches

11  wide.  And you know that the money was left at the

12  residence.  They both testified that no one touched the

13  money.

14          It is clear, then, that Ed and Elaine Brown

15  needed firearms and had plenty of money to obtain them,

16  yet their problem was that if they left the property,

17  they risked being apprehended by members of the United

18  States Marshal Service, so they recruited supporters.

19  Dena, please bring up 25.  Supporters like Danny Riley.

20  Dena, please bring up Government's Exhibit 26.

21  Supporters like Cirino Gonzalez.  And Dena, please bring

22  up 26a.  And supporters like Jason Gerhard.  They

23  recruited these supporters to bring them weapons.  The

24  most obvious evidence of the presence of supporters like

25  Danny Riley and Cirino Gonzalez and Jason Gerhard lies

1   with the very firearms that were taken from Ed and

2   Elaine Brown's residence after they were arrested, after

3   their October 4th arrest.

4          You heard that Jason Gerhard, who lived in

5   Brookhaven, New York, was a staunch supporter of Ed and

6   Elaine Brown and was frequently at their home.

7          You heard in the testimony of Deputy Berry and

8   Deputy Nunes that Jason Gerhard got into a motor vehicle

9   accident on July 17th while driving Elaine Brown's motor

10  vehicle.

11         You also heard that the United States Marshal

12  Service seized Elaine Brown's car that night on

13  July 17th, and Jason Gerhard was not happy about that.

14  What did he do?  He traveled the very next day on

15  July 18th to the Lebanon Police Department in order to

16  fill out a report of a theft.

17         Once there he met with Deputy Berry and Deputy

18  Nunes.  And what did he tell them?  He told them that

19  their attempt to arrest Ed and Elaine Brown was a

20  violation of the Constitution, constituted treason and

21  was punishable by death.

22         You also heard that two days after that

23  confrontation Jason Gerhard was stopped by Trooper Shawn

24  Harrington while he was in Charlestown, New Hampshire,

25  about 20 to 25 minutes from Plainfield.  He approached

1   Jason Gerhard, and what he saw in the back seat of Jason

2   Gerhard's vehicle was this weapon, Government's Exhibit

3   5a-2.

4            You know that Jason Gerhard on that night,

5   July 20, 2007, had earlier purchased that weapon from

6   Albert Lindquist from the Alstead Gun Shop.  You know

7   that because Albert Lindquist testified and showed the

8   paperwork for the purchase of the weapon.  Dena, please

9   pull up Government Exhibit 13g on page one.  The

10  paperwork shows that Jason Gerhard of Brookhaven, New

11  York, purchased two firearms, both Sturm Rugers, on

12  July 20th, 2007.

13           When law enforcement searched the residence of

14  Edward and Elaine Brown after they were arrested on

15  October 4th, they discovered the very same weapon that

16  Trooper Harrington saw in Jason Gerhard's vehicle.  They

17  also recovered this Sturm Ruger.  Both of these weapons

18  were located in the den cabinet, and both of the

19  firearms were purchased by Jason Gerhard at the Alstead

20  Gun Shop.

21           Dena, please pull up 30a-56.

22           Jason Gerhard also purchased the Bushmaster

23  semi-automatic assault weapon from the Alstead Gun Shop.

24  You know this because John DiBernardo, just like Albert

25  Lindquist, who also worked at the gun shop testified

18

1      about the purchase.

2              And yet perhaps the most deadly of all the

3      firearms purchased by Jason Gerhard for Ed and Elaine

4      Brown was this .50-caliber Serbu.  Jason Gerhard

5      purchased the .50-caliber from the Alstead Gun Shop and

6      John DiBernardo was the clerk who handled the

7      transaction.

8              But as you heard, ladies and gentlemen, Jason

9      Gerhard wasn't the only supporter buying .50-caliber

10     firearms for Ed and Elaine Brown.  Cirino Gonzalez from

11     Alice, Texas, and Danny Riley from Cohoes, New York,

12     each traveled from their homes all the way to New

13     Hampshire in order to purchase a .50-caliber weapon, and

14     you know this because you heard the testimony from

15     Richard Tatem at the Stone Eagle Gun Shop.

16             Please pull up Exhibit 2 at page two.  No,

17     Dena, that's the wrong one.  I'm sorry, you're correct.

18             The e-mail traffic between Danny Riley and

19     Cirino Gonzalez proves this point perfectly clear,

20     doesn't it?  Look at Exhibit 2.  It is an e-mail to

21     Cirino Gonzalez, and it discusses the purchase of a

22     .50-caliber Serbu, a manufacturer of .50-caliber

23     weapons.  In the e-mail Danny Riley tells Cirino

24     Gonzalez, when he let's me know when they arrive, I will

25     go to Newport, New Hampshire and get it and then come to

1    you with it.  I think you only need one for the house

2    unless you want one for your personal collection.

3            You know from the testimony of Richard Tatem,

4    the owner of Stone Eagle, that both Danny Riley and

5    Cirino Gonzalez picked up a .50-caliber.  You have them

6    here.  They're the two black .50-caliber weapons.

7            Now, when you ask yourselves whether the

8    evidence demonstrates that Ed and Elaine Brown recruited

9    supporters, ask yourself this.  Does it really strike

10   you that the likes of Danny Riley and Cirino Gonzalez

11   and Jason Gerhard actually had the financial means to

12   purchase all of this weaponry?  Danny Riley spent a lot

13   of time in Plainfield, New Hampshire.  13e-1, please,

14   Dena.

15           Does it strike you that Danny Riley or Jason

16   Gerhard could spend $2,320 for a .50-caliber weapon?  A

17   weapon that --

18           MR. IACOPINO:  Objection, your Honor, there's

19   no evidence about Danny Riley's financial circumstances

20   in the record.

21           THE COURT:  Overruled.

22           MS. OLLILA:  A weapon that they would then

23   leave behind at Ed and Elaine Brown's residence.  The

24   testimony made it abundantly clear that Ed and Elaine

25   Brown could afford to do so, although Elaine Brown was

1    the only Brown employed.  She made a lot of money as a

2    dentist.

3              MR. IACOPINO:  Objection.  Not in the record.

4              THE COURT:  Overruled.

5              MS. OLLILA:  Throughout the trial you had

6    certainly seen some of the money that they had at their

7    residence.  You heard about the money, the cube of money

8    contained in the safe in May 2006, and you saw some of

9    the money located in the master bedroom at the time of

10   the search after their arrest on October 4th.

11             Please pull up 30a-53, Dena.  And you found

12   out yesterday through defendant Ed Brown what was

13   located in the elevator shafts.  $101,000 in U.S.

14   currency.

15             So, ladies and gentlemen, don't you think it's

16   obvious that Elaine Brown, through her dental practice,

17   could have financed the entire buildup of arms in order

18   to drive off law enforcement?

19             Ed and Elaine Brown and their supporters never

20   intended to have this end peacefully.  They wanted

21   guerrilla warfare.  Yet throughout the trial what they

22   have done is try to recast the die and somehow claim

23   that they only took up arms after the Danny Riley

24   incident on June 7th when members of the United States

25   Marshal Service Special Operations Group attempted and

1   planned to arrest defendant Edward Brown at the end of

2   the driveway while he was picking up his mail.  They

3   were then going to negotiate for the peaceful surrender

4   of Elaine Brown.

5           The evidence of their theory that the only

6   time they were going to pick up arms was after June 7th

7   because they were so afraid after June 7th.  The

8   evidence you've seen, the paper evidence, ladies and

9   gentlemen, disproves this argument in its entirety.

10          The events of June 7th also prove this.  On

11  June 7th when Deputy Marchegiana was secreted in the

12  wood line, Ed Brown was patrolling the woods with poor

13  Zoe.  As he was patrolling the woods, he had his Colt in

14  his hand, and he had this SA 85 strapped around his

15  shoulder.

16          If Ed Brown and Elaine Brown only took up arms

17  after June 7th, then how was it that Ed Brown on that

18  very day already had weapons at the residence?

19          And what about the testimony of Deputy Recor,

20  Deputy Ed Recor.  His testimony was chilling.  He was

21  the deputy who testified that after Danny Riley was

22  tasered on June 7th, he heard activity at the residence.

23  And within 10 to 15 minutes of hearing activity, he saw

24  defendant Ed Brown in the tower.  And what did Ed Brown

25  have with him?  He had a .50-caliber firearm and a box

1    of ammunition which Deputy Recor said he put on the

2    wall.

3            If Ed and Elaine Brown only took up arms after

4    June 7th because they were so afraid, how in the world

5    could Ed Brown miraculously have obtained a .50-caliber

6    weapon within moments of the Danny Riley taser incident.

7    And if they were so petrified after June 7th, then why

8    did they have Ed and Elaine's jamboree on June 23rd, a

9    few weeks later, and allow men, women and children, as

10   many men, women and children as could arrive, they

11   allowed on to their property.

12           But you certainly know that Ed and Elaine

13   Brown had weapons before June 7th because the testimony

14   of Shane McDonald, the RE/MAX franchise owner, made that

15   much clear.  He testified that he went to their

16   residence on May 21st, 2007, two and a half weeks before

17   June 7th, because he wanted to negotiate the terms of a

18   lease for Elaine Brown's dental practice on Glen Road in

19   West Lebanon.  While at the residence he saw Ed Brown

20   with a gun in his waist.  And Shane McDonald was a funny

21   witness.  He said he sat down at the dining room table

22   and he figured Ed Brown had a better negotiating

23   position because Ed Brown put the gun on the table.

24   What Shane McDonald also testified to was that as he sat

25   there he saw Reno, Cirino Gonzalez, please put up 26, a

1   short distance away in the kitchen with a weapon under

2   his arm.  It was at this point, according to the

3   testimony of Shane McDonald, that he started to think he

4   might not have made a good decision.

5               Don't you think it was obvious, ladies and

6   gentlemen, from the testimony of Shane McDonald, that

7   the reason Reno, Cirino Gonzalez, was there, was to

8   protect Ed and Elaine Brown from being taken into

9   custody by law enforcement?  And you know that Ed Brown

10  had that pistol described by Shane McDonald because he

11  purchased it -- Dena, please bring up 32m-1, he

12  purchased it on April 9th, 2007, two months before the

13  June 7th Danny Riley incident.  And claiming that the

14  weaponry were only purchased after the Danny Riley

15  incident is also disproved by the fact that the

16  .50-caliber purchased by Danny Riley was purchased on

17  May 23rd, 2007, in Newport, New Hampshire, two weeks

18  prior to June 7th.  Please bring up 13e-1, Dena.  And

19  claiming that the weaponry and the firearms were

20  purchased by the likes of Cirino Gonzalez only after

21  June 7th in order to protect themselves is certainly

22  disproved by the fact that Cirino Gonzalez, just like

23  Danny Riley, purchased that .50-caliber on May 23rd, two

24  weeks prior to June 7th.

25               Please bring up 13f-1.

1            So why would Danny Riley and why would Cirino

2    Gonzalez travel from their residences in New York and

3    Texas, two weeks before June 7th, to purchase $5,000

4    worth of firearms if they didn't have every intention of

5    using them to protect their leaders.  Their leaders were

6    Ed and Elaine Brown.  It's precisely what they were

7    doing.  The purchase of firearms was all about their

8    desire to engage in an armed battle with the United

9    States Marshal Service on behalf of Ed and Elaine Brown.

10   But, try as they might, Ed and Elaine Brown just can't

11   hide from the facts -- please pull up 30a-66, Dena --

12   facts that demonstrate that the Bushmaster was purchased

13   by Jason Gerhard -- please bring up 13c, page two -- on

14   January 21st, 2007.  Almost five months before Danny

15   Riley ever even dreamed of walking down the driveway

16   with Zoe to pick up the mail.  Why would Jason Gerhard

17   travel from Brookhaven, New York, all the way to New

18   Hampshire five months before?  He wouldn't.  Just like

19   Danny Riley and Cirino Gonzalez, he was doing it because

20   he wanted to go to war, shoulder to shoulder, with Ed

21   and Elaine Brown.

22           This has nothing to do with Ed and Elaine

23   Brown's supposed fears after June 7th.  It has

24   everything to do with the fact that Ed and Elaine Brown

25   thought themselves worthy of disregarding the law, and

1   they thought themselves worthy of disregarding the

2   jury's verdict as if it never existed.

3           The testimony also clearly established that

4   the Tannerite at the residence was ordered on May 28,

5   2007, 10 days before June 7th.  2d, please, Dena.  Look

6   at the Government's Exhibit 2d.  It's an e-mail from

7   Danny Riley to Cirino Gonzalez and it's dated May 28th

8   with the subject text kaboom.  The e-mail demonstrates

9   the purchase of 50 pounds of explosives, Tannerite.  You

10  know that the Tannerite ultimately ended up at Ed and

11  Elaine Brown's residence because the boxes with the

12  shipping labels containing Danny Riley's name and his

13  residence were located at the residence of Ed and Elaine

14  Brown after they were arrested in October.

15          But what else does the e-mail state?  The

16  e-mail again sent ten days before June 7th says the

17  following.  Turn to page two, please, Dena, and enlarge

18  that.  Reno, I sent for 50 pounds of brown Skinnerite.

19  Hopefully it will be here when the other gear arrives.

20          If Ed and Elaine Brown only really wanted to

21  defend themselves after June 7th, what is he talking

22  about when he references when the other gear arrives?

23          And what about when he says, was Ed happy that

24  we are making progress?  What progress is Danny Riley

25  referring to?

1          Please go to 2e, page two, Dena.  How about in

2     another e-mail which Danny Riley sends to Cirino

3     Gonzalez, he says, are you guys scoped up?  This e-mail

4     was sent on May 30th, one week prior to June 7th.

5     Scoped up for what, ladies and gentlemen?

6          The progress that Danny Riley was referring to

7     has everything to do with the literature found in the

8     residence of Edward and Elaine Brown.  The literature

9     speaks volumes about the beliefs of Ed and Elaine Brown.

10    And here are just a few of their books.  Government's

11    Exhibit 33a-6.  Guerilla Warfare and Special Forces

12    Operations.  Government Exhibit 33a-7.  Unconventional

13    Warfare Devices and Techniques.  Government's

14    Exhibit 33a-2.  Unconventional Warfare Devices and

15    Techniques Incendiaries.  Government's Exhibit 33a-8.

16    Booby Traps.  Government's Exhibit 33a-3.  The Anarchist

17    Handbook.

18          In Government Exhibit 33a-6 entitled Guerilla

19    Warfare and Special Forces Techniques, just page five in

20    this book alone so perfectly describes exactly what Ed

21    and Elaine Brown are all about, what they and their

22    supporters are all about.  And this is what some of the

23    words say.

24          Resistance.  Resistance is defined as the act

25    of opposition of one individual or group to another.  A

1   resistance movement is the organized element of a

2   disaffected group which resists a government or

3   occupying power with means varying from passive to

4   violently active.  Resistance movements begin to form

5   when dissatisfaction occurs among strongly motivated

6   individuals who cannot further their cause by peaceful

7   and legal means.

8          These words, ladies and gentlemen, and so, so

9   many more epitomize what they wanted.  They wanted war.

10  So any new argument that the accumulation of 21 pipe

11  bombs, 20 IED's, deadly firearms, over 60,000 rounds of

12  ammunition, all accumulated in a short period of time,

13  is an attempt to engage in revisionist history in any

14  way possible to justify what they were doing.

15         Please go to Government 2i, page two, Dena.

16  Danny Riley made the point so clearly on August 4th when

17  he said, no one realizes it's militia time.  And he also

18  said oh yeah, I forgot, the number one most important

19  thing, people should come and make a stand to their

20  death.  Edward and Elaine Brown's stand and the stand of

21  their supporters, their grand stand included the use,

22  please pull up 39a-4, Dena, included the use of bombs

23  with nails taped to them, which is exactly why Danny

24  Riley's e-mail to his supporters, pull up 2i again,

25  Dena, and enlarge, which is exactly why Danny Riley's

1    e-mail to all their supporters requested, among a litany

2    of additional other information and materials, roofing

3    nails, bigger, better.

4              Make no doubt about it, though, ladies and

5    gentlemen.  Ed and Elaine Brown intended to survive.

6    The nature of their character, which included a pulpit

7    in their own living room, please pull up 4f, Dena,

8    included a pulpit in their living room, the nature of

9    their character wouldn't allow for anything less but

10   their survival.

11             So while Danny Riley was sending out e-mails

12   imploring supporters to wage battle to their death, Ed

13   and Elaine Brown were busy fortifying all those places

14   in their residence where they were likely to be.

15             Their bedroom is a great example.  30a-47,

16   please.  In one closet in their bedroom were two helmets

17   and two air cannisters, air tanks.  30a-46, please.

18   30a-50.  And 30a-51.  In Ed and Elaine Brown's changing

19   room off the master bedroom were two bulletproof vests.

20   30a-42.  Every single one of the pipe bombs were located

21   in their master bedroom.

22             And the firepower present in their bedroom was

23   shocking.  30a-31.  30a-62.  Even Ed and Elaine Brown's

24   master bathroom was equipped with a built-in tub and an

25   Enterprise Arms gun positioned close to the window.  If

1    you got stuck in the bathroom there was a wooden crate

2    under that table, please large that, that had plenty of

3    extra ammunition available.

4         In order to get to the den where Ed and Elaine

5    Brown would have wanted to watch themselves on TV during

6    the nine-month standoff, you'd have to walk through the

7    library hallway.  30a-67.  And 30a-72.  And if the

8    Bushmaster firearm or the Benelli shotgun weren't enough

9    firepower for them, 30a-68, they could turn to one of

10   the seven improvised explosive devices on the library

11   shelf.  30a-61.  The den itself came equipped with

12   plenty of firepower.  Conveniently located next to the

13   TV clicker was another gun.  30a-59.  30a-75.  And who

14   could actually get any exercise without the presence of

15   a .50-caliber sniper weapon at your disposal.

16        Elaine Brown also thought enough to have

17   detonation cord on her kitchen counter.  Do you remember

18   when Ken Erickson testified about detonation cord?  He

19   testified it was right next to a fruit bowl on the

20   kitchen counter.  Detonation cord, ladies and gentlemen,

21   is what he said burns at 26,000 feet per second.

22        But let's address the issue which counsel for

23   Elaine Brown has raised.  He made it a theme to point

24   out that Elaine Brown's fingerprints weren't on any of

25   the IED's or any of the bombs.  But did this actually

1    surprise you?  Because it shouldn't have surprised you.

2    Wasn't it clear that Elaine Brown's crucial role, not

3    her only role, but her crucial role was to be the bread

4    winner, to bring in the cash, to finance the entire

5    operation.  And wasn't it clear that Ed Brown's role,

6    his primary role and the primary role of his supporters

7    was to actually make the IED's and the pipe bombs all

8    along while Elaine was cleaning teeth.  In the same

9    vein, doesn't it make sense that Elaine Brown wouldn't

10   have any IED's or pipe bombs or semi-automatic assault

11   weapons lying around for dental patients to see.  What

12   better way to scare off the dental patients than to have

13   an IED in the same room.  It wouldn't have happened.

14          It makes sense, ladies and gentlemen.  Ed and

15   Elaine Brown believed that they were in this for the

16   long haul.  That's what they planned.  They couldn't

17   possibly survive unless Elaine Brown kept the money

18   trail flowing.

19          That's exactly why the undercover team was

20   allowed into their home during the night of October 4.

21   They had just successfully recovered a lot of the items

22   from Elaine Brown's dental practice on Glen Road.  They

23   broke in.  The undercover team was welcomed as heroes to

24   Ed and Elaine Brown because they had just staged a

25   successful coup which meant that the flow of money and

1    therefore the continuation of their cause would live.

2    Why else were they celebrating on the porch with pizza

3    and beer?

4             So don't be sidetracked by any claim that poor

5    old Elaine was just a cog in the wheel.  She was the

6    wheel that kept this conspiracy spinning.

7             And could Elaine Brown actually be claiming

8    that the actions of her husband and the actions of the

9    co-conspirators weren't reasonably foreseeable to her?

10            MR. LANGE:  Objection, it's burden shifting.

11            THE COURT:  Overruled.

12            MS. OLLILA:  Was it puzzling to you, ladies

13   and gentlemen, when counsel for Elaine Brown questioned

14   two of the United States' witnesses about what was

15   contained in the other nightstand next to the master

16   bed.  Although some of the witnesses, the witnesses

17   seemed somewhat puzzled by what counsel was doing,

18   counsel for Elaine Brown pushed on.  Could Elaine Brown

19   actually be claiming that she had no knowledge of what

20   was going on in her very own home?  One thing should

21   have been clear from the testimony of Ed Brown

22   yesterday.  Elaine Brown did know what was going on in

23   her home.  That's exactly why, when Ed Brown was asked

24   upon cross-examination by Mr. Huftalen, who brought the

25   SA 85, this weapon, into the home.  Ed Brown let it slip

 1   out.  What did he say?  He said my wife will remember

 2   who did that.  When Ed Brown was asked whether or not

 3   Elaine Brown knew about weapons in the residence during

 4   their initial arrest in 2006, once again he didn't think

 5   before he spoke.  He said of course she does.  She knows

 6   everything in the house.  Of course she knows everything

 7   in the house.  Do you think that as Elaine Brown entered

 8   the master bedroom to put the dust mop away, please

 9   30a-45, or to even get her Yoga mat, 30a-40a, that she

10   would somehow miss the presence of a police flak jacket?

11         Hollow point ammunition.  30a-47, Dena.  This

12   is the same hollow point ammunition which Ken Erickson

13   testified was used to kill big game.  Think she'd miss

14   the military issue ballistic helmets, goggles,

15   pyrotechnic fuse, and two air cannisters?  30a-46,

16   please, Dena.  And do you think that as Elaine Brown

17   laid in her bed in her nice linens, that she couldn't

18   see the pipe bombs and parachute flares and ammunition

19   stacked up on a baker's rack, 30a-40, less than ten feet

20   away from the edge of the bed on a closet which had no

21   door?  Could it possibly be that Elaine Brown didn't see

22   the gas mask on her nightstand, 30a-57, or that when she

23   reached into her nightstand to get a candle, 30a-53, she

24   somehow missed the presence of a pocket smoke escaping

25   mask?  Perhaps after Elaine Brown folded Ed Brown's

1    clothing and put it away in the dresser drawer she

2    neglected to see the knife, flashlights and night vision

3    goggles.  30a-56.

4           Ladies and gentlemen, I submit this to you,

5    the real Elaine Brown is the very woman who had this

6    Glock with her in her hand the night of her arrest when

7    she was on the porch with the undercover team.  That's

8    the real Elaine Brown.  She's not a shrinking violet.

9    That much is clear.  And you certainly heard from her

10   husband when he testified yesterday.  She carried

11   firearms on her, had for a long time, and shot weapons

12   at the residence.

13          What do you think that the presence of the

14   military ballistic vests, two of them, the two military

15   ballistic helmets, the two air supply systems, 21 pipe

16   bombs, 13 IED's, five deadly firearms, and thousands of

17   rounds of ammunition all in the master bedroom meant?

18   What it meant was even Elaine Brown wasn't headed to

19   that bunker.  She was going to stand arm and arm, hand

20   in hand with her husband Ed, and they were going to

21   fight.  They were going to fight and kill law

22   enforcement all because they didn't want to be taken

23   into custody.

24          I submit this to you, ladies and gentlemen,

25   the real Elaine Brown is the very woman who yelled such

1   vulgar profanities at the undercover team as soon as she

2   was arrested.  She fell victim for a second time of a

3   ruse advanced by law enforcement.

4           Ladies and gentlemen, the battle that Ed and

5   Elaine Brown and their supporters wanted, never

6   happened, because the United States Marshal Service in

7   the District of New Hampshire had Ed and Elaine Brown's

8   number from the jump start.  The United States Marshal

9   Service knew that Ed and Elaine Brown's cause would

10  eventually implode from within because it wasn't a cause

11  at all.

12          The United States Marshal Service knew that if

13  they acted with patience and deliberation they would

14  arrest their supporters one at a time and slowly close

15  the circle.

16          The United States Marshal Service also knew

17  that the fringe players would eventually fall away and

18  leave to either support another cause or simply drift

19  into the wind.

20          The battle they were looking for, the battle

21  they were hoping and praying for, never materialized.

22          The United States Marshal Service outsmarted

23  Ed and Elaine Brown and their supporters by a long shot

24  in every way and it is without a doubt that it must have

25  been incredibly difficult, but they prevailed, the

1    United States Marshal Service prevailed.

2           The number one goal at all times of the

3    Marshal Service was to insure that no one, not the

4    Browns, not their supporters, and not law enforcement,

5    was harmed in any way, and that is exactly what

6    happened.

7           From the date that Ed and Elaine Brown decided

8    to play by their rules, the United States Marshal

9    Service engaged in an unwavering plan for a peaceful

10   resolution.  At the end of the day the false beliefs

11   perpetuated by Ed and Elaine Brown fell flat because

12   they were up against the United States Marshal Service,

13   true professionals, exactly what you would expect them

14   to be.  True professionals whose solitary aim was to

15   comply with their duty to apprehend Ed and Elaine Brown

16   in a peaceful manner.

17          Although, please pull up 1i, Dena, although it

18   took almost nine months, law enforcement never wavered

19   in their approach.  Even in the bitter end.  Law

20   enforcement officers who moments earlier had a loaded

21   weapon pointed at them, acted with professionalism,

22   generosity and humanity toward two individuals who would

23   have killed them in order to avoid apprehension.

24          Ladies and gentlemen, the evidence in this

25   case has established that Ed and Elaine Brown did

1    everything in their power to forcefully resist, impede

2    and prohibit law enforcement officers from taking them

3    into custody.

4              The United States asks you return the only

5    verdicts consistent with the evidence in this case, and

6    those are verdicts of guilty.  Thank you.

7              THE COURT:  Thank you.  I'll see counsel for

8    just a moment.

9                        AT SIDEBAR

10             THE COURT:  Are the defendants requesting any

11   curative instructions?

12             MR. LANGE:  I think some of the government's

13   argument --

14             THE COURT:  I want to give you an opportunity.

15             MR. LANGE:  -- was based on speculation, went

16   beyond what could be reasonably inferred from the

17   evidence.  I'd just ask the court to instruct the jury

18   that what the lawyers say is not evidence.

19             THE COURT:  I will do that in any event in my

20   closing instructions.

21             MR. LANGE:  And they --

22             THE COURT:  I don't want to do that right now

23   because then it looks like I'm applying it to you.

24   Okay, so if you want, I'll do it, but I don't want it to

25   look bad.  Okay, so you're not asking.  Any other --

1    anything else?

2              MR. IACOPINO:  I join in his request.

3              THE COURT:  Anything else?

4              MR. IACOPINO:  Nothing else.

5              THE COURT:  Okay.  That's it.

6                        BEFORE THE JURY

7              THE COURT:  All right, ladies and gentlemen,

8    we're going to take a ten-minute recess and then we will

9    hear additional closings.

10             Don't make up your minds.  We have more to go.

11   Don't discuss the case.

12             I am told you have lunch.  We're going to let

13   you eat.

14             (Jury exited the courtroom.)

15             THE COURT:  All right, we're in recess.

16             (Recess at 2:00 p.m.)

17                        BEFORE THE JURY

18             THE COURT:  Mr. Lange, the jury will be

19   pleased to hear from you.

20             MR. LANGE:  Good afternoon.

21             THE JURY:  Good afternoon.

22             MR. LANGE:  I'm not going to be long.  I'm

23   going to ask you people to do what you took an oath to

24   do, which is very simply consider the evidence that's

25   presented here in the courtroom, apply your common sense

1    to that evidence, and apply the instructions which come

2    from his Honor, the judge.  That's what my client,

3    Elaine Brown, is entitled to, that's what you've agreed

4    to do.

5            This case should not be decided based on

6    eloquence or some theory of guilt by association or

7    character assassination.  The case should be decided by

8    you people based on the evidence and on the law.

9            The question for you is what has the

10   government proven beyond a reasonable doubt.  Beyond a

11   reasonable doubt is just what those words apply.  It

12   applies the use of your common sense and your common

13   experience.

14           What has the government proven in this case

15   with regard to Elaine Brown, and you consider each

16   defendant separately, beyond a reasonable doubt.

17           Well, they have proved that she possessed

18   this.  They have proven that beyond a reasonable doubt.

19   This is the Glock that she had when she was arrested at

20   her home on October 4th of 2007.  They have not proven

21   beyond a reasonable doubt that she possessed the

22   firearms.  There's lots of them there.

23           When you go back to the courtroom, you will

24   have the judge's instruction about what possession

25   means.  It comports with your common sense.

1          To possess something is to have actual

2     possession of it.  There is no indication that Elaine

3     Brown actually possessed any of those formidable

4     firearms, all 17 of them, other than the pistol, and

5     that is a firearm, no question about it.

6          Possession can also include what is call

7     constructive possession.  And that means you have the

8     power and intention to exercise control over something.

9     There is no sufficient evidence to prove that my client

10    had the power and intention to exercise control over

11    those firearms.  And I'll try to explain to you, as

12    succinctly as I can, why that matters.

13         It is also abundantly clear that the

14    government has not met its burden to prove that she

15    possessed or used in furtherance of anything the

16    destructive devices, and I'll try to remember the

17    witness's name, I believe it's Michael Powell.  He was

18    the explosives or ordnance enforcement officer from the

19    Bureau of Alcohol, Tobacco and Firearms.  I asked him

20    very few questions, but you will recall one of the

21    things I asked him about was the Glock.  I held the

22    Glock up, brought it up there, asked him if it's a

23    firearm, and he said yes, it's a firearm.  I asked him

24    if it was a grenade or if it was a mine or if it was a

25    missile or if it was a rocket, a booby trap or something

1    like that, and he said no.  What he was telling you was

2    was that firearm was not a destructive device.

3           The Goex cans, destructive device.  The what

4    has been called zip guns, destructive device, pipe bombs

5    may all be true, but the government has not linked those

6    items to my client.  Yes, she knew about them.  How

7    could she not.  She lived in the same house with her

8    husband, but that does not mean that she had the

9    dominion and control over those items.

10          Now, the government was very eloquent in its

11   closing argument about remember how it was always Ed and

12   Elaine, Ed and Elaine, Ed and Elaine.  Of course it's Ed

13   and Elaine.  They are married.  And it's abundantly

14   clear from the evidence that they were both convicted

15   across the hall back on January 18th of 2007.  But she

16   was released.  She went down to stay with her son David,

17   the fellow you heard from this morning, stayed there a

18   period of time, and then she went back.  And that's one

19   of the counts in this case.  It will be up to you to

20   decide whether that constitutes a crime.  The judge will

21   explain those elements.  I leave that to your common

22   sense and your good judgment.

23          She came back, she came back because she

24   missed her husband, and David the son described how much

25   happier she was back where she belonged.  Home is the

41

1    place you go where they have to take you in, and that's

2    where she went.

3           She had also been convicted of a felony as of

4    January 18, and she clearly, as I've already told you,

5    the evidence told you, what I tell you is not evidence,

6    what the prosecutor says is not evidence, we can comment

7    on it, you decide what the evidence is, she also

8    possessed the firearm after that conviction.  Again,

9    that's one of the counts in this case.  It will be up to

10   you to decide if the evidence supports a verdict in that

11   count.

12          You're going to be given a jury verdict form,

13   and basically you will work through it.  The counts

14   about being a felon in possession, failure to appear at

15   sentencing, they are toward the end of the form.  You

16   will have a form for each of the two defendants.

17          The government said, oh, Elaine in particular

18   is trying to justify the Glock because of what happened

19   with Danny Riley.  You know what happened to Danny

20   Riley.  He was tasered, he was shot at, he was taken

21   into custody.  There was a show of force, multiple

22   cruisers, 170-odd law enforcement personnel, New

23   Hampshire National Guard.  You know it was all there.

24   There is no evidence that prior to that date my client,

25   Elaine, had any firearms.  You will decide whether the

42

1    possession of firearms after that constitutes offenses

2    as indicated in Count Six, particularly in Count Six.

3            What I want to turn to now is what's a

4    conspiracy.  And I submit to you that my client is not

5    guilty of conspiracy.  A conspiracy is an unlawful

6    agreement to break the law.  I submit to you what she

7    did when she went home is simply to do what she felt she

8    had to do as a loyal wife.  I also submit to you that

9    she did not possess a firearm in furtherance of a

10   conspiracy, but that's the charge.

11           And even if she may have possessed a firearm,

12   you decide beyond a reasonable doubt that she possessed

13   a firearm in furtherance of a conspiracy.  That's one of

14   the counts on the form.  She certainly did not possess,

15   either directly, constructively, or in any other way,

16   shape or form, a destructive device.  There is no

17   evidence that she had anything to do with putting those

18   Goex cans there, putting those pipe bombs there, putting

19   the zip gun cans there or installing the flash bang

20   Tannerite that was up in the trees.

21           So I'm going to end simply where I began.  I

22   just ask you to do your jobs.  I ask you to apply the

23   law to the evidence as you find it, and when you do

24   that, you will return a just and fair verdict as to my

25   client.  Thank you.

43

1              THE COURT:  Thank you, Mr. Lange.  Mr.
2    Iacopino.
3              MR. IACOPINO:  Thank you, your Honor.  Good
4    afternoon.
5              THE JURY:  Good afternoon.
6              MR. IACOPINO:  One of the hardest things I
7    think any criminal defense lawyer has to do is come
8    speak to juries at the end of the case and sort of tie
9    it altogether and explain to you why my client, a living
10   breathing human being, should be found not guilty.  And
11   I always find refuge in talking about something the
12   judge will speak to you about, two things, actually, the
13   presumption of innocence and the burden of proof.
14             No matter what you believe about Edward
15   Brown's political beliefs and ideologies, no matter
16   whether you believe he's right or wrong with his
17   observations about the government, the tax system or the
18   court system, he still sits in this courtroom a living
19   breathing human being who enjoys the presumption of
20   innocence.
21             That means that he was innocent when he came
22   walking into this courtroom on the very first day.  That
23   means he's innocent, as I don't know how many government
24   employees came up and testified against him, he's
25   innocent as he sat there and told you his side of the

1    story.  And he'll remain innocent even while the

2    government's very eloquent closing was given.  He

3    remains innocent through my closing, and even through

4    the judge's charge to you, his instructions to you of

5    the law, and he remains innocent even as you go back

6    into that jury room back there, unless after

7    consideration of all the evidence, second point, you all

8    12 unanimously agree that the government has born the

9    burden of proof and that they've born that burden with

10   respect to each element of each charge beyond a

11   reasonable doubt.

12           That doesn't mean that it's he may have

13   committed these crimes, ladies and gentlemen.  Doesn't

14   mean that he probably committed these crimes.  Doesn't

15   mean that he possibly committed.  The burden of proof is

16   much higher than that.  It's proof beyond a reasonable

17   doubt.  The judge will tell you it's not proof beyond

18   all doubt, but it's proof beyond a doubt based on

19   reason.  And the government has failed to do that in

20   this case, despite the parade of witnesses, despite the

21   various exhibits that they have presented to you and,

22   well, through the court, have presented as evidence,

23   they have failed to carry that burden.

24           And we know that they've failed to carry that

25   burden because each of these offenses, or the burden

1    that they carry with respect to each of these offenses,

2    is to prove not only that Edward Brown took some action,

3    but that he had some type of criminal intent.

4            The judge will tell you with respect to Counts

5    One and Two and a couple of the other ones, excuse me if

6    I don't have this all written down, but that for several

7    of these counts, but most particularly Counts One and

8    Two, Edward Brown must have acted willfully, in other

9    words, with a willful intent to commit a crime.  The

10   judge will tell you that under our law, willfully means

11   to act voluntarily and intelligently and with the

12   specific intent that the underlying crime be committed.

13   That is to say, with bad purpose either to disobey or

14   disregard the law, and not to act by ignorance, accident

15   or mistake.

16           And with respect to Counts One and Two of this

17   indictment the government has to prove that Edward Brown

18   acted willfully.

19           The reason why the government can't do that

20   was told to you by Edward Brown himself, and I'll get to

21   that in a minute with respect to Counts One and Two.

22           But before we do that I want to go to the --

23   some of the other counts first.  I want to specifically

24   address with you the charge of failure to appear for

25   trial, which I believe against Ed Brown is count number

1   10 -- 9 in the indictment, and failure to appear for

2   sentencing with respect to Edward Brown is count -- it's

3   either 10 or 11, I don't have it specifically here.  The

4   judge will tell you what the elements of those charges

5   are.  One of them is that he has to act willfully also

6   for those charges.  But also the judge will tell you

7   that the action in that case is that he must have

8   willfully failed to appear for trial, and then the

9   important words that you will hear in these

10  instructions, as required on January 12, 2007.

11         During the government's closing they put on

12  their little slide show and one of the exhibits that

13  they provided in the slide show is this one.  It's

14  Exhibit 1a-2.  This is the order setting the conditions

15  of release for Edward Brown for his tax trial.  This is

16  the only piece of paper that gives you any evidence of

17  what Edward Brown was required to do when it came to

18  appearing for trial or even for sentencing.  If you look

19  on this piece of paper, there is nothing in here that

20  sets a date.  In fact, one of the check-offs has a place

21  for the court to actually write in a date and time to

22  appear.  There's nothing there.  It says as required.

23  And the government has provided no other piece of

24  evidence showing you that this defendant was ordered to

25  appear for court or on the day that he was there,

1    ordered to come back the next day.  Doesn't exist.

2    Doesn't exist in this case.  He was never ordered to

3    appear.  He was never required to appear because that's

4    how courts require things.  They order it.  And

5    likewise, there's no piece of paper that says he was

6    required to appear in April for sentencing.

7           You did see Exhibit 1c.  They put that up in

8    their slide show during closing argument as well, a

9    bench warrant for the arrest of Edward Brown.  Look at

10   it closely.  It's not addressed to Edward Brown, ladies

11   and gentlemen.  Not at all.  It's addressed to the

12   United States Marshal.  And there's no evidence that

13   you've heard that this was ever provided to Mr. Brown.

14   What you heard was that some time after sentencing a

15   letter may have been sent to him informing him that he

16   had been both tried and sentenced, but that is not an

17   order to appear in court for sentencing, nor is it an

18   order to appear at the trial.

19          The government has not met their burden,

20   ladies and gentlemen, when it comes to the charges of

21   failure to appear for trial against Ed Brown or failure

22   to appear for sentencing against Ed Brown.

23          As I indicated, I'm going to return in my

24   argument to Counts One and Two, the conspiracy counts.

25   That same criminal intent requirement is part of the

1    government's burden of proof with respect to those two.

2    Two charges.  Must act with a specific intent that the

3    underlying crime be committed with a bad purpose either

4    to disobey or disregard the law, not to act with

5    ignorance, accident or mistake.

6            And you heard the prosecutor ask you to draw a

7    lot of inferences in her closing argument to you.  And

8    admittedly, nobody can know what somebody's intent is

9    because you're not them.  Intent is a mental process.

10   But in this particular case, ladies and gentlemen, you

11   heard from Ed Brown.  He came right up here and took the

12   witness stand and told you what his intent was.  His

13   intent was to live.  Not to commit a crime.

14           You may not like Ed Brown, you may not have

15   liked his behavior on the witness stand, but he told you

16   things that I'm sure you were surprised to hear.  He

17   told you that he had weapons even before June 7th.  Told

18   you he had three of them.  He told you about things that

19   I'm sure the government was happy to have him testify

20   about because it really didn't help his case too much.

21   What do you take from that?  You take from it even

22   though I don't like the guy, I've got to believe him.

23   He's willing to tell me the truth, even if it hurts his

24   case.  And that's what he did.  And he told you that

25   this started long before January 12th in his mind.  He

1  told you how when there was a siege at Waco he took the

2  step of calling up the United States Department of

3  Justice Attorney General's Office.  Of course he did not

4  get Attorney General Janet Reno at the time.  No, he got

5  somebody, some clerk somewhere who was tasked with

6  taking his suggestion.  He told you how that made an

7  impression on him.  He told you about Ruby Ridge.  He

8  told you about the videos that they had of Waco and Ruby

9  Ridge in their home.

10         Well, that's the early nineties.  But he also

11  told you that in 2004 his wife's dental practice was

12  beset upon by 30 agents.  And he told you that there

13  were snipers there.  And that was confirmed by Shawn

14  Farnsworth who had gone up on the hill to buy supplies

15  and saw the snipers setting up.  This was to search

16  Elaine Brown's dental practice to download something

17  from her computer, something Ed Brown told you if they

18  had simply asked, we would have given it to them.  That

19  informs Ed Brown's mental state for your purposes here

20  today, ladies and gentlemen.

21         And in 2006 this ruse that they used to arrest

22  him on the tax case, again, more agents, snipers, called

23  them in from other jurisdictions.  One of those

24  deputies, though, told you, hey, I thought I could have

25  arrested him while he was doing yard work in April right

1    in the backyard of the dental practice.  I felt I could

2    have done that reasonably.

3            But that's not what happened.  That's not what

4    informed Ed Brown.  It wasn't one or two officers

5    saying, Ed, we have a warrant for your arrest, you have

6    to come with us.  It was, again, 20 or 30 agents and

7    snipers in a ruse.  That informs Ed Brown's mental

8    intent, ladies and gentlemen.

9            And then after he comes to court he's led to

10   believe, as he told you, that his wife would go with the

11   probation officers to get the guns out of the house.

12   Was that me?  I'm sorry.

13           THE COURT:  It's the microphone, malfunction.

14   You can move it out of the way.

15           MR. IACOPINO:  Thank you, your Honor.  Sorry,

16   that scared me.  But it tells you that probation was

17   supposed to go with his wife into the house.  The

18   marshals weren't supposed to go into the house until she

19   was there.  But what did you hear.  Not just from Ed,

20   but from the marshal who had come over from Vermont for

21   the second time.  What did you hear?  Oh yeah, we were

22   in the house before she got there.  That's what we were

23   tasked to do.  That, ladies and gentlemen, informed Ed

24   Brown's mental intent.  That informed his mental state.

25           June 7, 2007, 174 law enforcement officers,

1    armed personnel carriers, snipers, lethal and non-lethal

2    weapons, ghillie suits.  That informed Ed Brown's mental

3    intent, ladies and gentlemen.

4              Having a concert or a get together and have

5    the Department of Homeland Security helicopter that you

6    saw in the video presented by Mrs. Brown buzzing for 4

7    to 5 hours, you heard that testimony, that informed

8    Edward Brown's mental state.  That informed his intent,

9    ladies and gentlemen.

10             I suggest to you that's not too hard to

11   believe Ed Brown when he says to you I was not willfully

12   attempting to break any laws.  I was trying to live.

13   They were going to kill me.  I wanted to live.  And

14   that's why I did what I did.  That's why he got up on

15   the witness stand and told you that.  Because it was

16   true.  And if the government does not prove that he

17   acted willfully beyond a reasonable doubt, then you must

18   apply that second grade principle that I talked about,

19   the burden of proof.  If they don't prove it, he's not

20   guilty.  And if you find him not guilty on Counts One

21   and Two, ladies and gentlemen, you must necessarily by

22   law find him not guilty on Count Three, the use of a

23   firearm during a crime of violence.

24             Again, I'm going to feel like Randy Jackson

25   from American Idol.  I want to keep it real here with

1    you.  Ed Brown was not polite on the witness stand.  He

2    was not the most gentlemanly guy.  He didn't take

3    direction well.  But under our law he's still innocent

4    and you still have to give him the same consideration

5    that you would give to any other person who sat up there

6    and was polite and nice and took direction well.

7              And at the beginning of this trial I asked you

8    to make sure that you gave the Browns a fair shake.

9    That's one of the things that I mean about that.  You

10   have to give him a fair shake, and that's one of the

11   ways that you have to do it.

12             A couple of other things I want to address.

13   The prosecutor suggests that Ed Brown recruited people.

14   And I will submit to you that the evidence of Ed Brown

15   recruiting anybody is thin, if it exists at all, and it

16   certainly does not rise to a level of proving something

17   beyond a reasonable doubt.

18             The government provided you with

19   communications of two gentlemen through e-mails.  Those

20   communications did not come from Ed Brown.  They didn't

21   come from Elaine Brown.  There's absolutely nothing in

22   the evidence to suggest even how Dan Riley, Jason

23   Gerhard, this guy Reno Gonzalez, how they even met Mr.

24   Brown.  The government has not presented you with any

25   evidence like that.  So to suggest that he recruited

1    them as some kind of conspiracy just doesn't carry

2    water.

3           The burden of proof is with the government,

4    ladies and gentlemen, and in order to properly put the

5    government to their burden I beseech you that you not

6    engage in the assumptions that Ms. Ollila asked you to

7    engage in.

8           She asked you to consider where would Danny

9    Riley get the money to buy a gun.  Well, the government

10   didn't present any evidence to you of what Danny Riley's

11   wherewithal was.  They didn't even let you know if he

12   had a job or not.  All they did was show you his picture

13   after his arrest.  Of course it's an after an arrest

14   photo.  And from that picture she wants you to make an

15   assumption about his financial condition.  Don't do it.

16   There's no evidence of it.  Hold her to the burden of

17   proof.  Don't let her get away with rhetorical

18   flourishes.

19          Another thing in the government's argument.

20   She tried to accuse the defense, the defense, everybody

21   at the back here, of recasting the die.  In essence what

22   she did, she made what's called a straw man argument,

23   ladies and gentlemen.  A straw man argument is an

24   argument like a scarecrow full of straw.  It's easy to

25   beat down.  And if you consider the argument made by the

1    government, a lot of it was exactly that way.  She would

2    exaggerate the things that she claimed were our claims,

3    and then beat them down.  Don't fall for it.  She's

4    asking you to assume things.  The burden is right here,

5    and that burden is proof beyond a reasonable doubt on

6    every element, including the element that my client

7    acted willfully, with bad purpose, with the intent to

8    commit the underlying crime.

9         You have ample evidence that Edward Brown's

10   mental state was not that of somebody who was willfully

11   intending to commit a crime.  He wanted to do one thing,

12   ladies and gentlemen, he wanted to live, and therefore

13   you should return verdicts of not guilty.

14        THE COURT:  Thank you, Mr. Iacopino.  Mr.

15   Huftalen.

16        MR. HUFTALEN:  Thank you, your Honor.  The

17   government and Mr. Iacopino agree on at least one thing.

18   Mr. Brown wanted to live.  That's where we part company.

19   He wanted to live his way, and anybody who wouldn't let

20   him live his way, he'd kill.  Period.

21        If the evidence in this case has not proven to

22   you beyond a reasonable doubt that the gentleman seated

23   at the back table, Mr. Brown, is guilty of the charges

24   in the indictment, nothing that I can say right now is

25   going to change your mind.

1              So let's talk about Elaine Brown.   Mr. Lange

2    spoke very clearly, very succinctly, and very

3    persuasively with respect to her possessing destructive

4    devices.   When Judge Singal gives you the law, and he

5    will in a few minutes, listen carefully to what he says

6    about a conspiracy.   I expect that what he'll tell you

7    is that a conspiracy is an agreement, spoken or

8    unspoken.   I expect that he'll tell you that the

9    conspiracy does not have to be a formal agreement or

10   plan in which everyone involved sat down together and

11   worked out all the details.   That's what a conspiracy is

12   in the law.   Your common sense and the evidence in this

13   case will make it clear to you or have made clear to you

14   that she was a member of a conspiracy.   She just was.

15   She financed it.   She fed it.   She cleaned up after it.

16   And she held a gun on some of the outsiders to protect.

17   She was a member of a conspiracy.   She just plain was.

18              From that point Mr. Lange then went on and

19   talked about whether she possessed booby trap devices or

20   Goex cans with or without the nails, or pipe bombs, and

21   there's no evidence in this case that she touched any of

22   them, that she picked them up, that she held them, that

23   she built them, that she put them on the shelves.   But

24   what there is in this case is a whole lot of evidence

25   that they were there.   And there's a whole lot of

1    evidence that she was there.  She was there, they were

2    there, she saw them.

3          Mr. Brown admitted yesterday that he made the

4    pipe bombs.  That he made the zip guns, spring guns,

5    booby trap devices, whatever you call it.  That he put

6    the nails, the shrapnel, if you will, on the homemade

7    bombs, the IED's.  He did all of that.  He did it in

8    furtherance of his intention not to be taken into

9    custody.  He did that in furtherance of the two

10   conspiracies that he's charged with.  He did it to

11   hinder, to prevent, to obstruct by threats of violence

12   and otherwise, the U.S. Marshal Service from arresting

13   him on a lawful warrant.  That's what he did.

14         I suspect, or I expect, that another part of

15   the law that Judge Singal is going to talk to you about

16   goes as follows:

17         If you find beyond a reasonable doubt that a

18   defendant, Mr. Brown, was guilty on the conspiracy

19   charged in Count One or Count Two, then you may also

20   find that defendant -- this defendant, Elaine Brown

21   rather, guilty of carrying and using or possessing a

22   firearm in connection with a crime of violence.  It

23   sounds peculiar, but listen to the law as the judge

24   gives it to you.  If Mr. Brown is guilty of carrying,

25   using, possessing the destructive devices in furtherance

1    of, or the guns and firearms in furtherance of, and all

2    destructive devices are firearms, but all firearms

3    aren't destructive devices, you'll hear that too, if you

4    find that Mr. Brown and Mrs. Brown were in the

5    conspiracy, and if you find that Mr. Brown possessed,

6    carried or used the destructive devices in furtherance

7    of, and you find that it was, and listen carefully to

8    hear this, it was reasonably foreseeable to Mrs. Brown

9    that Mr. Brown would do this, that's it.  She's guilty.

10            So listen carefully to the law.  No one

11   nowhere, no one in this room, no one anywhere, I submit,

12   likes to sit in judgment of another human being.  It's

13   an uncomfortable thing to do.  It's a difficult thing to

14   do.  But sometimes you have to look at the facts and you

15   have to say it is what it is, I'm sorry, but it is what

16   it is.  And this is what you've seen since Tuesday of

17   last week.  This.  AUSA Ollila didn't exaggerate or

18   embellish the evidence in this case.  You've seen it.

19   Some of it you'll touch.  You will never forget it.

20   This case clearly, beyond all doubt, not just beyond

21   reasonable doubt, the evidence in this case clearly

22   proves beyond all doubt that Ed Brown, who was going to

23   kill anybody who came to arrest him, that's it, that's

24   the case.

25            We were here Tuesday, Wednesday, Thursday,

1    Monday, Tuesday, but that's what it boils down to.  You

2    all know it.  And when you hear the instructions that

3    Judge Singal gives you, you will understand that whether

4    Elaine Brown touched, picked up, isn't the critical

5    point.  The critical issue is, was it reasonably

6    foreseeable to her that he would, and I submit to you

7    that the evidence is beyond all doubt that it was

8    reasonably foreseeable.

9              I am holding this gun.  Is it reasonably

10   foreseeable that I will hold this gun?  It's an absurd

11   rhetorical question.

12             When you walk back in that room in a couple

13   minutes, or several minutes after you listen to Judge

14   Singal's instructions, you will take three things with

15   you.  The facts which are spread all over this courtroom

16   and are inside your memory, your collective memory from

17   the witness stand, the law which you will get from Judge

18   Singal, and only from Judge Singal, the third most

19   important thing you will take back, or equally important

20   thing with no disrespect intended to the court, is your

21   common sense.  You know exactly what went on here.  And

22   although your heart may go out to some people who are

23   involved, the facts speak for themselves.  Thank you

24   very much.

25             THE COURT:  Thank you, Mr. Huftalen.

1          MR. IACOPINO:  Your Honor, may we approach

2     before you begin your charge?

3          THE COURT:  Of course.

4                         AT SIDEBAR

5          THE COURT:  Before you do, counsel, you've

6     seen the revised jury verdict form.  Does anyone have

7     any objection to that?

8          MR. LANGE:  I have no objection to the form,

9     your Honor.

10          MR. HUFTALEN:  No.

11          THE COURT:  Now what can I do for you, Mr.

12     Iacopino?

13          MR. IACOPINO:  Before you asked if we wanted

14     you to make curative instructions to the jury.  I would

15     ask that you do so based on Mr. Huftalen's rebuttal

16     argument.  He stated that Elaine Brown held a gun on

17     agents, and that really wasn't any evidence that I think

18     is even fairly in the record and I think that it would

19     be important for the court to remind the jury of that

20     fact.

21          THE COURT:  Go ahead.

22          MR. HUFTALEN:  W. S. William Robertson who was

23     the undercover said that she held the gun and covered

24     the two of us.

25          THE COURT:  I'm going to let the jury decide

1    what the facts are.  That's a classic.  Any other

2    requests for curative instructions?

3                 MR. HUFTALEN:  Not from the government.

4                 MR. IACOPINO:  Not right now.

5                 MR. LANGE:  Are you going to include in your

6    general instruction that what the lawyers say is not

7    evidence?

8                 THE COURT:  You'll see it in there.  You have

9    it.  We're going to take a ten-minute break before I

10   give them instructions.

11                        BEFORE THE JURY

12                 THE COURT:  Ladies and gentlemen, we'll take a

13   ten-minute break and I'm going to give you jury your

14   instructions and then you're going to go deliberate.

15   Jury is excused for ten minutes.

16             (Recess taken.)

17                        BEFORE THE COURT

18                 THE COURT:  Before we bring the jury in,

19   counsel, the clerk advises that counsel has agreed to

20   the redacted indictment.  Is that correct?

21                 MR. HUFTALEN:  Government agrees.

22                 MR. IACOPINO:  Yes.

23                 MR. LANGE:  Yes, your Honor.

24                 THE COURT:  So that's what we will send in.

25   And are we ready for the jury?

1          MR. IACOPINO:  Yes.

2          MR. HUFTALEN:  Yes.

3          THE COURT:  Bring in the jury, please.

4          THE CLERK:  Yes, your Honor.

5                      BEFORE THE JURY

6          THE COURT:  Members of the jury, I'll now give

7   you your final jury instructions.  These instructions

8   will be in three parts.  First, general rules that

9   define and control your duties as jurors.  Second,

10  definitions of the elements of the offenses charged in

11  the indictment -- in other words, what the government

12  must prove to make its case.  And third, some rules for

13  your deliberations in the jury room and the return of

14  your verdict.  This is not going to be a memory contest.

15  I'm going to be sending a written copy of these

16  instructions with you into the jury room.

17         It is your duty to find all of the facts from

18  the evidence admitted in this case.  To those facts you

19  must apply the law as I give it to you.  The

20  determination of the law is my duty as the judge.  It is

21  your duty to apply the law exactly as I give it to you,

22  whether you agree with it or not.  You must not be

23  influenced by any personal likes or dislikes, opinions,

24  prejudices or sympathy.  That means that you must decide

25  this case solely on the evidence and according to the

1   law.  You took an oath proposing to do so at the

2   beginning of a case.

3          You must follow all of my instructions and not

4   single out some and ignore others; they are all equally

5   important.  You must not read into these instructions,

6   or into anything I may have said or done, any suggestion

7   as to what verdict you should return -- that is a matter

8   entirely for you to decide.

9          It is a cardinal principle of our system of

10  justice that every person accused of a crime is presumed

11  to be innocent unless and until his or her guilt is

12  established beyond a reasonable doubt.  Presumption is

13  not a mere formality.  It is a matter of the most

14  important substance.

15         The presumption of innocence alone is

16  sufficient to acquit a defendant unless you are

17  satisfied beyond a reasonable doubt of his or her guilt

18  after considering all of the evidence.  The defendants

19  before you, Edward Brown and Elaine Brown, are entitled

20  to the benefit of that presumption and you are not to

21  convict any of them unless you are persuaded of that

22  defendant's guilt beyond a reasonable doubt.

23         In this case, the defendants are being charged

24  together because the government alleges that they both

25  participated together in certain conspiracies.  But, in

1    considering the evidence and reaching your verdicts, you

2    will have to give separate consideration of the case

3    against each defendant.  Don't think of the defendants

4    as a group.  It is your duty to consider the charges

5    against each defendant separately and to return a

6    separate verdict for each defendant on each count.  That

7    means, for each count you must decide whether the

8    government has presented evidence proving that

9    particular charge beyond a reasonable doubt.

10          In a criminal case, the burden is at all times

11   on the government to prove guilt beyond a reasonable

12   doubt.  The law does not require that the government

13   prove guilt beyond all possible doubt.  Proof beyond a

14   reasonable doubt is sufficient to convict.  The burden

15   never shifts to the defendant.  It's always the

16   government's burden to prove each of the elements of the

17   crimes charged beyond a reasonable doubt.

18          If, after a fair and impartial consideration

19   of all the evidence, you have a reasonable doubt as to

20   the guilt of any one of the defendants on any particular

21   offense, it is your duty to acquit him or her of that

22   offense.  On the other hand, if after a fair and

23   impartial consideration of all of the evidence, you are

24   satisfied beyond a reasonable doubt of any of the

25   defendants' guilt on a particular offense, you should

64

1    vote to convict him or her of that offense.

2         A reasonable doubt does not mean a mere

3    possibility that the defendant may not be guilty; nor

4    does it mean a fanciful or imaginary doubt, nor one

5    based on groundless conjecture.  It means a doubt based

6    upon reason.

7         Each of the defendants' guilt must be

8    established upon the evidence and the reasonable

9    inferences to be drawn from that evidence.  The evidence

10   from which you are to decide what the facts are consists

11   of the sworn testimony of witnesses, both on direct and

12   cross-examination, regardless of who called the witness;

13   and the exhibits that have been received into evidence.

14        Although you may consider only the evidence

15   presented in the case, you are not limited in

16   considering that evidence to the bald statements made by

17   the witnesses or contained in the documents.  In other

18   words, you are not limited solely to what you see and

19   hear as the witnesses testify.  You are permitted to

20   draw from facts that you find to have been proven such

21   reasonable inferences as you believe are justified in

22   the light of common sense and personal experience.

23   That's something you do every day.  There's nothing

24   magical about that.

25        There are two kinds of evidence:  direct and

1    circumstantial.  Direct evidence is direct proof of a

2    fact, such as the testimony of an eyewitness.

3    Circumstantial evidence is indirect evidence, that is,

4    proof of a fact or chain of facts from which you could

5    draw the inference, by reason and common sense, that

6    another fact exists, even though that other fact hasn't

7    been proven directly.  You remember I gave you just a

8    silly example of that.  You're entitled to consider both

9    kinds of evidence.  The law permits you to give equal

10   weight to both, but it is for you the jury to decide how

11   much weight to give to any evidence.

12            Now, during the course of this trial you heard

13   testimony from persons who claim special expertise in

14   certain areas.

15            People who, by education and experience, have

16   become expert in some field or developed a special

17   expertise may state their opinions on matters in that

18   field and may also state their reasons for the opinions.

19            Expert opinion testimony should be judged like

20   any other testimony.  You may accept it or reject it or

21   give it as much weight as you think it deserves

22   considering the witness's education and experience, the

23   reasons given for the opinion, and all the other

24   evidence in the case.

25            Now, defendant Elaine Brown has a

 1   constitutional right not to testify, and no inference of

 2   guilt, or of anything else, may be drawn from the fact

 3   that she did not testify.  For any of you to draw such

 4   an inference would be wrong; and indeed, it would be a

 5   violation of your oath as a juror.

 6            Now, whether the government has sustained its

 7   burden of proof does not depend on the number of

 8   witnesses it has called or the number of exhibits it has

 9   offered, but instead upon the nature and quality of the

10   evidence presented.  You do not have to accept the

11   testimony of any witness if you find the witness is not

12   credible.  Not believable.  You must decide which

13   witnesses to believe and which facts are true.  To do

14   this, you must look at all of the evidence, drawing upon

15   your common sense and personal experience.

16            In deciding what to believe, you may consider

17   a number of factors, including the following:  The

18   witness's ability to see or hear or know the things to

19   which the witness testifies.  The quality of the

20   witness's memory.  The witness's manner while

21   testifying.  Whether the witness has an interest in the

22   outcome of the case or any motive, bias or prejudice.

23   Whether the witness is contradicted by anything the

24   witness said or wrote before trial or by other evidence.

25   And how reasonable the witness's testimony is when

1   considered in light of other evidence which you believe

2   to be true.

3           Again, you do that every day when you decide

4   who to believe and who not to believe.

5           Now, the evidence in this case includes facts

6   to which the lawyers have agreed or stipulated.  You

7   remember a stipulation was read to you at some point

8   during the trial.  A stipulation means simply that the

9   government and the defendants accept the truth of a

10  particular fact.  Since there's no disagreement, there

11  is no need for evidence apart from the stipulation.  You

12  must accept the stipulation as fact to be given whatever

13  weight you choose.

14          Now, what is not evidence.  Certain things are

15  not evidence and you may not consider them in deciding

16  what the facts are.  I will list them for you.

17          Arguments and statements by lawyers are not

18  evidence.  The lawyers are not witnesses.  What they say

19  in their opening statements, closing arguments, and at

20  other times is intended to help you interpret the

21  evidence, but as I told you at the beginning, it's not

22  evidence.  If the facts as you remember them differ from

23  the way the lawyers state them, it's your memory of the

24  facts that controls.

25          Questions and objections by lawyers are not

1   evidence.  Lawyers have a duty to their clients to

2   object when they believe a question or an exhibit is

3   improper under the rules of evidence.  You should not be

4   influenced by the objection or by my ruling on it.

5          Anything that I've excluded from evidence, and

6   that's happened occasionally during the trial, and

7   instructed you to disregard as not evidence, you must

8   not consider such items.

9          Anything you may have seen or heard when the

10  court was not in session is not evidence.  You are to

11  decide this case solely on the evidence received at

12  trial.

13         The indictment is not evidence.  This case,

14  like most criminal cases, began with an indictment.  The

15  indictment in this case was brought against these

16  defendants and has multiple counts.  You remember counts

17  means charges.  You will have the indictment before you

18  in the jury room during the course of your

19  deliberations.  This indictment will contain the counts

20  on which you will deliberate.  I caution you, as I have

21  before, that the fact that a defendant has had an

22  indictment filed against him or her is no evidence

23  whatsoever of his or her guilt.  The indictment is

24  simply an accusation.  It is the means by which the

25  allegations and the charges of the government are

1    brought before this court.  The indictment by itself

2    proves nothing.

3           Now, as part of the evidence in this case you

4    may have heard alleged statements by the defendants that

5    were recorded or other video recordings.  This is proper

6    evidence for you to consider.  You will have the ability

7    in the jury room to listen to recordings received into

8    evidence.  You will be provided a laptop in the jury

9    room so you can listen to the recordings and view videos

10   that were received into evidence.  You should not use

11   this laptop for any other purpose.

12          Now, during the presentation of evidence, you

13   have seen what is alleged to be firearms, ammunition and

14   other items identified as destructive devices.  Some of

15   these items have been admitted into evidence as

16   exhibits.  Unlike other exhibits, these alleged

17   firearms, ammunitions and the items identified as

18   destructive devices will not be present with you in the

19   jury room when you go to deliberate.  You will, however,

20   be allowed to examine them if you wish to do so.  If you

21   would like to examine any of these exhibits during your

22   deliberations, please communicate that wish to me by

23   giving a note to the jury officer, which he will give to

24   me.  A court security officer will then bring the

25   exhibits you request into the jury room, and you will be

70

1    allowed to examine them there in his presence.  Now, do

2    not deliberate in the jury room while he is present.

3    Look at whatever exhibits you wish to do and wait till

4    he leaves with the exhibits before you begin to

5    deliberate.  You're supposed to deliberate without

6    anyone else being in the jury room, so therefore don't

7    discuss the case or deliberate while anyone is there

8    bringing you an exhibit.  Wait until the officer leaves

9    with the exhibit.

10            I now come to the second part of my

11   instructions, the elements of the offenses the

12   government has charged and what it must prove to make

13   its case.

14            In general, the indictment charges that the

15   offenses were committed on or about certain dates.  It

16   is sufficient if the government proves beyond a

17   reasonable doubt that the offense was committed on dates

18   reasonably near the dates charged.

19            Count I, charge one, conspiracy to prevent

20   officers of the United States from discharging their

21   duties.

22            The defendants are charged in Count I with

23   conspiring with each other and other co-conspirators to

24   prevent by force, intimidation or threat officers of the

25   United States from arresting Edward and Elaine Brown.

1    It is against the law to conspire with someone to commit

2    this crime.  To prove that any of the defendants

3    conspired to commit this crime, the government must

4    prove the following beyond a reasonable doubt:

5              First, that the agreement specified in the

6    indictment, and not some other agreement, existed

7    between at least two people.

8              Second, that the defendant willfully joined

9    that agreement.

10             Third, that the defendant acted with intent to

11   prevent employees of the United States Marshal Service

12   in the discharge of their official duties.

13             Fourth, one of the conspirators committed an

14   overt act alleged in the indictment during the period of

15   the conspiracy in an effort to further the purpose of

16   the conspiracy.

17             And fifth, that the employees of the United

18   States Marshal Service are officers of the United

19   States.

20             I will instruct you further about the law of

21   conspiracy after I describe Count II.

22             Count II, conspiracy to commit offenses

23   against the United States.

24             In Count II the defendants are charged with

25   conspiring with each other and other co-conspirators to

1   commit a federal crime -- specifically, to assault,

2   resist, or impede officers of the United States in the

3   discharge of their duties to arrest Edward and Elaine

4   Brown.  It is against federal law to conspire with

5   someone to commit this crime.  For you to find that

6   either of the defendants are guilty of this conspiracy,

7   you must be convinced that the government has proven

8   each of the following things beyond a reasonable doubt:

9           First, that the agreement specified in the

10  indictment, and not some other agreement or agreements,

11  existed between at least two people to assault, resist,

12  or impede officers of the United States in the discharge

13  of their duties to arrest Edward and Elaine Brown.

14          Second, that the defendant willfully joined in

15  that agreement.

16          Third, that the defendant acted with intent to

17  further its unlawful purpose.

18          And fourth, that one of the conspirators

19  committed an overt act alleged in the indictment during

20  the period of the conspiracy in an effort to further the

21  purpose of the conspiracy.

22          A conspiracy is an agreement, spoken or

23  unspoken.  The conspiracy does not have to be a formal

24  agreement or plan in which everyone involved sat down

25  together and worked out all the details.

1          The government must prove beyond a reasonable

2     doubt that those who were involved shared a general

3     understanding about the crime.  Mere similarity of

4     conduct among various people, or the fact that they may

5     have associated with each other or discussed common aims

6     and interests does not necessarily establish proof of

7     the existence of a conspiracy, but you may consider such

8     factors.

9          To act willfully means to act voluntarily and

10    intelligently and with the specific intent that the

11    underlying crime be committed -- that is to say, with

12    bad purpose, either to disobey or disregard the law --

13    and not to act by ignorance, accident or mistake.  The

14    government must prove two kinds of intent beyond a

15    reasonable doubt before a defendant can be said to have

16    willfully joined a conspiracy.  First, an intent to

17    agree.  Second, an intent, whether reasonable or not,

18    that the underlying crime be committed.  Mere presence

19    at the scene of a crime is not alone enough, but you may

20    consider it among other factors.  Intent may be inferred

21    from the surrounding circumstances.

22         Proof that any defendant willfully joined in

23    the agreement must be based upon evidence of his or her

24    own words and/or actions.  You need not find that any

25    defendant agreed specifically to or knew about all the

74

1    details of the crime, or knew every other co-conspirator

2    or that he or she participated in each act of the

3    agreement or played a major role, but the government

4    must prove beyond a reasonable doubt that the defendant

5    knew the essential features and the general aims of the

6    venture.  Even if a defendant was not part of the

7    agreement at the very start, he or she can be found

8    guilty of conspiracy if the government proves that he or

9    she later joined the agreement later.  On the other

10   hand, a person who has no knowledge of a conspiracy, but

11   simply acts in a way that furthers some object or

12   purpose of the conspiracy, does not thereby become a

13   conspirator.

14            Count III and IV, carrying, using or

15   possessing a firearm, including a destructive device, in

16   connection with a crime of violence.

17            The defendants are charged in Counts III and

18   IV with carrying, using or possessing a firearm,

19   including a destructive device, in connection with a

20   crime of violence.  Count III charges defendant Edward

21   Brown.  Count IV charges defendant Elaine Brown with

22   that crime.  In order to prove that either of the

23   defendants carried, used or possessed a firearm in

24   connection with a crime of violence, the government must

25   prove the following beyond a reasonable doubt:

1           First, that the defendant conspired to prevent

2   officers of the United States from discharging their

3   duties as charged in Count I, or conspired to interfere

4   with federal law enforcement officers in the discharge

5   of their duties as charged in Count II of the

6   indictment.

7           Second, defendant knowingly carried or used a

8   firearm including a destructive device during and in

9   relation to, or possessed a firearm including a

10  destructive device in furtherance of, the commission of

11  that crime of violence.

12          The word knowingly as that term has been used

13  in these instructions, means that the act was done

14  voluntarily and intentionally and not because of mistake

15  or accident.

16          The term firearm means any weapon which will

17  or is designed to or may be readily converted to expel a

18  projectile by the action of an explosive.

19          A destructive device, the term destructive

20  device, means any explosive, incendiary bomb, grenade,

21  bomb or similar device, or any type of weapon by

22  whatever name known which will, or which may be readily

23  converted to, expel a projectile by the action of an

24  explosive or other propellant, and which has any barrel

25  with a bore of more than one-half inch in diameter.

1    Destructive device also includes any combination of

2    parts either designed or intended from which a

3    destructive device may be assembled.

4              Possess means to exercise authority, dominion

5    or control over something.  The law recognizes different

6    kinds of possession.  Possession includes actual and

7    constructive possession.  A person who has direct

8    physical control of something on or about his or her

9    person is in actual possession of it.  A person who is

10   not in actual possession, but who has both the power and

11   the intention to exercise control over something is in

12   constructive possession.  Whenever I've used the term

13   possession in these instructions, I mean actual as well

14   as constructive possession.  Possession also includes

15   sole possession or joint possession.  If one person

16   alone has actual or constructive possession, possession

17   is sole.  If two or more people share actual or

18   constructive possession, possession is joint.  Whenever

19   I've used the word possession in these instructions, I

20   mean joint as well as sole possession.

21              The term in furtherance as I've used it mean

22   to help, further, promote, or advance the crime.

23              There is another method by which you may

24   evaluate whether to find any of the defendants guilty of

25   carrying, using or possessing a firearm in connection

1   with a crime of violence.  If, in light of my

2   instructions, you find a reasonable doubt that a

3   defendant was guilty on the conspiracy charged in Count

4   I or II, then you may also, but you are not required to,

5   find that defendant guilty of carrying, using or

6   possessing a firearm in connection with a crime of

7   violence, provided you find beyond a reasonable doubt

8   each of the following elements:

9           First, that someone else committed the crime

10   of carrying, using or possessing a firearm in connection

11   with a crime of violence.

12           Second, that the person you find actually

13   committed the substantive crime of carrying, using or

14   possessing a firearm in connection with a crime of

15   violence was a member of the conspiracy of which you

16   found defendant was a member.

17           Third, that this co-conspirator committed the

18   substantive crime in furtherance of the conspiracy.

19           Fourth, that this defendant was a member of

20   the conspiracy at the time the substantive crime was

21   committed and had not withdrawn from it.

22           And fifth, the defendant could reasonably have

23   foreseen that one or more of his or her co-conspirators

24   might commit the substantive crime.  If you find all

25   five of these elements exist beyond a reasonable doubt,

1    you may find the defendant guilty of the substantive

2    crime charged even though he or she did not personally

3    participate in the acts constituting the crime or did

4    not have personal knowledge of them.  If, however,

5    you're not satisfied as to the existence of any one of

6    these five elements, then you may not find that

7    defendant guilty of that particular substantive crime

8    unless the government proves beyond a reasonable doubt

9    that the defendant personally committed that substantive

10   crime.

11           Counts V and VI:  Felon in possession.

12           The defendants are charged with a violation of

13   federal law which makes it a crime for a person

14   convicted of a felony to possess a firearm.  Edward

15   Brown is charged in Count V with possession of a firearm

16   after having been convicted of a crime punishable by

17   imprisonment for more than a year.  Elaine Brown is

18   charged in Count VI with possessing a firearm after

19   having been convicted of a crime punishable by

20   imprisonment for more than a year.  In order to prove

21   either of the defendants guilty of this crime, the

22   government must prove the following beyond a reasonable

23   doubt:

24           First, that that defendant was previously

25   convicted in any court of at least one crime punishable

1    by imprisonment for a term exceeding one year.

2              Second, that the defendant knowingly possessed

3    the firearm described in the indictment.

4              And third, that the firearm was in or affected

5    interstate commerce.

6              Count VII and VIII:  Obstruction of justice.

7              The defendants are charged with violation of

8    federal law, which makes it a crime to obstruct justice.

9    Edward Brown is charged with obstruction of justice in

10   Count VII.  Elaine Brown is charged with obstruction of

11   justice in Count VIII.  In order to prove this charge,

12   the government must prove the following beyond a

13   reasonable doubt:

14             First, that there were trial and sentencing

15   proceedings pending before a federal court against the

16   defendants Edward and Elaine Brown for violation of tax

17   laws and other financial crimes.

18             Second, the defendant knew of the pending

19   proceeding.

20             Third, the defendant threatened physical force

21   against the United States Marshals as charged in the

22   indictment.

23             And fourth, that the defendant's conduct

24   influenced, obstructed, or impeded, or endeavored to

25   influence, or obstruct, or to impede the due

1    administration of justice in that proceeding.  It is not

2    necessary to show that the defendant was successful in

3    achieving this forbidden objective, only that the

4    defendant corruptly tried to achieve it in a manner

5    which he or she knew was likely to influence, obstruct,

6    or impede the due administration of justice as to the

7    natural and probable effect of the defendant's actions.

8           Count IX:  Failure to appear for trial.

9           Edward Brown is charged with violation of

10   federal law which makes it a crime for anyone who has

11   been released on bail in this court to thereafter

12   willingly fail to appear when required to do so.  In

13   Count IX Edward Brown is charged with willfully failing

14   to appear at his trial on tax charges in January 2007.

15          In order to prove this charge, the government

16   must prove the following beyond a reasonable doubt:

17          First, that the defendant had been released on

18   bail pursuant to an order of a judge or a magistrate

19   judge of this court on condition that the defendant

20   appear in court for trial.

21          Second, that the defendant thereafter

22   willfully failed to appear at trial as required on

23   January 12, 2007 and continuing through January 18,

24   2007.

25          And third, that the offense charged in the

1    case in which the defendant had been released on bail

2    was punishable by a term of imprisonment of five years

3    or more.

4            Counts XI and X:  Failure to appear for

5    sentencing.

6            Defendants are charged with violation of

7    federal law which makes it a federal crime for anyone

8    who has been released on bail in this court to

9    thereafter willfully fail to appear when required to do

10   so for sentencing.  In Count X Edward Brown is charged

11   with willfully failing to appear at his sentencing

12   hearing on April 24, 2007, in connection with his

13   conviction on tax charges.  In Count XI Elaine Brown is

14   charged with willfully failing to appear at her

15   sentencing hearing on April 24, 2007, in connection with

16   her conviction on tax charges.

17           In order to prove this charge, the government

18   must prove the following beyond a reasonable doubt:

19           First, that the defendant had been released on

20   bail pursuant to an order of a judge or magistrate judge

21   of this court on condition that the defendant appear in

22   court for sentencing as required on April 24, 2007.

23           Second, that the defendant thereafter

24   willfully failed to appear for sentencing.

25           And third, that the offense charged in the

1   case in which the defendant had been released on bail

2   was punishable by a term of imprisonment of five years

3   or more.

4           Remember, the defendants deny committing the

5   offenses I've just described and both defendants have

6   pled not guilty to the charges made against them.

7           I now come to the last part of my

8   instructions, the rules for your deliberations.

9           When you retire to the jury room, you will

10  discuss this case with the other jurors.  You shall

11  permit your foreperson, Juror No. 1 here, to preside

12  over your deliberations, and your foreperson, Juror No.

13  1, will speak for you here in court.  Your verdict must

14  be unanimous.

15          Your verdict must be based solely on the

16  evidence and on the law as I have given it to you in

17  these instructions.  However, remember that nothing that

18  I have said or done is intended to suggest what your

19  verdict should be -- that's entirely for you to decide.

20          Each of you must decide the case for yourself,

21  but you should do so only after considering all of the

22  evidence, discussing it fully with the other jurors, and

23  listening to the views of the other jurors.

24          Don't be afraid to change your opinion if you

25  think you are wrong.  But don't come to a decision

1   simply because other jurors think it is right.

2            This case has taken considerable time and

3   effort to prepare and try.  There is no reason to think

4   that it could be better tried or that another jury is

5   better qualified to decide it.  It is important

6   therefore that you reach a verdict if you can do so

7   conscientiously.  If it looks at some point as if you

8   may have difficulty in reaching a unanimous verdict, and

9   if the greater number of you are agreed on a verdict,

10   the jurors in both the majority and the minority should

11   re-examine their positions to see whether they've given

12   careful consideration and sufficient weight to the

13   evidence that has favorably impressed the jurors who

14   disagree with them.  You should not hesitate to

15   reconsider your views from time to time and to change

16   them if you're persuaded that this is appropriate.

17            It is important that you attempt to reach a

18   verdict, but of course, only if each of you can do so

19   after having made your own conscientious determination.

20   Do not surrender an honest conviction about the evidence

21   simply to reach a verdict.

22            Now, to assist you in your deliberation on

23   these issues and to help you in reporting your decisions

24   I am providing to you two verdict forms.  One for each

25   defendant.  As to these instructions, nothing in the

84

1    form is intended to suggest what result you should

2    reach.  Would you pass those out for me.

3              THE CLERK:  Thank you, your Honor.

4              THE COURT:  There should be two attached by a

5    paper clip.  Does everyone have one?  Back row?  Yes,

6    okay, we're going to start with United States of America

7    versus Edward Brown.  Everyone put that in front of

8    them.  The top is the name of the case.  And it

9    indicates jury verdict form.  Starts with Count I.  You

10   remember I've gone through each of the counts with you.

11   It separates them out.  When and if you reach a

12   unanimous verdict you will see there's a spot, we the

13   jury find the defendant, Edward Brown, the foreperson

14   who will write either not guilty or guilty in that

15   space.

16             And then when you finish Count I you proceed

17   to question two.  You see the instruction right under

18   Count I.  I know you see it but I have to tell you

19   anyway.

20             Then the second one, we the jury find the

21   defendant, Edward Brown, not guilty or guilty of

22   conspiracy to hinder or prevent the United States

23   Marshals in attempting to arrest Edward and Elaine

24   Brown.

25             Now, you see some instructions at the bottom

1    of the page.  If you have answered either question one

2    guilty or question two guilty, go to question three.  If

3    you have answered both question one and question two not

4    guilty, skip questions three and four and go to question

5    five, and that's because question three and four only

6    apply if you found the defendant guilty of either one

7    and two.  Everyone understand?  Okay.

8              So if you found guilty on one and two or one

9    or two, you will go to question three.  We the jury find

10   the defendant, Edward Brown, not guilty, guilty, of

11   carrying, using or possessing a firearm in connection

12   with the crime of violence charged in Count I or II.

13             Now, if you answer that guilty, you'll go to

14   question four.  If you say not guilty, you'll skip

15   question four.  Question four has to do with whether the

16   firearm is a destructive device.  All destructive

17   devices are firearms, but not all firearms are

18   destructive devices.  So therefore unless you find the

19   defendant guilty of Count III, you can't go on to Count

20   IV because there's no underlying firearm.  Everyone

21   understand?  Okay.

22             Then you go to question five.  We the jury

23   find the defendant, Edward Brown, this is the felon in

24   possession, not guilty, guilty, of possessing a firearm

25   after having been convicted of a crime punishable by

1    imprisonment for more than one year.  And you see the

2    instruction.

3         Go to question six.  We the jury find the

4    defendant, Edward Brown, not guilty, guilty, of

5    obstructing justice.

6         Then question seven.  We the jury find the

7    defendant, Edward Brown, not guilty, guilty, of failing

8    to appear at trial.

9         Proceed to question eight.  We the jury find

10   the defendant, Edward Brown, not guilty, guilty, of

11   failing to appear at sentencing.

12        When you're done, the foreperson will date the

13   verdict form as you see it on the last page and sign it.

14        Then let's go over to Elaine Brown, and you

15   can do this in either order.  I'm just starting with one

16   and not the other.

17        Count I, again, conspiracy to prevent by

18   force, intimidation or threat, officers of the United

19   States from arresting Edward and Elaine Brown not

20   guilty, guilty.

21        Proceed to question two.  The jury finds not

22   guilty or guilty of Elaine Brown of conspiracy to hinder

23   or prevent the United States Marshals in attempting to

24   arrest Edward and Elaine Brown.  Again, if you have

25   found guilt as to one and two, go to question three.  If

1   you found not guilty to both, skip three and four and go

2   to five just as I have told you before.

3           Question three, we the jury find, Elaine

4   Brown, not guilty or guilty of carrying or using a

5   firearm in connection with the crime of violence charged

6   in Count I and II.  If you find not guilty on that, in

7   other words, there was no firearm, you skip the

8   destructive device.  If you find firearm, then you have

9   to decide whether that's a destructive device.  There

10  may be firearms that aren't destructive devices, there

11  may be firearms that are not destructive devices.  You

12  may find one or more firearms, you may find no firearms.

13  One of those in order for you to say guilty on Count IV

14  has to be a destructive device as defined in the

15  instructions.

16          Question five has to do with possessing a

17  firearm by a felon.

18          Then you go to question six, whether Elaine

19  Brown is guilty or not guilty of obstructing justice.

20          And then question seven, we the jury find

21  Elaine Brown not guilty or guilty of failing to appear

22  at sentencing.

23          Sign and date.  Then give a written note to

24  the jury officer outside your door, a note indicating

25  the jury has finished its deliberations and have

1    verdicts.  Do not give these verdict forms to the jury

2    officer.  Keep them.  I will take those verdict forms

3    from you at court.  Just give a note to the jury officer

4    saying you've reached a verdict and you're ready to

5    return to the courtroom.  After you return to the

6    courtroom your foreperson will deliver the completed

7    verdict forms as directed by me in open court.

8            Everyone understand what I'm saying?  Okay.

9            If it becomes necessary during your

10   deliberations to communicate with me, you may send a

11   note through the jury officer signed by your foreperson

12   or by one or more members of the jury.  No member of the

13   jury should ever attempt to communicate with me on

14   anything concerning this case except by a signed

15   writing.  And I will communicate with any member of the

16   jury on anything concerning this case in writing, or I

17   may bring you back here in open court if it will take a

18   little longer than something in writing.  If you send

19   out a question, I will consult with the parties as

20   promptly as possible before answering it.  That may take

21   some time.  You may continue with your deliberations

22   while waiting for the answer to any question.  Remember,

23   you're not to tell anyone, including me, how the jury

24   stands, numerically or otherwise, until after you've

25   reached a unanimous verdict or have been discharged.

1          In conclusion, ladies and gentlemen, if the

2    government has established the guilt of a defendant

3    under the law beyond a reasonable doubt, you should find

4    the defendant guilty.  If, on the other hand, the

5    government has not in your view established the guilt of

6    a defendant beyond a reasonable doubt, you should find

7    the defendant not guilty on that particular charge.

8          Now I'm going to confer briefly with counsel

9    over here at sidebar.  I may have some additional

10   remarks to make to you, and then I will submit this case

11   to you for deliberation.

12                        AT SIDEBAR

13          THE COURT:  Counsel for the government,

14   objections?

15          MR. HUFTALEN:  I noticed something that I

16   didn't notice earlier and that is on the verdict forms

17   for each with respect to Counts I and II, they're

18   written in the conjunctive with respect to Edward and

19   Elaine.

20          THE COURT:  All right, what does the

21   indictment say?

22          MR. HUFTALEN:  I believe the indictment says

23   Edward and Elaine.  I believe it says Edward and Elaine.

24          THE COURT:  Then the verdict reads the same as

25   the indictment?

1           MR. HUFTALEN:  You're right, I'm sorry, the

2    instruction is in the disjunctive, okay.

3           THE COURT:  Anything else?

4           MR. HUFTALEN:  Yeah, the redacted indictment

5    we have, or the indictment that's going to go in has

6    been redacted substantially and it looks peculiar with

7    all of the gray redacts on it.

8           THE COURT:  You want me to tell them to

9    disregard the gray?  Counsel agree?

10          MR. IACOPINO:  I join in that.

11          MR. LANGE:  I agree.

12          MR. HUFTALEN:  Lastly there's a forfeiture

13   provision at the end of the indictment.  We do not

14   intend to --

15          THE COURT:  Is that included in this form?

16          MR. HUFTALEN:  It is on the last page.  We

17   intend to pursue that civilly later, not through this.

18          THE COURT:  Okay.

19          MR. IACOPINO:  Has it been redacted out of the

20   indictment?

21          MR. HUFTALEN:  No, it hasn't.

22          THE COURT:  You want that redacted?

23          MR. IACOPINO:  Yeah, please.

24          MR. HUFTALEN:  We just take page 24 of 25 out.

25          THE COURT:  Okay, the last page, just rip it

1    off.

2              MR. HUFTALEN:  We can take the signature page

3    off as well and just take the last two?

4              THE COURT:  I don't think so.  Why don't you

5    remove page 24 and leave the last page.  Everyone agree?

6              MR. LANGE:  I agree.

7              THE COURT:  No one disagrees.  That one, okay.

8    Next?

9              MR. HUFTALEN:  Nothing further.

10             THE COURT:  Mr. Lange?

11             MR. LANGE:  Your Honor, I renew the points

12   that I made during the charge conference earlier this

13   afternoon.  I urge the court to give a justification

14   instruction.  You already have my argument.  Do you want

15   me to make it again?  I don't have anything to add to

16   what I argued before.

17             THE COURT:  Request is denied.

18             MR. LANGE:  With regard to the lesser included

19   offense I realize now that the deliberation form

20   incorporates many of my concerns, but I do want to

21   preserve for appellate purposes the court's decision not

22   to grant the proposed lesser included instruction I

23   submitted last night.

24             THE COURT:  I think it's covered.

25             MR. LANGE:  I misspoke with regard to my third

1    objection.  I urge the court to modify the next to last

2    paragraph on page 25 summarizing the burden of proof.

3    What I would urge the court to do is say in conclusion,

4    ladies and gentlemen, if the government established the

5    guilt of the defendant under the law beyond a reasonable

6    doubt, you may find the defendant guilty.  In other

7    words, I would ask that the "should" be replaced with

8    "may."

9           THE COURT:  That's denied.  What else?

10          MR. LANGE:  There's going to be further

11    explanation --

12          THE COURT:  Go ahead.

13          MR. LANGE:  My argument is that although

14    federal law doesn't at this point permit jury

15    nullification, there is, it appears, a tendency in the

16    Supreme Court particularly to give greater power to

17    jurors in deciding guilt or innocence in cases and I

18    think that the proposed jury instruction would be a

19    reasonable and constitutionally supportive step in the

20    direction of empowering jurors.

21          THE COURT:  Anything else?

22          MR. LANGE:  I join in Attorney Iacopino's

23    argument with respect to reasonable doubt in the Allen

24    charge.

25          THE COURT:  Mr. Iacopino.

 1           MR. IACOPINO:  Thank you, your Honor.  Your

 2   Honor, we too would object to the lack of a

 3   justification instruction as we discussed in chambers.

 4   As we indicated to you in chambers, we believe the

 5   defendant's testimony alone was enough evidence to

 6   warrant the theory of the defense instruction and that

 7   it was up to the jury to determine whether or not his

 8   beliefs were reasonable, objectively or not.

 9           Secondly, your Honor, I object as I did during

10   the charging conference to the beyond a reasonable doubt

11   instruction.  I think that the way the instruction was

12   given, and I understand that it's a pattern instruction,

13   but the way that it's given I think it shifts an

14   advantage to the government in terms of the ability of

15   the jury to understand the term reasonable doubt.

16           Third, I object to your portion of the charge

17   which is essentially from the Allen case because there

18   is no indication at this point in time that any of the

19   jurors have any -- there's any sort of stalemate or

20   inability to reach a verdict.

21           I join in all of the objections made by Mrs.

22   Brown's counsel.  I, too, would ask you to amend the

23   conclusionary paragraph on page 25.  I would ask you to

24   amend it, from our view, this is not the same objection

25   Mr. Lange made, but I think the last sentence should

1     read that, if on the other hand the government has not

2     in your view established the guilt of the defendant

3     beyond a reasonable doubt, you have and you should find

4     the defendant not guilty.  I believe that should be "you

5     must find the defendant not guilty."

6              MR. LANGE:  I concur with that last argument.

7              THE COURT:  Your requests are denied.  Your

8     objections are overruled.

9              Any issues with regard to the verdict form?

10             MR. HUFTALEN:  No.

11             MR. IACOPINO:  Not from us, judge.

12             THE COURT:  Mr. Lange.

13             MR. LANGE:  Not from me, your Honor.

14             THE COURT:  All right, I'm going to at this

15    point excuse -- before I forget, I'm going to mention

16    the indictment and the redactions, and I'm going to

17    excuse the alternate.  I'm going to tell the alternate

18    to not read anything about this case, discuss the case,

19    keep sterile so to speak, leave a phone number so that

20    we can reach the alternate in case one of the jurors

21    gets ill or whatever during the course of deliberations.

22    Does anyone object?

23             MR. HUFTALEN:  I do not object.

24             MR. LANGE:  No.

25             MR. IACOPINO:  No objection, your Honor.

1          THE COURT:  Now, what I'm going to do is, so

2    we're clear, is I'm going to excuse the alternate right

3    now before the other jurors leave before I commit this

4    case so that someone needs to get a phone number, I'm

5    going to instruct the alternate to give a phone number

6    so that we can either get the alternate back or tell

7    them we have a verdict.

8          THE CLERK:  Do I have a moment to do that?

9          THE COURT:  You absolutely can do that.  I'm

10   going to wait because I don't want him in the jury room

11   anyway, so you go with him, and I'll wait for you to

12   come back before I do a commitment order, all right?

13         THE CLERK:  Okay.  If I call somebody up, can

14   they come take him down?

15         THE COURT:  I'll wait for you to do that.

16         THE CLERK:  Okay.

17         THE COURT:  I'll just sit and wait until you

18   do that right now.  Give me a high sign.  You ready?

19   Let's collect the verdict forms.

20                    BEFORE THE JURY

21         THE CLERK:  Jurors, if you could pass the

22   verdict forms down and we will collect those.

23         THE COURT:  We're sending one with you to the

24   jury room.  You're not going to be without them.

25         THE CLERK:  I have them all, your Honor.

1          THE COURT:  Very good.  Now, I have no

2   additional instructions for you.  I do want to mention

3   to you when you get the indictment that we talked about,

4   some parts have been grayed out or gone.  Don't concern

5   yourselves with why or what's underneath it or you can't

6   see underneath it anyway because it's nothing, don't

7   worry about it, it's nothing to do with your

8   deliberations.  Just disregard the parts that are gone.

9          All right, now at this time we started with

10  three alternates and we've now discovered why we have

11  alternate jurors.  Alternate jurors are very important

12  and this case is an example.  If we didn't have

13  alternates we wouldn't be able to finish.  We still have

14  one alternate juror.  I'm going to dismiss that

15  alternate at this time conditionally.

16          I'm going to instruct the alternate, even

17  though they're not going to be deliberating with the

18  jury, not to read anything about this case, discuss the

19  case, not to do anything I've forbidden you to do up to

20  now because it's possible that if a juror gets ill or

21  whatever during the course of the deliberations, I may

22  call that alternate back and that alternate will become

23  a juror, and then the jury will start deliberating

24  again.  That's to prevent us not having enough jurors

25  during the course of deliberations.

1          The alternate juror in this case is Juror No.

2      8 at the end of the front row here.  Now Juror No. 8, I

3      want to emphasize, when you leave here you're going to

4      leave a phone number with the clerk so that the clerk

5      can call you and say come on down, all right, and you

6      may be called upon to come and begin deliberation with

7      the remaining members of this jury.  Don't discuss this

8      case with anyone.  Don't let anyone discuss it with you.

9      You're to do everything just as you were during the

10     course of this trial to remain just the way you were.

11     Don't consider this case.  Don't think about it.  Don't

12     discuss it.  Don't do anything that may affect what

13     you've heard in this courtroom.  Don't get any

14     additional views.  And then leave a phone number.  We

15     will call you, either A, if we need you to come down and

16     deliberate, or B, we will let you know the case is over

17     and you can then talk to whoever you wish.  All right?

18     You're excused right now.  I'm going to let you leave

19     now.  The rest of the jury stay here because he can't be

20     in the room while you're deliberating.  I'm just going

21     to wait a moment.

22          (Alternate juror leaving courtroom.)

23          THE CLERK:  Thank you, your Honor.

24          THE COURT:  I hereby order that this jury be,

25     and it is hereby, committed to the care, custody, and

1   safekeeping of the United States Marshal for the

2   District of New Hampshire, and its duly authorized

3   deputy marshals, and the duly sworn jury officers of

4   this court for the period of their deliberation in this

5   matter now before the court.  I further order that said

6   officers shall attend diligently upon the jury; shall

7   see that no one communicates with them, nor they with

8   others, except upon, and in accordance with, an order of

9   this court; and that their needs be speedily attended to

10  for such period of time as they may require.

11          Ladies and gentlemen of the jury, I commit

12  this case to you for deliberation and decision.  I

13  commend you to your verdict.  You may retire.  The jury

14  is excused.  We will be sending the exhibits into you as

15  soon as they are compiled.

16          (Jury excused to deliberation room.)

17          THE COURT:  Anything else for the government?

18          MR. HUFTALEN:  No, thank you.

19          THE COURT:  Mr. Lange, anything else?

20          MR. LANGE:  I have an exhibit to substitute.

21  I think we can do that by agreement.

22          THE COURT:  Substitute?

23          MR. LANGE:  It's the concert without the

24  sound.

25          MR. HUFTALEN:  No objection.

1               THE COURT:  What is the new --

2               MR. LANGE:  It's two delta dash one.

3               THE CLERK:  It's already been admitted, your

4    Honor.

5               THE COURT:  So this will be two delta dash one

6    A.

7               MR. LANGE:  It's the same.

8               THE COURT:  It's exactly the same?  Then it's

9    already in.  All right, anything else, Mr. Lange?

10              MR. LANGE:  No.

11              THE COURT:  Mr. Iacopino?

12              MR. IACOPINO:  Nothing, your Honor.

13              THE COURT:  All right, we're in recess.  Leave

14   your phone numbers with the clerk.

15              (Recess at 4:20 p.m. while jury deliberates.)

16              (7:00 p.m. in chambers.)

17              THE COURT:  We received a note from the jury.

18   Counsel is present in chambers.  It indicates as

19   follows.  Quote, can we obtain an index of the items

20   admitted as evidence to aid in a search for specific

21   items of evidence for review.

22              That's the extent of the note.  I propose to

23   answer as follows:  In response to your note I will have

24   the exhibit list sent to you as soon as the lists are

25   prepared.

1          Anyone object to that?

2          MR. LANGE:  No, your Honor.

3          MR. HUFTALEN:  No.

4          MR. IACOPINO:  No, sir.

5          THE COURT:  I propose at 7:30 to bring them

6     into court.  I'll instruct them to not think about the

7     case overnight and to not begin deliberating until all

8     the jurors are present in the jury room.

9          MR. IACOPINO:  What time are you going to

10    start them tomorrow?

11         THE COURT:  8:30.  Any objection to that?

12         MR. LANGE:  No.

13         (7:40 p.m. in chambers.)

14         THE COURT:  I got another note from the jury.

15    It says can we get additional copies of the judge's

16    final jury instructions, 11 copies.  I propose to

17    indicate to them, I'm going to bring them in the

18    courtroom because I'm going to wish them goodnight

19    anyway and give them the instructions I indicated

20    earlier.  They will have 11 additional copies available

21    for them when they come in tomorrow morning at 8:30.

22    Anyone object?

23         MR. HUFTALEN:  No.

24         MR. LANGE:  No.

25         MR. IACOPINO:  No, your Honor.

1          THE COURT:  Okay, we'll go in the courtroom

2     as soon as the jury is ready and we will wish them a

3     good evening.

4          MR. IACOPINO:  Thank you, sir.

5                    BEFORE THE JURY

6          THE COURT:  Members of the jury, in response

7     to your recent note we will have 11 copies available for

8     you when you come in in the morning.

9          We're going to finish your deliberations for

10    this evening.  I only called you in just to give you a

11    couple of reminders.

12         Now that you're in deliberations, obviously

13    once you leave here you're not going to talk to anybody

14    about the case.  You're not going to let anyone talk to

15    you about the case.  You're not going to do any

16    independent investigation or reading about this case in

17    the news or otherwise.  Stop thinking about this case to

18    the extent you can.  In fact, you have a little break

19    overnight, and when you come back tomorrow do not begin

20    deliberating, don't start discussing this case until all

21    of the jurors are present.  It's important and it's

22    required that the jury deliberate all together.  That

23    means all of you.  So if one person comes in late or

24    whatever, I don't know, it's not my business how you get

25    here, but if one of you is late, don't start until

102

1    you're all together, all right?

2            With that I wish you a very pleasant evening.

3    Thank you for your hard work today.  The jury is

4    excused.

5            (Jury is excused from the courtroom.)

6            THE COURT:  Anything else counsel?  No?  Okay,

7    we're in recess.

8            (Court recessed at 7:45 p.m.)

9                 C E R T I F I C A T E

10

11           I, Sandra L. Bailey, do hereby certify that

12   the foregoing transcript is a true and accurate

13   transcription of the within proceedings, to the best of

14   my knowledge, skill, ability and belief.

15

16

17   Submitted: 11/3/09        /s/ Sandra L. Bailey
                               SANDRA L. BAILEY, LCR, CM, CRR
18

19

20

21

22

23

24

25