**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3/1/10

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                * 09-CR-30-01/02-GZS
            v.                  * July 7, 2009
                                * 12:25 p.m.
EDWARD BROWN and ELAINE BROWN   *
                                *
* * * * * * * * * * * * * * * * *




Day 6
Afternoon Session
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE GEORGE Z. SINGAL
and a jury


Appearances:

For the Government:    Arnold Huftalen, AUSA
                       Terry Ollila, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH  03301

For the Defendant,     Michael J. Iacopino, Esq.
Edward Brown:          Brennan, Caron, Lenehan & Iacopino
                       85 Brook Street
                       Manchester, NH 03104

For the Defendant,     Bjorn R. Lange, Esq.
Elaine Brown:          Federal Defender Office
                       22 Bridge Street
                       Concord, NH  03301

Court Reporter:        Diane M. Churas, LCR, CRR
                       Official Court Reporter
                       U.S. District Court
                       55 Pleasant Street
                       Concord, NH   03301
                       (603) 225-1442

2

```
 1                        I N D E X

 2

 3

 4    WITNESS:        DIRECT   CROSS   REDIRECT RECROSS

 5    EDWARD BROWN

 6    By Mr. Huftalen          3

 7    WILLIAM SCOTT DION

 8    Voir dire by the Court, page 82

 9    CATHERINE FLOYD DION

10    Voir dire by the Court, page 85

11

12    EXHIBITS:                        ID.    Evid.

13    Government's Exhibit 47           4

14    Government's Exhibit 5k                  14

15    Government's Exhibit 27a-36              20

16    Government's Exhibit 5p                  26

17    Government's Exhibit 17a                 56

18

19

20

21

22

23

24

25
```

```
 1                      BEFORE THE COURT

 2              (Edward Brown resumed the stand.)

 3              THE COURT:  Mr. Brown, try to speak a little

 4     bit slower so the jury can understand you.

 5                      BEFORE THE JURY

 6              THE COURT:  You may proceed with

 7     cross-examination.

 8              MR. HUFTALEN:  Thank you.

 9                      CROSS-EXAMINATION

10     BY MR. HUFTALEN:

11              MR. HUFTALEN:  Mr. Brown, as you know, my name

12     is Arnold Huftalen.  I'm Assistant U.S. Attorney here in

13     the District of New Hampshire.  I'm going to ask you a

14     series of questions.  If you don't understand my

15     question, please tell me and I will rephrase it in a way

16     that makes it more clear.

17              THE WITNESS:  Yes, sir.

18        Q.   Mr. Brown, early in your direct testimony you

19     talked about your membership in what I believe is the

20     U.S. Constitution Rangers; correct?

21        A.   That is correct, sir.

22        Q.   Oftentimes people will say Constitutional

23     Rangers, but it's really Constitution Rangers; right?

24        A.   That is correct, sir.

25        Q.   And on a number of occasions during your
```

```
 1   direct testimony you referred to yourself as a ranger.

 2   You were referring to your membership in that

 3   organization, not in the United States Army; correct?

 4        A.   That is correct.

 5        Q.   When you were asked about the U.S.

 6   Constitution Ranger organization by Mr. Iacopino, he

 7   asked you whether or not it was a militia, and your

 8   answer was a fairly emphatic no.  Is that right?

 9        A.   That's correct, sir.

10        Q.   Sir, I'm going to hand you what I'm going to

11   mark as the next government sequential exhibit, which I

12   think will be Government's Exhibit 47?

13             THE CLERK:  That is correct.

14             (Government's Exhibit 47 was

15             marked for identification.)

16        Q.   And I'd just like to show it to you and ask

17   you whether or not that's on the front cover, "The

18   Ranger Handbook for the United States Constitution

19   Ranger"?

20        A.   That is correct, sir.

21        Q.   Let me show you page 31.

22             MR. IACOPINO:  Objection, your Honor.  May we

23   approach?

24             THE COURT:  Of course.

25                           AT SIDE BAR
```

1          MR. IACOPINO:  Your Honor, on Mr. Brown's

2     direct testimony he attempted to read a portion of the

3     mission of the Constitution Ranger.  The Court

4     disallowed him from doing that, did not permit him to do

5     it.  I think that the same ruling ought to apply to

6     reading out of some handbook at this point in time.

7          MR. HUFTALEN:  I did object.  I believe I

8     objected on hearsay grounds and it was appropriate.

9     What I'm doing now is impeaching his credibility.

10          MR. IACOPINO:  This is not a statement by him,

11     your Honor.

12          THE COURT:  Are you objecting to the admission

13     of this document?

14          MR. IACOPINO:  I'm objecting to him reading

15     anything out of it and asking the witness any questions

16     about it.

17          MR. HUFTALEN:  I'm not going to offer this.

18          THE COURT:  Ask a question, you object, I'll

19     rule.

20          MR. HUFTALEN:  Thank you.

21                    IN OPEN COURT

22     Q.   Mr. Brown, on direct you said that the U.S.

23     Constitution Rangers was not a militia; right?

24     A.   That is true, sir.

25     Q.   I've got what is marked Government's Exhibit

1   47 ID and I want to show you page 31 and just point to

2   the heading on that page where it says "the militia."

3          MR. IACOPINO:  Objection, lack of foundation,

4   move to strike.

5          THE COURT:  Sustained.

6      Q.   Why don't you take a look at this and tell me

7   whether it is the Ranger Handbook for the U.S.

8   Constitution Ranger.  Please, sir, just look at it

9   quietly and tell us whether or not it is.

10      A.   I designed it, so --

11      Q.   Please, sir, just look at it quietly and tell

12   us whether or not it is.

13      A.   It is correct, so far.

14          (Witness examined document.)

15      A.   Yes, sir, that is correct.

16      Q.   That is the handbook of the U.S. Constitution

17   Ranger?

18      A.   That is a copy or a draft of one of them, yes,

19   sir.

20      Q.   And did I understand you to say a moment ago

21   that you wrote this book?

22      A.   No, I didn't write it.  I was part of

23   developing that book; that's correct, sir.

24      Q.   What's your official or what was your official

25   title within the U.S. Constitution Ranger?

1          A.   I was merely a member of the organization in

2     the year 2000.  By late 2001 I was requested if I would

3     take a commander's position, which I accepted to do and

4     which I held for about three years and turned it over to

5     someone else.

6          Q.   Were you ever the national commander for the

7     U.S. Constitution Rangers?

8          A.   That's correct.

9          Q.   Now, page 31 of this book that you helped put

10    together talks at least on this page and goes on to

11    others about the militia; right?

12         A.   That's correct, yes, it does.

13         Q.   The Constitution Rangers, according to this

14    book, have an obligation to enforce the laws of the

15    United States.  Is that right?

16         A.   Well, our job -- we don't have enforcement

17    ability, no, sir, we do not.

18         Q.   Is it the position of the U.S. Constitution

19    Rangers that they are to ferret out corruption in

20    government, if you will?

21         A.   That's correct, sir.

22         Q.   And that lawful authority comes from whom?

23         A.   You.

24         Q.   Comes from me?

25         A.   Yeah.  Comes from everybody in this room.

1    Q.    When did I authorize you to go ferret out

2    corruption in the United States, sir?

3    A.    When the U.S. Attorney's Office failed to do

4    its job.  We brought the job to the U.S. Attorney's

5    Office -- or the information to the U.S. Attorney's

6    Office and they refused to accept it.  You now turned it

7    over to everybody else and us.

8    Q.    And at that point you took the law into your

9    own hands, didn't you?

10    A.    That's right.  You won't take it.  Your office

11    denied it.  And that's nothing to argue about --

12    THE COURT:  Just a second.  Wait, Mr. Brown,

13    for another question.

14    Q.    I think on your direct testimony you said that

15    your first true direct experience with the United States

16    Government was when you called the military to try to

17    get them to use your extermination process nationwide.

18    Am I right?  Yes or no, please.

19    A.    As I recall offhand.

20    Q.    That's a yes?

21    A.    I think so.

22    Q.    And they declined to let you take care of

23    their problem nationwide, didn't they?

24    A.    You could say they --

25    (Interruption by the reporter.)

1          THE COURT:  Whoa, whoa.  Mr. Brown, you have

2    to slow down.  The court reporter has to write it down.

3    The jury will disregard the entire answer.  Ask the

4    question again.

5          MR. HUFTALEN:  Yes, sir.

6      Q.    Your first direct experience with the United

7    States Government involved you reaching out to the

8    military to provide them with an extermination service.

9    Is that right?  That requires a yes or no answer.

10     A.    No.

11     Q.    Okay.  On your direct examination did you say

12   that your first true direct experience was -- with the

13   United States Government was when you called the

14   military concerning your extermination processes?

15     A.    Perhaps.

16     Q.    And would it be fair to say that the U.S.

17   Government declined your offer?

18     A.    It was a budgetary problem, yes, for that one.

19   They didn't want to save 90 percent.

20     Q.    Short answer is they declined; right?

21     A.    No.  You can't answer these questions with

22   short answers, sir, because -- I know what you're trying

23   to do and it's not going to work with me, sir.  I won't

24   agree with it.

25          THE COURT:  Jury will disregard that.  Ask a

1    question.

2              THE WITNESS:  Do you want the whole truth, Mr.

3    Huftalen?

4              THE COURT:  Just a second, Mr. Brown.

5              THE WITNESS:  Do you want the whole truth?

6              THE COURT:  Mr. Brown -- take the jury out.

7              (Jury left courtroom.)

8                       BEFORE THE COURT

9              THE COURT:  Mr. Brown, this is a warning.

10   You're not to act up in court.  You are to answer the

11   questions, and do not add anything else.

12             THE WITNESS:  Sir, you're trying to kill me

13   and my wife.

14             THE COURT:  Do not talk to me during the

15   course of the examination.

16             THE WITNESS:  Of course not, sir.

17             THE COURT:  Can you do that?

18             THE WITNESS:  I don't think so because as long

19   as you are going to disallow me to tell the truth, the

20   whole truth, and nothing but the truth, we are going to

21   have a continuous problem, yes, sir.

22             THE COURT:  I'm telling you now and warning

23   you.

24             THE WITNESS:  You tried to kill me, sir, so --

25             THE COURT:  If you continue this --

1           THE WITNESS:  Having the bailiffs come down

2    and pound me and taser me is of little value to me.

3           THE COURT:  Mr. Brown, I'm indicating to you

4    that if you continue this, you will be removed from the

5    courtroom and I will strike your entire direct

6    testimony.

7           THE WITNESS:  The last judge did.  Why would

8    you be any different?

9           THE COURT:  Are you going to behave yourself?

10          THE WITNESS:  I'm not sure I understand what

11   you mean.  I told you who I am, what I am.  I'm here to

12   tell the whole truth.  You don't seem to want it.  I'm

13   having a problem with that, sir.

14          I'm a man of honor.  I don't know, sir.  You

15   have that title.  But I am a man of honor.  You don't

16   seem to want to abide by honor.  I don't understand

17   that.

18          THE COURT:  All right.  Mr. Iacopino, do you

19   want to talk to your client?

20          MR. IACOPINO:  I would like to, your Honor.

21          THE COURT:  All right.  Mr. Brown, step down

22   and talk to Mr. Iacopino.

23          (Pause.)

24          MR. IACOPINO:  Your Honor, can I speak to Mr.

25   Brown in a private room?

1          THE COURT:  You may.  Is there ability to do

2     that?

3          MARSHAL:  Yes.

4          THE COURT:  All right.  We're going to take a

5     five-minute recess.

6          (Brief recess taken.)

7                    BEFORE THE COURT

8          THE COURT:  Ready for the jury?

9          MR. HUFTALEN:  Yes, sir.

10          THE COURT:  Did you have enough time, Mr.

11     Iacopino?

12          MR. IACOPINO:  Yes, sir, your Honor.

13          THE COURT:  All right.  Let's bring in the

14     jury.

15          THE CLERK:  Yes, your Honor.

16                    BEFORE THE JURY

17          THE COURT:  Members of the jury, two things.

18     First, it's possible this case, the presentation of

19     evidence, will finish tomorrow.  It's possible you might

20     get this case for deliberation tomorrow.  I tell you

21     this only so you make plans to stay later into the

22     evening.  It's not probable.  It will probably be the

23     next day, but I don't want to surprise you.  It's likely

24     that the day after tomorrow you will take this for

25     deliberation, and certainly you will be later then, but

1    it's possible.  So just in case, make your plans so that

2    no one's caught short.

3            Second of all, the events that took place

4    prior to your being sent out this last time, strike that

5    from your mind.  That's not to impact on your

6    deliberations at all.

7            Mr. Huftalen, you may continue.

8            MR. HUFTALEN:  Thank you, your Honor.

9    Q.   Mr. Brown, in order to save some time, I'm not

10   going to walk back and forth, but would you please look

11   over in the direction where I am.  Can you see this

12   firearm that I'm holding up marked for identification as

13   Government's Exhibit 5k, as in Keith.  Do you see it?

14   A.   I see it.

15   Q.   Do you recognize it, sir?

16   A.   I do not.

17   Q.   Let me walk a little bit closer.  Do you

18   recall seeing this in the videos early in the trial in

19   the master bathroom of your house?

20   A.   The bathroom piece, yes, I do.

21   Q.   Was this gun in your master bathroom as far as

22   you know?

23   A.   Yes, it was.

24           MR. HUFTALEN:  Your Honor, I offer Government

25   Exhibit 5k.

14

```
 1            THE COURT:  No objections, admitted.

 2            (Government's Exhibit 5k admitted.)

 3       Q.   Mr. Brown, when a search was conducted of the

 4   dental property, were you allowed in after the deputy

 5   marshals were there?

 6       A.   Only if I was disarmed.

 7       Q.   You were allowed in, but you had to take your

 8   gun off?

 9       A.   Correct.

10       Q.   Were you taken into custody on that day?

11       A.   No, sir.

12       Q.   Were you roughed up in any way?

13       A.   No, sir.

14       Q.   Was your wife taken into custody?

15       A.   Yes, sir.

16       Q.   On that day of this search she was taken into

17   custody?

18       A.   That's correct.

19       Q.   Where was she taken?

20       A.   In the office.  They were both held for hours

21   on end, a lot of the patients.  There were patients and

22   staff.

23       Q.   I will try to be more particular in my

24   questions.  Do you know whether or not your wife on that

25   day was handcuffed and brought to a jail facility?
```

1       A.   I don't know that.

2       Q.   Okay.

3       A.   I wasn't always there.

4       Q.   When you were arrested on the original tax

5  charges, that took place at the dental facility, right,

6  the dental office?

7       A.   Yes, it did.

8       Q.   Was your wife taken into custody that same

9  day?

10      A.   Correct.

11      Q.   You were both put in handcuffs and taken to a

12  jail facility; correct?

13      A.   Correct.

14      Q.   And were you physically abused or injured

15  during the custodial portion of your time thereafter?

16  Do you understand that question?  Let me ask you a

17  different question.

18      A.   Depends on your interpretation.  I could

19  probably explain it, but if you want.

20      Q.   Let me ask it a different way.  You were taken

21  into custody, and I believe your testimony was you spent

22  about ten minutes at the Plainfield police station; is

23  that right?

24      A.   Um-hum.

25      Q.   Yes?

16

```
 1        A.   Yes.

 2        Q.   Then you were brought down here to the U.S.

 3   District Court in Concord, New Hampshire?

 4        A.   Correct.

 5        Q.   You were held in custody in a holding cell

 6   here?

 7        A.   Um-hum.

 8             THE COURT:  You have to say yes or no.

 9        A.   Yes.

10        Q.   And you were later that evening released?

11        A.   Yes, I was.

12        Q.   And your wife was released before you were;

13   correct?

14        A.   That is correct.

15        Q.   Now, your wife was not physically injured

16   during the custodial portion of that day when she was in

17   custody, was she?

18        A.   Emotionally, not physically.

19        Q.   And likewise, you were not physically injured

20   during that time when you were in custody that day, were

21   you?

22        A.   Emotionally, not physically.

23        Q.   You do understand that your wife returned to

24   the home before you did, and one of the reasons she

25   returned to the home before you was so that probation
```

1    could take the guns out of the house; right?

2         A.   That's not why I was led to understand, no.   I

3    was led -- if you want the answer?

4         Q.   Let me ask it a different way.   One of the

5    conditions that Magistrate Judge Muirhead imposed on

6    that time was you would both be released, but that

7    firearms had to be removed from your home in Plainfield;

8    is that right?

9         A.   It's a partial answer.   That's not a yes or no

10   answer, sir.   Perhaps I can explain.

11             THE COURT:   Can you answer that question?

12             THE WITNESS:   Not the way he's asked it, no.

13             THE COURT:   All right.   Ask another question.

14        Q.   You were released on bail conditions; correct?

15        A.   That's correct.   Correct; we had a contract,

16   yes.

17        Q.   Well, that wasn't the question I asked.   My

18   question is you were released on bail conditions;

19   correct?

20        A.   Again, I can't answer it the way you're asking

21   me, no.   My conditions were a contract with Mr.

22   Muirhead.

23        Q.   Let's get to that point then.   In your mind

24   the Court didn't have the authority to order certain

25   things unless you agreed to it in a contract; is that

1   right?

2        A.    That's correct.

3        Q.    That's right?

4        A.    That's correct.   It's on record.

5        Q.    So Magistrate Judge Muirhead didn't have the

6   lawful authority to order that firearms be taken from

7   your house without your permission; right?

8        A.    That's correct, sir.

9        Q.    Okay.   One of the conditions that were put

10  into the bail conditions was -- and I read from the last

11  page of Government Exhibit 1a-2 -- surrender any

12  firearms to the U.S. District Court, 55 Pleasant Street,

13  Concord, New Hampshire, or its designated

14  representative, the United States Probation Office.

15             It goes on and says more, but did you

16  understand that part of that document required that

17  firearms had to be taken out of the home in Plainfield?

18       A.    Only if no one else -- no other government

19  agency or agent was in the building prior to the

20  removal.   That was our agreement; that's correct.

21       Q.    That was part of your -- I put in quotes --

22  contract?

23       A.    Right.

24       Q.    That doesn't appear anywhere in the bail

25  conditions signed and issued by Magistrate Muirhead?

1      A.   It was a verbal agreement, sir.

2      Q.   Oh, it was a verbal agreement.

3      A.   Yes.  It's on the record.

4      Q.   How many guns were in the house that day?

5      A.   There should have been 30 assorted guns and

6  miscellaneous knives and swords and stuff.

7          THE COURT:  Keep your voice up, Mr. Brown.

8          THE WITNESS:  I'm sorry, sir.

9      Q.   Knives, swords, and about 30 guns; is that

10  right?

11      A.   That's correct, sir.

12      Q.   On your direct did you refer to that as a

13  moderate collection of firearms?

14      A.   That's correct, sir.

15      Q.   So in your mind 30 guns, knives, and swords is

16  not large.  It's middle of the road, moderate?

17      A.   No, sir.  That's not even close to what some

18  of the collections are.  Some collections run to

19  hundreds of pieces.

20      Q.   Okay.  I'm going to show you a couple of

21  photographs and ask whether or not you can identify

22  them.  First one is marked as Government's Exhibit

23  27a-36.  Do you recognize what's depicted in that

24  picture?

25      A.   That is a 50-caliber FGS; that's correct, sir.

1      Q.   That's a 50-caliber rifle?

2      A.   Yes, sir.

3           MR. IACOPINO:  Which exhibit?  I'm sorry.

4           MR. HUFTALEN:  27a-36.

5           MR. IACOPINO:  Thank you.  I'm sorry.

6      Q.   That's a 50-caliber rifle that was in your

7  house?

8      A.   That's correct.

9      Q.   And that was taken out prior to your being

10 released on bail conditions?

11     A.   I've had that for several years, sir.

12     Q.   My question is that was taken out prior to

13 your being released on bail conditions; correct?

14     A.   That's correct.

15          MR. HUFTALEN:  I offer 27a-36.

16          THE COURT:  Without objection it's admitted.

17          (Government's Exhibit 27a-36 admitted.)

18     Q.   Mr. Brown, on the day you were arrested on the

19 tax charges, you were armed with a handgun in your

20 waistband; were you not?

21     A.   Of course.  I think.  The day I was arrested?

22 That particular day --

23     Q.   Let me ask another question.

24     A.   I told you I was vague on that because I've --

25 I've given you the benefit of the doubt, sir, and said

1   yeah, okay, I will accept that.

2       Q.   I appreciate that, but I don't want you to

3   give me the benefit of any doubt, sir.

4       A.   I'm not quite sure.

5       Q.   I want to ask you a question and let's get a

6   direct answer, yes or no.  As you sit here today can you

7   tell us whether or not you had a gun in your waistband

8   as you heard the deputies testify when you were taken

9   into custody outside the dental clinic?

10      A.   I can't.  I will give you the benefit of the

11  doubt.  I cannot be absolutely sure if I remember that,

12  because I thought I took the magazine out of the gun and

13  placed it in my glove compartment while I was in the car

14  still before I left the car.

15      Q.   Let's talk about what was in the car.  There

16  was a rifle in the car as well; right?

17      A.   That's correct.

18      Q.   And on the side of the car was a big gold

19  decal in the shape of a star.  That's the U.S.

20  Constitution Ranger emblem; correct?

21      A.   That's correct, sir.

22      Q.   And when you traveled around town, was it your

23  custom and practice to take your rifle with you and to

24  carry a handgun in the belt of your pants?

25      A.   Oh, for -- I've done that since the seventies.

1    That's nothing new.  Many people in New Hampshire do

2    that as well as throughout the country.

3        Q.   That's fine, but I'm asking about you because

4    that's what we are dealing with today.  I will try to be

5    specific on my questions.  You said on your direct that

6    you've been going out in the woods with guns since you

7    were age six; right?

8        A.   Well, no, I wasn't six.  Probably I was about

9    ten when I first started firing with shotguns.  I grew

10   up on a farm.

11       Q.   Okay.  Before that arrest I believe your

12   testimony was that you had a permit to carry a concealed

13   weapon.  Is that correct?

14       A.   Yeah, for years, for decades.  It's not new.

15   I also had a federal firearms license.

16       Q.   Did your wife know at that time that you

17   carried a firearm regularly?

18       A.   Of course.

19       Q.   Had she seen you with it?

20       A.   Of course.

21       Q.   The 30 some guns that were in the house, can

22   you tell us whether or not she was aware that those guns

23   were in the house at the time of the original arrest?

24       A.   Sounds abstract, sir, but of course.  How

25   would she not?  She knows everything in the house like

1    anybody would.  Why would you ask that question?

2        Q.   She knows everything in the house; right?

3        A.   No, I don't think she knows everything.

4        Q.   She knows everything that's out in plain

5    sight, sir; am I right?

6        A.   In plain sight, probably.

7        Q.   What did you mean when you said she knows

8    everything in the house before you changed that answer?

9        A.   I didn't change an answer, sir.  Why are you

10   saying that?

11       Q.   Did she know everything that was in the house?

12   Yes or no, please.

13       A.   I doubt it.

14            MR. IACOPINO:  Objection, your Honor.  He has

15   no way of knowing what somebody else knows.

16            MR. HUFTALEN:  I'll ask another question.

17            THE COURT:  Asked and answered.  Go ahead.

18       Q.   The weapons that were taken out of the house

19   included the following.  Correct me if I'm wrong.  An

20   Ithaca 12-gauge shotgun.  Is that right?

21       A.   My hunting gun, yes.

22       Q.   A Colt 1911 .45-caliber semiautomatic pistol;

23   is that right?

24       A.   Personal protection.

25       Q.   An S&W -- I assume that's a Smith & Wesson --

24

1    .357 revolver.  Was that taken?

2         A.   Target, yeah.

3         Q.   A Colt 30-caliber semiautomatic pistol.  Was

4    that taken?

5         A.   Correct.

6         Q.   A Colt Commander, 1991 A1A semiautomatic .45

7    pistol?

8         A.   Um-hum.

9              THE COURT:  Is that a yes or no?

10        A.   Yes.  Sorry.

11        Q.   Now, that gun, that's the same as Government

12   Exhibit 5n, this gun; right?

13        A.   All 1911s are the same, sir, yes.

14        Q.   This says 1991 on it, and what I just said was

15   1991 -- 1991 is just a later version -- please let me

16   finish, sir.  The 1991 is merely a later version of the

17   original 1911 design; is that right?

18        A.   Um-hum.

19        Q.   Yes?

20        A.   Yes.

21             THE COURT:  You have to say -- "um-hum"

22   doesn't translate into the record.  You have to use a

23   word.

24        A.   Yes, sir.

25        Q.   This Colt 1991A that was taken on the first

1    arrest on the tax charges was similar in every way to

2    the gun I'm holding in my hand, Government Exhibit 5n.

3         A.    Yes.

4         Q.    Then there was a J. Stevens single-shot pistol

5    that was taken.  Correct?

6         A.    Why am I not familiar with that.  Single-shot

7    pistol.  Some of the pieces that I didn't use much I may

8    not have even known.  I might have picked them up at a

9    yard sale.  That might have been one of them.  Stevens

10   was not like a brand name so to speak.

11        Q.    That's fine.  How about this name, XL8

12   22-caliber revolver.  Was that one of the guns taken?

13        A.    That sounds like maybe the Derringer you are

14   talking about?

15        Q.    No, I'm talking about a gun that's identified

16   as XL8 22-caliber revolver.

17        A.    I don't know that piece, sir.

18        Q.    It also says on this --

19             THE COURT:  Keep your voice up, Mr. Huftalen.

20             MR. HUFTALEN:  I'm sorry, I'm not near the

21   microphone.

22             THE COURT:  Why don't you use the podium

23   unless you need to use the exhibit.

24             MR. HUFTALEN:  I'm sorry for the delay, your

25   Honor.  Your Honor, I offer Government Exhibit 5p, as in

1   Peter, which I understand there is no objection.

2           THE COURT:  Any objection?  I hear none.  It's

3   admitted without objection.

4           (Government's Exhibit 5p admitted.)

5           MR. HUFTALEN:  Dena, could you pull up 5p,

6   please.

7           THE COURT:  There's a monitor right next to

8   you, Mr. Brown.  You will be able to see the exhibit.

9           THE WITNESS:  Yes, sir.

10      Q.   Mr. Brown, what's on the screen to your left

11  is the list that I was just looking at.  If we put it up

12  on the screen, perhaps we can get through this a little

13  more efficiently.  I had asked you about the first

14  seven, and I'd like to direct your attention to the

15  eighth entry, 50-caliber bolt action long-range rifle.

16  That's the 50-caliber that we just saw in the photo;

17  right?

18      A.   I imagine it is, yes.

19      Q.   How many fifties did you have?

20      A.   Only one.

21      Q.   Only one back then?

22      A.   Yes.

23      Q.   Underneath that there's a gun called a Wyatt

24  Earp.  Is that a gun?

25      A.   It's not a gun.  It's just a demonstration, a

1  replica.

2      Q.   And then there's an Ithaca shotgun.  Was that

3  taken?

4      A.   M51 12-guage is a hunting gun.  Yes, sir.

5      Q.   Then below that there is a line crossed off

6  that says duplicate.  So let's skip down one.  It says

7  Remington M33 22-caliber .22 Colt rifle.  Was there a

8  .22 rifle taken?

9      A.   A bolt, I believe there was.

10     Q.   I'm sorry, sir?

11     A.   Unless I used the piece a lot, a lot of times

12  collectors will pick up what we call trash cuts, trash

13  cuts to us.  Ithaca was one of my main line, and things

14  like Remington and small bore didn't have much interest

15  to me.  So I would not be that familiar with it even

16  though I owned it.  I'd stick it in the closet.

17     Q.   Not interested in the small bore as opposed to

18  being interested in the large bore?

19     A.   A .22 was strictly for target shooting, but

20  during training, sir, of any kind -- of any caliber gun,

21  you normally fire the gun that you train -- you know,

22  the gun you use or you have for target shooting.

23     Q.   Okay.  Below that it says Walthar PP .32.

24  That's a semiautomatic handgun; is that correct?

25     A.   That's right.

1       Q.   Below that it says Browning high power 9mm

2  semiautomatic.  That's another handgun taken; is that

3  right?

4       A.   That's right.

5       Q.   Below that, can you read what that says?

6  Looks like Glock pistol.  Is that what it says?

7       A.   Yes, I believe that's what they were trying to

8  write.

9       Q.   Was there a Glock pistol taken that day?

10           MR. IACOPINO:  Your Honor, I think it says

11  Caplock.

12      A.   Yeah.  There was no Glock in my possession.

13      Q.   Okay.  Was there a Caplock pistol taken?

14      A.   There very well might have been, yes.  It

15  might have been that small gun.

16      Q.   Winchester --

17      A.   Wait a minute.  That's a piece I'm not really

18  familiar with, sir.

19      Q.   That's fine.  We'll move on to the next one,

20  Mr. Brown.  The next entry says Winchester M1 carbine.

21  That's a rifle; right?

22      A.   That is correct, sir.

23      Q.   That was taken?

24      A.   Yes, sir, that was taken.

25           MR. HUFTALEN:  Dena, could you go to the

1    second page, please.  The first entry on the second page

2    says Plainfield 30 M1 carbine.  That's a rifle also;

3    right?

4          A.   That is correct, sir.

5          Q.   That was taken?

6          A.   Yes, sir.

7          Q.   Winchester lever action rifle 3030, that was

8    taken also?

9          A.   It certainly was.

10         Q.   Below that another Winchester lever action

11   3030 rifle.  There were two of those taken?

12         A.   I believe there were two.  There were two

13   lever action rifles.

14         Q.   There's two different serial numbers.  Does

15   that mean to you they are two different guns?

16         A.   I don't know.  I didn't realize there were two

17   Winchesters.

18         Q.   Below that it says Stevens crack shot single

19   shot .22.  Is that a rifle or a handgun that was taken?

20         A.   Old antique, original, a hundred years old.

21         Q.   Pistol or rifle?

22         A.   It's a small rifle, one of the original when I

23   was a child, ten years old, to have one in this country.

24         Q.   Below that, Ithaca 12-gauge, that's a shotgun

25   that was taken; right?

1      A.   That's correct; hunting, yes.

2      Q.   Below that, a Benelli 12-gauge shotgun?

3      A.   That's correct.

4      Q.   That was taken also?

5      A.   Right.

6      Q.   Below that a Remington 10-gauge semiautomatic

7   shotgun.

8      A.   Yes, sir.

9      Q.   10-gauge is bigger than 12-gauge; right?

10      A.   Big boy.  I use it for duck or geese.

11      Q.   Big boy did you say?

12      A.   Big boy for duck or geese shooting.  Mostly

13   for goose shooting.

14      Q.   And then below that it says National Ordnance

15   .30 semiautomatic.  Is that a handgun or a rifle?  If

16   you don't remember that's fine, Mr. Brown.

17      A.   No, that's okay.  I do.  .30 with a bayonet,

18   yes, sir.  I do remember having one with a bayonet .30.

19      Q.   With a bayonet?

20      A.   Correct.

21      Q.   The one below it, Interarms JW15 bolt action

22   .22.  That says with a scope.  Is that a rifle with a

23   scope taken?

24      A.   Yes.

25      Q.   Below that, Ithaca double barrel shotgun,

1   12-gauge, another shotgun taken?

2        A.   Yes, sir.

3        Q.   Below that, Remington Sportsman, excuse me.

4   58 semiauto 12-gauge.   Is that another shotgun taken?

5        A.   Yes, sir.

6        Q.   What's the next one say?   Federal -- I can't

7   read it.

8        A.   It's a gas gun.   Law enforcement uses them for

9   assault into a dwelling or building.   Usually shoot them

10  in first, and we picked that up some years ago I believe

11  it was.

12       Q.   So you had this gun that shoots gas canisters?

13       A.   Gas canisters; that's correct, sir.

14       Q.   Remington model -- does that say 788 bolt

15  rifle below?   Is that another rifle taken?

16       A.   788 bolt rifle.   I'm not sure --

17       Q.   That's okay.

18       A.   -- for some reason.

19       Q.   A lot of guns to remember.   If you don't

20  remember, that's fine.   Below that, do you remember that

21  one, a Remington Model 522 Viper 22-caliber semi rifle.

22       A.   Yes.   A little Viper, yes.

23       Q.   That was taken also?

24       A.   Yes, sir, it was.

25       Q.   Below that another Mossberg 12-gauge

1   pump-action shotgun, that was taken?

2        A.   Yes.

3        Q.   The one below it has some crossed out there.

4   It looks like it says CAI, or is that somebody's

5   initials?  Model JWB bolt action rifle.  Do you remember

6   that gun?

7        A.   Not really.  I'm sure it's one of the pieces.

8   If I looked at it, I could identify it.

9        Q.   Whatever it was, that appears to have been

10  taken that day, too; right?

11       A.   Yes.

12       Q.   The last two, the first -- the second to the

13  last, TC Hawken 50-cal -- does that say perc, as in

14  percussion, black powder?

15       A.   Yes.

16       Q.   What kind of gun is that?

17       A.   Old buffalo gun, 1800s, days of the old west.

18  It's a replica.

19       Q.   Below that is a Norinco 5.56 semiautomatic

20  rifle.  Is that what most people would refer to as an

21  assault type rifle?

22       A.   That's the proverbial -- I should say

23  Norinco's AK-47 rifle, yeah.

24       Q.   So all of those guns that we just went

25  through --

1            MR. HUFTALEN:  You can take that down, Dena.

2   Thank you.

3       Q.   Those were taken when you were arrested

4   originally on the tax charges; right?

5       A.   That's the ones we had agreed with the

6   judge -- with Mr. Muirhead to release, yes, if we

7   followed a certain set of rules.

8       Q.   Now, were those all your guns or were some of

9   those your wife's guns?

10      A.   I believe she owned one or two of her own --

11  one of her own and the rest of them were mine.

12      Q.   Did she own handguns or rifles?

13      A.   There were no long guns.  All the long guns

14  were part of my collection.

15      Q.   So she owned one handgun?

16      A.   I believe so.

17      Q.   Did she also have a license to carry a

18  concealed weapon?

19      A.   Yes.

20      Q.   Do you know whether or not she did?

21      A.   Yes.  She has for many years.

22      Q.   Mr. Brown, when you spoke of the conversations

23  you had with Deputy Chief DiMartino, you said that he

24  was cordial.  And he was; right?

25      A.   Yes, sir, he was.

1      Q.    In fact, you posted on the Internet at least

2   one video of you in the kitchen talking on the phone to

3   Mr. DiMartino; right?

4      A.    I remember that one, yes, sir.

5      Q.    And was that early on in your time in

6   Plainfield?  Was that in the January, February time

7   frame, do you recall?

8      A.    I believe it was.

9      Q.    And I think you said on direct that he asked

10   you to turn yourself in and do the right thing.  Did he

11   do that most every time he spoke with you?

12      A.    No.  He did say that, yes, but not every time,

13   no.  Most of the time we just talked.

14      Q.    And when he said to you or suggested to you

15   that you turn yourself in and do the right thing, you

16   didn't take him up on that offer, did you?

17      A.    Do you want me to explain?

18           THE COURT:  No, he's asking you if you took

19   him up on the offer.  Can you answer that question?

20           THE WITNESS:  No.  Not without an explanation

21   I couldn't, no.

22           THE COURT:  Ask another question.  He can't

23   answer it.

24      Q.    From the time you left the trial that was

25   going on across the hall January 11th, 2007, until you

1   were arrested on your property on October 4th, 2007, did

2   you ever make an attempt physically to leave your

3   property and go talk with Mr. DiMartino?

4          A.   No.  He never wanted to do that.

5          Q.   Did you ever make an attempt to leave your

6   property and turn yourself in?

7          A.   Why would I do that?

8               THE COURT:  He's asking you if you did it.

9          A.   Of course not.

10              THE COURT:  Next question.

11         Q.   From the time you left the trial in

12  January 2007 until -- let's pick June 7th as a point in

13  time.  Had the marshals barricaded your house so that

14  you couldn't get out?

15         A.   We wondered why they didn't.

16         Q.   But they didn't; correct?

17         A.   Correct.

18         Q.   And between January '07 and June '07 you had

19  quite a few people who came into your property and then

20  left again; right?

21         A.   Again, we wondered why, but that's correct,

22  yes.

23         Q.   People drove in.  Not just individuals but

24  entire families came; right?

25         A.   Including police officers, that's correct.

1      Q.    They came in.  They weren't stopped by the

2  Marshal Service in that time frame?

3      A.    Nobody.  They just came and went; correct.

4      Q.    And had you wanted to, you could have hopped

5  into the car with any one of them and driven off the

6  grounds of the property; right?

7      A.    If I had a death wish, yeah.

8      Q.    And your wife likewise based on your

9  observations could have gotten into a car with any of

10  these visitors and driven off the grounds; right?

11      A.    Same answer.

12      Q.    Same answer is yes, she could have but?

13      A.    If she had a death wish.

14      Q.    Now, January 7th forward, you say it was

15  during that time frame that you became fearful; right?

16      A.    I'm sorry, the date was what, sir?

17      Q.    June 7th when Danny Riley was tasered.

18      A.    Oh, no, oh, no, no, sir, no, sir.  From

19  November 18th I guess it was in 2004 is when we started

20  to get nervous about our lives, whether a sniper was

21  going to hit over America.

22      Q.    Okay.  So June 7th wasn't the point in time.

23  It started back in November of '04?

24      A.    That really escalated it, that's all.  That

25  really escalated it for us.

1           THE COURT:  Mr. Brown, I think if you move

2    back a little bit from the mike and just raise your

3    voice.  You're a little muffled when you are that close.

4    Try that.  Go ahead.

5           Q.   So you were fearful starting at least as early

6    as November of 2004?

7           A.   Yes, sir.  That's when it really began.

8           Q.   I didn't hear the last part.

9           A.   That is when it began, yes, sir.

10           THE COURT:  Keep your voice up.  I think in

11    the back they are having trouble hearing, the jury.

12           THE WITNESS:  Thanks to the BOP my voice is

13    like this from a cold.

14           THE COURT:  The jury will disregard.  Ask a

15    question.

16           Q.   Now, in the summer of 2007, in mid, late June

17    and again the middle of July, you had a couple of -- I

18    will refer to them as parties on your property where you

19    invited people from all over the country; right?

20           A.   Yes, sir.  We had jamborees.  They were fun,

21    yes.

22           Q.   One was called a Jamboree in June and another

23    was known as a Concert in July; is that right?

24           A.   Yes, that's correct.

25           Q.   And you had people come, bring their children?

1        A.   Yes, sir.

2        Q.   You had little kids running around your

3   property?

4        A.   Um-hum.

5        Q.   Yes?

6        A.   Yes.

7             MR. HUFTALEN:  Sorry to keep doing that, but

8   you have to say yes or no for the stenographer.

9        A.   Yes, sir.

10       Q.   And again in July when you had the concert,

11   you had not only adults but adults who brought children

12   onto the property?

13       A.   That's correct, sir.

14       Q.   Did any of those people tell you when they

15   came into your property that they were stopped by the

16   Marshal Service and told they couldn't come in?

17       A.   No.

18       Q.   And as far as you know, did any of those

19   people get stopped on the way out and told they can't

20   leave?

21       A.   That's correct.  The marshals were out there

22   just observing license plates and stuff along with other

23   agents.  That's all they were doing.

24       Q.   Okay.  That's all they were doing is making

25   observations; right?

 1      A.   That's correct.

 2      Q.   I jotted some notes down when you talked about

 3  what you referred to as this Global Hawk unmanned

 4  surveillance craft.  Is it your testimony that you saw

 5  something in the sky and you thought it was about

 6  30,000 feet in the air and you could identify it as an

 7  unmanned vehicle?

 8           (Witness nods head affirmatively.)

 9      Q.   Yes?

10      A.   Yes.

11      Q.   Did you have a telescope that you were looking

12  at it with?

13      A.   Didn't need one, sir.

14      Q.   With the naked eye 30,000 feet, your estimate,

15  you could see it?

16      A.   Yes, sir.  You can see clear into space up

17  there where I live.  You can see the stars with -- the

18  lights don't seem to block out the stars like they do

19  when you get down to a town more.  Mr. Monier confirmed

20  it.

21      Q.   Let me ask you another question.  No doubt you

22  can see -- I mean you can see the moon on a clear night

23  from most places; right?

24      A.   Sure, absolutely.

25      Q.   But you wouldn't be able to tell me if a space

1   ship landed on the moon.  I mean you'd just see this

2   thing up in the sky; right?

3        A.   That's correct.

4        Q.   But you could see this thing that you thought

5   was at 30,000 feet, and you could identify it not only

6   as an aircraft but as a Global Hawk unmanned

7   surveillance craft?

8        A.   That is correct, sir.  That was my guess.  Mr.

9   Monier of the U.S. Marshal Service confirmed it for me

10  within 48 hours.

11       Q.   Is it more likely that when you heard Marshal

12  Monier say it was an unmanned vehicle at 50,000 feet,

13  you sort of adopted his statement?

14       A.   No, sir.  We made the statement earlier prior

15  to that.  That's because the local town chief of police

16  said that we were just being paranoid.

17       Q.   That's fine.  When you spoke about Waco, you

18  said you followed it from day one.

19       A.   Yes, sir.

20       Q.   That was something that was of significant

21  interest to you; right?

22       A.   Massive.

23       Q.   And so much so that you took it upon yourself

24  to call the Attorney General's Office in the United

25  States in D.C. and give him advice on how to handle that

1  situation; right?

2      A.   That is correct, sir.  They were out of

3  control.

4      Q.   And you said -- I think you said, "They took

5  my advice, but they used lethal gas."

6      A.   Well, I didn't quite mean it that way.  They

7  don't take anyone's advice, sir, but we certainly if

8  nothing else planned to cede, but they just used the

9  wrong type of gas.  They used CS gas rather than some

10  type of sleeping gas.

11      Q.   But in your mind you are calling the Attorney

12  General of the United States and you think he's taking

13  your advice; right?

14      A.   Oh, no, absolutely not.  I talked to some

15  woman that was working there.  She was just doing her

16  job like everybody else in government.

17      Q.   You said -- and please tell me if I'm wrong.

18  I think I got the quote right.  You were a happy couple

19  and paid all debts and all taxes free and clear.  Did

20  you say that on direct?

21      A.   I sure did.

22      Q.   The fact of the matter, sir, is that you

23  didn't pay the United States federal income tax in year

24  1995, did you?

25      A.   Excuse me?

1      Q.   Did you pay federal income tax in the year

2  1995?

3      A.   I reserved it.

4      Q.   You reserved it.  I thought you'd said you

5  paid all taxes?

6      A.   Yes, to date they have all been paid.

7  Everything has been paid.  It came to the total sum of

8  about, as I recall, 13 and a half million dollars to pay

9  to the IRS, which we only owed $216,000 which turned

10  into 13 and a half million dollars.

11      Q.   Did you write a personal check for 13 and a

12  half million dollars?

13      A.   No, sir, accepted it for value.

14      Q.   Accepted it for value.  That means that you

15  drafted up a piece of paper and you said I, Edward Brown

16  of the Family Brown, hereby give you 13 and a half

17  million dollars.  Now the slate's clean.  Right?

18      A.   Of course not, sir.

19      Q.   What did you do?

20      A.   I'm sure you are aware of it because that's

21  one of the reasons why we were investigating your

22  office, sir.  It's got to do with this book right here,

23  sir.

24      Q.   That's fine.  Let me ask you another question.

25      A.   Would you like to see this book, sir, and have

1    me explain it?

2         Q.   I have no interest in seeing that book, sir.

3              THE COURT:  Stop.  Mr. Brown, stop, please.

4    Ask a question.

5         Q.   Did you pay 13 and a half million dollars in

6    U.S. currency to the IRS?  Yes or no, sir.

7         A.   That's not how the Uniform Commercial Code

8    operates, sir, that this court operates under.  I

9    operate the same way this court operates.

10             THE COURT:  Jury will disregard.

11        Q.   Did you pay 13 and a half million dollars

12   cash, U.S. currency, to the IRS?

13        A.   You can't pay it that way.

14        Q.   So the answer is no, you did not?

15        A.   With an explanation.  You can't answer it that

16   way, sir.  There is not a yes or no answer to that

17   question.

18        Q.   Did you write a check for 13 and a half

19   million dollars out of a bank account that either you or

20   your wife exercised control over?

21        A.   No, sir, I got a promissory note.  The IRS

22   received a promissory note.  So did this court receive

23   the promissory note.

24        Q.   Now, I asked you about 1995.  The same

25   situation applied for 1996, 1997, 1998, 1999, 2000,

1   2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008;

2   right?

3        A.   Took care of them all, sir.

4        Q.   Took care of them all the way you said earlier

5   you took care of them?

6        A.   After your office and the slam-dunking we took

7   from the government, and, yes, we took care of it all.

8   It's all been paid for.  We have evidence of that.

9        Q.   There's been some testimony through a couple

10  of deputy U.S. Marshals that I believe you heard about

11  what they described as a cube of U.S. currency in the

12  gun safe in your and your wife's bedroom.  Did you hear

13  that testimony?

14       A.   Yes, sir, I sure did.

15       Q.   Did you have large amounts of cash -- and by

16  large amounts I mean $100,000 or more -- in your house

17  between January '07 and October '07?

18       A.   I had $121,000 plus my gold, and the block

19  that he talked about was an absolute lie.  That did not

20  exist.

21       Q.   Did you, sir, hide over $100,000 in cash

22  behind a wall in the elevator shaft in your bedroom?

23       A.   That is correct.

24            MR. LANGE:  Objection.

25       A.   No, that's correct.

1          MR. LANGE:  Side bar, please.

2                         AT SIDE BAR

3          MR. LANGE:  I object to this line of

4    questioning.  I think it goes to trying to tar the

5    defendants with being tax evaders, and the Court's

6    already excluded our ability to respond as best I can

7    tell with regard to why they didn't pay their taxes.  So

8    I think it's an unfair line of inquiry unless the Court

9    determines that the government has opened the door and

10   we can fairly rebut it.

11         THE COURT:  Move on to another area.

12         MR. HUFTALEN:  Will do.

13                       IN OPEN COURT

14   Q.   When you had visitors at your home between

15   January and October of '07, did you allow all visitors

16   access to all parts of your house?

17   A.   No.

18   Q.   Of course not; right?

19   A.   Of course not.

20   Q.   No need; right?

21   A.   No.

22   Q.   Did you allow them to have unlimited access to

23   the first floor of your home?

24   A.   Pretty much, yes.

25   Q.   But did you allow them free access to your

1  personal private spaces on the second floor?  By that I

2  mean bedroom, den.

3       A.   No.

4       Q.   When people slept at the house, where did they

5  sleep?

6       A.   Because the house was still under

7  construction, they put cots so to speak on the floors,

8  here and there, couches, and they had their tents and

9  they brought their campers and they brought their big

10  huge motor homes and they came all different kinds of

11  ways.  They slept many different ways.

12       Q.   Danny or Daniel, sometimes referred to as Dan

13  Riley, stayed at your house a number of times within

14  that time frame.  Unless I specify differently, I'm

15  talking generally January '07 to October '07, okay?

16       A.   Yes, sir.

17       Q.   Dan Riley spent time at your house a number of

18  times in that time frame; right?

19       A.   Yes, he did.

20       Q.   Dan lived in upstate New York and came over to

21  you?

22       A.   From time to time, um-hum.

23       Q.   And did Dan bring with him supplies at times?

24       A.   Came and went.

25       Q.   Did he bring ammunition to you?

1       A.    Ammunition from Danny for me?  No.  Not to me.

2   That I can remember.  Not from Danny.  I had plenty of

3   my own.

4       Q.    Had plenty of your own.  Had over 60,000

5   rounds in October; right?

6       A.    No, sir.  You may have found 60,000.  That's

7   moderate by today's standards anyway, sir.  60,000

8   rounds is not many rounds by any standards in people

9   that collect guns, not at all.

10      Q.    Okay.

11      A.    Yes, sir.  I think you are misinformed by ATL

12  or whoever they are.

13          THE COURT:  Stop.  Ask him another question.

14      Q.    Dan Riley did bring firearms to your home

15  though, didn't he?

16      A.    He had personal stuff, yes.

17      Q.    I'm going to hold up a couple of guns over

18  here.  If you can't see them, let me know, please.  This

19  gun here, Government's Exhibit 5f, Danny Riley brought

20  this to your house; right?

21      A.    Honestly, I just talked to my wife about that.

22  I'm trying to remember who brought that to me.  It may

23  have been Danny.  I have no idea.  I honestly cannot

24  remember who brought it, but I do remember I fired that

25  at target practice, yes, and I've carried it a few

1    times.

2         Q.   Let's follow up on that.  I'm going to direct

3    your attention to this diagram in the corner.  I'm going

4    to leave it right there.  Pointing at the center of this

5    diagram, you recognize this as being of your house;

6    right?

7         A.   Um-hum.

8         Q.   And where my finger is here in the gray shaded

9    area in the center, middle, going off to the left side

10   of the house, that's the front entryway; correct?

11        A.   Yes, it is.

12        Q.   Traveling down on that two segments of the

13   house to the last portion of the house, there's a wall

14   that goes down, turns 45 degrees, turns 45 again, and

15   intersects with the lower house again.

16        A.   Yes.

17        Q.   That's just a cement or concrete knee wall

18   that's about three feet high; right?

19        A.   Well, it's an atrium in there.

20        Q.   It's unfinished; right?

21        A.   That's correct, yes.

22        Q.   It's made of concrete?

23        A.   Yes, sir.

24        Q.   That's where you used to fire rifles from on

25   occasion; right?

1       A.      Sometimes, but the firing range was down

2   towards the seven o'clock position; correct.

3       Q.      Down here where I'm pointing where it says

4   target?

5       A.      Yes, sir.

6       Q.      You and others would get in that area behind

7   that concrete wall and use that concrete wall as a

8   support for some of the rifles to fire down at the

9   target; correct?

10      A.      That's correct, sir.

11      Q.      Who fired rifles from that area other than

12  you?

13      A.      Many people.

14      Q.      Many people?

15      A.      Yeah.

16      Q.      Your wife included, Mrs. Brown; right?

17      A.      I don't think she ever was back in there.

18      Q.      You don't think she was back in there?

19      A.      No.  I don't remember her going back in there.

20  The few times that she's ever fired any of the guns at

21  all was her handgun, and that usually was on the septic

22  field area.

23      Q.      Okay.  So it's your testimony that she didn't

24  fire rifles, just handguns?

25      A.      She may have fired one or two, but she used

50

1    mostly a handgun.  I don't recall her firing a rifle

2    very often.

3         Q.   You fired Cirino Gonzalez' 50-caliber from

4    this area that I've identified, what you call the

5    atrium; right?

6         A.   At some time I probably fired most of the

7    different pieces that came in that have been fired, for

8    sure.

9         Q.   I said Cirino Gonzalez.  Let me leave this and

10   walk back over here.  Cirino Gonzalez is another person

11   who visited you; right?

12        A.   Yes.

13        Q.   He came up from Alice, Texas, and did he stay

14   at your house for a while?

15        A.   Yes.

16        Q.   Did he have military training?

17        A.   I believe he did, yes.

18        Q.   Did he offer his services in terms of security

19   with respect to your property?

20        A.   Services?  He offered to hang around awhile,

21   yes, he did.

22        Q.   He brought a 50-caliber rifle up to New

23   Hampshire and brought it to your house, the one that you

24   fired; right?

25        A.   He had a 50.

1     Q.   He had a 50 doesn't answer my question.  He

2     bought a 50-caliber in New Hampshire and he brought that

3     50-caliber to your house; is that right?

4     A.   He had a 50.

5     Q.   Did he bring a 50 to your house?

6     A.   Yes, he did, yes.  That's how I know he had

7     it, yes, sir.

8     Q.   Jason Gerhard bought a 50 also; right?

9     A.   Yes.

10    Q.   His is that huge silver stainless steel gun

11    over on the table; right?

12    A.   They are all the same size.  The appearance is

13    that it's larger because of the stainless steel, the

14    brightness of the color, but they are all the same.

15    Q.   Did Jason Gerhard buy a 50-caliber rifle?

16    A.   I'm sorry?

17    Q.   Did Jason Gerhard buy a 50-caliber rifle?

18    A.   I would assume so.  He brought one up.

19    Q.   I didn't mean to imply that he sold it.  What

20    I meant was he brought this thing to your house; right?

21    A.   Yes.

22    Q.   When I say this thing, I'm referring to

23    Government's Exhibit 5e.  Right?

24    A.   It's a lawfully purchased firearm, yes.

25    Q.   Lawfully purchased firearm.  Did he take it

1    home with him to Brookhaven, New York, when he left?

2         A.   I don't think so.

3         Q.   It was in your house on October 4th and he

4    wasn't there, was he?

5         A.   I'm sorry?

6         Q.   It was in your house on October 4th, '07;

7    correct?

8         A.   Probably.  If he did he would have left it up

9    on the third floor, yeah.

10        Q.   Left it up on the third floor?

11        A.   Probably.

12        Q.   He joined the Army; right?

13        A.   That's right.  I forgot all about that.

14        Q.   He left your house, joined the Army, and left

15   this gun there; right?

16        A.   That's right.

17        Q.   And he left this gun there too, 5a-2; right?

18        A.   Yeah.  I remember that piece was there, yes.

19        Q.   He left several other guns there, too, as

20   well; correct?

21        A.   That's why I didn't recognize some of the

22   pieces that were there because I don't touch other

23   people's firearms.  I said whatever was there was of no

24   concern of mine.

25        Q.   My question was he left several other guns at

1   your house when he went and joined the Army; right?

2        A.   Probably.  That's what he did, went in the

3   Army.  I forgot about that.

4        Q.   You said you don't touch other people's

5   weapons.  The 50-caliber that you touched on June 7th up

6   in the tower, whose weapon was that?  Yours?

7        A.   I was left no choice, sir.  In time of

8   impossibility you will do what you have to do.  Excuse

9   me.

10            THE COURT:  Just a second.  Hold it, Mr.

11   Brown.  Jury will disregard that answer.  Reask the

12   question.

13        Q.   You held a 50-caliber rifle in your hands on

14   June 7, 2007; is that correct?

15        A.   That is correct.

16        Q.   Was that the 50-caliber rifle that had been

17   purchased by Danny Riley which is Government Exhibit 5d

18   that I'm holding up here?

19        A.   I bet that was the one right there.

20        Q.   And you held this in your hands in what you

21   refer to as a deck, but other people have called the

22   tower in your home; correct?

23        A.   Excuse me?

24        Q.   On June 7th -- I will ask it again.  I'm

25   sorry.  On June 7th you held this gun in your hands, 5d;

1    right?

2         A.   Could have been.

3         Q.   Let me represent to you that 5d and 5e were

4    the only two 50-calibers taken from your house in

5    October.  Will you agree with me on that?

6         A.   I'll tell you I don't know.  I thought there

7    were three.

8         Q.   There was a third 50-caliber that had been at

9    your house, but it left at some point; right?

10        A.   I don't know.  I thought there were -- all

11   three of them were still there.

12        Q.   Okay.  Let me show you the third one and ask

13   you about that.  Sir, let me show you what's marked for

14   identification as Government Exhibit 17a.  This is a

15   50-caliber Serbu; correct?

16        A.   I assume it is what it is, yes.

17        Q.   Let me hold it a little bit closer to you and

18   get a closer look.

19        A.   I can see the piece, sir, from where you are.

20   It's just that the name Serbu -- I could hear him

21   talking about it.

22        Q.   Is this the gun Cirino Gonzalez had at your

23   house?

24        A.   I don't know.

25        Q.   Is this similar to the gun of Cirino Gonzalez?

1      A.    Similar.

2      Q.    When did Cirino Gonzalez leave your house to

3  go back to Texas?

4      A.    Again, they came.  I don't know.  They came

5  and they went all the time.  There was one time there

6  when I guess other family members were up there and they

7  came and they left.  I don't know dates or anything.  My

8  mind was on thousands of different things at the same

9  time.  You're asking me for particular -- I don't

10  remember.

11     Q.    Let me ask you another question, sir.  Can you

12  tell us today as you sit here whether or not it was this

13  weapon, 17a ID, Cirino's 50, this weapon, 5d, Danny

14  Riley's 50, or this other weapon, Jason Gerhard's 50,

15  which is -- it's got a number on it here -- that you had

16  with you in the tower?  Jason's is 5d.  Can you tell us

17  which of these three fifties you had up in the tower --

18  or deck, excuse me.

19     A.    How can I tell you that?

20     Q.    I'm asking you can you tell us which of these

21  three you held in that tower?

22     A.    No.  I honestly can't tell you which of the

23  three were in the tower.

24     Q.    Were there any other fifties in the house in

25  this time frame besides these three?

1      A.   No, no.

2           MR. HUFTALEN:  Your Honor, I offer

3  Government's 17a.

4           THE COURT:  Any objection?

5           MR. IACOPINO:  Yes, your Honor.

6           THE COURT:  Basis?

7           MR. IACOPINO:  Relevance.

8           THE COURT:  Overruled.

9           MR. LANGE:  Objection, foundation.

10          THE COURT:  Overruled.

11          (Government's Exhibit 17a admitted.)

12     Q.   Mr. Brown, at the time that you held a

13  50-caliber rifle up in your deck, had you seen any

14  armored personnel carriers coming up to your property?

15     A.   I was just notified, sir, about five minutes

16  prior to the time I reached the tower that there were

17  two APCs with three state police cruisers in front and

18  three state police cruisers behind.  Each of the

19  vehicles had just proceeded in my direction.  Plus I had

20  just seen a helicopter not more than two or three

21  minutes before.  I was panicked.  I headed for up on top

22  so I could get a better view of what was going on,

23  because I could see all the way up into parts of the

24  power lines as well and off into the distance.  So it

25  was kind of like a moment a little bit of trying to

1   decide what's going on, see what's going on.  So I think

2   you lose some rationality during that period of time.

3           THE COURT:  Jury will disregard that answer.

4   Reask the question.

5       Q.  At the time you held the 50-caliber on

6   June 7th in the tower, had you seen any APCs entering

7   your property?

8       A.  No.  I knew they were there though.  They were

9   there, no question in my mind.

10      Q.  Had Danny Riley come back to you and said

11  anything about the incident involving him at the time --

12      A.  No, he did not.

13      Q.  -- at the time you held the 50?  I didn't hear

14  your answer.

15      A.  No.  He did not have to.

16      Q.  He did not have to?

17      A.  No.  I was already notified that they were

18  there.

19      Q.  The Colt 1991 that's Government's Exhibit 5n,

20  you bought this gun in April of 2007; correct?

21      A.  That's not correct.

22      Q.  It's not correct?

23      A.  That's not correct.

24      Q.  You saw that there was a bill of sale that was

25  entered into evidence that has the serial number for

1   this gun on it saying it was sold to you in April of

2   '07.  Did you not see this?

3        A.   Of course.  I wrote that bill of sale.  I'm

4   very well aware of that bill of sale, yes.  I wrote half

5   of it and then the other half was written by the lady

6   whose husband had died that gave me that gun; that's

7   correct.

8        Q.   Her husband died; right?

9        A.   That's correct.  One of my best friends, yes.

10        Q.   In fact, he was at your house when he became

11   ill; correct?

12        A.   Correct.  I think the government finished him

13   off, too.

14        Q.   I'm sorry, I did not hear you.

15        A.   I think the government killed him as well,

16   too.

17             THE COURT:  Move on.  Ask another question.

18        Q.   If you didn't buy it in April as the bill of

19   sale says, when did you buy it?

20        A.   Sir, it was given to me by my friend while he

21   was at my house back in February, and when he was

22   leaving he said he wanted me to have this.  At the

23   moment -- it was actually in January, end of January.

24   At that moment I had had no firearms, no guns on me or

25   in the house, and he wanted me to keep it.  He insisted

1   I took it.  So from him I took it.  He's also a

2   commander of the Rangers in Vermont.

3       Q.   Let me ask another question.  At the time you

4   bought that gun, whether it was January or whether it

5   was April, you knew that a jury sitting across the hall

6   had convicted you of a crime; correct?

7       A.   No, they did not convict me of anything, sir.

8   They never had a trial.

9       Q.   Hang on.

10      A.   I was not there.

11      Q.   Were you aware that the jury, after hearing

12  evidence, deliberated and returned a verdict of guilty?

13      A.   No, sir.

14      Q.   You're not aware of that?

15      A.   No.  I could care less.  I have no

16  consideration for these people anymore or even then.

17      Q.   Let's go on to something else.  You said in

18  your direct testimony that you didn't touch weapons that

19  were other people's.  They were their personal property

20  on their person; right?

21      A.   I'm sorry, sir?

22      Q.   On your direct testimony did you say weapons

23  of other people were theirs.  I didn't touch them.

24      A.   That's correct, sir.  I don't touch other

25  people's property.

1      Q.   But you did touch somebody's gun on June 7th;

2   right?

3      A.   Sir, I would have grabbed a spear, a flame

4   thrower, a guided missile, a nuclear bomb that morning.

5   I don't think you have been in a situation like that and

6   known that kind of fear, obviously.

7      Q.   Sir, in the bedroom of your house -- that's

8   the bedroom that you and your wife slept in; right?

9      A.   Correct.

10     Q.   And as you walk into the bedroom the bed's on

11  the left; correct?

12     A.   That is correct.

13     Q.   Which side of the bed did you sleep on?  The

14  far side or the near side?

15     A.   Facing the bed I would have slept on the right

16  side.

17     Q.   Okay.  Would have been the far side?

18     A.   Walking into the door, yes.

19     Q.   So your side of the bed was closer to the

20  50-caliber, the .308, and the other rifle that were over

21  in the corner; right?

22     A.   To everything, yes, sir; to everything, yes,

23  sir.

24     Q.   And your wife's side of the bed was closer to

25  the pipe bombs that were in the closet; right?

1      A.   Excuse me?

2      Q.   Your wife's side of the bed was closer to the

3   pipe bombs that were in the closet; correct?

4      A.   Are you intending to infer something, sir,

5   about my wife?

6      Q.   I'm asking you whether or not --

7      A.   I don't like your inference.

8           THE COURT:  Mr. Brown, can you answer that

9   questions?

10          THE WITNESS:  No, I'm not going to answer

11   that.

12     A.   Sure, yes, she was.  What of it?

13          THE COURT:  Next question.

14     Q.   No door on that closet; correct?

15     A.   Yes.

16     Q.   You could see the pipe bombs when you walked

17   in the room; correct?

18     A.   Opening the door, yes.

19     Q.   If you look to the right, you saw the pipe

20   bombs on a rack in the closet; is that right?

21     A.   Yes.

22     Q.   Let's go back to the guns in the corner by the

23   windows in the back door.  French doors that opened up

24   in the back of your house; right?

25     A.   Correct.

1       Q.    And from those French doors you had an

2   unobstructed view of the back of your property; is that

3   right?

4       A.    Part of it.

5       Q.    And next to those French doors were Danny

6   Riley's 50-caliber rifle, the 5d; right?

7       A.    I think so.

8       Q.    And there was a .308 with a scope that was

9   there as well; right?

10      A.    I'm familiar with that.

11      Q.    And there was another rifle standing up.  Was

12  that a .223 or a .22?

13      A.    I forget.  I believe that was a .22.

14      Q.    Who put those guns there?  You or somebody

15  else?

16      A.    I did.

17      Q.    How about the gun that was in the master

18  bathroom, 5k, we talked about early on?  Who positioned

19  that in the bathroom?  You or someone else?

20      A.    I don't know.

21      Q.    You don't know?

22      A.    No, I have no idea.

23      Q.    What about the 50-caliber that was up by the

24  front window on the third floor overlooking the front of

25  the house, the big silver one?

63

1          A.    Again, I don't know.  I don't know who put it

2    up there.  I think that's the one that belonged to Mr.

3    Gerhard, Jason, but I don't know who put it up there.

4          Q.    So you don't know who put the 50-caliber

5    ammunition with it either; right?

6          A.    No, I don't.

7          Q.    How about in your bedroom?  Did you line the

8    50-caliber rounds up against the wall next to the gun?

9          A.    Yes.

10          Q.    And there were these Goex cans that were found

11    in a number of places in the house.  You saw the video

12    on that and you knew that they were there; right?

13          A.    That's correct.

14          Q.    Did you position those in each of the places

15    where they were found?

16          A.    Absolutely.

17          Q.    Did you position one in the jelly cupboard in

18    your wife's kitchen?

19          A.    Absolutely.

20          Q.    And did you position one --

21          A.    Sir, to save everyone's time, absolutely.

22          Q.    And you're the one that put the nails around

23    them and wrapped the nails on with tape?

24          A.    So I could counter any hand grenades that you

25    might have thrown at us.  And I say you, sir, because

1    the orders came from your office I found out later.

2            THE COURT:  Stop.  Jury will disregard the

3    last portion.  Ask another question.

4        Q.   Did you put the fuses through the top of those

5    Goex cans?

6        A.   I did.

7        Q.   And did you position all of the Goex cans that

8    were in what has been referred to --

9        A.   I already said to you, sir, I did that.

10       Q.   What has been referred to as the library.  You

11   put those in the library?

12       A.   I already said to you, sir, I did that.

13       Q.   And this 50-caliber ammo in the library?

14       A.   That's correct, sir.

15       Q.   How about the .223 that was on the floor

16   overlooking the entryway, --

17       A.   Enough.

18       Q.   -- did you position --

19       A.   Everything you found there I did, yes, sir.

20           THE COURT:  Just answer his questions.

21       A.   What's your point?

22           THE COURT:  Answer his question, Mr. Brown.

23           THE WITNESS:  If he keeps asking me dumb

24   questions, I'm not going to answer him.

25           THE COURT:  Mr. Brown, you are required to

1   answer the questions.

2          THE WITNESS:  I'm sorry, sir, this is a bogus

3   court to begin with in limiting me here, especially as

4   an agent and a courtesy to this Court, and you do know

5   that, sir, because of this law right here.

6      Q.   Mr. Brown, with respect to the pipe bombs, you

7   said on direct one of them had a fuse in it, but the

8   others did not; correct?

9      A.   That is correct.

10     Q.   All of those pipe bombs had a hole drilled in

11  them so that a fuse could be put in; right?

12     A.   That is correct.

13     Q.   And there's tape across every hole so that the

14  gunpowder wouldn't leak out; is that right?

15     A.   Yeah, I guess.  Yeah, I think that's why I did

16  that, yes.

17     Q.   And did you also cut pieces of fuse that were

18  laid on the top of them in the bedroom?

19     A.   Yes, I did.

20     Q.   There was a piece of deck cord that was found

21  on the kitchen table in your house.

22     A.   I heard that earlier and I don't even know

23  what that is, sir.

24     Q.   Okay.  So you don't know what that was?

25     A.   I have no idea what that is.

1          Q.    That's okay.  The Tannerite that was

2     positioned in the trees, --

3          A.    Correct.

4          Q.    -- you put that up there so that it could be

5     shot at if you saw people coming through the wood line;

6     is that right?

7          A.    Like a flash bang.  It's a distraction; that's

8     correct, sir.  That's why I put it up so high in the

9     tree; that's correct.

10         Q.    You test fired Tannerite a number of times to

11    determine what size round was required to cause it to

12    explode; is that right?

13         A.    I had already determined that for myself.  A

14    .253 was the minimum round that I could fire to detonate

15    it, yes.

16         Q.    On direct examination Mr. Iacopino asked you

17    whether or not you fired at anyone on June 7th, and I

18    believe your answer was no, you did not; right?

19         A.    Absolutely did not.  Never fired a gun at all.

20         Q.    But then you said -- and tell me if I'm wrong.

21    I wrote down what you said.  If I had seen one, I'd do

22    what I had to do.

23         A.    If I had seen one what?

24         Q.    That's what I was going to ask you.

25         A.    I'm asking you.  You seem to know all the

1    answers here.

2         Q.   I believe your testimony was:  If I had seen

3    one, I'd do what I had to do, and then words to the

4    effect of:  Nobody likes to talk or use those words,

5    but.  You were saying that had you seen a person walking

6    through the wood line, you would have fired; correct?

7         A.   I don't think so, sir.  You're inferring again

8    or trying to place a thought here in the jury's mind.

9    Sir, you are so wrong and this is so wrong.

10             THE COURT:  Finish your question.

11        Q.   You didn't say that?

12        A.   You're saying that I said that?

13        Q.   Mr. Brown --

14             THE COURT:  Just a second, Mr. Brown.  Let him

15   finish his question and then I will give you time to

16   answer.  Go ahead.

17        Q.   When the undercover team came into your house

18   or onto your property on October 4th, that late

19   afternoon and evening, you testified that you did not

20   hold a rifle on them; correct?

21        A.   Absolutely.

22        Q.   But you did have this rifle that I'm holding

23   up here, Government Exhibit 5f, in your hands when they

24   were present; correct?

25        A.   On the 7th?

1        Q.    No, October 4th, the day of your arrest.

2        A.    October 4th; that is correct.  I believe that

3   was that one, yes, sir.

4        Q.    And you held this when they were unloading

5   materials into the garage?

6        A.    That is correct.  I didn't know who these men

7   were.  They were unidentified.  They just said that they

8   were bounty hunters or something or whatever.

9        Q.    But you held the gun?

10        A.    I held the gun.

11        Q.    The only difference between the undercover's

12   testimony, Mr. Robertson, and yours is he said you held

13   it on them, and you say you held it but not on them;

14   right?

15        A.    I never lie, sir.

16        Q.    My question is the only difference with

17   respect to you and this gun, in his testimony and yours,

18   is he says you held it on them, waved it back and forth,

19   and you say, no, I held it, but I didn't point it at

20   anyone.  Is that correct?

21        A.    That's correct; I do not point guns at people

22   unless I intend to do something with it.

23        Q.    You had a 1911 or 1991, the Colt 45, in your

24   pocket the whole time; right?

25        A.    That's correct.

1      Q.   And your wife had a Glock in her hand?

2      A.   I have no idea what she had.

3      Q.   You didn't see her come out on the porch as he

4  testified?

5      A.   Sir, do you want an answer?

6      Q.   No, I'd like you to let me finish the

7  question.

8           THE COURT:  The question is did you see her

9  come out onto the porch.

10      A.   I didn't notice.

11      Q.   You didn't notice?

12      A.   No.  My eyes were fixed on five men.  I didn't

13  know who they were and --

14           THE COURT:  Stop, Mr. Brown.  There's no

15  question pending.

16           MR. HUFTALEN:  Can I have one moment.

17           (Pause.)

18           THE WITNESS:  Judge, am I allowed --

19           THE COURT:  Just a second, Mr. Brown.  There's

20  no question -- quiet, please.

21           THE WITNESS:  I just want to --

22           THE COURT:  I said just stop.  Stop.

23      Q.   BY MR. HUFTALEN:  Mr. Brown, you heard Marshal

24  Monier testify early in the case that he sent two

25  letters to you, Government Exhibit 1f and 1f-1.  Did you

1   see the letters that he sent?

2        A.   Honestly, sir, I don't remember.  My wife may

3   have remembered them.  I don't remember letters from Mr.

4   Monier.  All I ever heard from him was statements on the

5   television news a couple of times, and that was it.  We

6   never had any communication.

7        Q.   Mr. Brown, during the course of the time that

8   you were up at your property between January 2007 and

9   October 2007, would it be fair to say in your words you

10  warned certain people that they might be hurt?

11       A.   Warned them they'd be hurt?

12       Q.   You warned them that they might be hurt if

13  attempts were made to arrest you.

14       A.   Sir, we have been warning everybody, including

15  the general public, for 20 years, or 15 years anyway,

16  about the dangers of the United States Government.

17       Q.   Let me ask you specifically then.  You are

18  quoted in a newspaper article on January 16th as saying:

19  You attack my property, it's going to get really

20  violent.  I don't care who it is.  Did you say that?

21       A.   Say that again, sir.

22       Q.   You attack my property, it's going to get

23  really violent.  I don't care who it is.  January 16th,

24  Concord Monitor.  Did you say that?

25       A.   Article 10 of the New Hampshire Constitution

1   absolutely guarantees me and obligates me to do so, yes,

2   sir.

3           THE COURT:  Jury will disregard everything

4   before yes, sir.

5           THE WITNESS:  Of course.  Disregard the truth,

6   folks.

7           THE COURT:  Jury will disregard that.  Jury's

8   excused.

9           (Jury left courtroom.)

10                      BEFORE THE COURT

11          THE COURT:  Mr. Brown, I've tried to be very

12   patient with you.

13          THE WITNESS:  No, you haven't, sir.

14          THE COURT:  And you insist on being

15   contemptuous.  I'm going to give you a final

16   opportunity.  If I bring the jury back, will you abide

17   by my orders?

18          THE WITNESS:  Sir, if you will honor your

19   position as a judge as you took an oath to do so and you

20   allow me to give full testimony as you said earlier to

21   tell the whole truth and nothing but the truth so help

22   me God, yes, sir, I will comply with everything you say.

23          THE COURT:  Will you abide by my instructions

24   with regard to running this courtroom?  You will follow

25   my orders?

1          THE WITNESS:  I have total respect for any

2    courtroom, sir, that runs in a lawful manner,

3    absolutely, but if you do not, sir, no, sir, I will not.

4          THE COURT:  All right.  Mr. Iacopino, I'm

5    about to exclude him for the remainder of the

6    proceedings until he can promise me to obey himself.  As

7    part of that, I will consider striking his entire

8    testimony.

9          THE WITNESS:  Of course.

10         THE COURT:  Mr. Brown, you're doing it again.

11         THE WITNESS:  I'm getting ready to leave.

12   You're going to throw me out, so I might as well get

13   ready.

14         THE COURT:  I'm going to adjourn and give you

15   a chance, Mr. Iacopino, to indicate to me why I should

16   not do that.  We'll resume tomorrow morning at 8:30.  I

17   will give you time to talk to your client.  But I've

18   lost patience with this.

19         All right.  We are in recess.  We are going to

20   continue with the other individuals as soon as we have a

21   break here.  Take a ten-minute break.

22         MR. IACOPINO:  Your Honor, is the jury going

23   to be coming back in?

24         THE COURT:  Do you want them back in?  I'll

25   bring them back in.  Mr. Brown, you can take a seat at

1   the table.  Bring in the jury.

2          THE CLERK:  Yes, your Honor.

3                     BEFORE THE JURY

4          THE COURT:  Ladies and gentlemen of the jury,

5   we are going to recess for the day.  I want you to

6   disregard the issue with Mr. Brown that I had.  It's not

7   to enter into your deliberations or evidence.  We'll

8   resume tomorrow morning at 8:30, and again, it's

9   possible we may send it to you for deliberation

10  tomorrow.  Unlikely, but possible, but certainly the

11  next day it's likely.  Until then, remember, don't read

12  any newspapers, don't listen to any news reports, don't

13  do any independent research, and don't discuss this case

14  with anyone.  Keep an open mind.  You haven't heard all

15  of the evidence.

16         Jury's excused until 8:30 tomorrow morning.

17         (Jury excused at 2:00 p.m.)

18                     IN CHAMBERS

19         THE COURT:  All right.  We are going to put on

20  the Dions, and what area do you want me to inquire into?

21         MR. LANGE:  Your Honor, we'd like you to

22  inquire of these witnesses, each of them, as to the same

23  areas.

24         THE COURT:  All right.  Go ahead.

25         MR. LANGE:  That would be as to how they first

1    met Ed and Elaine Brown.  I anticipate their answer

2    would be that they met back in 1999.  Their contacts

3    with each other thereafter, I believe their answers

4    would be, if allowed to give them, that they met

5    socially regularly, had dinner at each other's homes,

6    and I would ask them if they went to the Plainfield

7    residence after the Browns had been convicted and before

8    they were arrested.  My indication is that they would

9    answer yes.

10           I would ask them to describe what happened at

11   the home, and they would describe, I anticipate, the

12   atmosphere was cordial, that Ed did most of the talking,

13   that Elaine appeared to be underweight, that she was

14   cordial.  They would also testify, if asked, that they

15   did not hear any of the threats, any indication of hate

16   or anger toward the authorities, state or federal, from

17   either Ed or Elaine, and that Elaine was upset about the

18   loss of her dental practice, especially her employees

19   being forced out of work.  And if asked, they would say

20   that they were there while the Browns were building

21   their home and that it was their dream home and that was

22   why they put so much into it.

23           THE COURT:  What period of time was this?

24           MR. LANGE:  That would have been prior,

25   actually probably beginning in around 1999, 2000.  They

1   did not visit with Ed and Elaine Brown after the power

2   was cut off, which would have been at the beginning of

3   June of 2007.  They have had communication with them

4   since, but that's irrelevant and I wouldn't seek to

5   elicit it.

6          THE COURT:  All right.  This is what I have,

7   how you first -- the circumstances of how you first met

8   the two defendants, their contacts, what type of

9   contacts, where or when thereafter, and what was the

10  nature of the contacts, their visits to the Plainfield

11  home of the Browns after the Browns were convicted.

12  This is during the time when the marshals were out

13  front.

14          MR. LANGE:  Yes.  Actually I don't think the

15  marshals were out front.  They were around but they were

16  covert.

17          THE COURT:  Arrest warrants were outstanding.

18          MR. LANGE:  Arrest warrants were outstanding.

19          THE COURT:  You will ask them questions about

20  what they saw and what they did at the Brown house?

21          MR. LANGE:  Right; in that time period.

22          THE COURT:  And conversations they had with

23  the Browns?

24          MR. LANGE:  Yes, sir.

25          THE COURT:  And you will ask how the Browns

1   appeared?

2           MR. LANGE:  Yes, your Honor.

3           THE COURT:  And did they hear any threats from

4   either of the defendants?

5           MR. LANGE:  That's right.

6           THE COURT:  And was Elaine upset about the

7   loss of her dental practice?

8           MR. LANGE:  Correct.

9           THE COURT:  And that they stopped -- you

10  wouldn't ask them anything after June of '07 when they

11  stopped visiting.

12          MR. LANGE:  I would not.

13          THE COURT:  Anything from Mr. Iacopino?

14          MR. IACOPINO:  I probably will have no

15  questions for these witnesses.

16          THE COURT:  I gather cross-exam is going to

17  consist of what they saw at the Browns' home once they

18  opened it up.  Am I correct?

19          MR. HUFTALEN:  What they saw and any bias they

20  may have based upon their relationship, he taking over

21  as the commander of the U.S. Constitution Rangers.

22          THE COURT:  Is Dion the commander?

23          MR. HUFTALEN:  He's the new boss.  That's my

24  understanding, I've been told.  I haven't seen his

25  credentials.  I can tell you that when he went into the

1   District of Massachusetts recently, he requested to be

2   annotated as a member of the U.S. Constitution Rangers,

3   District of Massachusetts.  When he was checked through

4   security -- excuse me.  Let me rephrase that.  Today

5   Dion requested he be annotated as a member of the U.S.

6   Constitution Rangers from the District of Massachusetts

7   when he was checked through security in this courtroom

8   today.  So he's apparently holding himself out as a

9   Constitution Ranger, closely affiliated I would say on

10   cross with Mr. Brown.

11          THE COURT:  Anything else from anybody?  All

12   right.  As soon as the lawyers are here, I will advise

13   them of the areas and then we'll put them on the stand.

14          MR. LANGE:  You will do the questioning?

15          THE COURT:  I will do the questioning, and

16   then I will ask for any additional issues and we'll

17   proceed that way.

18          MR. LANGE:  Your Honor, ordinarily my sense is

19   that marshals are anxious to get the Browns back home.

20   It's been a long day for them by 2:30, but I would urge

21   the Court to ask the marshals to give Mr. Iacopino a

22   chance to speak to Mr. Brown before they take him back.

23          THE COURT:  I will tell him.

24          MR. LANGE:  I'm concerned because if Mr.

25   Brown's testimony is stricken in its entirety, it will

1    obviously have an adverse impact on my client and on my

2    defense.

3         THE COURT:  I'm fully willing to listen to

4    alternatives, but I'm reaching the end of my rope with

5    Mr. Brown.  I've tried to be as patient as I can.  He

6    does not recognize my authority as the judge in this

7    court, or as he calls me Mr., that's clearly -- and this

8    has been consistent, that he doesn't recognize this to

9    be a court, and I've tried to deal with him on a low

10   level basis, but he's indicated very clearly that he

11   will only obey rules that he agrees with and I'm running

12   out of things to do.  And clearly unless he is willing

13   to engage in cross-examination, I'm not going to leave

14   the direct there, and that's within my discretion.

15        I will have the marshals keep Mr. Brown here

16   for a short time after we recess for the day so you can

17   talk to him, Mr. Iacopino.

18        MR. IACOPINO:  I would just point out -- I

19   kind of need to know what it is that you want him to say

20   to you before you allow him to continue his testimony.

21        THE COURT:  I want him to indicate that he

22   will obey my instructions.  If he disagrees with them,

23   he has the right to appeal, but he doesn't get to pick

24   and choose depending on whether he disagrees with me

25   whether he will stop talking or answer a question or

1    stop elaborating when I've told him to stop.

2              MR. IACOPINO:  Okay.

3              THE COURT:  Now, if he can't do that and

4    recognize my authority that I'm running the courtroom,

5    we are going to have a problem very quickly tomorrow.

6              MR. IACOPINO:  Can I ask how much more cross

7    the government has?

8              MR. HUFTALEN:  A lot less than I've already

9    done.

10             MR. IACOPINO:  Does that mean a half hour,

11   20 minutes, an hour?

12             MR. HUFTALEN:  Ten minutes, tops.

13             THE COURT:  All right.  So let me know -- you

14   don't have to hang around here.  Let me know when the

15   other lawyers are here and we'll proceed.  We'll go into

16   court.  Defendants should be in the courtroom when we do

17   this.

18             (Recess taken.)

19                        IN CHAMBERS

20   (Michael Ramsdell, Esq. present for Catherine Floyd

21   Dion.  William Christie, Esq. present for William Scott

22   Dion.)

23             MR. RAMSDELL:  We're not looking to take up

24   much of the Court's time.  I apologize if I should have

25   asked this question before.  Literally we want to

1    explain to our clients before they come in the courtroom

2    what the process is going to be.

3         THE COURT:  I'm going to have them each

4    seriatim take the stand.  You should be next to your

5    client.  I'm going to explain they have a Fifth

6    Amendment privilege that they are a possible witness.

7    I'm going to indicate -- make sure they indicate they've

8    discussed the issue of self-incrimination with each of

9    you, and I'm going to indicate to them the areas that

10   counsel has presented to me.  Let me tell you what they

11   are so theirs is no surprises.

12        Counsel is going to inquire about the

13   circumstances of their meeting the defendants, their

14   contacts with the defendants in terms of social

15   occasions, and obviously any other occasions, their

16   contacts at the Plainfield house after the Browns were

17   convicted, what they saw at the house, what happened at

18   the house in terms of -- I guess they'd have dinner or

19   social occasions there.  They are going to ask about

20   conversations they may have had with Elaine or Ed or

21   will be asked to describe Elaine's appearance, Ed's

22   appearance, what they heard from the Browns during the

23   time they were at the house, and specifically, did they

24   hear any threats.  I assume it would open up anything

25   else that they heard.  About Elaine being upset about

1    the loss of her dental practice, and there would be no

2    questions, at least on direct, as of June of '07.   I

3    don't know what contacts they had then, but obviously

4    that would be opened up on cross-examination.

5            On cross, obviously they would be asked what

6    they saw at the house, who else was there, any issues

7    with regard to bias, including membership in the

8    Constitution Rangers.

9            MR. HUFTALEN:  There is one other thing I

10   thought of, Judge.

11           THE COURT:  Yes?

12           MR. HUFTALEN:  I'd also ask them whether or

13   not they were involved with providing Ed and Elaine with

14   any supplies or materials to help them evade -- or stay

15   in the hold-out and evade arrest.

16           THE COURT:  Including any derivatives thereof.

17   Obviously cross-examination is more open.  Depends on

18   their answers.  That's it.  You are free to discuss this

19   with your clients in advance.  Let us know when you're

20   ready.

21           MR. RAMSDELL:  Thank you very much.

22           THE COURT:  Take your time.

23           (Recess taken.)

24                     BEFORE THE COURT

25           THE COURT:  Mr. Dion.

```
 1                    WILLIAM SCOTT DION

 2   having been duly affirmed, testified as follows:

 3              THE WITNESS:  I so affirm.

 4              THE CLERK:  For the record, if you'd please

 5   state your name and spell your name.

 6              THE WITNESS:  It's William Scott Dion,

 7   W-I-L-L-I-A-M, Scott, S-C-O-T-T, capital D-I-O-N.

 8              THE COURT:  Mr. Dion, you're a potential

 9   witness in this matter.  I'm sure you've had an

10   opportunity to talk to your lawyer, Mr. Christie.

11   You're aware that you have a right not to testify if

12   your answers might tend to incriminate you.  Are you

13   aware of that?

14              THE WITNESS:  Correct.

15              THE COURT:  And have you had enough time to

16   speak to your attorney on that issue?

17              THE WITNESS:  Yes.

18              THE COURT:  And your attorney advises me that

19   you may take a privilege against self-incrimination, but

20   I want to, before you make a decision on that, indicate

21   to you the areas that you might be questioned about.

22   You would be questioned about your early contacts with

23   both of the defendants and each of the contacts

24   thereafter, including any social or other contacts you

25   have with them.  You would be asked specifically about
```

1    your visits to the Plainfield home of theirs after they

2    had been convicted of tax evasion.  You would also be

3    asked questions about what you saw and what you heard at

4    the Browns' home during those visits.  You would be

5    asked how the Browns appeared, how they looked to you,

6    whether you heard any threats or any other conversation

7    at the home, and you will be inquired into with regard

8    to what any conversation you did hear was about.  You

9    will be asked specifically whether Mrs. Brown was upset

10   about the loss of her dental practice.

11           And the direct examination I'm advised will

12   stop as of June of '07, but that will be the last time

13   period you'd be asked about.  But on cross-examination

14   it might go beyond that period of time.

15           On cross-examination I'm advised that they --

16   you would be asked about who you saw there and what

17   items you saw there, your membership in the Constitution

18   Rangers, and whether or not you provided supplies or

19   other material to the Browns that they may have used

20   while they were at the Plainfield home.

21           Have you had an opportunity to discuss each of

22   these issues with your attorney?

23           THE WITNESS:  Yes.

24           MR. HUFTALEN:  Is it your intent to assert

25   your privilege with regard to conviction -- your Fifth

1   Amendment privilege with regard to self-incrimination

2   with regard to any of these questions?

3            THE WITNESS:  Yes, I would exercise my rights.

4            THE COURT:  Are there any that you would not

5   exercise your right against self-incrimination that I've

6   listed for you?

7            THE WITNESS:  Few, if any.

8            THE COURT:  Can you think of any?  You can

9   talk to your lawyer before you answer.

10           (Pause.)

11           THE COURT:  Are there any that you would not

12  assert your right against self-incrimination.

13           THE WITNESS:  None that I can think of.

14           THE COURT:  Any other questions from counsel

15  or any comments or suggestions?  Mr. Lange?

16           MR. LANGE:  No.  I take it that neither the

17  Court nor the government would provide immunity to this

18  witness.

19           THE COURT:  The government.

20           MR. HUFTALEN:  Will not provide.

21           THE COURT:  Anything else, Mr. Lange, either

22  suggestions or additional issues?

23           MR. LANGE:  No.  You covered the areas that I

24  had.

25           THE COURT:  Thank you.  Mr. Iacopino, anything

1    at all?

2              MR. IACOPINO:  Nothing, your Honor.

3              THE COURT:  Then my intention is to excuse

4    this witness because there are no issues indicated to me

5    that he's willing to testify without asserting his

6    privilege against self-incrimination.  Does anyone

7    object to that?  I hear no objection.

8              MR. LANGE:  I object to the government's

9    position not to provide immunity, but I understand the

10   witness has his legal right.

11             THE COURT:  Your objection is with regard to

12   the government not giving immunity.

13             MR. LANGE:  That's right.

14             MR. IACOPINO:  I would join in that, your

15   Honor.

16             THE COURT:  That objection is preserved.

17   Otherwise there is no objection and I will go ahead and

18   excuse you.  Thank you, Mr. Dion.  And thank you, Mr.

19   Christie, for taking on this issue.

20             Mr. Ramsdell and Ms. Dion.

21             THE COURT:  Ms. Dion, if you would come right

22   up front here along with your counsel.

23                       CATHERINE FLOYD DION

24   having been duly affirmed, testified as follows:

25             THE WITNESS:  I affirm.

1          THE CLERK:  For the record, if you'd please

2     state your name and spell your name.

3     A.     Catherine Floyd, C-A-T-H-E-R-I-N-E, F L O Y D.

4          THE COURT:  Ms. Dion, your attorney advises me

5     that you may assert a privilege against

6     self-incrimination; is that correct?

7          THE WITNESS:  Yes.

8          THE COURT:  And you are aware that you have a

9     right not to answer questions if those answers may

10    incriminate you.  Do you understand that?

11         THE WITNESS:  Yes.

12         THE COURT:  And have you had a full and

13    adequate opportunity to discuss that with your attorney?

14         THE WITNESS:  Yes.

15         THE COURT:  Before you make a final decision,

16    I want to indicate to you the areas that you might be

17    questioned about.  You would be questioned about your

18    early contacts with each of the defendants and each of

19    the contacts you've had with each of them thereafter,

20    including any social or other contacts you may have had

21    with them.  You would be asked specifically about your

22    visits to the Plainfield home of theirs after they had

23    been convicted of tax evasion in this court.  You would

24    also be asked questions about what you saw and what you

25    heard at the Brown home during those visits.  You would

1   be asked how the Browns appeared, how they looked to

2   you, whether you heard any threats or any other

3   conversations at the home, and you would be inquired

4   into with regard to any other conversation you heard

5   while you were there.  You would also be asked

6   specifically whether Mrs. Brown was upset about the loss

7   of her dental practice, and I'm advised that in direct

8   examination Mr. Lange would not ask you any questions

9   about what happened after June of '07, but it is

10  possible that on cross-examination the attorney would

11  ask questions beyond that period of time, beyond

12  June 2007.

13          I'm advised that on cross-examination you

14  would be asked about who you saw at the Plainfield home,

15  what items, including firearms, you may have seen there,

16  and be asked questions either about your membership or

17  your husband's membership in the Constitution Rangers.

18  You would also be asked whether you provided supplies or

19  other material to the Browns that they may have used

20  while they were at the Plainfield home.

21          Have you had an opportunity to discuss each of

22  those issues with your attorney?

23          THE WITNESS:  Yes.

24          THE COURT:  Is it your intent to assert your

25  privilege against self-incrimination with regard to any

1    of these questions?

2              THE WITNESS:  Yes.

3              THE COURT:  Are there any questions that you

4    would not assert -- that I've listed, any areas that you

5    would not assert your right against self-incrimination?

6              THE WITNESS:  No.

7              THE COURT:  Do you want to talk to counsel at

8    all?

9              Any other questions or requests from Mr.

10   Lange.

11             MR. LANGE:  Yes.  As with the other witness, I

12   would request the government grant immunity for this

13   witness so that my client can have this witness testify

14   as part of her defense.

15             THE COURT:  Mr. Huftalen?

16             MR. HUFTALEN:  The government will not.

17             MR. IACOPINO:  Your Honor, I would beseech the

18   Court to do so.

19             THE COURT:  The Court is not in a position to

20   do so and will not do so.  Are there any other -- my

21   intent again is to excuse this witness.  Absent -- while

22   preserving the objections you just made, are there any

23   other requests or additional areas that counsel wishes

24   me to cover?

25             MR. LANGE:  Your Honor, I have no other

1   requests.  I respect this citizen's right to assert her

2   right against self-incrimination.

3            THE COURT:  Thank you.

4            MR. IACOPINO:  Nothing, your Honor.

5            THE COURT:  Thank you.  All right.  You're

6   excused.  She will not be testifying.

7            Yes?  You have something you want to say, Mr.

8   Huftalen?

9            MR. HUFTALEN:  Yes, I do.

10           THE COURT:  Let me just deal with witness

11  issues.  Do you have additional witnesses after Mr.

12  Brown, Mr. Iacopino?

13           MR. IACOPINO:  No, your Honor.

14           MR. LANGE:  We'll have our witnesses here at

15  nine o'clock, your Honor.

16           THE COURT:  How long do you think your case

17  is?

18           MR. LANGE:  I don't know.

19           THE COURT:  That's fair.  That's a good

20  answer.  All right.  Now Mr. Huftalen.

21           MR. HUFTALEN:  This morning I offered a couple

22  of exhibits.  They were video exhibits and one of them

23  was mistakenly marked.  It's the undercover video of the

24  arrest with no audio.  I moved it in as Government 1a-A.

25  That was not the appropriate designation.  It is

1    Government Exhibit 1i-A.

2              THE COURT:  You want to substitute the

3    designation?  Or is it a different exhibit?  Did you

4    just misidentify it?

5              MR. HUFTALEN:  Just misidentified it.  We just

6    changed the name or the number on the exhibit sticker.

7              THE COURT:  That's without objection?  It is

8    without objection.  Very good.

9              Anything else before we adjourn for the day?

10   See you all at 8:30.

11              (Adjourned at 3:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

91

```
 1

 2                  C E R T I F I C A T E

 3

 4          I, Diane M. Churas, do hereby certify that the

 5   foregoing transcript is a true and accurate

 6   transcription of the within proceedings, to the best of

 7   my knowledge, skill, ability and belief.

 8
     Submitted:  12/1/09
 9
                           /s/  Diane M. Churas  __
10                         DIANE M. CHURAS, LCR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```