**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3/1/10

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  09-CR-30-01/02-GZS
              v.                *  July 8, 2009
                                *  8:20 a.m.
EDWARD BROWN and ELAINE BROWN   *
                                *
* * * * * * * * * * * * * * * * *




Day 7
Morning Session
EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE GEORGE Z. SINGAL
and a jury


Appearances:

For the Government:   Arnold Huftalen, AUSA
                      Terry Ollila, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH  03301

For the Defendant,    Michael J. Iacopino, Esq.
Edward Brown:         Brennan, Caron, Lenehan & Iacopino
                      85 Brook Street
                      Manchester, NH 03104

For the Defendant,    Bjorn R. Lange, Esq.
Elaine Brown:         Federal Defender Office
                      22 Bridge Street
                      Concord, NH  03301

Court Reporter:       Diane M. Churas, LCR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1442

2

1                          I N D E X

2

3    WITNESS:           DIRECT  CROSS   REDIRECT RECROSS

4    EDWARD BROWN
     By Mr. Huftalen              9                33
5    By Mr. Lange            20
     By Mr. Iacopino                    22
6
     CHRISTINE ARVIZU
7    By Mr. Lange            35
     By Mr. Huftalen                    43
8
     SHAWN FARNSWORTH
9    By Mr. Lange            45
     By Mr. Huftalen                    52
10   By Mr. Iacopino                    55

11   SUSAN BERGE
     By Mr. Lange            57
12   By Mr. Huftalen                    68

13   DAVID VONKLEIST
     By Mr. Lange            73
14
     DAVID HATCH-BERNIER
15   By Mr. Lange            94
     By Mr. Huftalen                    99
16   By Mr. Iacopino                   102

17   EXHIBITS:                          ID   Evd.
     Defendant's Exhibit 2D-1                72
18   Government's Exhibit 34a-3              78
     Defendant's Exhibit 2P                  96
19   Defendant's Exhibit 2E-5               103

20

21

22

23

24

25

3

```
 1                        IN CHAMBERS

 2             THE COURT:  Mr. Iacopino, you've had an

 3    opportunity to talk to your client?

 4             MR. IACOPINO:  I have twice, your Honor.

 5             THE COURT:  Pardon me?

 6             MR. IACOPINO:  I have twice.

 7             THE COURT:  Is he ready to proceed?

 8             MR. IACOPINO:  He is ready.  Yesterday he

 9    indicated that he believes he would be able to follow

10    the judge's instructions.  I will report to you though

11    this morning he's rather agitated.

12             THE COURT:  We'll do the best we can.  We'll

13    try to give him as fair a trial as he allows us to do.

14             MR. IACOPINO:  Your Honor, in fairness, I

15    do -- the government represented they have about ten

16    more minutes of cross-examination.  I do intend to

17    redirect.

18             THE COURT:  I'm not going to hold the

19    government to the ten minutes, and you certainly can

20    redirect after Mr. Lange has an opportunity.

21             Number two, Mr. Lange, at some point when you

22    do decide whether your client is going to testify, if

23    she's not going to testify let me know so I can make

24    sure on the record that she understands her rights with

25    regard to her testimony.
```

4

1          MR. LANGE:  I will need to speak to her

2     briefly.

3          THE COURT:  Anytime.  I just wanted to remind

4     me and you in that regard.

5          Finally, with regard to a couple of potential

6     witnesses, I think of Mr. Lange, is Christine Arvizu; is

7     that correct?

8          MR. LANGE:  Yes, your Honor.

9          THE COURT:  Of White River Junction, New

10     Hampshire?

11          MR. LANGE:  Of Vermont.

12          THE COURT:  Vermont?

13          MR. HUFTALEN:  It's right across the river

14     from Lebanon.

15          THE COURT:  And Sean Farnsworth of Rumney, New

16     Hampshire?

17          MR. LANGE:  Yes, sir.

18          THE COURT:  Those were late additions after we

19     went through jury selection.

20          MR. LANGE:  They were.

21          THE COURT:  I'm going to ask the jury if any

22     of them know them.  If any of them do, we may have an

23     issue because even though I preliminarily agreed to let

24     them go, if we are going to have a problem, they may be

25     out.

1            MR. LANGE:  I understand.

2            THE COURT:  Anything else, counsel?  Go ahead.

3            MR. HUFTALEN:  Yes.  Last night I received an

4    e-mail at 8:35 from Inspector LaBier who's the case

5    agent for this case informing me that some posts

6    appeared on the Newhampshireunderground.com log site or

7    website.  Those posts appear to indicate that Kat, with

8    a K, Kanning, with a K, who's a fairly vocal supporter

9    of the Browns and who I'm told was in court yesterday is

10   attempting to ascertain the identity of one of the

11   jurors.  There were comments asking whether or not it is

12   a security person in this courthouse, some posts in

13   response to that with a photograph, which I didn't see,

14   but her response is, okay, thanks but that's not him.

15           I think it may be the security person in

16   Keene.  Given the history of this case and the threats

17   that have been made against a number of people and

18   public comments which are not part of the record, and

19   I'm not trying to put them in the trial record here, by

20   Mr. Brown concerning the jurors in the last trial, I'm

21   extremely concerned.

22           I did two minutes' worth of research this

23   morning of First Circuit law with respect to anonymous

24   juries, and I don't know what the Court's options are,

25   but if there's a way to order that the identities of the

1   jurors which have not yet been made public remain

2   anonymous for a certain period of years, I think it

3   would be prudent to do.

4          THE COURT:  All right.  I'm going to get

5   counsel on both sides to think about that, government.

6          MR. IACOPINO:  I didn't understand one thing

7   that Mr. Huftalen said.  You said something about it

8   being Keene?

9          MR. HUFTALEN:  I will give you the copy of the

10  posts and you can look at that.

11         THE COURT:  Counsel, put together whatever

12  authority you'd like in this regard and I will talk to

13  you tomorrow morning with regard to where we go on that

14  issue.

15         MR. HUFTALEN:  Thank you.

16         MR. LANGE:  Your Honor, I assume you have not

17  changed your mind at this point with regard to a

18  justification instruction.

19         THE COURT:  I have an open mind on the issue.

20  I think it's a tough hill to climb with the defendants.

21  I'm convincible.  But I have to be blunt with you, it

22  seems difficult under the circumstances, though please

23  understand that -- file whatever you want and try to

24  persuade me however you wish.  It's a difficult issue

25  under the best of circumstances, for instance, the Lahey

1    case, very difficult here under these circumstances.

2    But I'm convincible.

3              MR. LANGE:  Thank you.

4              MR. HUFTALEN:  Mr. Iacopino, you can keep that

5    copy of the blogs that are referred to, and I will get

6    copies for Mr. Lange.

7              THE COURT:  First thing we're going to do is

8    I'm going to talk to the jury and ask about these names.

9    If someone knows them I will call them over to side bar

10   and see where we go.  If no one does, then we'll move

11   along.  Have your client not on the stand.

12             MR. IACOPINO:  Okay.

13             THE COURT:  Have him next to you because it

14   may be necessary for us to talk to a juror at side bar.

15   Anything else, counsel?

16             MR. HUFTALEN:  No.

17             THE COURT:  All right.  See you in court.

18                        BEFORE THE COURT

19             MR. HUFTALEN:  One matter, your Honor.

20   Yesterday I read into the record a stipulation to

21   Government's Exhibit 46, and you instructed me to read

22   it to the jury when we came back and I didn't.

23             THE COURT:  All right.  We'll do it right now.

24   First I'm going to take care of the witness issues and

25   then you can read it in front of the jury.  Bring in the

1  jury, please.

2          THE CLERK:  Yes, your Honor.

3               BEFORE THE JURY

4          THE COURT:  Members of the jury, good morning.

5  Thank you for being so prompt this morning.  You

6  remember that during the jury selection process I read a

7  list of possible witnesses to find out if anybody knew

8  anyone.  I have two more names as possible witnesses.  I

9  don't know if they will be or not obviously.  If

10  anybody -- does anybody know, have any personal

11  relationship, relative of, etc., of Christine Arvizu of

12  White River Junction, Vermont?  Just raise your hand if

13  the answer is yes.

14          All right.  There's no one raising their hand.

15  Number two, Sean Farnsworth of Rumney, New Hampshire.

16  No one raised their hand.  All right.  Thank you very

17  much, members of the jury.

18          And Mr. Huftalen.

19          MR. HUFTALEN:  Thank you, your Honor.  The

20  government and counsel for the defendants and the

21  defendants through them have reached a stipulation which

22  I'd like to read into the record at this time.

23          THE COURT:  You may.  Ladies and gentlemen,

24  you remember I told you at the beginning during my

25  preliminary instructions that sometimes the two sides or

1   the three sides will agree on something; so it's not

2   necessary to present a witness.  This is such a

3   stipulation.  Go ahead.

4           MR. HUFTALEN:  Thank you, your Honor.  It's

5   marked as Government Exhibit 46 and it's captioned in

6   this case and reads as follows:  Stipulation, the

7   government and both defendants, Edward Brown and Elaine

8   Brown through respective undersigned counsel, stipulate

9   that Government Exhibits 8b, 8c, 8d, 8e, 8f, 8g, 8h, 8i,

10  8j, 8k, 8L, 8m, 8n, 8o, 8p, 8q, 8r, 8s, 8t, 8u, 8v, 8w,

11  9a, 9b-1, 9b-2, 9b-3, 9c-1 through 9c-10, 9c-11, 9c-12,

12  9d, 9e-1 through 9e-7, 9f-1 and 11j all contain

13  gunpowder.  And then there are signatures of counsel.

14          THE COURT:  All right.  Ladies and gentlemen

15  of the jury, you can accept that evidence as true, give

16  it whatever weight you believe that it deserves.

17  Anything else with regard to that stipulation, counsel?

18  I hear nothing.

19          MR. HUFTALEN:  Nothing.

20          THE COURT:  All right.  And, Mr. Brown, you

21  may take the stand.  Please be seated.  You are still

22  under oath. You may proceed.

23          MR. HUFTALEN:  Thank you.

24              CROSS-EXAMINATION (cont'd)

25  BY MR. HUFTALEN:

1          MR. HUFTALEN:  Mr. Brown, good morning.

2          Q.   Mr. Brown, during Mr. Lange's opening

3     statement when you were in the courtroom, you heard him

4     say that your wife returned to you after having spent

5     some time away from the home in January and February of

6     2007.  Is that true?

7          A.   She returned to me; that's correct.

8          Q.   And before returning to you, she had been

9     living in Massachusetts.  Is that what you understood?

10         A.   Yes, yes.

11         Q.   Mr. Lange described her as a -- I believe one

12    of the words he used was a devoted wife.  Would you

13    agree with that characterization?

14         A.   Absolutely.  We have been together 24 years.

15         Q.   You consider your relationship with your wife

16    to be an important and sincere relationship?

17         A.   There is nothing more important to me in the

18    world than my wife except God.

19         Q.   And would it be fair to say that over the

20    years you've come to share beliefs?

21         A.   We're on the same path in life.

22         Q.   And with respect to some of the beliefs that

23    you articulated yesterday concerning fear of the

24    government, does she share those with you?

25         A.   Sir, I am the government in this country.  I

1  don't fear myself.  I fear the criminal element in

2  government.  The public service changed the direction of

3  their endeavors in terms of how they represent us.

4          Q.   Mr. Brown, while you and your wife were at

5  your home between February of 2007 and October of 2007

6  you made a number of statements through the media.  Is

7  that right?

8          A.   That's correct.

9          Q.   And oftentimes you made statements through

10  radio shows, be they local broadcasts or Internet radio.

11  Is that also true?

12          A.   Yes.

13          Q.   And is it also true that on many occasions you

14  and your wife were together speaking, each of you,

15  during those radio broadcasts?

16          A.   Yes.

17          Q.   In particular are you familiar with the

18  Republic Broadcast Network?

19          A.   I'm familiar with it.

20          Q.   Known commonly as RBN?

21          A.   Yes.

22          Q.   RBN, or the Republic Broadcast Network,

23  carried on almost a daily radio show called Ed Brown

24  Under Siege; is that right?

25          A.   That's correct.

1        Q.   And you oftentimes called in and spoke with a

2   host and with callers on that show; did you not?

3        A.   Yes.

4        Q.   And on a number of occasions did your wife

5   participate in those conversations with you?

6        A.   Yes.

7        Q.   Would it be fair to characterize those

8   comments by you as comments to your supporters?

9        A.   No.  To the world, sir.

10       Q.   To the world.  Okay.  Was the purpose in those

11   statements by you to let the world know who you were and

12   what you were doing?

13       A.   No.  The statements were to warn the world of

14   the danger that they are in, the same as John F. Kennedy

15   did prior to his assassination.

16       Q.   And with particularity, were you warning the

17   world of the dangers --

18            MR. IACOPINO:  Objection, your Honor.  May we

19   approach?

20            THE COURT:  You may.

21                        AT SIDE BAR

22            THE COURT:  Go ahead.

23            MR. IACOPINO:  Your Honor, I object.  This is

24   well beyond the scope of direct examination.  It's an

25   area in which I was actually prohibited from addressing

1   this particular witness on direct examination by the

2   Court, and it's political statements that are irrelevant

3   to the issues before the Court.  On that basis, your

4   Honor, I don't think he should be permitted this line of

5   cross-examination.

6          I would also point out that although I respect

7   Mr. Huftalen, I think that this line of

8   cross-examination could be perceived to be an effort to

9   agitate this defendant in his behavior on the witness

10  stand.

11         THE COURT:  I don't think your client is being

12  agitated at all.  I think he's much calmer than he was

13  yesterday.  And number two, I think these are

14  preliminary questions; so Mr. Huftalen is trying to set

15  a foundation for later questions and I'm going to deny

16  it.

17         MR. HUFTALEN:  Yes.  Thank you.

18                    IN OPEN COURT

19  Q.   Mr. Brown, let me ask you that question in a

20  different way.  Would it be fair to say that your

21  comments on RBN on the Ed Brown Under Siege radio show

22  during the time frame between February '07 and October

23  '07 were designed by you in particularity to warn the

24  world, as you say, of the dangers specifically

25  identified in your particular situation?

1      A.   No.

2      Q.   Did you speak about your particular situation,

3  and by that I mean the fact that you were at your home

4  and that the Marshal Service was making attempts to

5  arrest you.

6      A.   Well, of course they weren't there to arrest

7  me.  They were attempting to create a scenario of arrest

8  and allusion that we were the bad guys.  That's all they

9  were doing.  They had to do it that way.  That's why

10  they didn't try to speak to us a few weeks earlier in a

11  public manner.

12      Q.   Mr. Brown, do you remember speaking on that

13  show on March 20th, 2007, with your wife by your side

14  speaking as well about the position you had taken?

15      A.   How could I know?  I don't remember any

16  particular date.  I don't remember most of the

17  conversations we've had or things I've even said over

18  the year.

19      Q.   Let me ask you with particularity, do you

20  recall on March 20, 2007, in response to statements by

21  you that people had to make a stand, your wife said, and

22  I quote, you've got to defend with all the force you

23  need to defend with.  Do you recall words to that

24  effect?

25      A.   No.  But I maintain on the stand absolutely

1   the position that all Americans have had to take from

2   its inception, this country since its inception against

3   the same people, and it's happening again now with the

4   same people by the way.

5       Q.   Let me ask you if you recall immediately

6   thereafter those statements by she that you said:  And

7   how far and much force will you need to do if necessary

8   under the law?  Do you remember saying that?

9       A.   No.  But whatever the law dictates.  I would

10  have probably stated something that the law had said or

11  one of our forefathers had said more than likely.

12      Q.   And do you remember in response to your

13  question Mrs. Brown saying on March 20th, '07, "To the

14  death."  Do you recall her using those words?

15      A.   Sir, I don't recall words that were used from

16  my wife this morning barely.  No.  She may have said

17  that.  I don't know.  If it's recorded, you would know

18  that already, and if that's the case, that's the case.

19  I don't remember personally, no.

20      Q.   And do you recall whether or not in response

21  to that you said, "To the death.  Do you hear it, ladies

22  and gentlemen?"

23      A.   Oh, sir, again, I repeat to you.  This country

24  was founded to take that kind of position.  We live in a

25  live free or die state.  Do you understand what that

1    means, sir?

2        Q.   Mr. Brown, about a minute and a half or a

3    minute and 40 seconds later, do you recall your wife

4    saying, "We don't know how this will end, but there's

5    only two ways we're coming out of here, as a free man

6    and a free woman or in body bags."  Do you recall her

7    saying that?

8            MR. IACOPINO:  Objection, hearsay.

9            THE COURT:  Overruled.

10       A.   I'm sorry, I don't remember her saying that.

11   If I clearly remembered, I would tell you that.  I don't

12   remember her saying that.

13       Q.   Do you remember her using that phrase numerous

14   times in many public statements thereafter?

15       A.   She may have even heard me use that statement,

16   you know, if that's the case.  The federal government

17   has used it several times and that's probably why you

18   originally had picked it up.

19           THE COURT:  The jury will disregard the last

20   part.

21           THE WITNESS:  Of course.

22           THE COURT:  Mr. Brown, don't start.

23           THE WITNESS:  Of course.  You asked me --

24           THE COURT:  Mr. Brown --

25           THE WITNESS:  -- to speak the whole truth,

1    sir.  I will speak the whole truth and nothing but the

2    truth so help me God.  If you try to delay me, sir,

3    we'll have this confrontation.

4              THE COURT:  Mr. Brown, you have to obey the

5    rules of the court.

6              THE WITNESS:  Sir, there are no rules except

7    the ones that you make, sir, for your own personal

8    enrichment.  That's a fact of record.  Would you like to

9    have me bring that record forward, sir, to show the

10   jury?  I will be glad to do so.

11             THE COURT:  Jury's excused.

12             THE WITNESS:  Yes.

13             (Jury left courtroom.)

14                     BEFORE THE COURT

15             THE COURT:  Mr. Brown, you can go back to your

16   counsel.  Be seated.  I'll hear from the government with

17   regard to possible sanctions.

18             MR. HUFTALEN:  Your Honor, although there are

19   a number of other questions I'd like to ask Mr. Brown, I

20   believe I've had a fair and full opportunity to

21   cross-examine him and I will ask no further questions at

22   this point, and I would request that his, both direct

23   and cross, not be stricken from the record.  With

24   respect to his continuing misbehavior, I respectfully

25   request that if he continues to interrupt the

 1    proceedings, that he be removed from the courtroom.

 2              THE COURT:  Mr. Iacopino, your position?

 3              MR. IACOPINO:  Your Honor, we certainly oppose

 4    any decision by the Court to strike Mr. Brown's direct

 5    testimony, and in doing so I would rely on United States

 6    versus Bartelho, 129 Fed. 3d, 663, which in summary

 7    states that if defendant's behavior interferes with the

 8    cross-examination and prohibits the government from

 9    getting a fair cross-examination, then the appropriate

10    remedy might be to strike his direct testimony -- strike

11    all of his testimony.

12              However, your Honor, I don't think that that's

13    been the case here.  The government's made a

14    representation to you they believe they have had a full

15    and fair opportunity to cross-examine the defendant, and

16    I would point out for the record that the defendant's

17    comments that are causing difficulty here are not in

18    terms of providing information in the questions.  They

19    are in nature of the defendant's remarks towards the

20    Court.  And I don't think that these cases address that,

21    and I don't think that an appropriate remedy for a

22    contemptuous remark to the judge is in fact the striking

23    of the testimony.  I think that's where you are

24    required, your Honor, to balance the defendant's Sixth

25    Amendment right to a trial and to a fair trial and to

1   his right to testify against what other sanctions you

2   might impose on a condemnor in your court.  I think the

3   appropriate way to deal with any sanctions for contempt,

4   your Honor, would be in a separate hearing at the

5   conclusion of these proceedings and not during the

6   course of these proceedings.  And that would be our

7   response to you.

8           THE COURT:  All right.  Mr. Lange, do you have

9   a position?

10          MR. LANGE:  Yes, your Honor.  I would ask that

11  his testimony not be stricken.

12          THE COURT:  All right.  I'm not going to

13  strike his testimony at this point.  Mr. Brown has in

14  the way he's answering the questions, refusing to answer

15  the questions directly, and is deliberately refusing to

16  obey the rules of court.  I'm warning Mr. Brown that if

17  he continues his disruptive behavior, he will be removed

18  from the courtroom, just so he's aware of what happens.

19  That will happen even though he's in the midst of being

20  examined.  He can return to the courtroom if he promises

21  to obey the court rules.  Are we ready for the jury?

22          MR. HUFTALEN:  Government's ready.

23          MR. IACOPINO:  Yes, your Honor.

24          THE COURT:  Bring in the jury.

25                          BEFORE THE JURY

1          THE COURT:  Mr. Brown, you may resume the

2     stand.

3          MR. HUFTALEN:  No further questions, your

4     Honor.

5          THE COURT:  Thank you.  Mr. Lange?

6                    CROSS-EXAMINATION

7     BY MR. LANGE:

8          MR. LANGE:  Good morning, sir.

9          THE WITNESS:  Good morning, sir.

10          MR. LANGE:  I just have a couple points I want

11     to clarify.

12     Q.    First of all with regard to the Tannerite

13     that's been discussed during the course of this trial,

14     what part, if any, did Elaine play with regard to

15     anything involving the Tannerite?

16     A.    Nothing.

17     Q.    With regard to the Goex cans or the various

18     other cans of black powder, some of which were described

19     as having a fuse in the top and some of which were

20     described as having nails taped around them, what part,

21     if any, did Elaine have with regard to any of those

22     items?

23     A.    Nothing.

24     Q.    There was a basket of -- looked like plumbing

25     parts, items had been assembled that several of the ATF

1    witnesses testified about.  Do you remember where that

2    basket was?  There was a basket -- do you remember or

3    you don't?  It was a basket.  I don't remember if these

4    were the pipes with the cotter pin --

5         A.   Correct.

6         Q.   -- or if they were the pipes with the hole in

7    the middle.  Do you remember the basket?

8         A.   My wife had nothing to do with any of that --

9    those devices, nothing.

10        Q.   So that's true with regard to what's been

11   described as the pipe bombs?

12        A.   That's what they called them, yes.

13        Q.   That's true with what has been described as

14   the zip guns or booby traps?

15        A.   They were neither zip guns nor booby traps.

16   They were merely sound signaling devices.  And they

17   didn't work anyway.  That's why I put them back in the

18   house.

19        Q.   Earlier in the trial there was a photograph of

20   a portion of a tree trunk in your yard, and there was a

21   wire going out and there was some debris around the

22   wire.  What was that?

23        A.   Correct.  That was a test with one of the

24   sound devices to see if they would work.  We found --

25   they found the one shell.  I noticed it was the one --

1   we finally forced it to make it work, but they were no

2   good.  The springs weren't strong enough to make them

3   work; so we got rid of them.

4       Q.   What part, if any, did Elaine have with regard

5   to those items?

6       A.   Nothing.

7            MR. LANGE:  Those are my questions.

8       A.   Wasn't even present.

9            THE COURT:  Thank you, Mr. Lange.  Mr.

10  Iacopino, redirect.

11           MR. IACOPINO:  Thank you, your Honor.  Your

12  Honor, may I just approach the witness with Exhibit 5p

13  which was introduced during cross-examination?

14           THE COURT:  Of course.

15           MR. IACOPINO:  I'm sorry, your Honor.  I

16  should have grabbed it before.

17           THE COURT:  Take your time.

18                   REDIRECT EXAMINATION

19  BY MR. IACOPINO:

20      Q.   Mr. Brown, I'm going to show you what was

21  marked during your cross-examination as Exhibit 5p,

22  okay?  And the exhibit that was presented to you by the

23  government has one, two, three, four pages.  Would you

24  just take a quick look at those four pages, and tell me

25  if pages three and four are simply another list of the

1    same guns that are contained on page one and two?

2        A.   That's correct; they are just redundancies.

3    Those pages are the same as page one.  Page four is the

4    same as page one.

5        Q.   So anybody who reviews this exhibit should

6    understand that if -- they can't just count all the way

7    through the four pages and determine a number of weapons

8    from that.

9        A.   Oh, of course not.  That's how the U.S.

10   Attorney's Office operates.

11       Q.   Mr. Brown, towards the end of your testimony

12   you were asked by Mr. Huftalen about comments that

13   you've made on various public radio shows.  Do you

14   recall that series of questions?

15       A.   Yes, sir.

16       Q.   And you told him that you did in fact make

17   such comments; correct?

18       A.   That's correct.

19       Q.   In fact on WFRB radio in an interview with a

20   gentleman by the name of Chris Fazio did you not tell

21   the public that shots were fired by the government on

22   June 7th and that changed the whole complexion of the

23   situation?

24           MR. HUFTALEN:  Objection.

25       A.   Correct.

 1            THE COURT:  Just a second.

 2            MR. HUFTALEN:  Objection.

 3            THE COURT:  Basis?

 4            MR. HUFTALEN:  Hearsay.

 5            MR. IACOPINO:  Government's opened the door.

 6            THE COURT:  You're allowed.

 7       Q.   Did you tell the public that?  That on

 8  June 7th shots were fired by the government and that

 9  changed the whole complexion of the situation?

10       A.   That is correct.

11       Q.   Did you also make a statement to the public on

12  the radio that the police had decided that they were

13  going to kill Ed and Elaine for a few bucks even though

14  Ed indicated that he would pay if the government would

15  show him the law that required him to pay it?

16       A.   That's correct.

17            MR. HUFTALEN:  Objection.

18            THE COURT:  Just a second.  Objection is

19  sustained.  Jury will disregard his answer.

20       Q.   Did you tell the public in a radio interview

21  of Mr. Fazio that there was no crisis situation at the

22  Brown residence prior to June 7th, but that the

23  government was trying to incite the crisis situation by

24  its actions on June 7th, but it didn't work and it

25  wouldn't work?

 1      A.   That's right.

 2           MR. HUFTALEN:  Objection, hearsay, move to

 3  strike.

 4           THE COURT:  Sustained.  The jury will

 5  disregard.

 6           MR. IACOPINO:  Your Honor, may I approach on

 7  this?

 8           THE COURT:  No.  Move on.

 9           THE WITNESS:  Good job.

10           THE COURT:  Hold it.  Mr. Brown, out of the

11  courtroom.  Take him out.

12           THE WITNESS:  You'd do well for a prosecutor,

13  Judge.  You'd do well.

14           THE COURT:  The jury.

15           (Jury left courtroom.)

16                     BEFORE THE COURT

17           THE COURT:  The record will reflect that after

18  I sustained the last objection, Mr. Brown talked to the

19  Court, smirked, and muttered "good job" to the Court.

20  This is one of multiple times Mr. Brown has been

21  contemptuous, and I've warned him.  He is to remain out

22  of the court until he can behave himself.  We're going

23  to take a five-minute recess.  Mr. Iacopino, talk to

24  your client.  Tell him he's free to reenter the court

25  when he's able to behave, follow the court orders, and

1    not be contemptuous to the Court.  We'll take a

2    five-minute recess.

3              (Brief recess taken.)

4                        BEFORE THE COURT

5              THE COURT:  Mr. Iacopino, your client I see is

6    not present.

7              MR. IACOPINO:  No, he's not, your Honor, but

8    that's only because I -- when the court staff asked me,

9    I said I'd rather address you.  I have spoken to my

10   client.  The last thing that he indicated to me before I

11   left was that he would try to follow your instructions,

12   and so I didn't know if that was going to satisfy the

13   Court or not; so that's why I came out to report that to

14   the Court.

15             THE COURT:  Mr. Lange, do you have a position?

16             MR. LANGE:  No, your Honor.

17             THE COURT:  Government?

18             MR. HUFTALEN:  If he behaves himself, I think

19   he should be in the courtroom.

20             THE COURT:  Bring Mr. Brown in, put him back

21   on the stand, please.  We'll give it one more try.

22             (Mr. Brown resumed the stand.)

23             THE COURT:  Ready for the jury?

24             MR. HUFTALEN:  Yes.

25             THE COURT:  Bring in the jury, please.

```
 1                    BEFORE THE JURY

 2           THE COURT:  Mr. Iacopino?

 3           MR. IACOPINO:  Thank you, your Honor.

 4      Q.   BY MR. IACOPINO:  Mr. Brown, did you give an

 5  interview on June 8, 2007, to Republic Broadcasting

 6  Network?

 7           MR. HUFTALEN:  Objection.  May we approach?

 8           THE COURT:  Yes.

 9                     AT SIDE BAR

10           MR. HUFTALEN:  I object to the continuing line

11  of questions that Mr. Iacopino knows are going to draw

12  hearsay objections and I believe may be designed to make

13  the government look like the obstructionist in this

14  trial.  To the extent he's eliciting hearsay statements

15  which are statements made by Mr. Brown, they are

16  self-serving, they are hearsay, and I don't believe

17  there's any legitimate hearsay exception upon which a

18  basis of admissibility could be made.

19           THE COURT:  What's the expected response?

20           MR. IACOPINO:  Your Honor, the expected

21  response is on that date he did give such a statement

22  and that he specifically told people not to come to New

23  Hampshire and that he did not want people coming up to

24  the residence.  This is a day after Danny Riley was

25  tasered at the home, and I believe that the government
```

1    in their cross-examination has opened the door to every

2    public statement that my client's made because they have

3    picked and they have chosen amongst many to put in front

4    of this jury, and we have the right to show that my

5    client was not out there continuously making these

6    public statements that he's left the jury with the

7    impression that they have made.

8             And they started this with the indictment,

9    your Honor.  The indictment contained a number of overt

10   acts that asserted that various people were making

11   public statements.  Now, I understand that those have

12   been removed from the indictment at this point on my

13   motion, but the fact is that this is an issue that was

14   created by the government, and we have the right to make

15   sure that this jury understands that my client was not

16   out there continuously trying to rile people up or to

17   come up to New Hampshire or to cause violence or

18   trouble.

19             MR. LANGE:  I join.

20             THE COURT:  I'm not clear what exception to

21   the hearsay rule you are asserting here, either one of

22   you, Mr. Lange or Mr. Iacopino.

23             MR. LANGE:  Yes, your Honor.  It's the

24   doctrine of rule of completeness, once the government

25   opened the door by bringing in the defendant's

1    statements.

2            THE COURT:  That's Rule --

3            MR. LANGE:  104?

4            THE COURT:  It's 106, remainder of writings or

5    recorded statements.  Is that the one you are talking

6    about?

7            MR. LANGE:  Yes, your Honor.

8            THE COURT:  Is this part of a statement that

9    the government referred to or a separate statement?

10           MR. IACOPINO:  We don't know because the

11   defendant when he was questioned by the government

12   didn't know what dates he made various particular

13   statements, but the impression that's been left with

14   this jury, your Honor, from the cross-examination is

15   that my client had made -- was making such statements.

16   It also leaves the impression that my client acted

17   willfully, bringing a state of mind into state here,

18   your Honor, and I would respectfully submit that under

19   these circumstances, under both 803(3) and under the

20   catch-all provision, this is appropriate evidence to be

21   presented through his direct examination.

22           THE COURT:  As far as the catch-all provision,

23   I see no indicia of reliability on that statement at

24   all.  As far as Rule 106, if you can lay a foundation

25   that it was part of another statement, I will deal with

1    it.  Do you have another rule that you want to refer to?

2            MR. IACOPINO:  Not at this point, your Honor.

3            THE COURT:  All right.  That's out then.

4                    IN OPEN COURT

5        Q.  BY MR. IACOPINO:  Mr. Brown, I'm going to

6    change tracks for a moment, okay?  During your

7    cross-examination you were asked about the fact that at

8    some of the jamborees and the barbecue that was had at

9    your home, children were present.  Do you recall that

10   series of questions by Mr. Huftalen?

11       A.  Yes, I do.

12       Q.  At any point in time when visitors came on

13   your property, were there ever booby traps set out?

14       A.  No.  That's in itself -- of course not.

15       Q.  Were there ever any kind of explosives

16   available to anybody?

17       A.  No, sir.

18       Q.  Were guns left around for children to find?

19       A.  No, sir.

20       Q.  Was your property made safe for any children

21   and families that may come up?

22       A.  That's correct, sir.

23       Q.  He also asked you about those jamborees and

24   about aircraft.

25       A.  Yes, sir.

1      Q.   And at the second jamboree did aircraft come

2   over your home?

3      A.   Yes, sir.

4      Q.   Please explain to the jury what type of

5   aircraft and the conduct of that aircraft.

6      A.   It was a helicopter with two or three

7   personnel inside of it.  You could see them clearly

8   because they were just at treetop level.  They came in

9   at approximately -- I believe it was around one o'clock,

10   around there sometime, and they stayed for eight hours

11   and hovered and circled and circled and hovered just

12   above the tops of the trees.  We were concerned many

13   times throughout the day that if anything should happen,

14   if it crashes with the crowd that was down below.  We

15   asked them to retire.  They refused.  We called the

16   Lebanon Airport.  The same thing.  They said that they

17   could not --

18            THE COURT:  That's it.  Stop.  You are moving

19   into hearsay.  Move on, next question.

20      Q.   Is it fair to say that the aircraft bothered

21   you enough you tried to take action to stop it?

22      A.   Excuse me?

23      Q.   Is it fair to say that the aircraft was

24   bothersome enough that you tried to take action to stop

25   it by calling somebody with authority?

1     A.   That's correct.  They were like right here,

2   absolutely.

3     Q.   Thank you.  On June 7th, 2007, how did you

4   learn about the presence of armored cars and things of

5   that nature in the area of your home?

6     A.   After a distress fire as I testified earlier

7   standing out in front, within about three or four

8   minutes or so, a cellphone rang.  I picked it up.  The

9   caller simply said there was APC, armored personnel

10  carrier, heading south on 12A toward our home with three

11  state troopers in cruisers in the front and three state

12  troopers in the back, and they said they had seen one

13  earlier, probably about an hour prior to that, the same

14  kind of situation.

15    Q.   How did that make you feel?

16    A.   I panicked almost.  I decided they're coming

17  now.

18    Q.   What did you think the armored personnel

19  carrier and the various state trooper vehicles -- what

20  did you think their purpose was?

21    A.   I know what their purpose was.  Their purpose

22  is to assault.  That's what they do.  That's the only

23  reason they'd be in the area is to assault.

24    Q.   Assault who?

25    A.   Me.  Who else?  I was already in speculation

1    after what's already happened prior with the helicopter

2    circling over and everything else.  I knew.  It was

3    building, constantly building.  U.S. Attorney's Office

4    kept building them up.

5              THE COURT:  All right.  Ask another question.

6         Q.   Why did you pick up that 50-caliber on

7    June 7th?

8         A.   Defense.

9              THE COURT:  Ask another question.

10        Q.   Defense of what?

11        A.   Defense of my life and property, my wife.

12        Q.   After June 7, 2007, did you want people to

13   come up to your property?

14        A.   Not like they were before, no.

15             MR. IACOPINO:  Thank you.  I have no further

16   questions.

17             THE COURT:  Thank you, Mr. Iacopino.

18   Government, questions?

19             MR. HUFTALEN:  Very, very briefly, your Honor.

20             THE COURT:  Go ahead.

21                      RECROSS-EXAMINATION

22   BY MR. HUFTALEN:

23        Q.   The last question Mr. Iacopino asked you, I

24   think he said after June 7th you didn't want people to

25   come to your property.  Is that right?

1          A.    Not as much, sir.

2          Q.    But it was after June 7th that you had the

3     jamboree and the barbecue and the parties; is that

4     right?

5          A.    That's correct.  I didn't set any of that up.

6     They came on their own, sir.  After June 7th I was

7     discouraging it.  They came in anyway from all over the

8     country.

9          Q.    Okay.  So the jamboree that was on your

10    property you didn't want to happen.  It was other people

11    that came and did it?

12         A.    That's correct.

13         Q.    And the barbecue in July, you didn't want that

14    to happen.  It was the other people who made you do

15    that?

16         A.    No, I didn't.  That's correct.

17              MR. HUFTALEN:  Okay.  Thank you.  Nothing

18    further.

19              THE COURT:  Mr. Lange, questions?

20              MR. LANGE:  No, thank you.

21              THE COURT:  Mr. Iacopino?

22              MR. IACOPINO:  Nothing further, your Honor.

23              THE COURT:  Thank you, Mr. Brown.  You may

24    step down.

25              (End of excerpt.)

```
 1              THE COURT:  Call your next witness, Mr.

 2   Iacopino.

 3              MR. IACOPINO:  We rest, your Honor.

 4              THE COURT:  All right.  Mr. Lange, call your

 5   first witness.

 6              MR. LANGE:  I call Christine Arvizu.

 7              THE COURT:  Let me see counsel for a moment.

 8                        AT SIDE BAR

 9              THE COURT:  Mr. Lange, are there any Fifth

10   Amendment issues with this witness?

11              MR. LANGE:  No, there are none with any of the

12   witnesses that I'm aware of.

13              THE COURT:  Very good.  Thank you.

14                      IN OPEN COURT

15              THE COURT:  Swear the witness, please.

16                      CHRISTINE ARVIZU

17   having been duly sworn, testified as follows:

18              THE CLERK:  For the record, if you'd please

19   state your name and spell your name.

20              THE WITNESS:  Christine Arvizu,

21   C-H-R-I-S-T-I-N-E, A-R-V-I-Z-U.

22              THE COURT:  You may proceed.

23                    DIRECT EXAMINATION

24   BY MR. LANGE:

25              MR. LANGE:  Good morning, ma'am.
```

1          THE WITNESS:  Good morning.

2     Q.   What town do you live in?

3     A.   White River Junction, Vermont.

4     Q.   What sort of work do you do, or do you work?

5     A.   Right now I don't.  Since I was diagnosed with

6  cancer eight weeks ago I haven't been working.

7     Q.   What kind of work were you doing before then?

8     A.   I did respite care for children for the last

9  five years, and before that I did cancer research.

10          THE COURT:  Move a little closer to the mike,

11  if you would, ma'am.  Thank you.

12          MR. LANGE:  Elaine, will you stand up.

13     Q.   The woman standing up, do you know her?

14     A.   Yes.

15          MR. LANGE: Thank you.  You can step down.

16     Q.   How do you know her?

17     A.   Originally I went to her as a dentist when I

18  had a sort of out of control problem with my mouth, and

19  I met her at her dentist office.

20     Q.   Was that the one in West Lebanon?

21     A.   Yes.

22     Q.   Do you remember approximately how long ago

23  that was?

24     A.   I would say approximately two years.

25     Q.   What was the difficulty that caused you to go

1    to her?

2         A.   Well, I have usually gone to a dentist in

3    Canada, but I had some kind of an issue in my mouth.  It

4    was a throbbing, throbbing problem and I didn't have

5    time to get up to Canada.  So I'd heard she had a good

6    reputation; so I gave her a try, and she did an

7    excellent job finding out what the problem was.

8         Q.   Have anything to do with your teeth?

9         A.   No.

10        Q.   She directed you somewhere else?

11        A.   Yeah, she realized it wasn't my teeth, and she

12   was very clear about that, and she directed me to

13   consult with my doctor.

14        Q.   Now, did you go back to her again as a

15   patient?

16        A.   Yes, I did.

17        Q.   Which office did you go to?

18        A.   I went twice, one more time to her office.  I

19   told her what my doctor said, and it was angio-edema and

20   wanted her to check it again, and she most graciously

21   did and was very reasonable with her charges also.  And

22   then since she had such compassion towards me and was so

23   fair and considerate of me, I wanted to continue seeing

24   her as a dentist.

25        Q.   That second visit, that was at the Glen Road

1   office in West Lebanon?

2        A.   Yes.

3        Q.   You saw her again?

4        A.   Yes.

5        Q.   Where?

6        A.   In her home in Plainfield.

7        Q.   Now, when you went to see her at her home in

8   Plainfield, was her office set up inside the home?

9        A.   Yes, it was.

10       Q.   Before you went out there, without being

11  specific, had you heard anything about the Browns on the

12  media?

13       A.   Yes, I had.

14       Q.   Based on what you had heard about the Browns,

15  how did you feel about going up to Center of Town Road

16  and going up that driveway and going to the home?

17       A.   A little apprehensive because it isn't a

18  pleasant thing.  You are going to a place that might be

19  as described.

20            THE COURT:  Excuse me, ma'am.  Could you give

21  us a time for this visit, please.

22            THE WITNESS:  I don't remember.  I go to the

23  dentist so often I really don't keep track of --

24            THE COURT:  You don't know the year?

25            THE WITNESS:  Oh, yeah, two years ago.

```
 1              THE COURT:  So it would have been 2007?

 2              THE WITNESS:  Yeah.

 3              THE COURT:  And a month?

 4              THE WITNESS:  It was during good weather.

 5              THE COURT:  Spring or summer?

 6              THE WITNESS:  Yeah, uh-huh.

 7              THE COURT:  Go ahead.

 8         Q.   BY MR. LANGE:  What happened when you -- first

 9    of all, who met you at the door?

10         A.   Elaine.

11         Q.   Was there any obstruction or anything that

12    prevented you from getting from the road up the driveway

13    to the door?

14         A.   No, not at all.

15         Q.   Knock on the door?  Doorbell?

16         A.   Yes.

17         Q.   And Elaine met you at the door?

18         A.   Yes, she did.

19         Q.   Was there anybody else there when you got

20    there?

21         A.   No, the first time I don't remember there

22    being anyone else there.

23         Q.   Were there -- no other patients there?

24         A.   Not that I saw.  I wasn't really looking for

25    them, but I didn't notice anyone else.
```

40

1      Q.   Did she see you right away?

2      A.   I think -- yes, she did.  I think there was

3  some time when I might have been there too early and had

4  to wait, but there was -- I'd say right away the first

5  time.

6      Q.   And she took care of your teeth?

7      A.   Yes.

8      Q.   Without going into detail, what was the

9  problem?

10     A.   I had a crown that kept falling off.

11     Q.   You don't recall anybody else being there the

12  first time?

13     A.   No.

14     Q.   When you went into the house the first time,

15  were you just on the first floor?

16     A.   Yes.

17     Q.   Did you ever when you went to the house in

18  Plainfield go above the first floor?

19     A.   No, I did not.

20     Q.   Describe what you saw on the first floor.

21     A.   It was a very well-decorated pleasant sort of

22  simple type home in the sense that it wasn't cluttered.

23  It was very peaceful.  I really felt very much at ease

24  there, and I thought the decor was very tastefully and

25  very well done.

41

```
 1          Q.   Did you see any firearms?

 2          A.   No, I did not.

 3          Q.   Did you see any explosive devices?

 4          A.   No, I did not.

 5          Q.   Can you see that table over there?

 6          A.   Yes.

 7          Q.   And the table toward the other corner?

 8               THE COURT:  You're free to stand up.

 9          A.   Okay.  I can see those, yes.

10          Q.   Was there anything like that in your view on

11    the first visit?

12          A.   No.

13          Q.   And you went back?

14          A.   Yes, I did.

15          Q.   How much later did you go back?

16          A.   I would say a week or two.

17          Q.   And did you go a third time?

18          A.   Yes, I did.

19          Q.   And when was that?

20          A.   Again, maybe a week or two apart.

21          Q.   To follow up on the judge's questions, was

22    this in the summertime, warm weather?

23          A.   Yes, yes.

24          Q.   Did anything change with regard to what you

25    saw on the first floor the second time or the third
```

1    time?

2        A.    No, it did not.

3        Q.    Again, nothing like what's over on those

4    tables?

5        A.    No, nothing whatsoever.

6        Q.    Did Elaine show you around downstairs?

7        A.    Yes, she did.

8        Q.    Do you remember going to a concert at the

9    Brown home in Plainfield?

10       A.    Yes, I did.

11       Q.    Do you know whether that was in June or July?

12       A.    I'm not sure.  I'm thinking June, but I'm not

13   sure.

14       Q.    Any idea who set the concert up?

15       A.    No.  All I remember, there was a group of

16   people that were supporting Ron Paul.  I had heard it

17   about town or through a friend.  I'm not sure who set it

18   up.

19       Q.    Probably all the jurors know, but in case they

20   don't, who is or was Ron Paul?

21       A.    He was a Republican that was running for

22   president.

23       Q.    Without talking about what you discussed, did

24   you have conversations with Elaine during that concert?

25       A.    Not very much of a conversation, just

1    pleasantries.

2         Q.   Anything seem out of the ordinary with regard

3    to Elaine?

4         A.   No.

5         Q.   Was there anything that happened in any of

6    your visits to the Plainfield home which caused you to

7    be alarmed?

8         A.   Not at all.

9              MR. LANGE:  Your witness.

10             THE COURT:  Thank you, Mr. Lange.  Government,

11   cross-examination.

12             MR. HUFTALEN:  Thank you.

13             THE COURT:  Mr. Huftalen?

14                       CROSS-EXAMINATION

15   BY MR. HUFTALEN:

16        Q.   Ma'am, on the three occasions that you went

17   for dental visits, did you drive yourself or did someone

18   give you a ride?

19        A.   I drove myself.

20        Q.   And on none of those occasions did you see

21   anyone trying to stop you from going in, did you?

22        A.   No.

23        Q.   Did anyone try to stop you or question you as

24   you left the property?

25        A.   No.

1      Q.    How about when you went to the event in June

2   or July?  Did anyone try to stop you either in or out?

3      A.    No.

4      Q.    If Elaine had asked you to give her a ride

5   into West Lebanon or back to your house, would you have?

6      A.    I imagine so.

7           MR. HUFTALEN:  Thank you very much.  I have no

8   other questions.

9           THE COURT:  Mr. Iacopino, questions?

10           MR. IACOPINO:  I have no questions, your

11   Honor.

12           THE COURT:  Mr. Lange?

13           MR. LANGE:  I have no further questions.

14           THE COURT:  Thank you.  You may step down.  Do

15   you wish this witness excused?

16           MR. LANGE:  That's what I was going to bring

17   up.  If the witnesses that I call this morning choose to

18   remain, I do not intend to call them again as witnesses

19   at any point.  I don't know whether they want to remain

20   or not remain, but my request is that they be allowed to

21   if they want to.

22           MR. HUFTALEN:  I have no objection if the

23   witness is excused.

24           THE COURT:  Very good.

25           MR. LANGE:  Call Shawn Farnsworth.

45

```
 1                    SHAWN FARNSWORTH

 2   having been duly sworn, testified as follows:

 3            THE CLERK:  For the record, if you'd please

 4   state your name and spell your name.

 5            THE WITNESS:  Shawn Paul Farnsworth,

 6   S-H-A-W-N, P-A-U-L, F-A-R-N-S-W-O-R-T-H.

 7            THE COURT:  You may proceed, Mr. Lange.

 8                    DIRECT EXAMINATION

 9   BY MR. LANGE:

10            MR. LANGE:  Good morning, Mr. Farnsworth.

11            THE COURT:  Move up to the mike so we can hear

12   you.

13       Q.   Sir, what town do you live in?

14       A.   Lebanon, New Hampshire.

15       Q.   What do you do for work?

16       A.   I'm a contractor.

17       Q.   What kind of contracting do you do?

18       A.   Painting, drywall, carpentry, roofing, siding.

19   Pretty much do it all.

20       Q.   Is this a workday for you?

21       A.   Yes, sir.

22       Q.   Are you here under subpoena?

23       A.   Yes.

24       Q.   I want to go back to 2006.  Were you working

25   on the Brown property on Center of Town Road in
```

1    Plainfield, New Hampshire?

2         A.   Yes, sir.

3         Q.   I want to turn your attention to a day in May.

4    Was there a particular day in May that stands out in

5    your mind from back then?

6         A.   When the marshals showed up at the end of the

7    day.  Must be the day you're talking about.

8         Q.   It is.  Now, when you were working on the

9    property, was Ed usually there?

10        A.   Yes, sir.

11        Q.   Elaine would not be there during the day?

12        A.   No.

13        Q.   Was Ed there that day?

14        A.   No.

15        Q.   What time did you get to the job site?  What

16   time did you get to the Brown property?

17        A.   Should have been around 7:30, 8:00 at the

18   latest.

19        Q.   In the morning?

20        A.   Yes, sir.

21        Q.   Were either of the Browns there when you got

22   there?

23        A.   No.

24             THE COURT:  You said May of '06?

25             MR. LANGE:  2006.  I believe it's May 24th,

1    your Honor.

2              THE COURT:  All right.  Go ahead.

3         Q.   Do you remember what kind of work you were

4    doing that day?

5         A.   I honestly don't recall.

6         Q.   How long were you working at the Brown

7    property?

8         A.   Off and on for a couple years.

9         Q.   A fairly big job?

10        A.   Yeah.

11        Q.   So you also had a crew?

12        A.   Yes, sir.

13        Q.   How big was the crew?  How many men that day?

14        A.   That day, I believe there was five of us there

15   that day.

16        Q.   Neither of the Browns showed up all day?

17        A.   No, sir.

18        Q.   What was quitting time then?

19        A.   Four o'clock.

20        Q.   What happened around quitting time?

21        A.   We packed up tools, normally clean up the job

22   every day, got in our trucks, and just as we went to

23   take off, put our vehicles in drive and drove up the

24   driveway about ten feet and started to head out, we had

25   one vehicle in front of the driveway in front of the

1   front door, and I was heading up the hill.  So virtually

2   one guy was going around the driveway this way and one

3   was going around this way.

4        Q.   Let me ask you, what did you see -- what kind

5   of vehicle did you see coming down the driveway toward

6   the house?

7        A.   I want to say it was an Astro van, Ford Astro

8   van.

9        Q.   How many vehicles came down the driveway?

10       A.   I honestly don't recall.  I don't remember if

11   it was one or two.  I want to say it was two.  They came

12   down like this.

13       Q.   It's a circular drive.  Actually there's a

14   diagram of the house there.  And what happened when the

15   vehicles came down the driveway?

16       A.   They came down quite fast and blocked us in

17   and told us we needed to get out of the vehicles.

18       Q.   Who got out of the vehicles?

19       A.   We all did.

20       Q.   Out of your vehicles?

21       A.   Yeah.

22       Q.   Who got out of the vehicles that were blocking

23   the driveway?

24       A.   We all got out of the vehicles.  We were told

25   to get out of the vehicles.

1      Q.    Who told you to get out of the vehicles?

2      A.    The marshals did.

3      Q.    How do you know they were marshals?

4      A.    It was pretty obvious.  I mean, they had full

5   gear on.  You know, they had black gear on.  I don't

6   know what kind of guns they had, but I know they had at

7   least three or four of them.

8      Q.    You gestured as if you were holding a rifle or

9   a long gun at port arms?

10      A.    Oh, yeah.  It was a semiautomatic I'm

11   guessing.  I don't know much about guns, but it was an

12   assault rifle.

13      Q.    That got your attention?

14      A.    Oh, yeah.  It would get anybody's attention.

15      Q.    What did they tell you to do?

16      A.    They started asking me some questions about Ed

17   Brown.

18      Q.    And did you answer their questions?

19      A.    I did.  I asked them -- there was one new guy

20   on the job that day and they had gone over -- two guys

21   had gone over to one vehicle, and us three were in my

22   truck.

23      Q.    When you say two guys had gone over to the

24   other vehicle, that's two guys from your crew?

25      A.    Yes, sir.  And I had asked the marshals -- you

1    know, one guy didn't know anything about this job.  It

2    was his first day on the job.  So he wouldn't -- he was

3    probably scared pretty well.

4         Q.    What happened after that?

5         A.    I answered their quirky questions, and I got

6    in the vehicle and I realized that I had forgotten my

7    materials list for the next day and it was a pretty

8    ritual thing to grab materials in the morning on the way

9    through seeing as how the lumberyard was there on the

10   way through.  So I jumped out.  We had already gotten

11   back in our vehicles and started taking off, realized

12   that, and I got out of my vehicle and walked back in the

13   house to grab the list of materials.  Nature called and

14   I had to go to the bathroom; so I went to the bathroom

15   real quick, and just as I was coming out, one of the

16   marshals came into the house, into the dining room area,

17   and ordered me out of the house right now.

18        Q.    What else did he do besides order you out of

19   the house?

20        A.    Pretty much escorted me out of the house.

21   Asked me what I was doing in the house, and I explained

22   to him I was grabbing my block of wood that had the

23   materials list that was sitting on the counter in the

24   kitchen, explained to him that I had gone to the

25   bathroom, and pretty much escorted me out of the house.

1      Q.   You told the jury a few moments ago that they

2   asked quirky questions.  Did they want to know about

3   firearms?

4      A.   They had asked me -- and they had asked the

5   other guys -- pretty much all of us were there at that

6   point together.  The quirky questions were, asked me if

7   I had ever seen Ed do anything strange with guns.  And

8   my answer to that question was no.  Asked me if I had

9   ever seen Ed go in the woods with any guns or explosives

10   or any things.  No.  Asked me if I had ever seen Ed

11   display any weird actions towards the government at all.

12   Once again, no.  Asked me if I had ever been in the

13   woods.  I explained to them that I was there to build a

14   house.  I wasn't there to poke through somebody's woods.

15   I was there to do my job and get it done and that was --

16   you know, they were just oddball questions.  They were

17   just questions out of the ordinary.

18      Q.   Did you want to be involved in any of this?

19      A.   I don't want -- didn't want to be involved in

20   any of this, no.  I think they are great people and we

21   were doing what they wanted me to do at the house and

22   was building a beautiful house and didn't think that

23   nothing would ever become of it, so that's why I carried

24   on.  We all carried on.

25      Q.   Came back and worked some more the next day?

1          A.    Yes, sir.

2                MR. LANGE:  Your witness.

3                THE COURT:  Thank you, Mr. Lange.  Government?

4                          CROSS-EXAMINATION

5    BY MR. HUFTALEN:

6                MR. HUFTALEN:  Mr. Farnsworth, good morning.

7    My name is Arnold Huftalen.  I'm an Assistant United

8    States Attorney.  I just have a couple questions for

9    you.

10               THE WITNESS:  Sure.

11         Q.    Did you know why the Deputy U.S. Marshals were

12   there that day?

13         A.    I figured it out real quick.

14         Q.    They didn't tell you?

15         A.    They told me -- they told me -- they asked me

16   if I had realized that Ed and Elaine Brown had been

17   arrested.

18         Q.    And did they tell you that they were there to

19   assist getting firearms out of the house?

20         A.    I don't recall.  I don't recall that.

21         Q.    And did I understand your testimony to be that

22   you were asked questions outside in your vehicle in the

23   driveway area?

24         A.    Yes, sir.  I was asked questions twice as

25   well.

1      Q.   And then you realized you forgot something, so
2   you went back in the house?
3      A.   Um-hum.
4      Q.   They didn't stop you from going in the house
5   though, did they?
6      A.   No.
7      Q.   Once you were in, one of the deputies came
8   into the house and asked you what you were doing in the
9   house?
10      A.   Yeah.
11      Q.   And then is it your testimony that he escorted
12   you back out of the house?
13      A.   Um-hum.
14      Q.   And then you left?
15      A.   I proceeded to go about ten more feet in my
16   vehicle, and then I was ordered to stop my vehicle and
17   get out of my vehicle once again.  I got out of my
18   vehicle and I was questioned once again as three of them
19   were surrounding me asking me what I did inside.
20      Q.   On that occasion where you had just gone back
21   inside; right?
22      A.   They asked me the questions of what I was
23   doing inside, yes.
24      Q.   Did you understand the questions to be about
25   what you had done when you just went back in?  That's my

1   question.

2        A.   Yeah.

3        Q.   And then after those questions were asked and

4   answered, you left?

5        A.   I did.  They asked me if I had taken any guns

6   or anything like that.  And yes, I answered their

7   questions and moved on.

8             MR. HUFTALEN:  Thank you very much.  I have

9   nothing further.

10            THE COURT:  Thank you, Mr. Huftalen.  Mr.

11   Iacopino, any questions?

12            MR. IACOPINO:  No, your Honor.

13            THE COURT:  Mr. Lange?

14            MR. LANGE:  I have no questions.  I would ask

15   that this witness be excused.  He's free to leave the

16   courthouse?

17            THE COURT:  The witness is excused.  Go back

18   to work.

19            MR. IACOPINO:  Actually, your Honor, I do have

20   one question if I may.  I'm sorry.

21            THE COURT:  All right.  Resume the stand.  You

22   are still under oath.  Mr. Iacopino, you may proceed.

23            MR. IACOPINO:  I'm very sorry, Mr. Farnsworth.

24   Please sit down for the question.

25                              CROSS-EXAMINATION

55

1   BY MR. IACOPINO:

2        Q.   You indicated you worked for the Browns for a

3   couple of years building this house; is that correct?

4        A.   Yeah.

5        Q.   Did you start back in 2004?

6        A.   I honestly don't recall the start time.  I did

7   some work in his garage repairing some drywall.

8             THE COURT:  Just stop.  Ask another question.

9        Q.   Do you recall a time or were you aware of a

10  time when Mrs. Brown's dental office in West Lebanon was

11  searched by agents of the government?

12       A.   Yes, sir.

13       Q.   And what sticks out in your mind about that?

14       A.   They --

15            MR. HUFTALEN:  I'm going to object at this

16  point on foundational grounds.

17            THE COURT:  Lay a foundation that he has

18  personal knowledge.

19       A.   When the government had --

20            THE COURT:  Stop.

21            MR. IACOPINO:  Let me ask you another

22  question.

23       Q.   You talked today about an event that occurred

24  in 2006 when agents came to the house.  Before that,

25  some period of time before that, were you aware of

1   government agents coming to Dr. Brown's dental office in

2   West Lebanon to search it?

3       A.   Yes.  I was working at his house at that point

4   and I do recall that.

5       Q.   And did you in fact have the occasion to go

6   down to West Lebanon and see what was going on?

7       A.   Yeah.  I was going down to grab materials.

8       Q.   And where were you grabbing materials?

9       A.   I was at the block plant.

10      Q.   And where is that in relationship to Dr.

11  Brown's office in West Lebanon?

12      A.   Right above her office.

13      Q.   And did you see the government agents around

14  her office?

15      A.   Yes, sir.

16      Q.   And did you know them to be government agents

17  by what they were wearing?

18      A.   It was very obvious.

19      Q.   And what else did you see?

20      A.   I saw them jump out of their green Suburban.

21  I watched them crawl up the bank.  I watched them

22  sniper -- lay out his assault rifles and had it aimed

23  right down the hill.  As I was leaving I realized what

24  was really going on.

25           THE COURT:  Stop.  Ask a question.

57

1          Q.   Did that frighten you?

2          A.   Who wouldn't be frightened by that?

3               MR. IACOPINO:  Thank you.  I have no further

4     questions.

5               THE COURT:  Thank you, Mr. Iacopino.  Mr.

6     Lange, questions?

7               MR. LANGE:  I'd ask that he be excused.

8               THE COURT:  Does the government have --

9               MR. HUFTALEN:  No further questions.

10               THE COURT:  You're excused.  You can go back

11     to work.  Thank you.  Call your next witness.

12               MR. LANGE:  Susan Berge.

13                         SUSAN BERGE

14     having been duly sworn, testified as follows:

15               THE CLERK:  For the record, if you'd please

16     state your name and spell your name.

17               THE WITNESS:  My name is Susan Berge.  My last

18     name is spelled B-E-R-G-E.

19               THE COURT:  You may proceed.

20                      DIRECT EXAMINATION

21     BY MR. LANGE:

22               MR. LANGE:  Good morning, ma'am.

23               THE WITNESS:  Good morning.

24          Q.   What town and state do you live in?

25          A.   I live in Burrillville, Rhode Island.

1      Q.   How long have you lived in Rhode Island?

2      A.   Oh, Lordy Lou.  Since 1976.

3      Q.   What sort of work, if any, do you do?

4      A.   I write and publish a weekly stock market

5   analysis for institutional money managers here and in

6   western Europe.

7      Q.   Do you know Ed and Elaine Brown, the people

8   that are seated at the table to my right?

9      A.   Yes, I do.

10      Q.   When did you first meet them?

11      A.   I first met them I think it was late June,

12   early July of 2007.

13      Q.   How did that happen?

14      A.   I was sitting at work one day and part of the

15   stock report service that I have has scrolling headlines

16   at the top of the monitor and I noticed a headline that

17   said:  Elderly couple in stand-off with federal

18   authorities or something, and I found that headline

19   quite intriguing.  So I clicked on it and I read the

20   article, and that's how I first heard about Ed and

21   Elaine Brown.

22      Q.   What did you do after seeing what you just saw

23   on the Internet?

24      A.   I followed the story through local New

25   Hampshire papers and through whatever information I

59

1    could get on the Internet for a couple of weeks, and

2    then all of a sudden I couldn't get any more information

3    and I didn't know what happened.  I was very worried

4    that perhaps --

5              THE COURT:  Just stop.  Ask another question.

6              MR. LANGE:  You have to respond to questions.

7              THE COURT:  Don't elaborate.  Just answer his

8    questions.  He will ask you another question.

9              THE WITNESS:  All right.

10        Q.   Did you drive to their home in Plainfield?

11        A.   Yes, I did.  One Saturday morning I decided to

12   drive up there for myself to see if they were okay.

13        Q.   Do you remember what month and around what

14   date this was?

15        A.   It was late June, early July of 2007 I

16   believe.

17        Q.   How did you know where to go?

18        A.   I didn't really.  I knew the name of the town,

19   and once I got into the town, I just kept stopping at

20   little shops and antique stores and stuff and asking do

21   you know how I can get to their house.

22        Q.   Did they know?

23        A.   They knew.

24        Q.   You got to the driveway?

25        A.   Um-hum.

60

1          THE COURT:  Is that a yes?

2     A.   Yes.  I'm sorry.

3     Q.   Was there anything blocking your access to the

4  driveway?

5     A.   No, there was not.

6     Q.   Did you see anybody at the end of the

7  driveway?

8     A.   No, I did not.

9     Q.   You drove up the driveway?

10     A.   Yes.

11     Q.   What, if anything, do you remember about the

12  driveway?

13     A.   It was long.

14     Q.   Anything obstructing your access to the

15  driveway?

16     A.   No, there was nothing.  I was a little bit

17  surprised.  There was nothing up there at all.

18          THE COURT:  Stop.  Just a second.  Listen to

19  the question.  Just answer the question.

20     Q.   Did you see any sort of signs warning you as

21  you went up the driveway?

22     A.   I don't believe I did, no.

23     Q.   Did you see any physical objects which caused

24  you any type of anxiety?

25     A.   No.

1        Q.    Did either Ed or Elaine Brown know you were

2    coming?

3        A.    No.

4        Q.    Why didn't you try to contact them and let

5    them know you were coming?

6        A.    Didn't occur to me.

7        Q.    You had never met with them?

8        A.    No.

9        Q.    Had you ever communicated with them directly

10   before that day?

11       A.    No, I did not.

12       Q.    Did you go on up the driveway and go to the

13   house?  There's a diagram there in the corner.

14       A.    Yes, I drove right up so that I parked my car

15   right in the front near the front door so that they

16   could see my car and they could see who I was so they

17   wouldn't be afraid.

18       Q.    Did you get out of your car?

19       A.    Yes.

20       Q.    Was there anybody outside when you got out of

21   your vehicle?

22       A.    No.

23       Q.    Approximately what time of day was this?

24       A.    I think it was about 11, 11:30 in the morning.

25   I think it was late morning.

1    Q.   Daylight?

2    A.   Yes.

3    Q.   Did you go to the door?

4    A.   Yes.

5    Q.   Was there anybody in the door area?

6    A.   No.

7    Q.   What did you do?

8    A.   I either rang the doorbell or knocked, I can't

9    remember which, and Ed answered the door.

10   Q.   And that would be the man seated at the second

11   table?

12   A.   Yes.

13   Q.   How did you know it was Ed at that point?

14   A.   Because I had seen his picture on the

15   Internet.

16   Q.   What did you say to him?

17   A.   I said, "Mr. Brown, I've driven up from Rhode

18   Island because I've read about your case and I just

19   wanted to come up and see if you and Elaine were all

20   right."

21   Q.   Did you notice any firearms when you went into

22   the house?

23   A.   No.

24   Q.   Did you notice whether or not Ed had a pistol

25   in his waistband?

1      A.   I don't recall seeing one at that time, no.

2      Q.   You came back subsequently?

3      A.   I came back, yes, for the concert on the 14th.

4      Q.   Did he have a pistol at that time?

5      A.   I believe so, yes.

6      Q.   Now, the first meeting that you had with the

7   Browns, approximately how long did that last?

8      A.   Oh, it was about three hours.

9      Q.   I'm not going to get into the specifics of

10   what you discussed, but did you have general

11   conversation?

12      A.   Yes, we did.

13      Q.   Do you remember where the conversation took

14   place?

15      A.   In the kitchen.

16      Q.   What, if anything, did you notice about the

17   kitchen?

18      A.   It looked like any kitchen in America.

19      Q.   At any point did you feel any anxiety when you

20   were there?

21      A.   Driving up the driveway was the only time when

22   I felt a little anxious because I had read that there

23   were federal people in the woods and I was a little

24   scared about that, but once I got to the house and I met

25   Ed and Elaine, I was not afraid at all.

64

1          Q.    Did you come back a week or two later to

2    attend a concert?

3          A.    Yes.

4          Q.    Was it basically the same situation when you

5    drove up the driveway?

6          A.    Oh, there were a lot of people.  There were a

7    lot of cars and there were policemen at the top of the

8    driveway.  It was a very different situation from the

9    first time I went up.

10         Q.    Did anybody try to stop you from going up the

11   driveway?

12         A.    No, sir.

13         Q.    What were the policemen doing?

14         A.    I'm not really sure.  I guess they were

15   probably --

16               THE COURT:  Wait.  Ask another question.

17         Q.    What did you observe the policemen doing?

18   Don't speculate.  Just describe what you saw.

19         A.    I didn't observe them doing anything.  They

20   were just standing there and they had police cars on the

21   road.

22         Q.    They were not blocking access to the driveway?

23         A.    No.

24         Q.    Describe the approximate number of people who

25   were on the property for this concert.

65

1      A.    I think there were probably about a hundred.

2      Q.    Describe their ages.

3      A.    There were little children, three, four, five

4  years old.  There were people in their sixties and

5  seventies that were World War II veterans.  It was a

6  very broad range of ages.

7      Q.    Do you remember seeing anyone other than Ed

8  carrying a firearm?

9      A.    No.

10      Q.    Do you remember anything else about that

11  concert?

12      A.    Well, it was my first exposure to a

13  helicopter.

14      Q.    How so?

15      A.    Well, there was a Department of Homeland

16  Security helicopter that was buzzing around all daylong.

17      Q.    Now, do you know whether or not it was

18  Department of Homeland Security or is that just an

19  assumption?

20      A.    No.  Somebody checked the number on the

21  chopper and discovered that it was registered to the

22  Department of Homeland Security.

23      Q.    That's what they told you?

24      A.    Yes.

25      Q.    Did you meet somebody named Randy Weaver that

1  day?

2          A.   Yes, I did.

3          Q.   Who is Randy Weaver?

4          A.   Randy Weaver is a patriot who was in a

5  stand-off in Idaho with federal officials and his wife

6  and --

7               THE COURT:  Hold it.

8          A.   -- 14-year-old son were killed.

9               THE COURT:  Hold it, hold it.  Ma'am, you know

10  I said hold it.  Don't continue after I said stop.

11              Jury will disregard that.  Ask another

12  question.

13         Q.   You recognized him from media?

14         A.   Yes.

15         Q.   And you met him?

16         A.   Yes, I did.

17         Q.   And how was he conducting himself that day?

18         A.   Flawless gentleman.

19         Q.   Did you see any sort of military type presence

20  during that concert either by the government or by

21  anybody on the Browns' property?

22         A.   No, sir.

23         Q.   How was the music?

24         A.   The music was great.

25         Q.   Now, was there a second concert that you went

1    to, or did you not go to that one?

2         A.   No, I didn't go to any one after that.

3         Q.   Now, later in the summer or particularly in

4    September, was there a concert that was scheduled which

5    did not happen?

6         A.   That's correct.

7         Q.   Did you have another meeting with the Browns

8    after that and before October 4th of 2007?

9         A.   I think the last time I saw them at their home

10   was in either late August or early September.

11        Q.   Why were you up in Plainfield then?

12        A.   Well, I had brought my son back up to college

13   and I was on my way back to Rhode Island and I thought I

14   would swing by and say hello.

15        Q.   Free access up the driveway?

16        A.   Yes.

17        Q.   Did the Browns know you were coming?

18        A.   No.

19        Q.   When you got there who was there?

20        A.   Ed and Elaine.

21        Q.   Anybody else that you recall?

22        A.   No.

23        Q.   Any firearms other than the one you've already

24   described that you saw?

25        A.   No.

1      Q.   Now, did you go inside the house?

2      A.   No, I didn't.  Ed and Elaine were in the back

3  doing some gardening.

4      Q.   Had a conversation outside?

5      A.   Yes.

6      Q.   How did they seem?

7      A.   I'm sorry?

8      Q.   How did they seem, the Browns?  How did they

9  appear?

10     A.   They seemed fine.

11     Q.   If it had been possible, would you have gone

12  back to the Browns' after October 4th, 2007?  Based on

13  your contacts with them over 2007, what you saw, would

14  you have any reservations about going up there again if

15  they were there?

16     A.   Oh, not at all, no.

17          MR. LANGE:  Your witness.

18          THE COURT:  Thank you, Mr. Lange.  Government?

19          MR. HUFTALEN:  Thank you.

20                    CROSS-EXAMINATION

21  BY MR. HUFTALEN:

22          MR. HUFTALEN:  Good morning, ma'am.  My name

23  is Arnold Huftalen.  I'm an Assistant United States

24  Attorney.  I just have a couple questions for you.

25          THE WITNESS:  Um-hum.

1     Q.   It sounds as if you followed the Brown matter

2     fairly closely on the web; is that right?

3     A.   I did, um-hum.

4     Q.   Did you seek out web-based articles and news

5     stories about what was going on up there?

6     A.   Yes.   I accessed the local New Hampshire press

7     to find articles to see -- just to keep updated.

8     Q.   I think in addition to the local newspapers,

9     did you say on direct you also looked at the Internet?

10    A.   Yeah.   Well, that's how I found the

11    newspapers.

12    Q.   And when you were looking at these articles

13    about the Brown situation, did you see articles that

14    talked about the stand-off between the Browns and

15    federal authorities?

16    A.   Yes.

17    Q.   And did you understand when you were reading

18    those articles that the federal authorities had arrest

19    warrants for the Browns, or did you not follow it that

20    closely?

21    A.   That part escaped me.   I didn't -- that wasn't

22    -- I didn't pay attention to that.

23    Q.   When you followed these stories, to the extent

24    you did, did you see any statements attributable to me

25    that either Mr. Brown or Mrs. Brown -- about violence

1    that might come to law enforcement?

2                 MR. IACOPINO:  Objection.

3                 THE COURT:  Basis?

4                 MR. IACOPINO:  Beyond the scope and --

5                 THE COURT:  And?

6                 MR. IACOPINO:  Beyond the scope, your Honor,

7    irrelevant and hearsay.

8                 THE COURT:  I think it's double hearsay.

9         Q.   Okay.  When you went up there and you drove in

10   the first time and you met with them, they were polite

11   and cordial; right?

12        A.   Yes.

13        Q.   And when you left, if Mrs. Brown had said to

14   you can I hitch a ride into town, what would you have

15   done?

16        A.   I probably would have given her a ride.

17        Q.   Did you see anybody there out at the end of

18   the driveway saying you can't bring Elaine Brown out of

19   the property today?

20        A.   No.

21        Q.   How about the second time you went?  If she

22   had asked can you give me a ride to town, would you have

23   given her a ride?

24        A.   I probably would have, yeah.

25        Q.   Would the same answer apply to the third time

1   you were up there?

2        A.   Yeah.

3        Q.   And when you were there for the concert, did

4   you see anybody making attempts to search vehicles as

5   they left the property?

6        A.   No.

7             MR. HUFTALEN:  Thank you very much.  Nothing

8   further, Judge.

9             THE COURT:  Mr. Iacopino, questions?

10             MR. IACOPINO:  No questions, your Honor.

11             THE COURT:  Mr. Lange?

12             MR. LANGE:  Nothing further.

13             THE COURT:  Thank you.  You're all done.

14   You're excused.  You can go home.

15             MR. LANGE:  Your Honor, the next witness I'm

16   going to attempt to do a short video.  I don't know if

17   the government's seen the video, but I want to give them

18   a chance to look at it.

19             THE COURT:  You haven't shown it to the

20   government?

21             MR. LANGE:  They may have seen it.  It's the

22   concert video.  It's on my exhibit list.

23             MR. HUFTALEN:  Could I speak with Mr. Lange

24   for just a moment?

25             THE COURT:  Why don't you talk to him.

1               (Pause.)

2               THE COURT:  Which exhibit number is that?

3               MR. LANGE:  It's Defendant's 2D.  It will be

4     2D-1 because I will submit it without the audio.

5               THE COURT:  2D-1, government object?

6               MR. HUFTALEN:  Without audio we have no

7     objection.

8               THE COURT:  You are moving for its admission?

9               MR. LANGE:  Yes.

10              THE COURT:  Without objection it's admitted.

11              (Defendant's Exhibit 2D-1 admitted.)

12              MR. LANGE:  Call Mr. Vonkleist.

13              THE COURT:  Are you going to play this at this

14    time?

15              MR. LANGE:  Not yet.

16              THE COURT:  The witness is who?

17              MR. LANGE:  David Vonkleist.

18                    DAVID VONKLEIST

19    having been duly affirmed, testified as follows:

20              THE WITNESS:  I affirm.

21              THE CLERK:  For the record, if you'd please

22    state your name and spell your name.

23         A.   My name is Robert David Vonkleist,

24    R-O-B-E-R-T, D-A-V-I-D, V-O-N-K-L-E-I-S-T.

25                    DIRECT EXAMINATION

1    BY MR. LANGE:

2              MR. LANGE:  Good morning, sir.

3              THE WITNESS:  Yes.

4         Q.   What city and state do you live in?

5         A.   I am in Wellfleet, Massachusetts.

6         Q.   What sort of work do you do?

7         A.   I'm a musician.  I do voice-overs, and I've

8    been a broadcaster for, oh, 25 years I guess.

9         Q.   I want to go back to the year 2007.  In 2007

10   did you have any contact with the two defendants in this

11   case, Ed Brown and Elaine Brown?

12        A.   Yes.

13        Q.   When had you first met the Browns?

14        A.   I believe I first met Ed and Elaine in '97.  I

15   think that was the year.

16        Q.   What were the circumstances?

17        A.   I was traveling with my ex-wife, Joyce Riley.

18   We were trying to help veterans around the country.  She

19   is a medical malpractice legal consultant, expert

20   witness, federal whistleblower.  She served as a reserve

21   flight nurse --

22             MR. LANGE:  Let me be very clear in this

23   trial.  Please try to answer the questions.

24        A.   Yes, sir.

25        Q.   And the circumstances were that you were with

1    your wife traveling around the country?

2        A.    Yes, we were, and we were doing free programs

3    to help inform the veterans --

4             THE COURT:   Just a second.   Ask another

5    question.   Listen to the question.   Just answer that

6    question.

7             THE WITNESS:   I'm doing the best I can.

8             THE COURT:   Do better.   Ask another question.

9             THE WITNESS:   Yes, sir.

10       Q.    Where was it that you first met Ed and Elaine

11   Brown?

12       A.    I believe it was at the American Legion in

13   that town.

14       Q.    In Plainfield, New Hampshire?

15       A.    I don't recall the name of the town.   It was

16   nearby.

17       Q.    Was it in New Hampshire?

18       A.    Yes, sir.

19       Q.    And you were traveling with your ex-wife doing

20   a show on veterans?

21       A.    Yes, sir.

22       Q.    And this would have been 1997?

23       A.    To the best of my recollection.

24       Q.    How much contact did you have with Elaine

25   Brown back at that initial meeting?

1       A.   I think we were just introduced.  I didn't

2  have much contact with her at the time.

3       Q.   Over the next ten years, between '97 and 2007,

4  how much contact did you have with Ed Brown?

5       A.   I don't believe we had any contact.  I mean,

6  not that I can recall.

7       Q.   How about Elaine Brown?

8       A.   None, the same.

9       Q.   What happened in 2007 with regard to you and

10  the Browns?

11       A.   I heard about the issue with the income tax

12  and we had Elaine Brown on our radio show as a guest.

13       Q.   Do you remember approximately when that was?

14       A.   I would have to say I think it was in June of

15  '07.

16       Q.   What was the radio show?

17       A.   It's called The Power Hour.

18       Q.   And is that AM?  FM?

19       A.   Yes.

20       Q.   It's both?

21       A.   AM, FM, shortwave, Internet, satellite.

22       Q.   Where were you broadcasting out of?

23       A.   Little town called Versailles, Missouri.

24       Q.   The interviews you had were telephone

25  interviews?

76

1     A.   Yes.

2     Q.   Little bit later in June of 2007, did you

3  yourself physically come to Plainfield, New Hampshire?

4     A.   Yes, I did.

5     Q.   Did you go to the Brown property?

6     A.   Yes, I did.

7     Q.   Do you remember the approximate date that you

8  did that?

9     A.   Mid to late June.  I don't remember the date,

10  but it was in June, yeah.

11     Q.   For what purpose?

12     A.   After the interview with Elaine Brown, on the

13  suggestion of my ex-wife Joyce, she thought it might be

14  a good idea if I were to go up there and do a musical

15  concert, bring people there to bring awareness to the

16  situation that the Browns were facing.

17     Q.   Who set up that concert?

18     A.   I don't think it was anybody that really set

19  it up.  We just called and said, hey, if I show up and

20  play some guitar, would you mind?  They said, no, that

21  would be great.  Put the word out, bunch of people

22  showed up.  It was like a picnic.

23     Q.   When you went up the driveway to the Brown

24  property, were there any obstructions?

25     A.   No, a couple cars parked there, but no

1   obstructions.

2        Q.   Was there any military police presence?

3        A.   No.

4        Q.   How about on the Brown property itself?  Did

5   you see anybody with firearms?

6        A.   No.

7        Q.   Did you play at that first concert?

8        A.   Yes, I did.

9        Q.   Now, do you have a -- I don't know how to

10  describe it -- I suppose a particular mode of dress when

11  you are giving a concert?

12       A.   I suppose my trademark has become red, white,

13  and blue and I've got, I don't know, a dozen or so red,

14  white, and blue stars and bars shirts.

15            MR. LANGE:  Sir, may I approach?

16            THE COURT:  Of course.

17       Q.   I'm going to show you an exhibit in this book

18  here, Government's Exhibit 34a-3 for identification.

19       A.   Um-hum.

20       Q.   Do you recognize the person there?

21       A.   Yes.

22            MR. LANGE:  I move to put Government's Exhibit

23  34a-3 into evidence.

24            MR. HUFTALEN:  No objection.

25            THE COURT:  Admitted.

1                (Government's Exhibit 34a-3 admitted.)

2                THE COURT:  Go ahead, Mr. Lange.  Do you want

3     that displayed?

4                MR. LANGE:  I do, please.

5                THE COURT:  All right.  It's on the panels,

6     members of the jury.

7         Q.   You can see the screen?

8         A.   Um-hum.

9         Q.   How long did you remain at the Brown property

10    for that concert?

11        A.   I was there for the afternoon and I believe we

12    stayed for a barbecue afterward.  Some people put some

13    hamburgers on if I recall.  I was there for the

14    afternoon.

15        Q.   Approximately how many people were there for

16    your performance?

17        A.   I don't know.  I would have to say probably 40

18    or 50.

19        Q.   Was there a second concert later, some weeks

20    later?

21        A.   Yes, there was.

22        Q.   Who set that concert up, if you know?

23        A.   I don't know who set that one up.

24        Q.   You came back for that concert?

25        A.   Yes.  I was invited.

1        Q.    Any problems getting up the driveway?

2        A.    No.  I mean, there were a few more cars.

3    There were more people in attendance for this one.

4        Q.    How many?

5        A.    How many what?

6        Q.    How many people attended?

7        A.    I would probably say a hundred, hundred or

8    more.  I wasn't really paying attention.

9        Q.    Did you play at that concert?

10       A.    Yes, I did.

11       Q.    Was that the principal thing you did at that

12   concert or did you do something else?

13       A.    Yes, I did something else.

14       Q.    What was that?

15       A.    I had a video camera, and because of the

16   tension that appeared to be rising in the situation, we

17   were video -- live streaming on the Internet.

18             MR. LANGE:  Your Honor, I'm going to offer

19   into evidence, I believe by agreement, Government's --

20   I'm sorry, Defendant 2D-1.

21             THE COURT:  That's already in I think.

22             MR. LANGE:  Thank you.

23       Q.    See your monitor, sir?

24       A.    Um-hum.

25       Q.    What is the jury looking at right at that

1   point?

2          A.   That's a band called Poker Face.  Paul Topete

3   is in the center playing guitar, and people -- you can

4   see behind it.  They had a fire and there was food out

5   there and people milling about.

6          Q.   Where was that stage set up?

7          A.   It was right on the parking area in front of

8   the house.

9          Q.   In front of the Brown house?

10          A.   Yes.

11               MR. LANGE:  If you could play it without the

12   audio, please.

13               (Playing video.)

14          Q.   And you're the person who's holding the camera

15   that's taking these images?

16          A.   I had the camera on a tripod.

17          Q.   And this is simply a portion of it.  Why did

18   you pan back at that point?

19          A.   Because if you look, there's a helicopter

20   right there.  The helicopter was hovering and scaring a

21   lot of people.  Sometimes it flew as low as I would say

22   not more than two or 300 feet, less than a football

23   field.  At one point I thought it was going to hit the

24   wind generator, the windmill.  And it was unnerving, it

25   was intimidating, and I felt that it was pointless, as

1    did everybody else.

2             MR. LANGE:  I'm just going to run this to the

3    end.  It's not going to take very long.

4        Q.    Approximately what time of day was this?

5        A.    This helicopter hovered, like I said, it

6    seemed to be like for a good four or five hours.  As I

7    recall -- please don't hold me to it, but as I recall,

8    it started somewhere around three in the afternoon and

9    it went until after dark.  Again, please don't hold me

10   to the times.  It was for many hours and it did go until

11   dark.

12       Q.    You can see the lights on the helicopter?

13       A.    Yes.  It was dusk.  And you can see how close

14   it was to the tower right there with the windmill.

15            (Pause.)

16       A.    Breaks my heart.

17       Q.    And that's a longer shot of the home?

18       A.    Yes.  This is what our country has come to.

19            THE COURT:  Wait just a second, please.

20            THE WITNESS:  I'm sorry.  It broke my heart.

21            THE COURT:  Hold it.  Stop, please.  Wait for

22   a question.  Mr. Lange?

23       Q.    Did you have contact with the Browns at the

24   second concert?

25       A.    Yes, I saw them several times.  I apologize.

1    I'm sorry.

2        Q.   Was Ed --

3             MR. LANGE:  There are tissues on the counter.

4        Q.   Was Ed carrying a pistol in his waist?

5        A.   I did see him at one time carrying a pistol on

6    his waist.  I don't remember watching for it.

7        Q.   How about Elaine?  Did you see her at any time

8    with any sort of a firearm?

9        A.   No, I did not.

10       Q.   At either of the concerts were there firearms?

11       A.   I didn't see any.

12       Q.   Did you go inside that building there

13   depicted -- the Brown home during either of your visits

14   to the property?

15       A.   Yes, I did.

16       Q.   Which floor did you go on?

17       A.   Main floor.

18       Q.   And did you see anything there out of the

19   ordinary?

20       A.   Nothing.

21       Q.   Did you see anything inside the house that

22   caused you any sort of alarm?

23       A.   None whatsoever.

24       Q.   There are objects on the table behind that

25   monitor on the far wall.  There are also firearms on the

1   table.  You may not be able to see it.  You may have to

2   stand, closer to the deputy's work area.  Did you see

3   anything like that at the Brown property at either of

4   those concerts in the summer of 2007?

5        A.   No, I did not.  I saw nothing of the sort.

6        Q.   Did you hear anyone make any threats during

7   your times at the concerts, threats toward anybody?

8        A.   Not that I recall.

9        Q.   Did you come to any assessments as to the

10  situation with regard to the Browns' perception of what

11  they were facing?

12       A.   Would you rephrase it?  I'm sorry.

13       Q.   It's a terrible question.  Did they in any way

14  indicate to you any fear of anything when you met with

15  them face to face?

16       A.   I believe that they were in fear for their

17  physical safety given what had happened.

18            MR. HUFTALEN:  Objection.

19            THE COURT:  Sustained.  Jury will disregard.

20       Q.   Your understanding is that they were in fear

21  for their safety?

22       A.   Yes.

23       Q.   And that was based on what you observed in the

24  situation?

25       A.   In answer to what we just observed with the

84

```
 1    helicopter flying over.  I mean, that type of activity

 2    would strike fear in anybody, including me, and it

 3    should strike fear into the heart of every single

 4    American in this country to see where we've gone in this

 5    country.

 6              MR. LANGE:  Those are my questions.

 7              THE COURT:  Thank you, Mr. Lange.  Government,

 8    any questions?

 9              MR. HUFTALEN:  No.

10              THE COURT:  Mr. Iacopino, questions?

11              MR. IACOPINO:  No questions, your Honor.

12              THE COURT:  Thank you.  You may step down.

13    You're excused.  Call your next witness.

14              THE WITNESS:  God save us all.  God save us

15    all.

16              THE COURT:  Take the exhibit down.

17              MR. HUFTALEN:  May we approach?

18              THE COURT:  Of course.

19                        AT SIDE BAR

20              THE COURT:  Yes?

21              MR. HUFTALEN:  Judge, I don't know if you

22    heard it, but I think the jury did because at our table

23    we did.  As that witness walked by he said to the jurors

24    twice, "Save us all, save us all."

25              THE COURT:  All right.  Is that correct?
```

1    Anyone hear that?

2              MR. HUFTALEN:  I heard him say God bless you,

3    too.

4              THE COURT:  I'm going to have to inquire of

5    the jury.

6                        IN OPEN COURT

7              THE COURT:  Hold that witness, please.

8              MR. LANGE:  Do you want Mr. Bernier off the

9    stand?

10             THE COURT:  Yes, please step down.  Ladies and

11   gentlemen of the jury, during the last witness's

12   testimony as he was leaving -- this is just a raise your

13   hand issue.  Did any of you hear him say anything as he

14   walked by you?

15             (Show of hands.)

16             THE COURT:  All right.  I'm going to excuse

17   the jury.  Don't discuss anything that you may have

18   heard.

19             (Jury left courtroom.)

20             THE COURT:  I'll see counsel.  We're in

21   recess.

22                        IN CHAMBERS

23             THE COURT:  The record will indicate

24   approximately half the jurors indicate they heard the

25   witness say something to them as he was leaving.

1   Counsel have any suggestions how I ought to deal with

2   this?  Government?

3           MR. HUFTALEN:  I think you should instruct the

4   jury that they should disregard any remarks made by the

5   witness as he walked by and take no further action with

6   respect to this trial.  I'm not asking for a mistrial.

7           MR. LANGE:  I concur.

8           THE COURT:  Mr. Iacopino?

9           MR. IACOPINO:  I think we should just ignore

10  it.  I don't even think we should raise it with them and

11  should just go on.

12          THE COURT:  Counsel, do you want me to ask the

13  jury what they heard?

14          MR. LANGE:  I do not.

15          THE COURT:  Mr. Lange no.  Mr. Iacopino?

16          MR. IACOPINO:  No, your Honor.

17          MR. HUFTALEN:  No, your Honor.

18          THE COURT:  I want everyone to understand

19  there may be a waiver issue here as far as the defense

20  is concerned, serious waiver.

21          MR. IACOPINO:  I will run it by my client,

22  your Honor, but I don't think there will be a change in

23  the position.

24          MR. LANGE:  I will talk to Mrs. Brown.

25          THE COURT:  My concern is that a deliberate

1   suggestion to the jury is contemptuous, and to deal with

2   that contemptuous conduct, if it existed I need to know

3   what the jury heard.  I'm going to bring in each member

4   of the jury separately and ask what they heard and I

5   will deal with it as required.

6            MR. LANGE:  I object, your Honor.

7            THE COURT:  Tell me why you object.

8            MR. LANGE:  I think it would unduly emphasize

9   it.  I think that the law says the jurors are presumed

10  to follow instructions.  I think if they are told to

11  disregard that parting shot as the witness walked in

12  front of them, they will do so.

13           THE COURT:  Do you believe that the Court

14  shouldn't deal with someone that attempts to influence

15  the jury during the course of the trial?

16           MR. LANGE:  If the Court is going to do that,

17  I would ask that that be done at the conclusion of the

18  trial after verdict rather than highlighting it at this

19  point.

20           MR. IACOPINO:  I would join in that request,

21  your Honor.

22           THE COURT:  In the meantime your witness is

23  where?

24           MR. LANGE:  Wherever you want him to be.  He

25  left the stand.  If you want him to remain, there's a

1  process that he can be brought before the Court and

2  counsel can be appointed.

3          THE COURT:  All right.  I will think about it.

4          MR. HUFTALEN:  His conduct is not only

5  contemptuous.  It is more likely than not a violation of

6  Title 18, Section 1503(a) in that it appears that he

7  corruptly endeavored to influence or impede the

8  administration of justice, which is a felony.

9          THE COURT:  All right.  I'll think about it.

10  Take your break.

11          (Recess taken.)

12                    IN CHAMBERS

13          THE COURT:  All right.  I'm going to bring the

14  jurors in.  Bring in the first juror.  Only the ones

15  that say they heard something.

16          MR. IACOPINO:  I understand you are going to

17  voir dire them, your Honor?

18          THE COURT:  Anybody want to do this in the

19  courtroom?  We're in chambers now.

20          MR. LANGE:  I think we should do it in the

21  courtroom.

22          THE COURT:  Mr. Iacopino?

23          MR. IACOPINO:  I guess we should do it in the

24  courtroom, your Honor.

25          THE COURT:  Because?

1          MR. IACOPINO:  I think because it's part of a

2    public proceeding.

3          THE COURT:  Government's position?

4          MR. HUFTALEN:  No position.

5          THE COURT:  We're going to do it here.  Hi.

6    Sit down, please.  Your juror number?

7          JUROR NO. 1:  One.

8          THE COURT:  Did you hear Mr. Vonkleist say

9    something just as he passed the jury?

10         JUROR NO. 1:  Yes, I did.

11         THE COURT:  What did you hear him say?

12         JUROR NO. 1:  What I heard was, "Save us all,

13   save us all," repeated twice as he went by the jury box

14   exiting from the stand.

15         THE COURT:  I'm going to instruct you to

16   disregard that.  It's to have no impact on your

17   proceedings and not to discuss what you heard with any

18   other juror.  Can you do that?

19         JUROR NO. 1:  Yes, sir.

20         THE COURT:  All right.  Thank you very much.

21   Questions anyone?

22         MR. HUFTALEN:  No, your Honor.

23         MR. IACOPINO:  I have one question, your

24   Honor.

25         THE COURT:  Yes?

1            MR. IACOPINO:  Did he say it out loud or did

2    he say it under his breath?

3            JUROR NO. 1:  It was very audible, to myself

4    anyway.

5            THE COURT:  Thank you very much.

6            (Pause.)

7            THE COURT:  Have a seat.  Your juror number?

8            JUROR NO. 2:  Two.

9            THE COURT:  Did you hear Mr. Vonkleist say

10   anything as he passed the jury?

11           JUROR NO. 2:  Yes, I did.

12           THE COURT:  What did you hear?

13           JUROR NO. 2:  I heard him say, "Save us all."

14           THE COURT:  Did you have any trouble hearing

15   that?

16           JUROR NO. 2:  No.

17           THE COURT:  I'm instructing you to disregard

18   that.  That's to have no impact on your deliberations

19   and don't discuss it with the other jurors.  Can you do

20   that?

21           JUROR NO. 2:  I can.

22           THE COURT:  Thank you very much.  Anyone else?

23           ALL:  No, your Honor.

24           THE COURT:  Thank you very much.

25           (Pause.)

1              THE COURT:  Have a seat.  Your juror number

2    is?

3              JUROR NO. 3:  Three.

4              THE COURT:  Juror No. 3, did you hear Mr.

5    Vonkleist say anything as he passed the jury?

6              JUROR NO. 3:  Yes, I did.

7              THE COURT:  What did you hear, sir?

8              JUROR NO. 3:  Save yourselves.

9              THE COURT:  And how many times did you hear

10   that said?

11             JUROR NO. 3:  Once.

12             THE COURT:  And I'm going to instruct you that

13   you are to disregard that just as I've done in other

14   occasions and not discuss that with any of the other

15   jurors.  Can you do that?

16             JUROR NO. 3:  Yes.

17             THE COURT:  Very good.  Thank you.  Any

18   questions?

19             ALL:  No, thank you.

20             THE COURT:  All right.  Thank you very much.

21   Go have your snack.

22             (Pause.)

23             THE COURT:  Have a seat.  Your juror number?

24             JUROR NO. 5:  Five.

25             THE COURT:  Juror No. 5, did you hear Mr.

1   Vonkleist say anything as he passed the jury?

2            JUROR NO. 5:  What I recollect was that he

3   said something about "God help us" and then I couldn't

4   hear the rest of it.

5            THE COURT:  I'm instructing you to disregard

6   that and not discuss it with the other jurors, have no

7   part in your deliberations.  Can you do that?

8            JUROR NO. 5:  Yes, sir.

9            THE COURT:  Thank you very much.

10           JUROR NO. 5:  Thank you.

11           (Pause.)

12           THE COURT:  Have a seat.  Your juror number?

13           JUROR NO. 6:  Six.

14           THE COURT:  Juror No. 6, did you hear Mr.

15   Vonkleist say anything as he went by the jury rail?

16           JUROR NO. 6:  Yes.

17           THE COURT:  What did you hear?

18           JUROR NO. 6:  I heard "God save us all."

19           THE COURT:  And how many times did you hear

20   that said?

21           JUROR NO. 6:  I heard him say it when he was

22   getting up off the stand.  He said, "God save us."

23           THE COURT:  And if I were to instruct you to

24   disregard that just as I have other things and to have

25   it play no part in your deliberations and you're not to

1    discuss it with the other jurors at all, can you do

2    that?

3              JUROR NO. 6:  Yes.

4              THE COURT:  Thank you very much.  Counsel,

5    feel free to jump in if you have a question anytime.

6              (Pause.)

7              THE COURT:  Have a seat.  Your juror number?

8              JUROR NO. 7:  Seven.

9              THE COURT:  And did you hear Mr. Vonkleist say

10   anything as he went by the jury?

11             JUROR NO. 7:  I heard him mumbling and I

12   thought I heard something about power.  That's about

13   all.

14             THE COURT:  If I were to order you to

15   disregard that and to not discuss it with the other

16   jurors, can you do that?

17             JUROR NO. 7:  Absolutely.

18             THE COURT:  Thank you very much.

19             (Pause.)

20             THE CLERK:  That's it, your Honor.

21             THE COURT:  Counsel have any other requests in

22   this regard?

23             MR. LANGE:  No, your Honor.

24             THE COURT:  Mr. Iacopino?

25             MR. IACOPINO:  No requests, your Honor.

```
 1              THE COURT:  Government?

 2              MR. HUFTALEN:  Government does not.

 3              THE COURT:  What I'm going to do is I'm going

 4    to let Mr. Vonkleist go and consider additional issues

 5    with regard to Mr. Vonkleist, but I see no reason we

 6    can't proceed with the trial.  Anyone object to that?

 7              MR. HUFTALEN:  Government does not.

 8              MR. LANGE:  No, your Honor.

 9              MR. IACOPINO:  No, your Honor.

10              THE COURT:  I hear no objections.  We're going

11    back in.

12                          BEFORE THE JURY

13              THE COURT:  Call your next witness.  Come

14    right up to the front if you could.

15                        DAVID HATCH-BERNIER

16    having been duly sworn, testified as follows:

17              THE CLERK:  For the record, if you'd please

18    state your name and spell your name.

19         A.   David Hatch Bernier, D-A-V-I-D,

20    H-A-T-C-H-B-E-R-N-I-E-R.

21                        DIRECT EXAMINATION

22    BY MR. LANGE:

23         Q.   David, could you please tell the jury where

24    you live?  What city?

25         A.   I live in Worcester, Massachusetts.
```

95

```
 1          Q.   How long have you lived there?

 2          A.   Three and a half years.

 3          Q.   What is your profession?

 4          A.   I'm an architect.

 5          Q.   How long have you been an architect?

 6          A.   I graduated from the Boston Architectural

 7     College in 2005.  So four years.

 8          Q.   Do you know the woman seated at the table to

 9     my right in the black jacket?

10          A.   Yes.

11          Q.   Who is she?

12          A.   She's my mother, Elaine Brown.

13          Q.   As an architect and as her son, were you asked

14     to get involved in the design of the home in Plainfield?

15          A.   I was.

16          Q.   What were you asked to do?

17          A.   They gave me criteria, what they wanted in a

18     house, and I did some sketches.  We went back and forth

19     and made some changes and came up with a design that

20     they liked and that was buildable.

21          Q.   Sir, did you bring something with you when you

22     came up to Concord this morning?

23          A.   I did.

24          Q.   What did you bring?

25          A.   I brought the first and second floor plans and
```

```
 1    a rendered elevation of the proposed house.

 2         Q.   Were these drawn before the house was built?

 3         A.   Yes.

 4         Q.   The house as built, does it conform completely

 5    to this sketch?

 6         A.   Not completely, but the design intent is still

 7    there.

 8              MR. LANGE:  Your Honor, I offer Defendant's

 9    2P.

10              THE COURT:  Any objections?

11              MR. HUFTALEN:  No objection.

12              THE COURT:  Admitted without objection, 2P.

13              (Defendant's Exhibit 2P admitted.)

14         Q.   David, approximately when was it that you did

15    the sketch that I've laid in front of you?

16         A.   This was in early to mid-2004.  I was still in

17    college at the time.

18         Q.   Probably one of the first designs you actually

19    had done and that was going to be built?

20         A.   Correct.

21         Q.   What was the intent?  What was the intent of

22    the building?

23         A.   The intent was -- well, two things.  They

24    wanted a house that was Mediterranean in design, a lot

25    of stucco, a lot of bright open spaces on the interior
```

1   of the building.  The second criteria was that the

2   building impact the environment as little as possible.

3   We used green technologies, eco-friendly building

4   materials, a lot of concrete, heavily insulated walls, a

5   lot of big, bright open spaces on the interior.  It was

6   oriented to the south to maximize passive solar gain.

7         Q.   Was security any consideration in the layout

8   of the plan?

9         A.   Somewhat, yes.  The house is in a very remote

10  location.  If they had any type of alarm system, if the

11  alarm went off, nobody would hear it.  So you need to be

12  able to store your possessions safely and sleep well at

13  night.

14        Q.   As of October of 2007 when the Browns were

15  arrested, was the house complete?

16        A.   No.

17        Q.   I want to turn to the summer of 2007.  Did you

18  go up to the property to visit your mother?

19        A.   Several times, yes.

20        Q.   Did you go inside the house?

21        A.   Yes.

22        Q.   How long did you remain?

23        A.   Anywhere from two to four hours at the most, I

24  think.

25        Q.   Social meeting?

1      A.   Yes, and also to check on the progress of the

2   construction.

3      Q.   Can you give me your best estimate of the date

4   of that visit?

5      A.   The last visit would have been I believe

6   mid-September of 2007.

7      Q.   Did you go all through the house or did you

8   stay on the first floor?

9      A.   I went all through the house.

10      Q.   Did you see anything there that caused you

11   alarm?

12      A.   No.   It was surprisingly calm and normal.

13      Q.   Do you recall whether or not there were any

14   firearms?  Did you see any firearms?

15      A.   I didn't see any stored in the house.  I

16   assumed that some of the people on the property may have

17   had some, but I can't confirm that for sure.

18      Q.   The last time before October 4th of 2007 that

19   you were there was approximately September?

20      A.   Yes.

21      Q.   Was there an earlier time that summer?

22      A.   Yes.

23      Q.   Did you visit twice?

24      A.   Probably maybe another three weeks prior to

25   that.

1       Q.   Situation the same as the second visit?

2       A.   Pretty much.

3       Q.   Nobody blocked your way up the driveway or

4  back down the driveway?

5       A.   No, not at all.

6            MR. LANGE:  Those are my questions.

7  Government witness.

8            THE COURT:  Thank you.  Government, questions?

9            MR. HUFTALEN:  Yes, very briefly.

10                        CROSS-EXAMINATION

11  BY MR. HUFTALEN:

12       Q.   Mrs. Brown was living with you before she went

13  back to Plainfield in '07; is that right?

14       A.   Correct.

15       Q.   In fact, you were ordered by the Court to be

16  her guardian so to speak; right?

17       A.   Correct, yes.

18       Q.   And did she speak with you about her desire to

19  go back and live with her husband, Mr. Brown?

20            MR. IACOPINO:  Objection.  This is beyond the

21  scope of direct examination.

22            MR. LANGE:  As do I.

23            THE COURT:  Overruled.  Go ahead.

24       A.   She expressed feelings that she missed her

25  husband, but there was never any talk about actually

1   leaving the house and going up there.

2        Q.   Let's make it clear.  You didn't bring her

3   back to the house; correct?

4        A.   I was in Washington, D.C. on business that

5   weekend.

6        Q.   When she was living with you, you understood

7   that she had been convicted in this courthouse of tax

8   crimes; correct?

9        A.   Correct.

10            MR. IACOPINO:  Objection, irrelevant.

11            THE COURT:  Overruled.

12       Q.   Yes?

13       A.   Yes.

14       Q.   Was it apparent to you that she knew that she

15  had been convicted?

16            MR. IACOPINO:  Objection, speculation,

17  irrelevance.

18            THE COURT:  Overruled.

19       A.   Yes.

20       Q.   Did you know that at least in October of 2007

21  your mother was sleeping in a bed less than ten feet

22  away from more than twenty pipe bombs?

23       A.   No, I did not.

24       Q.   Did you know that in her bedroom, in addition

25  to the stuffed animals, there were multiple weapons

1    including a 50-caliber rifle?

2              MR. IACOPINO:  Objection, your Honor.  His

3    knowledge about this is irrelevant.

4              THE COURT:  Overruled.

5              MR. HUFTALEN:  He's testified that he's been

6    there.

7         Q.   Did you know --

8         A.   No.

9         Q.   -- that there was a 50-caliber rifle in her

10   bedroom?

11        A.   No, I did not.

12        Q.   A 308 rifle?

13        A.   I've never even held a gun.  I really don't

14   approve of them myself.  I can't tell a pistol from a

15   machine gun.

16        Q.   Fair enough.  On each of the times when you

17   visited your mother, did anybody attempt to stop you

18   from leaving the property?

19        A.   No.

20        Q.   Had she asked you for a ride to go back to

21   your house, would you have given her a ride?

22        A.   After she left my house?

23        Q.   Yes, sir.

24        A.   I -- honestly I don't know how to answer that.

25   I don't think she ever would have.  She was so happy to

 1    be back home.

 2         Q.   My question is if she had asked you, would you

 3    have offered to give her a ride?  Not talking about

 4    whether she would, just if she did.

 5              MR. IACOPINO:  Objection, calls for

 6    speculation, your Honor.

 7              THE COURT:  If you're just speculating, say

 8    so.

 9         A.   I certainly would be speculating.  I never

10    even --

11              THE COURT:  That's it.  Far enough.

12              MR. HUFTALEN:  That's fine.

13         Q.   Did you know that your mother carried

14    firearms?

15         A.   No, I didn't.

16              MR. HUFTALEN:  I have nothing further, Judge.

17    Thank you.

18              THE COURT:  Thank you.  Mr. Iacopino,

19    questions?

20                        CROSS-EXAMINATION

21    BY MR. IACOPINO:

22         Q.   What was the view like from the Brown

23    residence in Plainfield?

24         A.   After the addition was built, it was amazing.

25    You could see for miles.

1      Q.   Is that why there was an observation deck

2  built onto the house?

3      A.   Yeah.  Actually for Christmas I was going to

4  be giving them a telescope to enjoy the view.  It was

5  all about the view, and we also built that tower

6  partially hollow on the inside to take some of the

7  breezes, again, using green technology into the house.

8           MR. IACOPINO:  Thank you.  No further

9  questions.

10          THE COURT:  Thank you.  Mr. Lange?

11          MR. LANGE:  Nothing further.

12          THE COURT:  Thank you.  You may step down.

13  Call your next witness.

14          MR. LANGE:  I need to speak briefly to my

15  client.

16          (Pause.)

17          MR. LANGE:  Your Honor, I have one exhibit

18  that I don't think has come into evidence.  I've shown

19  it to the government.  It's Defendant's 2E-5.  I offer

20  that.  It's a summary of phone calls.

21          MR. HUFTALEN:  I've seen that before.  No

22  objection, your Honor.

23          THE COURT:  It's admitted without objection.

24          (Defendant's Exhibit 2E-5 admitted.)

25          MR. LANGE:  With respect to Elaine Brown's

1    case, we rest.

2              THE COURT:  Okay.  Ladies and gentlemen of the

3    jury, I will have to excuse you for a moment.  Don't

4    discuss the case.

5              (Jury left courtroom.)

6                      BEFORE THE COURT

7              THE COURT:  Be seated.  Mr. Lange, I will be

8    talking to your client.

9              Mrs. Brown, if you could stand, please.  Your

10   counsel indicates by resting that you would not be

11   testifying; is that correct?

12             MRS. BROWN:  That's correct.

13             THE COURT:  You have your constitutional right

14   to testify.  I want you to know that if you do testify,

15   it will be under oath subject to penalties of perjury,

16   subject to cross-examination without your ability to

17   raise Fifth Amendment privilege.  Do you understand?

18             MRS. BROWN:  Yes, sir.

19             THE COURT:  You have a constitutional right

20   not to testify, and if you decide not to testify, I will

21   on request instruct the jury that they can draw no

22   negative inference from the fact that you did not

23   testify.  Mr. Lange is very experienced in these

24   matters.  You should listen carefully to his advice, but

25   ultimately the decision is yours.  Do you understand

1   what I've told you?

2           MRS. BROWN:  Yes.

3           THE COURT:  Without telling me what your

4   lawyer has said to you, have you had time to discuss

5   with your attorney this issue and receive his advice

6   with regard to testifying?

7           MRS. BROWN:  Yes.

8           THE COURT:  And is it your decision not to

9   testify?

10          MRS. BROWN:  Yes, it is.

11          THE COURT:  Thank you.  Mr. Lange, you will

12  indicate if you wish a jury instruction with regard to

13  the non-inference.

14          MR. LANGE:  Yes, I do.

15          THE COURT:  All right.  We'll put that in.  Is

16  the government going to have any additional witnesses?

17          MR. HUFTALEN:  No, your Honor.

18          THE COURT:  All right.  I will bring the jury

19  in.

20          MR. LANGE:  Your Honor, do I do a Rule 29 now

21  or do I do that later?

22          THE COURT:  I want the jury to hear the last

23  of everyone resting.  Then I will excuse the jury.

24  We'll hear your motions, and then we will set some times

25  for a charge conference and ultimate arguments.

1           Bring the jury in, please.

2           THE CLERK: Yes, your Honor.

3                     BEFORE THE JURY

4           THE COURT:  Mr. Lange, you've rested?

5           MR. LANGE:  Yes, we've rested.

6           THE COURT:  Government rests?

7           MR. HUFTALEN:  Government rests.

8           THE COURT:  Mr. Iacopino?

9           MR. IACOPINO:  We've rested, your Honor.

10          THE COURT:  All right.  Ladies and gentlemen

11   of the jury, that indicates that there will be no

12   additional evidence in this case.  Everyone has rested.

13   That doesn't mean it's time to start making up your mind

14   because you haven't heard closing arguments.  Closing

15   arguments, as you remember, are not evidence, but it's

16   important to listen carefully to closing arguments

17   because the lawyers give you views with regard to how to

18   deal with the evidence, and you haven't heard my

19   instructions on how to deal with the issues of law.  So

20   keep an open mind.

21          What I'm going to do now is I need to talk to

22   the lawyers about the jury instructions, etc.  So I'm

23   going to excuse you.  It may be at least an hour before

24   I bring you back, at which point I anticipate unless

25   things change that you will be hearing closing arguments

1   from counsel.  And we'll see where we go from there

2   depending on the time.  Bear with me.  We'll just see

3   where we are.  We'll either give you instructions today

4   or tomorrow.  I will see how much time is involved.

5           Again, don't discuss this case or anything

6   else I've instructed you not to discuss.  Jury's

7   excused.

8           (Jury left courtroom.)

9                   BEFORE THE COURT

10          THE COURT:  All right.  Rule 29 motions.  Mr.

11  Iacopino?

12          MR. IACOPINO:  Thank you, your Honor.  At this

13  point in time on behalf of Mr. Brown I would move under

14  Rule 29 to dismiss Counts 1, 2, 3, 7, 9, and 10 of the

15  indictment.  I would set forth with respect to Counts 9

16  and 10 -- those are the counts dealing with failure to

17  appear for trial under 18 USC, Section 3146, and failure

18  to appear for sentencing under the same statute.  I

19  would respectfully submit to the Court at this point in

20  time there is no evidence upon which this jury -- a

21  rational jury could find that Mr. Brown was ever ordered

22  to come to trial on the day that he did not show up or

23  to return to trial by a court, that there is nothing in

24  I believe it's Exhibit 1a-1 that in any way -- I'm

25  sorry, 1a-2 that in any way provided notice, and I would

1   draw your attention to the wording of the statute, 18

2   USC, Section 3146.  Penalty for failure to appear, says

3   whoever having been released on this chapter knowingly

4   fails to appear before a court as required by the

5   conditions of release.

6          Conditions of release that Mr. Brown had do

7   not specifically indicate that he was required to appear

8   on that third or fourth day of trial, whenever it was

9   that he was not present, to appear.

10         There is no order in evidence, and it may be a

11  pecularity of the practice in this district, it may not,

12  but there is no written piece of paper that says the

13  defendant must appear for his trial.  And the same goes

14  for sentence, your Honor.  There has been no evidence

15  submitted, no piece of paper submitted, no order of this

16  Court or the District of New Hampshire court.

17         THE COURT:  One second.

18         (Pause.)

19         THE COURT:  Go ahead.  I'm sorry.

20         MR. IACOPINO:  There's been no order submitted

21  to this Court that demonstrates that Mr. Brown was

22  required to appear by court order for a sentencing date,

23  and on those grounds, your Honor, I respectfully move to

24  dismiss Counts 9 and 10 of the indictment pursuant to

25  Rule 29 of the Rules of Criminal Procedure.

1          THE COURT:  Thank you, Mr. Iacopino.  Mr.

2   Lange?  Did you have something else?

3          MR. IACOPINO:  I had four other counts I was

4   going to move to dismiss, your Honor.

5          THE COURT:  Go right ahead.

6          MR. IACOPINO:  With respect to Counts 1, 2, 3,

7   and 7, your Honor, I would renew my Rule 29 motion that

8   I made at the close of the government's case.  With

9   respect to those counts, particularly with respect to

10  Count 1, Count 2, and Count 3, as I indicated

11  previously, those counts are all essentially seeking to

12  sanction the same basic conduct, and I'd respectfully

13  submit that there is not sufficient evidence for a

14  rational juror to find beyond a reasonable doubt at this

15  point, your Honor, that either of the defendants

16  undertook to knowingly and willfully conspire and agree

17  with each other to prevent by force, intimidation, and

18  threat employees of the government in the discharge of

19  their official duties, your Honor.

20          And with respect to Count 3 -- I'm sorry, 7,

21  which is the felon in possession count, as I indicated

22  previously, your Honor -- I'm sorry, Count 3 is the

23  possession.  I keep saying possession of a firearm by a

24  felon.  What I mean to say, your Honor, is carrying and

25  possessing a firearm during and in relation to a crime

1   of violence, your Honor.  That count by its own wording

2   is necessitated upon a conviction on Counts 1 and 2.  I

3   respectfully submit that because Counts 1 and 2 are not

4   substantiated by the evidence, that Count 3 must fail as

5   well, and for those reasons, your Honor, we move that

6   Counts 1, 2, 3, 7, which is the obstruction of justice

7   charge, 9 and 10, all be dismissed under Rule 29.

8            THE COURT:  Thank you very much.  Mr. Lange?

9            MR. LANGE:  Pursuant to Rule 29 I move for

10  directed verdicts of acquittal on all counts charging my

11  client, Elaine Brown.  Particularly, I move for

12  judgments of acquittal with regard to Count 1, Count 2,

13  Count 3, Count 4, Count 6, Count 8, Count 11.

14           I particularly want to address Counts 1 and 2

15  and also 3, which is to some degree contingent on those

16  first two counts.  I submit in particular that the

17  government has failed to meet its burden to prove the

18  material element in those counts:  My client possessed,

19  either constructively or to a Pinkerton liability, a

20  destructive device as defined by the federal criminal

21  code.  I stand by my objection.  The government has

22  failed to prove each and every material element as to

23  all the counts charging my client.

24           THE COURT:  Thank you.  Government?

25           MR. HUFTALEN:  The government's position is

1    that the evidence hasn't gotten worse for the government

2    since the close of the government's case, at which point

3    the Court denied the Rule 29 motions, and I would submit

4    briefly that the ruling should be the same.

5              With respect to the first two counts, the

6    conspiracy counts, there's ample evidence in the record

7    from which a jury could infer reasonably that Mrs. Brown

8    was involved in a conspiracy, whether it was spoken or

9    unspoken as I'm sure your instructions will include.

10   With respect to the Pinkerton liability, it is I submit

11   beyond for adventure in this case, that it was

12   reasonably foreseeable to Mrs. Brown that her husband

13   would possess and carry those destructive devices and

14   other firearms during and in commission of violent

15   crimes, which are Counts 1 and 2.

16             With respect to the 922(g) felon in possession

17   counts, again, there is no doubt the defendants were

18   each convicted in this court of tax crimes.  They were

19   both on bail conditions, which are part of the evidence

20   which specifically required that they not possess

21   firearms.  Each of them was in possession of a firearm

22   on the day they were arrested, October 4, 2007, and the

23   evidence is ample with respect to firearms in their

24   house and in their possession actively and

25   constructively for a number of months before that.

1          With respect to the obstruction of justice

2   counts, 1503(a) I also submit that there is more than

3   ample evidence to get to the jury the theory that the

4   defendants corruptly endeavored to influence and impede

5   the due administration of justice, and that is, the

6   administration of justice in their original tax case.

7   They both refused to come for their sentencing to impede

8   that case.  Mr. Brown in particular refused to attend

9   the trials and didn't come back after the third day of

10  evidence.

11         With respect to all of the counts, it's the

12  government's position that there is not only a prima

13  facie case made out with respect to each of the

14  elements, but the evidence is overwhelming as to each

15  element of each count as to each defendant.  Thank you.

16         THE COURT:  Motions are denied.  Anything else

17  before we recess?  Mr. Lange, do you want to make a

18  motion under Petrozziello?

19         MR. LANGE:  I'm sorry, yes, I do.  I move that

20  the statements that were admitted de bene against my

21  client be stricken and not submitted to the jury on the

22  grounds that the government has not met its burden under

23  the Petrozziello case to show that those statements were

24  made during the course of the conspiracy and that they

25  were in furtherance of that conspiracy.

1          THE COURT:  Thank you.  You join, Mr.

2     Iacopino?

3          MR. IACOPINO:  I do, your Honor.  In

4     particular, I would point to the statements that the

5     government attributes to Jason Gerhard at the Lebanon

6     Police Department and the statements attributed to

7     Daniel Riley and Cirino Gonzalez.

8          THE COURT:  Thank you.  During the course of

9     these proceedings, I have conditionally admitted certain

10    statements made by alleged co-conspirators according to

11    the procedure approved by the First Circuit in United

12    States versus Ciampaglia, 628 Fed 2d, 632.  Having heard

13    all of the evidence, I now find that the government has

14    proven by a preponderance of the evidence that a

15    conspiracy existed and that the defendant and the stated

16    co-conspirators who made the statements were members of

17    the conspiracy at the time the challenged statements

18    were made.

19          I further find that the government has proven

20    by a preponderance of the evidence that the challenged

21    statements were made in furtherance of the conspiracy.

22    These findings are based at least partially on evidence

23    other than the challenged statements themselves.

24    Therefore, in accordance with the procedures set forth

25    in United States versus Petrozziello, 548 F.2d in 20 and

1   pursuant to 801(d)(2)(E), I'm now fully admitting the

2   statements made by these co-conspirators that I

3   conditionally admitted earlier in the proceedings.

4           All right.  Counsel, I will have for you

5   proposed jury instructions in about five minutes.  They

6   will be delivered down here in the courtroom.

7   Fifteen minutes after you receive them, I will have a

8   charge conference in my chambers.  To the extent anyone

9   needs any additional time, let me know.  Anything else

10  before we adjourn?

11          MR. HUFTALEN:  No, thank you.

12          THE COURT:  All right.  We're in recess.

13                        IN CHAMBERS

14          THE COURT:  All right.  We're with counsel in

15  chambers for a charge conference.  Counsel has received

16  previously copies of the proposed final jury

17  instructions along with jury verdict forms relating to

18  each defendant.  Counsel has indicated they are ready

19  for the charge conference.  Counsel is present.

20          For the government, any objections?

21          MR. HUFTALEN:  No.

22          THE COURT:  Any additions?

23          MR. HUFTALEN:  No.

24          THE COURT:  Jury verdict form is okay?

25          MR. HUFTALEN:  Fine.

1           THE COURT:  Mr. Lange?

2           MR. LANGE:  Yes, I have objections.  First of

3    all, I want to state that I would request as I did in

4    the proposed jury instructions at the beginning of the

5    trial an instruction on the defense of justification.

6           THE COURT:  The Lahey defense?

7           MR. LANGE:  Yes.  I know the Court's going to

8    deny that.

9           THE COURT:  For the record, Lahey's 473 F.3d,

10   401.  Go ahead.

11          MR. LANGE:  I understand that that will be

12   denied.

13          THE COURT:  Well, tell me why you think it's

14   appropriate.  I'm not going to just deny it out of hand,

15   but I look at the criteria, and in my view defendant has

16   to be an -- under an unlawful and present threat of

17   death or serious bodily harm, and it's an objective test

18   in my view, and I say that because the Lahey test is

19   based on the Dickson decision and several others that

20   seem to indicate an objective criteria, including U.S.

21   versus Holliday, 457 F.3d, 121.

22          MR. LANGE:  Your Honor, with respect to

23   Elaine, as I recall the testimony, there is no

24   indication that she herself had a firearm prior to the

25   Danny Riley episode.  My position is that the Danny

1    Riley episode gave her reason to believe that the

2    government was going to use serious force or possibly

3    lethal force to arrest her.  I submit that that's

4    unlawful because of the case law that says that it's not

5    lawful to use -- for the government -- for law

6    enforcement to use lethal force to arrest someone for a

7    non-dangerous offense.  At that point it was dangerous.

8            THE COURT:  I don't see any objective

9    reasonableness here.  Your note that the footnote in

10   Lahey by Judge Selya indicates that Lahey may not even

11   be applicable when law enforcement is involved.

12           MR. LANGE:  Our position is that it should be

13   applicable because this was a home and that given what

14   occurred on and after June 7, 2007, the instruction

15   should be given.

16           THE COURT:  Thank you.  I also don't find that

17   the defendant does not meet the criteria of not

18   recklessly placing herself in a situation where she

19   would be forced to engage in criminal activity.  Both of

20   them were there and could have surrendered anytime.

21   Also don't meet the criteria that there was no

22   reasonable legal alternative but to engage in their

23   conduct.  They could have surrendered, and they also

24   don't meet the fourth criteria.

25           Lahey is a case which is quite unusual, and

1    under these circumstances what the defendants are

2    requesting is that if the defendants have a subjective

3    view that a government agent who has a valid arrest

4    warrant and wants to arrest them, they have a right to

5    engage in self-defense against that government agent.  I

6    don't think that's the law, and it's certainly not the

7    law in my view here that Lahey applies.  I want the

8    record to be clear.  Your request is on the record.

9    Anything else, Mr. Lange?

10           MR. LANGE:  Yes, your Honor.  I submit that

11   the objective test under Wood apply here.  I'm arguing

12   that not Elaine Brown's subjective state.  There's no

13   evidence at this point what that was, but my position is

14   that someone in Elaine Brown's position, given the show

15   of force that the government did on June 7th, would have

16   reason to believe that they were under a threat of death

17   or serious bodily injury from unlawful force.

18           THE COURT:  Even if that were true, she

19   doesn't meet the other criteria, and they are in the

20   conjunctive, and in my view, again, I don't believe that

21   any rational person would have believed that throughout

22   that period of time.  Just a second.

23           MR. HUFTALEN:  In addition, to the cases that

24   you've referred to your Honor, I think there is some

25   language in Holt, which is at 464 F.3d, 101, page 107,

1    which is a felon already in possession by someone who's

2    been committed.  I think it gives insight into the

3    circuit's thinking with respect to the objective

4    standard, and it says:  Conceivably, extraordinary cases

5    might arise where voluntary possession would exist in a

6    literal sense, and yet Congress could not have intended

7    the statute to apply.  We imagine a felon who snatches a

8    loaded gun out of the hand of a five-year-old or a felon

9    who wrestles a gun from an armed intruder and promptly

10   surrenders possession after the intervention.  In such a

11   case if the government were foolish enough to prosecute,

12   some caveat might indeed be needed, e.g., an instruction

13   on necessity or a justification defense, but nothing

14   like that is present in this case.

15            I think it certainly isn't explicit, and I'm

16   not saying that it states that the circuit's position is

17   that it's an objective standard, but I think the circuit

18   went out of its way to say if in the future -- and this

19   is an '06 case which predates Lahey.  I think the

20   circuit was saying there are some very limited

21   circumstances in which this justification defense might

22   apply in a 922(g) case, and what they give are objective

23   observations as opposed to a subjective analysis by the

24   person holding the gun.

25            THE COURT:  All right.  Go ahead, Mr. Lange.

1    I'm sorry to interrupt.

2            MR. LANGE:  Yes.  My second concern is with

3    regard to the lesser included offense.  I submitted last

4    night a proposed jury instruction on the lesser included

5    offense with regard to Count 3, the 924(c) count.  My

6    position -- and I think it's afforded by Castillo, a

7    Supreme Court case cited in my paper, and O'Brien, the

8    First Circuit case.

9            THE COURT:  Just a second.  Let me get it.

10           (Pause.)

11           THE COURT:  This is what you filed yesterday?

12           MR. LANGE:  It is.

13           THE COURT:  Let the record reflect that the

14    deadline for requested jury instructions were some time

15    ago, and this instruction was not filed until yesterday

16    evening.

17           MR. LANGE:  That's correct.

18           THE COURT:  All right.  Go ahead.

19           MR. LANGE:  And the reason it wasn't filed

20    until yesterday evening is I had to get authority from

21    my client to request it.  I respect deadlines.  I don't

22    treat them lightly, but I don't think that Elaine's

23    defense should be prejudiced because of lapses on my

24    part.  If there's a sanction, it should be imposed on

25    me, not on her.  I think the law supports the lesser

1    included offense.

2              THE COURT:  Count what?

3              MR. LANGE:  Count 3.  As I read the Castillo

4    and O'Brien cases, they appear to say under 18 U.S. Code

5    924(c), the nature of the firearm is an element of the

6    offense.

7              Admittedly those were not destructive device

8    cases.  Those were, at least Castillo, a machine gun

9    case.  My recollection is in Castillo, the Supreme Court

10   said that the nature of the firearm, a machine gun, was

11   an element because it raised the mandatory minimum

12   offense from 5 to 30 years.  By analogy the same

13   principle should be applied here.  It makes a big

14   difference in this case to Elaine Brown as to whether

15   she's accountable for a firearm as defined in 18 U.S.

16   Code 921 or a destructive device as defined.

17             I take no issue with the Court's proposed jury

18   instruction on the definitions of the offenses, but my

19   concern is that the jury could well find that my client

20   was accountable under the Pinkerton theory or

21   conspiratorial theory for the firearms, and there would

22   be no way to know whether they considered the lesser

23   offense or the offense of destructive device.  I think

24   it's two separate offenses --

25             THE COURT:  Let me interrupt you.  Take a look

1   at the jury form.

2           MR. LANGE:  I like the jury form, your Honor.

3           THE COURT:  I do have a separate question

4   asking them to determine whether that's a destructive

5   device.

6           MR. LANGE:  I know, your Honor, but it's not

7   incorporated in the instructions.  If the jury has a

8   reasonable doubt as to whether or not the government's

9   proven destructive device, they should then consider the

10  lesser.  I understand that to be the state of the law in

11  lesser included offenses.

12          THE COURT:  But I'm asking them by virtue of

13  the jury verdict form to make a special finding with

14  regard to whether it's a destructive device.  In other

15  words, they have to first find that it was a firearm,

16  and second, they would have to go on and find whether or

17  not it was a destructive device.

18          MR. LANGE:  I may be mistaken or I didn't see

19  that.

20          MR. IACOPINO:  He's talking about the form.

21          THE COURT:  Look at Question 3 and then

22  Question 4.

23          MR. LANGE:  I understand the form, but there

24  is no instruction as to the order of deliberation.

25          THE COURT:  I think the jury form indicates

1   they go from question to question.  I understand what

2   you're saying, but I think I've covered it.  I'm not

3   indicating agreement or disagreement, but I am asking

4   the jury specifically to make a -- for instance, on

5   Question 3 they have to determine whether or not she was

6   using or possessing a firearm, and then it says proceed

7   to Question 4.  Question 4 asks them to determine

8   whether or not that was a destructive device.

9          MR. LANGE:  I understand, your Honor.  I stand

10  by my request for the deliberation order.  I think it's

11  clearer that way.  It was a hard one to write, and I

12  understand what the form says and I certainly am glad

13  there's that distinction there between firearms and

14  destructive devices, but I don't think it's made clear

15  to the jury that if they convict as to Question 4, they

16  needn't reach Question 3.

17         My next argument will probably not prevail.  I

18  know the state of law --

19         THE COURT:  That's not the way to tee it up.

20         MR. LANGE:  I'm asking the Court to go where I

21  do not believe federal courts have gone recently.  I

22  understand defendants are not entitled to a

23  nullification instruction.  If I thought they were, I

24  would ask for one on behalf of my client.  But the very

25  next to the last page, page 25, talks about if they have

1    a conclusion that the guilt has been established beyond

2    a reasonable doubt, they should find the defendant

3    guilty.  I certainly agree with that.  But what I would

4    urge the Court to do is to rewrite the second sentence

5    in the next to the last paragraph on page 25 so that it

6    reads that:  If on the other hand the government does

7    not in your view establish the guilt of defendant beyond

8    a reasonable doubt, you may.

9            I think the jury has the discretion to return

10   a verdict of not guilty if they feel that's a just

11   verdict, and I think the language should be tailored to

12   permit that.

13           THE COURT:  I'm not going to do that.

14   Anything else, Mr. Lange?

15           MR. LANGE:  No, your Honor.

16           THE COURT:  Mr. Iacopino?

17           MR. IACOPINO:  Your Honor, I object to the

18   lack of a justification instruction contained in these

19   instructions on the same basis that Mr. Lange did on

20   behalf of Mr. Brown.

21           I would also point out that I believe that

22   there is in fact evidence in the record through my

23   client's testimony going back to 2004 his fear that the

24   government was trying to kill him and a basis for that

25   fear, and I think that the appropriate view of whether

1    this is subjective or objective should be left to the

2    jury to determine whether or not that fear was

3    objective.  In other words, whether a reasonable person

4    would -- based upon the evidence they have heard from

5    his testimony and through some of the cross-examination,

6    whether the jury would find that a reasonable person

7    would have that view, and I think that's where the

8    objective-subjective standard comes, and I think that

9    also meets the Court's other position that they somehow

10   put themselves into this position recklessly.  I believe

11   under Lahey is the reference.

12          I believe that there is in evidence -- and it

13   may not be abundant, but there is in evidence through my

14   client's testimony his stated fear that the government

15   was trying to kill him from even before the tax trial

16   began, and I think that that is some evidence which

17   entitles us to this theory of the defense instruction,

18   and I would join for the other reasons laid out by Mr.

19   Lange, but also for those reasons I think in this record

20   there is in fact evidence of the -- evidence upon which

21   the justification instruction should be given by the

22   Court.

23          THE COURT:  Your request is denied.

24          MR. IACOPINO:  Secondly, your Honor, in your

25   proof beyond a reasonable doubt instruction on page 3

1   and 4, your Honor, I note that the second sentence of

2   the instruction you go on to say:  The government does

3   not -- that the government is not required to prove

4   guilt beyond all possible doubt.  Proof beyond a

5   reasonable doubt is sufficient to convict.  I understand

6   that.  Then the final paragraph of that particular

7   instruction goes on to say that a reasonable doubt does

8   not mean a mere possibility that the defendant may not

9   be guilty, nor does it mean a fanciful or imaginary

10   doubt, nor one based upon groundless conjecture.  It

11   means a doubt based on reason.

12          And I'm concerned because basically what you

13   do here is you tell them everything that a reasonable

14   doubt is not, and based upon that, your Honor, I believe

15   that it has a one-sided effect that tends to make a

16   reasonable doubt a harder thing for them to achieve than

17   is required under the law, and for that reason I would

18   request one of two things, your Honor.  Either that

19   sentence in that last paragraph be omitted or that the

20   Court give -- I think some of this language may have

21   actually come from this charge, a charge that was

22   authored by Judge Souter when he was on the New

23   Hampshire Supreme Court called state versus Wentworth,

24   and that charge, although it contains some of that same

25   language, is a little more complete I think.

1          And if you are going to instruct on reasonable

2     doubt or tell the jury what reasonable doubt is not, I

3     would ask that the Court give the following instruction:

4     A reasonable doubt is just what the words would

5     ordinarily imply.  The use of the word "reasonable"

6     means simply that the doubt must be reasonable rather

7     than unreasonable.  It must be a doubt based on reason.

8     It is not a frivolous or fanciful doubt, nor is it one

9     that can be easily explained away.  Rather, it is such a

10    doubt based upon reason as remains after consideration

11    of all the evidence that the state has offered against

12    it.  The test that you must use is this.  If you have a

13    reasonable doubt as to whether the state has proved any

14    one or more of the elements of the crime charged, you

15    must find the defendant not guilty.  However, if you

16    find the state has proved all of the elements of the

17    offense charged beyond a reasonable doubt, you should

18    find the defendant guilty.

19          That's the full Wentworth charge insofar as

20    any definition of reasonable doubt.  I understand the

21    law in the First Circuit is that they prefer that

22    reasonable doubt not be defined because it is a term

23    that the First Circuit, as I understand the cases,

24    believes that jurors can understand, but I'm just

25    concerned that when we halfway defined it by telling

1    them what it's not, that we make it that much more of an

2    unachievable --

3              MR. LANGE:  I don't think you mean to say

4    unachievable.  I think what you mean to say is that you

5    are reducing the burden of proof which is properly on

6    the government.  With that modification, I join in the

7    argument.

8              THE COURT:  The language I've used in the

9    pattern instruction was previously approved multiple

10   times by the circuit.  I deny that request.  Anything

11   else?

12             MR. IACOPINO:  Yes, your Honor.  I do have a

13   question for you, and this is more in the portion of

14   your instructions that involve how they are going to

15   deliberate on page 9.  I understand not wanting to have

16   the firearms in the jury room and allowing them a

17   process if there's any that they want to see.  Will we

18   be notified when they do that?

19             THE COURT:  Anytime they ask for a note, you

20   will be notified.  Any note that's received, I will give

21   that -- notice of that note to counsel.

22             MR. IACOPINO:  Okay.  Thank you.  I just

23   wanted to know because I've been involved in trials

24   where things are brought in and --

25             THE COURT:  If I get a note from the jury, you

1    are going to know about it.  I tell them in these

2    instructions, if you want to communicate with me, you

3    have to do it in writing.

4           MR. IACOPINO:  So there won't be just a

5    bailiff assigned to them.  They knock on the door, can

6    you bring us this or that.

7           THE COURT:  They are told any communication

8    with me has to be in writing.  Court people are aware of

9    that.

10          MR. IACOPINO:  Your Honor, I'm going to

11   object -- I know it's been approved by the First Circuit

12   in the past, but I'm also going to object, page 23, the

13   partial Allen charge given to the jury.  There's been no

14   indication that the jury's not going to be able to reach

15   agreement, and I understand that that portion of the

16   charge has been approved from prior cases and our state

17   court as well, but I would object on the record on the

18   basis that I think that it forces jurors to come to

19   agreement when they might not on their own -- on the

20   basis of their own review of the evidence and the law as

21   presented to them to come to agreement.

22          MR. LANGE:  I join.

23          THE COURT:  That's refused.  Go ahead.

24          MR. IACOPINO:  And then on page 14, this may

25   sound like wordsmithing and I don't mean to wordsmith.

1   Page 14 is the possession during a crime of violence

2   charge.  What I'm going to ask you to do is in the

3   subparagraph marked second right at the bottom of the

4   page, I'm going to ask if you can tie that subparagraph

5   specifically to Counts 1 and 2.

6          The way I understand Counts 3 and 4 to be

7   charged is they are -- they allege that the crime of

8   violence during which the possession is related to is

9   Counts 1 and 2 of the indictment.  I'm just -- I think

10  it's very important that that be hammered home with the

11  jury because if they do acquit on Counts 1 and 2, then

12  Count 3 necessarily or Count 4 for each defendant, would

13  necessarily go by the wayside.  So I would ask that you

14  specify in that subparagraph that the crime of violence

15  must be Counts 1 and 2, because there are other crimes,

16  for instance, Count 3, obstruction of justice, or the

17  possession of the firearm, neither one of those would

18  support -- the possession of a firearm by a felon,

19  neither one of those would support a conviction under

20  Counts 3 and 4.

21         THE COURT:  All right.  I think it's

22  adequately covered in the instruction.

23         MR. HUFTALEN:  It's also covered in the jury

24  verdict form where they are instructed if they find not

25  guilty on 1 and 2, skip 3 and 4.

1           THE COURT:  It is.  All right.  What else?

2           MR. IACOPINO:  I believe that's all I have,

3    your Honor.

4           THE COURT:  Any objection to the verdict form?

5           MR. IACOPINO:  No, your Honor, I don't have

6    any objection.

7           THE COURT:  Okay then.  I propose that we'll

8    start closings -- jury have a chance to eat?

9           THE CLERK:  We ordered lunch for 1:30, your

10   Honor.

11          THE COURT:  Good.  We are going to start

12   closings at one.  Jury will eat.  We'll take a break

13   right after the first closing and proceed to the second

14   closing.  Who's doing second closing?  Mr. Lange.  Third

15   closing will be Mr. Iacopino, then 15 minutes.  Did I

16   say one hour yesterday or an hour and a quarter?

17          MS. OLLILA:  You said an hour and a quarter.

18          THE COURT:  That's fine.  We'll go an hour and

19   a quarter.  Everyone has an hour and a quarter,

20   15-minute rebuttal.

21          MR. IACOPINO:  Judge, is it your intention to

22   get in all the closings today?

23          THE COURT:  We'll do all the closings and I

24   intend to instruct.

25          MR. LANGE:  Your Honor, I apologize.  I do

1  have a problem with the deliberation form.

2          THE COURT:  Go ahead.  Educate me.

3          MR. LANGE:  I'm sorry I missed it.  I

4  understand now the highlighted deliberation order, if

5  you will, at the bottom of the first page, but -- bottom

6  of page one of the jury verdict form.

7          THE COURT:  Looking at Elaine's?

8          MR. LANGE:  Yes.  It says -- it doesn't give

9  them the option of -- they go -- assuming they convict

10  her on the first two counts, they go to the third count.

11  They go to firearm, and then they -- oh, I see.  So then

12  if they go to Question 4, in other words, they can find

13  her guilty of the firearm, then not guilty of the

14  destructive device.

15          THE COURT:  Exactly right.

16          MR. LANGE:  I understand.  I apologize.

17          THE COURT:  Exactly right.  That's what I

18  think you were discussing before.  That's okay.  You're

19  tired.  You people have worked very, very hard.

20          MR. IACOPINO:  What about vice versa on that

21  though?

22          THE COURT:  I think it's the correct order.

23  All right.  Everybody understand what we're doing?  No

24  one's going to do any arguments that I've excluded.

25          MR. LANGE:  Your Honor, I will not be arguing

1    the Tax Code.  I will not be arguing justification.  I

2    wish I could.

3            THE COURT:  No nullification obviously.

4            MS. OLLILA:  I do talk very briefly about

5    Pinkerton theory of liability.  I've never practiced

6    before your Honor.

7            THE COURT:  We have the Pinkerton theory in

8    the instructions.

9            MS. OLLILA:  I know that, but I don't know

10   whether you have a problem with prosecutors talking

11   about jury instructions.

12           THE COURT:  You are free to argue that you

13   will see in the instructions, or I anticipate you will

14   see in the instructions.  You are free to do that.

15   Anybody have any questions about argument?  I'm pretty

16   easygoing.  If there is an objection I will deal with

17   it.

18           MR. HUFTALEN:  No questions.  My memory is

19   rebuttal and rebuttal only.

20           THE COURT:  Remember, no personal views as to

21   truth, no golden rule.

22           MR. LANGE:  No, the golden rule's out.  We're

23   Old Testament here.  We're not New Testament.

24           THE COURT:  All right.  One o'clock.  Be

25   ready.

133

1                    (Recessed at 12:30 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

134

1

2                        C E R T I F I C A T E

3

4            I, Diane M. Churas, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8
     Submitted:  12/1/09
9
                              /s/  Diane M. Churas  __
10                            DIANE M. CHURAS, LCR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25